UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10197-RGS

JAMES A. HALEY

v.

CITY OF BOSTON,
JOSEPH KELLEY,
JOHN B. HARRINGTON,
and UNKNOWN EMPLOYEES OF THE CITY OF BOSTON

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO DISMISS

December 31, 2009

STEARNS, D.J.

Plaintiff James A. Haley served thirty-four years in state prison after being convicted of the first-degree murder of David Myers, the boyfriend of his sister-in-law, Gloria Custis. Defendants Joseph Kelley and John Harrington are former Boston Police officers who headed the investigation that led to Haley's arrest. Although Haley was never exonerated of the murder, he was released from custody when the Commonwealth, in response to a public records request, disclosed an exculpatory police report that had not been produced at Haley's trial. The principal claims of the Complaint are framed under the Federal Civil Rights Act, 42 U.S.C. § 1983, although Haley also pursues common-law theories of liability against the City of Boston and unnamed police superior officers. Defendants have moved to dismiss all counts of the Complaint. A hearing on the motion was held on October 23, 2009.

BACKGROUND

The Massachusetts Supreme Judicial Court (SJC) summarized the facts developed

at Haley's trial in 1972 as follows.

> The victim, David Myers, was a man twenty-five years old, five feet seven inches tall, and weighed 230 pounds.  He lived in a ground-floor apartment in Dorchester with Gloria Custis and their six months old baby.  The defendant, James Haley, was about the same height as the victim, but much slimmer, weighing about 120 pounds.  His wife Brenda is Gloria's sister, and the defendant and Brenda lived in the apartment for about a month in March, 1971.  On May 3, 1971, the defendant struck Brenda and threatened her, and the same day she went to her parents' home in Delaware.  She came back to Boston for about a week in June, but did not see the defendant.  She came back again on July 9, and spoke to the defendant on the telephone.  On Saturday, July 10, while Brenda and Gloria were on their way to Gloria's apartment, they saw the defendant about thirty-five feet away and he looked at them, but there was no conversation with him.  Brenda and Gloria then went to Gloria's apartment, although Brenda was staying with a third sister at a different address.

> On the same Saturday Gloria and the victim went to bed in their apartment between 10 and 10:30 P.M.  The doors were locked, but a kitchen window was open.  In the early morning of July 11, she awoke, heard their dog barking, and saw the victim going toward the kitchen.  She said, 'What's the matter, David?'  He said, 'James stabbed me. James stabbed me.'  As she was getting up from the bed, she heard a gunshot, and as she was running toward the kitchen, David said, 'Why did you stab me, man?  Brenda's not here.'  Gloria then looked into the bathroom, where the light was on, and saw the defendant and the victim struggling over the tub.  The defendant had a small gun and a large knife in his hands, and the victim had his hands over the defendant's hands, trying to get the knife and gun away from him.

> The telephone in the apartment was disconnected, and Gloria thought that the telephone in the upstairs apartment of a neighbor was also disconnected.  She grabbed her clothes, ran out the door and yelled for help.  She ran a block and a half or two blocks to her brother's apartment, arriving fifteen or twenty minutes after 5 A.M.  The police were called.  With her brother and two others, she returned to her apartment, met the police there, and let them in.  The victim was lying on the floor.  He was taken to a hospital and pronounced dead at 5:45 A.M.  The cause of death was a bullet wound in the head.  He had been stabbed first.  A bullet removed from the victim's head and two spent bullets found in the apartment had been fired from the same gun.

> The defendant worked at the Massachusetts Institute of Technology on Saturday, July 10, until 2:45 P.M.  Later he visited his mother at the hospital.  Still later, in the evening, he was at a party in Dorchester.  He left with others

to get sandwiches about 3 A.M. and returned about 4 A.M.  The defendant's sister, who was at the party, testified that she saw the defendant about 5 to 6 A.M., when the crime apparently occurred.

Commonwealth v. Haley, 363 Mass. 513, 514-516 (1973).  No physical evidence linked Haley to the crime.  Rather, the trial pitted the credibility of Gloria Custis and her sister Brenda against that of Haley's sister, Patricia Mason, whose testimony placed Haley at a party when the murder occurred.  On March 3, 1972, Haley was convicted of first-degree murder.  The jury recommended against the death penalty and Haley was sentenced to life without parole.[1]  Haley's direct appeal and his two subsequent motions for a new trial were unsuccessful.  See Commonwealth v. Haley, 413 Mass. 770 (1992).

In 2006, Haley filed requests pursuant to the Massachusetts Public Records Act (Mass. Gen. Laws ch. 66, § 10), with the Suffolk County District Attorney's Office (Suffolk D.A.'s Office) and the Boston Police Department for the files relating to his case.  The Suffolk D.A.'s Office could not find Haley's file.  On February 14, 2006, the Boston Police Department (BPD) produced sixty pages of investigative records from its files.

> The documents included transcribed, redacted statements given to police by Gloria and Brenda on the day of Myers's killing, July 11, 1971.  In her statement, Brenda told police that the last time she had seen Haley was a month earlier, from a distance, walking down the street.  Similarly, Gloria told police that the last time she had seen Haley before July 11 was a month earlier.  Neither Gloria nor Brenda told police in their statements that they saw Haley on July 10, as they had testified at trial.

Commonwealth v. Haley, No. SUCR1971-58947, Memorandum on Defendant's Motion to

---

[1]Massachusetts abolished the death penalty in 1975, three years after Haley's trial. See Commonwealth v. O'Neal, 369 Mass. 242, 263 (1975) (finding mandatory death penalty unconstitutional under the Massachusetts Declaration of Rights as a violation of due process and a cruel and unusual punishment) (plurality opinion); Commonwealth v. Harrington, 367 Mass. 13, 21-22 (1975) (eliminating discretionary death penalty in light of Furman v. Georgia, 408 U.S. 238 (1972)).

Dismiss Indictment, at 19 (Mass. Super. Aug. 26, 2008) (hereafter "Superior Court Decision").  The import of these statements to Haley's defense was described by the Superior Court as follows: "Gloria and Brenda's police statements were significant in that they could be interpreted to mean that the July 10 encounter with Haley did not occur, thus undermining Gloria's credibility as the critical eyewitness and eliminating the alleged impetus for the July 11 break-in of Myers's apartment." Id. at 24.

Spurred by the new revelation, Haley filed a third motion for a new trial in October of 2007, alleging that the withholding of the statements attributed to Gloria and Brenda violated his right to due process.  Haley also sought additional post-conviction discovery. On December 21, 2007, the Commonwealth moved to vacate Haley's conviction and grant him a new trial.  The Superior Court allowed the motion that same day.  The Commonwealth did not, however, concede Haley's innocence.  "The Commonwealth specifically states that it does not now comment on the factual guilt or innocence of the defendant of the crime charged.  The Commonwealth's review of the 1971 investigation and prosecution of the defendant does not exonerate him; it does establish that he did not receive a fair trial."  Def. Mem. in Supp. - Ex. L, at 3.  Haley was released on bail on January 18, 2008, pending a new trial.

On June 13, 2008, the Suffolk D.A.'s Office wrote to Haley stating that all of the trial and appellate documents in his case had been "inadvertently lost or destroyed."  On June 27, 2008, Haley filed a motion to dismiss the murder indictment with prejudice.  The motion was granted by the Superior Court without prejudice on August 26, 2008.[2]  Haley filed this

---

[2]The Superior Court professed its belief that a retrial was not only possible on the extant record, but was required by the public interest: "This Court concludes that although

lawsuit on February 11, 2009.

DISCUSSION

Defendants move to dismiss Haley's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Under Rule 12(b)(6), a court will dismiss a Complaint if, after accepting all well-pleaded

facts as true and drawing all reasonable inferences in favor of a plaintiff, it determines that

the Complaint "fails to state a claim upon which relief can be granted."  Fed. R. Civ. P.

12(b)(6).  To survive a motion to dismiss, the factual allegations in a complaint must

"possess enough heft" to set forth "a plausible entitlement to relief."  Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 557, 559 (2007); Thomas v. Rhode Island, 542 F.3d 944, 948 (1st

Cir. 2008).  A plaintiff must plead "more than labels and conclusions," and his factual

allegations must be sufficient to "raise a right [to] relief above the speculative level."

Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008). The standard

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A

pleading that offers labels and conclusions or a formulaic recitation of the elements of a

cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s]

devoid of further factual enhancement."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)

(citations omitted).

Individual Defendants (Counts I-VII and IX)

In his Complaint, Haley makes the following quasi-factual allegations against the

---

Haley will undoubtedly be disadvantaged in defending himself in any future prosecution due to the loss of exculpatory evidence and the passage of time, he has not demonstrated that he cannot obtain a fair trial so as to warrant the drastic remedy of dismissal with prejudice in derogation of the public's substantial interest in prosecuting those accused of crime and bringing the guilty to justice."  Superior Court Decision at 36.

individual defendants, principally Kelley and Harrington (the Defendant Officers).

1.  "Defendants deliberately withheld exculpatory evidence, as well as fabricated false reports and other evidence, thereby misleading the criminal prosecution of Plaintiff."  Compl. ¶ 45.

2.  "Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings."  Compl. ¶ 53. "Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  In so doing, the Defendants fabricated evidence and withheld exculpatory information."  Compl. ¶ 54.

3.  The aforementioned acts "occurred with the knowledge and consent of those of the Defendant Officers who acted in a supervisory capacity, such that these officers personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or else affirmatively turned a blind eye."  Compl. ¶ 59.

4.  "[D]uring the constitutional violations described above, one or more of the Defendants (and other as-yet-unknown Boston Police Officers) stood by without intervening to prevent the misconduct."  Compl. ¶ 65.

5.  "Defendants reached an agreement amongst themselves to frame Plaintiff for the crime."  Compl. ¶ 71.

In Counts I through V of the Complaint, Haley alleges that defendants' conduct violated his federal constitutional rights to due process and a fair trial.  Counts VI (malicious prosecution) and IX (civil conspiracy) are state common-law claims asserted against the Defendant Officers.  Count VII (negligent investigation) was withdrawn by Haley prior to the hearing.[3]  Counts VIII (negligent training and supervision) and X ("respondeat superior") are hybrid claims brought against the City of Boston.

The first issue the court must resolve is whether, as defendants contend, the claims

---

[3]See Opp. at 35 n.13 ("Plaintiff is no longer pursuing his state law negligence claims against Defendants Kelley and Harrington.").

against Kelley and Harrington are barred by the defense of qualified immunity.  Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See also Mitchell v. Forsyth, 472 U.S. 511, 528 (1985); Duarte v. Healy, 405 Mass. 43, 47 (1989).  "[T]he qualified immunity inquiry . . . allows . . . for the inevitable reality that 'law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is [constitutional], and . . . that . . . those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable.'" Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir. 1995), quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987). The line properly drawn is not between the constitutional and the unconstitutional, but between acts that although unconstitutional are nonetheless objectively reasonable and acts that are unconstitutional on their face.  Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992), quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam).   "Immunity does not depend on the good faith or particular beliefs of the officer as to the state of the law; rather the test is objective." Pasqualone v. Gately, 422 Mass. 398, 402 (1996).  While determinations of reasonableness are usually reserved for juries, qualified immunity is an exception.  Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 694-695 (1st Cir. 1994).

In assessing a defense of qualified immunity, a court may choose to "first determine whether the plaintiff has alleged a deprivation of an actual constitutional right at all." Conn

v. Gabbert, 526 U.S. 286, 290 (1999).  The "threshold" question in this mode of analysis

is as follows: "Taken in the light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right? . . . If no constitutional

right would have been violated were the allegations established, there is no necessity for

further inquiries concerning qualified immunity."  Saucier v. Katz, 533 U.S. 194, 201

(2001).[4]   Where a constitutional violation is made out on the face of the parties'

submissions, a trial court is to decide the immunity issue at the earliest practicable

opportunity.  "[B]ecause '[t]he entitlement is an immunity from suit rather than a mere

defense to liability,' . . . we repeatedly have stressed the importance of resolving immunity

questions at the earliest possible stage in the litigation."  Hunter, 502 U.S. at 227, quoting

Mitchell, 472 U.S. at 511.  "[T]he defense is meant to give government officials a right, not

merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as

discovery.'"  Behrens v. Pelletier, 516 U.S. 299, 308 (1996).  See also Brum v. Town of

Dartmouth, 428 Mass. 684, 688 (1999) (same, Massachusetts Tort Claims Act immunity).

Whether the constitutional right asserted by a plaintiff is "clearly established" is a

matter of law for the court. Siegert v. Gilley, 500 U.S. 226, 232 (1991). "The right in

---

[4]The Court had previously identified a particular value in this order of procedure. "Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999). However, in Saucier, this value was elevated into a mandate under which lower courts were always to answer the constitutional question before asking whether the right asserted was "clearly established" law. In Pearson v. Callahan, 129 S.Ct. 808 (2009), the Court backed away from Saucier, acknowledging that "[t]here are circumstances in which the first step of the Saucier procedure may create a risk of bad decisionmaking." Id. at 820. There are cases "in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." Id.

question . . . must be clearly established in a 'particularized' sense, so that 'the contours of the right' are clear enough for any reasonable official in the defendant's position to know that what the official is doing violates that right." Danese v. Asman, 875 F.2d 1239, 1242 (6th Cir. 1989), quoting Anderson, 483 U.S. at 640.  As a rule, a right is "clearly established" when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts "that a reasonable officer could not have believed that his actions were lawful." Wilson, 526 U.S. at 617.  See also Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 144-145 (1st Cir. 2001) (relevant state as well as federal decisions should be considered).

While "general statements of the law are not inherently incapable of giving fair and clear warning," they do so only if their application to a specific set of facts is clear.  United States v. Lanier, 520 U.S. 259, 271 (1997).  See, e.g.,  Safford Unified Sch. Dist. No. 1 v. Redding, 129 S.Ct. 2633, 2643-2644 (2009) (the range of disagreement among lower courts over the application of New Jersey v. T.L.O., 469 U.S. 325 (1985), to student strip searches is sufficient enough to warrant a grant of qualified immunity to school officials who relied on cases viewing such searches "differently from the way we [now] see them"); Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam) (the high level of generality in which Graham v. Connor, 490 U.S. 386 (1989), and Tennessee v. Garner, 471 U.S. 1 (1985), discuss excessive force provides a fair warning in only the most obvious cases involving the use of deadly force).

In the Complaint, Haley charges the officer defendants of engaging in a wide-ranging conspiracy to falsely accuse him of murder, frame him, fabricate false reports, and withhold exculpatory evidence.  For all but one of these allegations, Haley offers no supporting facts

to satisfy the enhanced pleading standard set out in <u>Twombley</u> and <u>Iqbal</u>.[5]  The only

allegation with a plausible grounding in fact is that the failure of the officer defendants to

disclose <u>Brady</u>[6] material in the ordinary course of discovery was deliberate.

"There is no general constitutional right to discovery in a criminal case, and <u>Brady</u>

did not create one; as the Court [has observed], 'the Due Process Clause has little to say

regarding the amount of discovery which the parties must be afforded . . . .'" <u>Weatherford</u>

<u>v. Bursey</u>, 429 U.S. 545, 559 (1977), quoting <u>Wardius v. Oregon</u>, 412 U.S. 470, 474 (1973).

Rather, discovery in the context of a criminal prosecution is a creature of statute and the

Federal Rules of Criminal Procedure.  The right identified in <u>Brady</u> is not a discovery right,

but a trial right requiring the production on request of evidence of an exculpatory nature in

the possession or control of the prosecution for use by the defendant at trial.  In identifying

a constitutional violation, the <u>Brady</u> Court looked to the due process guarantee of a fair trial.

373 U.S. at 86 ("We agree with the Court of Appeals that suppression of this confession

---

[5]Indeed, the record points in the opposite direction for Haley's allegation that "Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause . . . ."  The Superior Court previously found that probable cause existed in this case based solely on Gloria's testimony: "It is undisputed that Gloria Custis testified before the grand jury, and her eyewitness testimony alone would be sufficient information to warrant a prudent man in believing that Haley killed Myers. Accordingly, this Court will not dismiss the indictment for lack of probable cause." Superior Court Decision at 22.  While the finding of probable cause by the Superior Court is important evidence that probable cause did in fact exist, it is not conclusive.  <u>See</u> <u>Bacon</u> <u>v. Towne</u>, 58 Mass. 217, 236 (1849).  The Superior Court also observed that Haley "cannot prove that Gloria and Brenda's police statements were in fact withheld from the grand jury because all records of the grand jury proceeds have been inadvertently lost or destroyed by the Commonwealth.  Nor can Haley demonstrate that the prosecutor contrived to suppress the police statements for the purposes of obtaining an indictment." Superior Court Decision at 23.

[6]<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[at trial] was a violation of the Due Process Clause of the Fourteenth Amendment.").  In

tracing Brady's lineage, the Court specifically looked to Mooney v. Holohan, 294 U.S. 103

(1935), as the progenitor of the doctrine.  Brady, 373 U.S. at 86.  As the Court stated in

Mooney:

> [Due process] is a requirement that cannot be deemed to be satisfied by
> mere notice and hearing if a state has contrived a conviction through the
> pretense of a trial which in truth is but used as a means of depriving a
> defendant of liberty through a deliberate deception of court and jury by the
> presentation of testimony known to be perjured.  Such a contrivance by a
> state to procure the conviction and imprisonment of a defendant is as
> inconsistent with the rudimentary demands of justice as is the obtaining of a
> like result by intimidation.

294 U.S. at 112.  Relying on this passage, the Brady Court continued: "The principle of

Mooney v. Holohan is not punishment of society for misdeeds of a prosecutor but

avoidance of an unfair trial to the accused.  Society wins not only when the guilty are

convicted but when criminal trials are fair . . . ."  373 U.S. at 87.  Brady, in other words,

reinforces the constitutional right to a fair trial, not a constitutional right to "fair" discovery.[7]

Although defendants contend that under a Saucier analysis Haley has failed to make

a "threshold showing" of a constitutional violation, taking the facts in the light most favorable

to Haley the court will, as did the Commonwealth in moving to vacate Haley's conviction,[8]

---

[7]Other district courts have reached the same conclusion.  See, e.g., Burke v. Town of Walpole, 2004 WL 507795, at *25 (D. Mass. Jan. 22, 2004) (O'Toole, J.) ("Brady, and its most notable kissing cousins, Giglio v. United States, 405 U.S. 150 (1972), and United States v. Agurs, 427 U.S. 97 (1976), holds, at most, that the failure of the *prosecutor* to disclose exculpatory evidence to the defense at *trial* amounts to a denial of a fair trial in violation of the due process clause.") (emphases in original).

[8]"[T]he defendant was deprived of certain exculpatory evidence at trial and . . . the defendant was arguably prejudiced by such nondisclosure."  Def. Mem. in Supp. - Ex. L, at 1.

assume that a violation of his due process right to a fair trial in fact occurred.  The court will

focus instead, as the parties do, on the second element of the Saucier analysis:  whether

a constitutional right to the disclosure of the evidence at issue – the prior inconsistent

statements of Gloria and Brenda – had been "clearly established" at the time of Haley's

trial.

In Brady, the Court specifically defined the constitutional violation as follows: "[T]he

suppression by the prosecution of evidence favorable to an accused upon request[9] violates

due process where the evidence is material either to guilt or to punishment, irrespective of

the good faith or bad faith of the prosecution."[10]  373 U.S. at 87.  For any number of years

thereafter, exculpatory evidence (consistent with Brady's definition) was understood to be

limited to material evidence tending to show a defendant's guilt or innocence of the crime

charged.[11]  Here it is evident that the redacted statements attributed to Gloria and Brenda

---

[9]Haley's counsel filed a pretrial motion on December 30, 1971, requesting to be "furnished with evidence favorable to the accused." The motion was allowed on January 31, 1972.  Compl. ¶ 30.

[10]Haley contends that Brady was merely an expansion on earlier precedent.  See Pyle v. Kansas, 317 U.S. 213, 216 (1942) ("[A]llegations that [a defendant's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution."). While this may be true, it does not render the exculpatory right "clearly established."  There can be little debate over the fact that Brady is the foundational precedent for the right to exculpatory evidence and it is Brady that the parties turn to in their briefs as the point of departure.

[11]It was not "clearly established" under Massachusetts law that impeachment material constituted exculpatory evidence before the SJC's decision in Commonwealth v. Ellison, 376 Mass. 1, 22 (1978), holding that exculpatory evidence includes "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the

were not exculpatory in the sense of establishing Haley's innocence of the murder.  At best,

they constituted prior inconsistent statements, which while admissible on the issue of the

sisters' credibility, were understood in 1972 to be inadmissible for any substantive purpose.

See Commonwealth v. Daye, 393 Mass. 55, 61 (1984); Commonwealth v. Lacy, 371 Mass.

363, 369 (1976).[12]  This would have been all the more the case had the sisters on cross-

examination denied making the statements or explained them as a misunderstanding on

Kelley's part of what they had said.[13]

_____

credibility of a key prosecution witness." The same proposition was established with
certainty by the Supreme Court in United States v. Bagley, 473 U.S. 667, 676 (1985).

[12]To the extent that the sisters' statements might have been arguably admissible as
substantive evidence of a prior identification (or lack thereof), that is not a right that was
established under federal law, much less clearly so, prior to United States v. Owens, 484
U.S. 554 (1988).

[13]There is a genuine question as to the materiality (prejudice) resulting to Haley as
the result of the nondisclosure of the disputed statements.  In Bagley, five Justices found
a single standard of materiality sufficient to cover all cases of prosecutorial nondisclosure
regardless of a defense request or its degree of specificity.  "[E]vidence is material only if
there is a reasonable probability that, had the evidence been disclosed to the defense, the
result of the proceeding would have been different.  A 'reasonable probability' is a
probability sufficient to undermine confidence in the outcome [of the trial]."  Bagley, 473
U.S. at 682.  Under Bagley, "a showing of materiality does not require demonstration by a
preponderance that disclosure of the suppressed evidence would have resulted ultimately
in the defendant's acquittal. . . .  Bagley's touchstone of materiality is a 'reasonable
probability' of a different result, and the adjective is important.  The question is not whether
the defendant would more likely than not have received a different verdict with the
evidence, but whether in its absence he received a fair trial, understood as a trial resulting
in a verdict worthy of confidence."  Kyles v. Whitley, 514 U.S. 419, 434 (1995).  Bagley, in
other words, is not a "sufficiency of the evidence" test, that is, a defendant "need not
demonstrate that after discounting the inculpatory evidence in light of the undisclosed
evidence, there would not have been enough left to convict," but rather whether in the
overall context of the trial, "the favorable evidence could reasonably be taken to put the
whole case in such a different light as to undermine confidence in the verdict."  Id. at
434-435.  The burden under Bagley of showing prejudice is heavy.  "[T]here is never a real
'Brady violation' unless the nondisclosure was so serious that there is a reasonable
probability that the suppressed evidence would have produced a different verdict." Strickler

Haley argues for his part that "it was amply clear before [the] criminal trial that material impeachment evidence was subsumed within the Brady rule and thus had to be disclosed prior to trial."  Opp. at 13-14.  An initial hurdle faced by Haley is that Brady has long been understood to impose an obligation of production on prosecutors, but not on police.  "[T]o speak of the duty binding police officers as a Brady duty is simply incorrect. The Supreme Court has always defined the Brady duty as one that rests with the prosecution."  Jean v. Collins, 221 F.3d 656, 660 (4th Cir. 2000).  See also Batiste v. Fleming, 1990 WL 254020, at *1 (1st Cir. Oct. 2, 1990) (holding that while prosecution may have limited obligation to furnish defendant with obviously exculpatory evidence, police officers "had no constitutional duty to supply any evidence or records."); Moreta-Ramirez v. Lemert, 156 F. Supp. 2d 138, 142 (D.P.R. 2001) ("Clearly, the duty to disclose established by Brady, is imposed on the prosecution.  Brady does not express a view as to the duty of police officers to disclose exculpatory evidence.").[14]

A second hurdle for Haley is erected by Brady's definition of exculpatory evidence as encompassing only "evidence material either to guilt or to punishment . . . ."  373 U.S. at 87.  Haley argues that four days before the jury was empaneled in his trial, the Supreme Court implied in Giglio, 405 U.S. at 154-155, that impeachment evidence could constitute Brady material: "Taliento's credibility as a witness was therefore an important issue in the

_____

v. Greene, 527 U.S. 263, 281 (1999).

[14]Further, the affirmative duty of a prosecutor to seek out exculpatory material in the possession of police investigators was not made clear until Kyles, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").  See also Commonwealth v. Martin, 427 Mass. 816, 823-824 (1998) (same).

case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."[15] However, this principle was not made explicit until years later in Bagley, 473 U.S. at 676 ("Impeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule."). Haley's assumption that a Supreme Court ruling of four-days vintage is controlling fails for the simple reason that Giglio's oblique allusion to the impeachment of a witness's credibility concerned exculpatory evidence of a nature not present in this case, that is, an inducement given to a prosecution witness in exchange for favorable testimony. There is no suggestion that either Gloria or Brenda was given any "promise, reward or inducement" in exchange for testimony at trial. Cf. Bagley, 473 U.S. at 672 (evidence of compensation paid to government informants withheld); Giglio, 405 U.S. at 765 (evidence of an agreement not to prosecute in exchange for testimony withheld). Had it been "clearly established" in Giglio that the Brady exculpatory obligation extended to a witness's prior inconsistent statements, it would not have been necessary for the Court to expand on the issue in Bagley.

A third and equally compelling point is that the statements given by Gloria and Brenda to Harrington only became inconsistent and potentially impeaching when they testified at trial to having seen Haley on the day of the murder. Haley argues that at that point, the Defendant Officers had an obligation to bring the statements to the attention of the prosecutors and Haley's counsel (or the trial judge).[16] In Harrington's case, this would

_____

[15] Giglio was decided on February 24, 1972. Jury empanelment in Haley's trial began on February 28, 1972.

[16]This argument also assumes that the statements had not already been given to prosecutors - a point defendants do not concede. See Campbell v. Maine, 632 F. Supp. 111, 121 (D. Me.1985), aff'd, 787 F.2d 776 (1st Cir.1986) ("The only duty of a police officer

have been impossible as he had died three months prior to the commencement of the trial.[17]  Harrington's death also eliminated the possibility of any continuing conspiracy with Kelley.   Nor does it seem reasonable to charge Kelley, a police detective, with the obligation of reading and analyzing Supreme Court decisions and confronting prosecutors with the portent of a four-day old decision, particularly one that took federal judges decades to fully absorb.  "If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."  Wilson, 526 U.S. at 618.  See also Shedlock v. Dep't of Corr., 442 Mass. 844, 861 (2004) (prison officials "could not be required to predict how the Supreme Court would resolve a statutory question that had received differing answers amongst lower Federal courts.").

State Law Claims Against City of Boston (Counts VIII and X)

Although qualified immunity requires dismissal of the claims against Harrington and Kelley, this does not dispose of the claims against the City of Boston.  Count VIII (negligent training and supervision)[18] sounds in tort and as such, Haley was required to adhere to the

---

in possession of exculpatory information is to turn it over to the prosecutor.").  Although the loss of the prosecutor's case file prevents the court from determining its precise contents, the statements given by Gloria and Brenda to Harrington were referred to by Officer Kelley in his trial testimony.  Def. Mem. in Supp. - Ex. J, at 542.  This fact alone tends to dispel any suggestion by Haley that a cover-up of the statements was underway during his trial.

[17]Haley makes the somewhat macabre argument that Harrington should be held posthumously liable for "his deliberate efforts to bury the Police Interview Statements, fabricate evidence and conspire with Defendant Kelley" prior to his death.  Opp. at 11. There are no specific allegations to this effect regarding Harrington set out in the Complaint and if there were they would constitute the type of speculative pleading condemned in Twombly and Iqbal.

[18]Haley alleges that the "City of Boston breached [its duty of care owed to plaintiff] by failing to train and supervise its police officers adequately with regard to the proper

requirements of the Massachusetts Tort Claims Act (MTCA).[19]  Under Mass. Gen. Laws ch.

258, § 4:

> [a] civil action shall not be instituted against a public employer on a claim for
> damages under this chapter unless the claimant shall have first presented his
> claim in writing to the executive officer of such public employer within two
> years after the date upon which the cause of action arose . . . .

The parties disagree on the precise date on which Haley's cause of action arose, but it is

undisputed that he filed the lawsuit before making a presentment.  Haley filed the lawsuit

on February 11, 2009.  He served his presentment letter to the Boston City Clerk on April

28, 2009.  See Opp. - Ex. C.

Section 4 of Chapter 258 bars any suit for damages against a municipality unless

a plaintiff within two years of the date on which the cause of action accrued presents notice

in writing to the municipality's chief executive officer.  See Gilmore v. Commonwealth, 417

Mass. 718, 721-722 (1994).  "Presentment is . . . a statutory condition precedent to

recovery under G.L. c. 258."  Vasys v. Metro. Dist. Comm'n, 387 Mass. 51, 55 (1982).

Strict compliance with the statute is the rule.  Richardson v. Dailey, 424 Mass. 258,

261-262 (1997).  See Daveiga v. Boston Pub. Health Comm'n, 449 Mass. 434, 436-437

---

investigation of crimes, including the proper disclosure of exculpatory information." Compl.
¶ 90.  This Count is pled separately from the claims under the Federal Civil Rights Act,
although it need not have been. A municipality, unlike a state, cannot claim Eleventh
Amendment immunity (directly or derivatively) from suit under section 1983. Owen v. City
of Independence, 445 U.S. 622, 650 (1980); Monell v. Dep't of Soc. Servs., 436 U.S. 658,
663 (1978).

[19]Count X of the Complaint (respondeat superior) is not a freestanding cause of
action.  It simply recites (in a not fully accurate fashion) the principle of tort law that an
employer like the City of Boston is "liable as [a] principal for all torts committed by its
agents."  Compl. ¶ 99.

(2007) (presentment to the Mayor of Boston ineffective where the agency being sued, even though under pervasive City control, was nonetheless chartered as a legally distinct "body politic and corporate."). "The purpose of this rule is to provide notice to the highest ranking official with the ability to fully investigate, arbitrate, compromise or settle such claim . . . in order to ensure that the interests of the [agency] are protected." Garcia v. Essex County Sheriff's Dep't, 65 Mass. App. Ct. 104, 107 (2005) (internal quotation omitted).[20]

Haley acknowledges that he "filed suit prior to seeking presentment" but quotes Martin v. Commonwealth, 53 Mass. App. Ct. 526, 530 (2002), for the proposition that the MTCA's "presentment requirement is not intended to demand such rigid adherence as to bar legitimate claims for failing to invoke perfectly the correct 'Open Sesame.'" Opp. at 34. Martin, however, is not apropos.[21]  In Martin, the Appeals Court addressed the inability a pro se plaintiff to clearly articulate the contents of a presentment letter.  Distinguishing Weaver v. Commonwealth, 387 Mass. 43 (1982), the Appeals Court concluded that "close scrutiny discloses that the strict compliance precept is concerned more with whether presentment has been made to the proper executive officer (*proper party noticed*) than with

_____

[20]There are two exceptions to the strict compliance rule.  "First, under the 'lulling' exception, the public employer will be estopped from asserting any defect in the presentment . . . if, during the conduct of the litigation and at a time when presentment still could have been made, the plaintiff was led to believe that presentment would not be an issue in the case. . . . Second, under the 'actual notice' exception, the presentment requirement will be deemed fulfilled if the plaintiff can show that, despite defective presentment, the designated executive officer had actual notice of the written claim." Bellanti v. Boston Pub. Health Comm'n, 70 Mass. App. Ct. 401, 406-407 (2007) (citations omitted).  Haley does not argue that either exception applies in his case.

[21]Haley also cites to Anderson v. Phoenix Invest. Counsel of Boston, Inc., 387 Mass. 444, 455 (1982), but this case is completely inapposite.  Anderson addressed the fairness of a retroactive application of a recently enacted Chapter 93A statute of limitations.

the content of the presentment (*adequacy of content*)."[22] <u>Martin</u>, 53 Mass. App. Ct. at 529.

Here the dispute is not over the clarity of the contents of Haley's presentment, but over the

fact that Haley (represented by counsel) failed to make any presentment at all before filing

suit.[23]   Because Haley's decision to ignore the presentment requirement arises in the first

context identified by the court, the strict compliance rule bars his claims against the City of

Boston.

## ORDER

For the foregoing reasons, Haley's Complaint is <u>DISMISSED</u> with prejudice.

Defendants' motion for the taking of judicial notice is <u>DISMISSED</u> as moot.  The Clerk will

enter judgment for defendants on all Counts of the Complaint and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[22]As this court has previously observed:

> [d]isputes over the adequacy of a presentment letter usually arise in one of three contexts: (1) whether notice of a claim was timely; (2) whether the claim was presented to the proper official; and (3) whether the presentment adequately identified the nature of the claim and the legal basis on which liability is alleged. *In the first two contexts, strict compliance is the unbending rule.*

<u>Koran v. Weaver</u>, 482 F. Supp. 2d 165, 169 (D. Mass. 2007) (emphasis added).

[23]Tellingly, Haley's presentment letter was mailed the day after defendants filed their Motion to Dismiss pointing out the lack of a presentment.