# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES A. HALEY, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CITY OF BOSTON, Former Boston Police Sergeant ) | No.: 1:2009cv10197-RGS |
| Detective JOSEPH KELLEY, and Former Boston ) | |
| Police Detective JOHN B. HARRINGTON, as well ) | |
| as yet UNKNOWN EMPLOYEES OF THE CITY ) | |
| OF BOSTON, ) | |
|     Defendants. ) | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CITY OF BOSTON, FORMER BOSTON POLICE SERGEANT DETECTIVE JOSEPH KELLEY, FORMER BOSTON POLICE DETECTIVE JOHN B. HARRINGTON, AND UNNAMED EMPLOYES OF THE CITY OF BOSTON'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION AND PROCEDURAL HISTORY

In this civil action, the Plaintiff, the Estate of James A. Haley ("Plaintiff")[1] has asserted multiple constitutional claims pursuant to 42.U.S.C. § 1983, as well as claims under state and common law against the Defendants, City of Boston ("City"), former Boston Police Sergeant Detective Joseph Kelley ("Detective Kelley"), former Boston Police Detective John B. Harrington ("Detective Harrington")[2], and unknown employees of the City of Boston[3] (all hereinafter collectively known as "Defendants"). Specifically, Plaintiff asserts that the Defendants deprived him of his due process right to a fair trial by withholding from the

---

[1] Although James Haley is deceased and the administratrix of his estate is the Plaintiff in this matter, Mr. Haley is referred to in this memorandum as the Plaintiff.

[2] Individual Defendants Joseph Kelley and John B. Harrington were deceased prior to the filing of the instant action. Their estates have never been served with process in this matter. Lack of timely service was raised as a defense within the Defendants' Motion to Dismiss [ECF docket #9]; however it was not addressed within the Court's Memoranda and Orders on the motion [ECF dockets # 26 and 34], because this court dismissed the claims against the individual Defendants on separate grounds. Joseph Kelley and John B. Harrington have not filed answers in this matter. As set forth below, their estates are closed and are not subject to liability. Although this memorandum addresses the substantive claims against them, neither Kelley nor Harrington nor their respective former estates are proper parties to this action.

[3] As of the date of this filing, the Plaintiff has taken no action to identify the alleged John Doe defendants.

prosecutor during Plaintiff's trial for the murder of David Myers, ("Myers"), two transcribed statements of witnesses Gloria Custis ("Gloria") and Brenda Haley ("Brenda").

In their Motion to Dismiss [EFC #9], Defendants sought dismissal of each of Plaintiff's claims, which motion this Honorable Court granted.  Haley v. City of Boston, 677 F.Supp.2d 379, (D. Mass., 2009), Haley v. City of Boston, 2010 WL 3198900 (D.Mass. Aug. 12, 2010).  On Plaintiff's appeal, the United States Court of Appeals for the First Circuit affirmed in part and reversed in part this Court's judgment.  Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011).  The Appeals Court upheld the dismissal of all claims against the individual Defendants, except for Plaintiff's § 1983 due process claim, which it allowed to survive in a limited capacity. Id.  The Appeals Court granted qualified immunity to the individual Defendants to the extent that the Plaintiff's claim was based on a deprivation of Plaintiff's rights under Brady v. Maryland.  Haley, 657 F.3d at 47; Brady v. Maryland, 373 U.S 83 (1963).  The Court held that qualified immunity attached because "in 1972, it was not clearly established that Brady's no-fault disclosure obligation applied to police officers as opposed to prosecutors."  Haley, 657 F.3d at 47.

The Appeals Court, however, declined to dismiss what it termed Plaintiff's § 1983 "deliberate suppression" claim, which "draws sustenance from a line of cases flowing from the Supreme Court's seminal decision in Mooney v. Holohan, which held that state actors violate an accused's due process rights when they engage in 'deliberate deception.'"  Haley, 657 F.3d at 48; Mooney v. Holohan, 294 U.S. 103, 112 (1935).  The Appeals Court held that Plaintiff's due process claim against the individual Defendants could survive qualified immunity to the extent that it is based on "deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction."

Haley, 657 F.3d at 49-50.   Therefore, in order for the Plaintiff to avoid qualified immunity on

his sole remaining claim against the individual Defendants, he must demonstrate that the

Defendants engaged in deliberate deception by purposefully concealing the statements from

the prosecution in order to secure a wrongful conviction and that the statements were material.

As demonstrated by the summary judgment record, the Plaintiff cannot make either showing,

and his claim against the individual Defendants must be dismissed.   Also, Detectives Kelley

and Harrington are entitled to summary judgment because their former estates were never

served in this matter and are closed and not subject to liability.   Further, summary judgment is

appropriate as to Detective Harrington because his death preceded any discovery obligations

in the underlying criminal trial.

The Appeals Court also declined to dismiss Plaintiff's Monell action against the City

of Boston, which is based on a "failure to train" theory.   This claim is, however subject to

summary judgment because the Plaintiff cannot demonstrate: 1) an underlying constitutional

violation by any individual Defendant, 2) any failure to train by the City, or 3) any evidence

of a widespread, well-settled unconstitutional policy, custom or practice of police withholding

exculpatory evidence from the prosecution prior to Plaintiff's trial.

**II.      RELEVANT PRINCIPLES OF LAW**

   **A.  <u>Summary judgment standard</u>**

Summary judgment is appropriate when "there is no genuine issue as to any material

fact and … the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

Once the moving party shows "that there is an absence of evidence to support the nonmoving

party's position, "the burden shifts to the nonmoving party to establish the existence of at

least one factual issue that is both genuine and material."  <u>Mitchell v. City of Boston</u>, 130

F.Supp. 2d 201, 208 (D. Mass. 2001) (citations and internal quotation marks omitted).  "On issues where the nonmovant bears the ultimate burden of proof, he must present *definite, competent evidence* to rebut the motion."  Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991) (emphasis added).  "Not every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment."  Id.  Further, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Mitchell v. City of Boston, 130 F.Supp.2d at 208.

### B.  Qualified Immunity Standard

The First Circuit applies a two-part test for qualified immunity: (1) whether the plaintiff has made out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the violation—although the court need not necessarily address the questions in that order.  See Maldonado v. Fontanes, 568 F.3d 263, 269–70 (1st Cir. 2009), citing Pearson v. Callahan, 555 U.S. 223, 232, (2009).  The "clearly established" prong, in turn, encompasses two questions: whether the right was, in general, "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right," Maldonado, 568 F.3d at 269, quoting Anderson v. Creighton, 483 U.S. 635, 640, (1987); and whether, under the particular facts of the case, a reasonable defendant would have understood that he was violating the right.  Id.  Where "it is plain that a constitutional right is not clearly established, a court may grant the requested immunity without undertaking the 'essentially academic exercise' of ascertaining whether the specific facts depict a constitutional violation."  Haley, 657 F.3d at 47.

III.   **ARGUMENT**

   A.  **Detectives Kelley and Harrington are entitled to qualified immunity because Plaintiff cannot demonstrate that they engaged in deliberate deception by purposefully concealing evidence.**

   i.   The summary record is completely devoid of evidence that the Defendants deliberately suppressed the statements; the record establishes that the witness statements were provided to the district attorney.

Detectives Kelley and Harrington are entitled to qualified immunity on Plaintiff's §

1983 "deliberate suppression" claim because the summary judgment record demonstrates that

they did not violate Plaintiff's right to due process by engaging in deliberate deception by

purposefully concealing evidence, as per the line of cases flowing from Mooney v. Holohan,

294 U.S. 103 (1935).  As framed by the Appeals Court, in order to overcome qualified

immunity, Plaintiff must establish that Detectives Kelley and Harrington engaged in

"[d]eliberate concealment of material evidence by the police, designed to grease the skids for

false testimony and encourage wrongful conviction."   Haley, 657 F.3d at 49-50.   Since a

police officer's only duty to disclose exculpatory information is to the prosecutor and not the

criminal defendant or his defense counsel, Plaintiff must show that the statements were

deliberately concealed from the prosecutor.  Campbell v. Maine, 632 F. Supp. 111, 121 (D.

Me.1985), aff'd, 787 F.2d 776 (1st Cir.1986) ("The only duty of a police officer in possession

of exculpatory information is to turn it over to the prosecutor.").

The summary record is completely devoid of any evidence whatsoever that the

Defendants deliberately suppressed the statements taken of Gloria and Brenda ("the

statements") on July 11, 1971 from the prosecution.  Statement of Material Facts ("SMF")

¶20.  In fact, the record clearly establishes that the witness statements were provided to the

district attorney.  On February 14, 2006, in response to a public records request, the Boston

Police Department ("BPD") sent Plaintiff sixty (60) pages from the Myers homicide file, which included a fifteen page paginated document titled "Commonwealth v. James Haley," that included Gloria Custis' transcribed statement (contained in pages 1-6), Brenda Haley's transcribed statement (contained in pages 7-10), and James Haley's transcribed statement (contained in pages 11-14).  SMF ¶ 53.  The first page of the document is an index which lists the document's contents and the corresponding page numbers on which each witnesses' statement begins.  SMF ¶ 53.  The statements of Gloria and Brenda were transcribed by BPD Stenographer Harold Kraus.  SMF ¶ 7.

The BPD also produced the following documents contained in the homicide file: 1) handwritten notes of Detective Kelly which indicate, "about 9:30 a.m. I went to 28 Glenway St. home of Helen Davis and talked to Gloria Custis and **took a statement** from her and also **a statement** from Brenda Haley," 2) a form entitled "City of Boston Police Department Bureau of Field Operations List of Material Submitted to the Office of the District Attorney," dated September 1, 1971, which was prepared by Sgt. Det. Kelley for the Haley prosecution and indicates that "Reports of Officers" and "Statements" were included among the materials submitted to the prosecutor, and 3) a memorandum summarizing Sgt. Det. Kelley's testimony before the grand jury on September 10, 1971, indicating that he "testified in essence to the **statement of one Gloria Custis**." SMF ¶¶ 54-56.

It defies logic that a police detective who wanted to conceal and destroy the content of the oral statements taken from Gloria and Brenda would 1) write notes in his file indicating that he took the statements; 2) have the police stenographer create a written transcript of the statements, 3) put the statements together with the statement of Haley in a single paginated document, with Haley's statement contained in pages 11-14, and create a cover sheet/ index

listing all three statements as the document's contents, 4) make copies of this document, and 5) leave copies of the document and handwritten notes in the homicide file where they remained in 2006.   Haley's transcribed statement, which was paginated with numbers 11-14, was in the possession of the prosecutor and was provided to Plaintiff's trial counsel, Attorney Alfred Farese ("Farese") in pre-trial discovery.  SMF ¶ 19.  There is absolutely no evidence to suggest that the prosecutor did not have pages 1-12 of the document.  SMF ¶ 20.  Clearly, any capable defense lawyer or prosecutor would have been put on notice of the existence of other statements contained in pages 1-12.

In fact, any doubt as to whose statement was transcribed in pages 1-12 would have been removed simply by reading Haley's statement.  In the course of the transcribed interview, Sgt. Det. Kelley stated to Haley "we have Gloria who gave a **full and complete statement to me** putting you in the apartment struggling with the victim and she heard a gunshot."  SMF ¶ 16.  The July 11th transcribed statement of Gloria Custis is the only statement given by Gloria to Sgt. Det. Kelly.  SMF ¶ 17.

There is ample additional evidence that the Detectives did not intend to conceal the statements and that they were disclosed to the prosecutor.  At trial, Sgt. Det. Kelley testified that on the morning of July 11, 1971, he went to the home of Helen Davis at 28 Glenway Street where he spoke to both Gloria and Brenda.  SMF ¶ 43.  On cross-examination, Sgt. Det. Kelley testified:

Q:     Is there anything in your record to indicate what time it took place?
A:     **I have it in the statement, yes, 9:25 to be exact**.

Q:     Now do you have anything to indicate what time you went to the home of the Davis's?
A:     Yes.
Q:     And what time was that?
A:     9:25 a.m. SMF ¶ 44.

Page one of Custis's transcribed statement clearly indicates that it was taken at 9:25 a.m. and it is the only document in the homicide file that references this time.  SMF ¶ 44.  Sgt. Det. Kelly's reference to Custis's statement during his testimony demonstrates that he was not trying to conceal its existence, and indeed, he likely had it on the stand with him. Furthermore, the prosecutor was aware of the existence and contents of Gloria's statement, because according to the aforementioned BPD memorandum in the homicide file, the statement was read into the grand jury minutes by Sgt. Det. Kelley.  SMF ¶ 55.  The trial judge would also have been aware of the statement because he also read the grand jury minutes.  SMF ¶ 29.  Additionally, the form in the homicide file which was specifically prepared by Sgt. Det. Kelley to document material submitted to the prosecutor in the Haley prosecution indicates that "Reports of Officers" and "Statements" were included among the materials submitted to the district attorney.  SMF ¶ 54.

On the other hand, Plaintiff has not produced a shred of evidence which would demonstrate that detectives did not disclose the statements to the prosecutor and that the statements were not in the prosecutor's files.  SMF ¶ 20.  ADA Muldoon and Judge Roy are deceased and the District Attorney's Office lost and/or destroyed its entire trial and appellate files.  SMF ¶¶ 51, 63.  "Haley cannot prove that Gloria and Brenda's statements were in fact withheld from the grand jury because all records of the grand jury proceedings have been inadvertently lost or destroyed by the Commonwealth."  Comm. v. Haley, Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment, SUCR1971-58947 ((Mass. Super. August 26, 2008) at pp. 19-20.  Also, former ADA David Meier, who represented the Commonwealth during the proceedings on Plaintiff's motion for a new trial in 2007 and 2008 testified that not only had both the trial and appellate files in the underlying criminal case

have been lost and/or destroyed, but that he did not "have any basis of knowledge that Brenda

Haley or Gloria Custis' statements were not contained in the Suffolk County District

Attorney's trial file or appellate file."  SMF ¶ 65.

    ii.  <u>Plaintiff's only evidence that the statements were deliberately concealed is that
Farese did not use them at trial.   This does not demonstrate that the prosecutor did
not have the statements.  There are ample reasons why the prosecutor would not
have produced them to defense counsel.</u>

Plaintiff's only proffered evidence that the individual Defendants deliberately

concealed the statements is the fact that Attorney Farese did not use them at trial.  This is not,

however, evidence that the prosecutor did not receive the statements.  There is ample

evidence to show that the prosecutor would not have disclosed the statements in his

possession to defense counsel.  There is also significant evidence that Attorney Farese's

failure to use the statements at trial was not because he didn't have them but was a function of

his own lack of preparation.

Prior to trial, Farese filed a Motion to Inspect and Copy Statements Made by

Defendant, which was allowed at the pre-trial.  SMF ¶ 27.  Mr. Haley's transcribed statement

(with page numbers 11-14) was therefore produced.  Farese also filed a Motion to Inspect

Statements of Commonwealth's Witnesses.  SMF ¶ 28.  The Commonwealth did not assent to

this motion at the pre-trial and the court deferred ruling on it to the trial Judge.  SMF ¶ 28.  At

trial, prior to empanelling the jury, J. Roy took up this motion and denied it.  SMF ¶ 29.

Again the Commonwealth did not assent.  SMF ¶ 29.  The court also denied Farese's Motion

to be Furnished with Statements Concerning Identification, and a Motion for Inspection of

Grand Jury Minutes.  SMF ¶ 29.

If the prosecutor did not possess statements of the Commonwealth's witnesses which

would have been responsive to Farese's motion, he would likely have assented to the motion

and there would have been no reason for this motion to be heard at either the pre-trial or trial. It is entirely likely that the prosecutor turned over Haley's statement in light of the judge's allowance of the motion to disclose statements of the defendant, but did not turn over the statements of Gloria and Brenda in light of the judge's denial of the motion to disclose statements of the Commonwealth's witnesses.

In response to this argument, Plaintiff points out that the Court allowed Haley's Motion to be Furnished with Evidence Favorable to the Accused, which involved requests for all evidence which is of an exculpatory nature, including evidence that could be used to impeach the Commonwealth's witnesses. However, it is entirely likely that given the existing law in 1972, a prosecutor would not have produced the statements in response to this motion.

It was not until 1976, in U.S. v. Agurs, that the Supreme Court held for the first time that the prosecution had an obligation to provide defense counsel with exculpatory information when no specific request had been made. U.S. v. Agurs, 427 U.S. 97 (1976) (holding that, nonetheless, prosecutor does **not** have duty to deliver his entire file to a criminal defendant). The time lapse between _Brady_ and _Agurs_ is significant because Haley's motions for disclosure of exculpatory evidence and witness statements were filed and heard in 1971 and 1972, at which time the prosecution did not yet have a duty to seek out and identify exculpatory evidence. SMF ¶ 26. Further, in 1976, the Supreme Court held that in responding to a general request for exculpatory information, a prosecutor's duty to disclose was limited to evidence which was "obviously exculpatory." U.S. v. Agurs, 427 U.S. at 106-107. The Supreme Court also held for the first time that where there was no specific request for exculpatory evidence, a prosecutor had a duty to produce evidence that was "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce."

<u>Id</u>.  It was not until 1985 that the Supreme Court rejected any difference between exculpatory and impeachment evidence for purposes of disclosure requirements.  <u>U.S. v. Bagley</u>, 473 U.S. 667 (1985).

Beyond <u>Brady</u> and its Supreme Court progeny, it was not until 1975 that Massachusetts announced a new rule that a criminal defendant may move for discovery of prior written statements of *prosecution witnesses* without a showing of "particularized need." <u>Commonwealth v. Lewinski</u>, 367 Mass. 889, 900-03 (1975) ("under past practice it has been within the very wide discretion of the judge whether to allow or disallow discovery ahead of trial of a statement of a prospective prosecution witness, and a showing of 'particularized need' has been in all events required").  <u>Strickler v. Greene</u>, 527 U.S. 263, 285-86 n. 30 (1999) (recognizing that state law may provide that a criminal defendant is not entitled to certain discovery, such as statements made by witnesses or prospective witnesses to agents of the Commonwealth, or reports, memoranda or other internal documents made by agents in connection with the investigation or prosecution of the case).  Further, it was not clearly established under Massachusetts law that impeachment material constituted exculpatory evidence before the Supreme Judicial Court's decision in <u>Commonwealth v. Ellison</u>, holding that exculpatory evidence includes "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness."  <u>Commonwealth v. Ellison</u>, 376 Mass. 1, 22 (1978).  Indeed, this may have been why Attorney Farese filed separate motions for exculpatory evidence and statements of Commonwealth's witnesses.  Moreover, Mass. R. Crim. P. 14(a), which currently entitles a defendant to automatic discovery of certain

evidence, had not been enacted as of the time of Haley's criminal trial in 1972.  Comm. v. Haley, Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment, SUCR1971-58947 ((Mass. Super. August 26, 2008) at pp. 27-28.

 In addition, in Commonwealth v. Preston, the Supreme Judicial Court refused to impose on the prosecution the burden of determining "whether one statement may or may not have been inconsistent with another statement." 359 Mass. 368, 371 (1971).  Thereafter, in 1974, the Mass Appeals Court relied on Preston in holding that there was no affirmative duty for the prosecution to take steps to obtain records sought in a criminal defendant's motion for exculpatory evidence. Commonwealth v. Collella, 2 Mass. App. Ct. 706, 708-09 (1974).

These cases are significant because Plaintiff cannot establish that the transcribed statements were "obviously exculpatory" or even that they had any impeachment value until after Gloria and Brenda testified at Haley's criminal trial.  The statements were not obviously exculpatory.  "Here it is evident that the redacted statements attributed to Gloria and Brenda were not exculpatory in the sense of establishing Haley's innocence of the murder. At best, they constituted prior inconsistent statements, which while admissible on the issue of the sisters' credibility, were understood in 1972 to be inadmissible for any substantive purpose. ... This would have been all the more the case had the sisters on cross-examination denied making the statements or explained them as a misunderstanding on Kelley's part of what they had said." Haley v. City of Boston, 2010 WL 3198900 at *2 (D.Mass. Aug 12, 2010). Further, Haley's claims are based on the contention that Gloria and Brenda's statements are inconsistent with their trial testimony regarding the last time they saw Haley prior to Myers' murder.  These purportedly inconsistent statements were not made until trial; therefore the

Defendants and the prosecutor would not have had reason to identify the statements as having any impeachment value prior to trial.

Attorney Farese did not renew his previously denied motions for statements of Commonwealth witnesses or grand jury minures after hearing the content of Gloria and Brenda's testimony at trial.  SMF ¶ 42.  In 1972, the cogent occasion for the showing of particularized need was understood to be the time when the particular witness has given his testimony at trial because at that point a judgment could be better made, based, oftentimes, on weaknesses or discrepancies apparent from the testimony.  Lewinski, 367 Mass. at 900-01, citing Commonwealth v. French, 357 Mass. 356, 377-78 (1970).  In Lewinski, the defendant failed to renew his request for statements of Commonwealth's witnesses for impeachment purposes at the close of the witnesses' direct testimony.  The failure to renew the motion on an appropriate showing of particularized need at this time prevented the defendant in Lewinski from obtaining the statements and indeed, failed to even preserve the issue for review on appeal.  Id. at 901.

Therefore, under the state of the law in 1972, there is ample evidence to support the proposition that the prosecutor in possession of the statements would not have provided them to Plaintiff's defense counsel because Haley was not entitled to them as a matter of law.  In fact, the Plaintiff's own witness, Attorney Thomas E. Dwyer, Jr., who worked in the Suffolk County District Attorney's Office between 1972 and 1978 testified that, at that time, "office policy in regards to the discoverability of witness statements" was "not to disclose them."  SMF ¶ 66.

13

iii   <u>Farese's failure to use the statements at trial was likely caused by his own lack of preparation, rather than him not having received them.</u>

The mere fact that Farese did not use the statements at trial is not indicative of whether he possessed them. Attorney Farese's failure to use the statements may well have been due to his own well-documented unpreparedness. Just prior to empanelment, Attorney Farese requested a 48-hour continuance of the trial, stating that he had just completed another murder trial in Rhode Island two days earlier and that "by me being forced to trial today, I wouldn't have adequate time to prepare a case properly." SMF ¶ 31. The request was denied and the trial commenced immediately. SMF ¶ 31. Plaintiff claimed in various post-conviction proceedings that Farese provided ineffective assistance of counsel at trial. SMF ¶ 48. Specifically, Plaintiff alleged that Attorney Farese was clearly inadequately prepared for trial, that he had attempted both before and during trial to fire Farese, that from the time of his arrest up until trial, Farese refused to discuss the case and prepare for trial with him, and even during the trial, Farese would not confer with Haley regarding defense strategy. SMF ¶ 48. Indeed, Plaintiff even produced a letter from an attorney at the Harvard Negotiation Project who upon review of the criminal trial transcript stated it was "the most outrageous example of a defense attorney's incompetence that I have seen" and that "a first year law student would have done better." SMF ¶ 49.

Attorney Farese, who is deceased, has prevented the parties from confirming that the statements were provided to him as his entire file was lost and/ or destroyed some time prior to 1982. SMF ¶¶ 50, 51. Since 1) Plaintiff has offered no evidence that the statements were concealed from or not produced to the prosecutor, 2) Plaintiff's showing that Attorney Farese did not use the statements at trial is in no way probative of whether Farese, let alone the prosecutor possessed them, 3) there is ample evidence to demonstrate that the Defendants not

only didn't deliberately conceal the statements, but actually provided them to the prosecution, and 4) Farese's failure to use the statements at trial was likely a function of his own lack of preparation, the individual defendants did not deprive Plaintiff of his due process right to a fair trial and are entitled to qualified immunity.

**B.   Even if the Defendants had deliberately concealed the statements, they are still entitled to qualified immunity, because this does not rise to the level of behavior which was clearly established as violating due process in 1972.**

Even if the Defendants had purposefully withheld the statement from the prosecutor they are still entitled to qualified immunity because this would not rise to the level of unconstitutional behavior outlawed under Mooney v. Holohan, 294 U.S. 103, 112 (1935). The conduct of which Plaintiff complains in this case does not rise to the level of procuring known false evidence that is the purview of the Mooney cases. Mooney and the cases stemming from it identify the intentional production of coerced or perjured testimony or the suppression of evidence known to be exculpatory prior to trial as a due process violation. See Mooney v. Holohan, 294 U.S. 103, 112 (1935), (due process violation where there is a "deliberate deception of court and jury by the presentation of testimony known to be perjured"), Brown v. Mississippi, 297 U.S. 278, 286 (1936), (due process violation where "state authorities have contrived a conviction resting solely upon confessions obtained by violence."),  Pyle v. Kansas, 317 U.S. 213, 214-15 (1942), (due process violation where "perjured testimony, knowingly used by the State authorities to obtain [a] conviction" and where witnesses with testimony "material to petitioner's defense" were "intimidated and their testimony suppressed."), Limone v. Condon, 372 F.3d 39, 49, (1st Cir. 2004), (due process violation caused by presentation of witness with knowledge he would commit perjury to frame an innocent man).  The cases cited by the Appeals Court's decision in this matter for

the proposition that "deliberate concealment of material evidence" would constitute a <u>Mooney</u> violation involved evidence known to be false on its face.  <u>Haley</u> 657 F.3d at 49-50; See <u>Newsome v. McCabe</u>, 256 F.3d 747, 749 (7th Cir. 2001) (due process violation where police did not inform prosecutors that defendant's fingerprints did not match those at the scene and had encouraged line-up identifications where they knew witnesses had previously identified other mug shots) and see Pierce <u>v. Gilcrhist</u>, 359 F.3d 1279,1282 (10th Cir. 2004) (due process violation where forensic analysis suppressed fact that hairs and enzymes in blood samples from defendant did not match those found at crime scene.)  Therefore even though the behavior outlawed by <u>Mooney</u> and other cases cited by the Appeals Court was clearly established by1972 as violating due process rights, it is clear that the alleged withholding – even deliberate concealment – of the impeachment material contained in the statements would not rise to this level.   The individual Defendants are therefore entitled to qualified immunity.

### C.  <u>The Defendants are entitled to summary judgment because the statements were not material.</u>

Plaintiff cannot support a § 1983 due process violation claim because the statements did not constitute "material evidence." The Supreme Court held in <u>United States v. Bagley</u> that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." 473 U.S. 667, 678 (1985).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The burden under <u>Bagley</u> of showing prejudice is heavy. '[T]here is never a real ' Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " <u>Haley</u>, 2010 WL 3198900 at *3 (D.Mass. Aug 12, 2010), quoting <u>Strickler v. Greene</u>, 527 U.S. 263,

281, (1999).  Whether or not such evidence is material is a question of law decided by the

court.  Bagley, 473 U.S. at 683.

This Court has already found that "the evidence withheld was not material."  Haley,

2010 WL 3198900 at *3, n.4.  This court specifically elaborated:

> "there is no reasonable probability that the production and use of Brenda's and
> Gloria's statements in cross-examination at trial would have resulted in a different
> verdict.  It is doubtful that the loss of the opportunity to impeach the sisters on a
> relatively minor and readily explainable aspect of their testimony would have
> undermined a reasonable observer's confidence in the ultimate verdict. At best, one or
> the other (or both) of the sisters might have admitted being mistaken when interviewed
> by the police (or being confused or misquoted).  In light of Gloria's eyewitness
> account of the murder and the unconvincing attempt at an alibi defense, there is no
> reasonable probability of a different outcome at trial."  Id. at *3.

The import of the statements at issue is not such that it would have changed the

outcome of Haley's criminal trial.  As found by the Superior Court in its August 26, 2008

dismissal of the indictment against Haley without prejudice, Gloria and Brenda's statements

were only significant in that they could be interpreted to mean that the July 10, 1971

encounter with Haley did not occur, thus undermining Gloria's credibility.  SMF  ¶ 64.  The

court found that the statements did ***not*** alter or disqualify Gloria's eyewitness identification of

Haley as Myers' assailant; nor did the statements suggest anyone else as the assailant. Comm.

v. Haley, Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment,

SUCR1971-58947 at p. 25.

At trial, Gloria testified that on July 10, 1971, she saw Haley on the corner of Glenarm

and Washington "late in the afternoon."  SMF  ¶ 39.  At that time, Haley "just looked at

[them]."  SMF  ¶ 39.  Gloria also testified regarding the circumstances and events leading up

to and after Myers' murder and her observations of Haley in the apartment she shared with

Myers in the early morning of July 11, 1971.  SMF  ¶ 38.  Gloria specifically testified that

Myers' stated, "James stabbed me.  James stabbed me," and thereafter she heard one gunshot and heard Myers say, "Why did you stab me, man? Brenda's not here."  SMF ¶ 38.  Gloria testified that she then left her apartment, "yelled for someone," and ran up the street to 28 Glenway Street."

At trial, Brenda testified: (1) she was married to Haley; (2) on May 3, 1971, she went to Delaware after she and Haley had an argument and he hit her in the eye; (3) she returned to Boston on July 9, 1971 to get a divorce, at which time she stayed with her sister Barbara at 12 Mount Bowdoin Terrace; (4) she called Haley from Boston and spoke to him on the telephone on July 9, 1971 regarding the divorce; (5) the next day, while she was with Gloria, she saw Haley "in a food store at the corner of Glenarm and Washington and he had been in the store and out the store again when [she] saw him;" (6) they did not speak to Haley, but she "guessed" Haley recognized them when he looked down the street because "he just stood there for a few minutes and then he walked along;" and (7) when she saw Haley, "[i]t was in mid-afternoon, about maybe four or five, maybe six."  SMF ¶¶ 33-37.

At trial, various police personnel testified about the condition of the apartment, evidence retrieved from the scene and photographs taken at the scene including a window with the screen pulled open and an overturned bucket outside the window used to gain entrance into the apartment.  SMF ¶ 5.  Haley also called Alice Marsh as an alibi witness who confirmed that she saw Haley at a house in Dorchester on the afternoon of July 10, 1971 at approximately 5:00 p.m., the location of which was not far from where Gloria and Brenda claimed to have seen him, clearly contradicting his alibi defense that he was at work at MIT and then visited his mother at a hospital.  SMF ¶ 46.  By calling this witness, Haley supported

both Gloria and Brenda's testimony that they saw him in the afternoon in Dorchester at "maybe four or five, maybe six." SMF ¶¶ 46, 37.

The statements would have had little, if any impact if used at trial. Even without reference to the statements, Plaintiff's counsel still cross-examined Gloria regarding her testimony at the probable cause hearing that she had not seen Haley prior to the murder. SMF ¶¶ 40, 41. Referring to her testimony at the probable cause hearing, defense counsel inquired of Gloria:

> Q:  Now, on July 23rd of 1971 were you ever asked this question? "When did you see James that day for the first time." Were you ever asked that question?
> …
> Q:  Wasn't your answer, "I didn't see him at all that day until he entered my house at five o'clock in the morning."? SMF ¶ 41.

Neither Gloria nor Brenda could even confirm that Haley saw them during the July 11th encounter. Also, even if Haley had used the statements to impeach the trial testimony that Haley may have seen Brenda on the night before the murder, this would not have undermined the Commonwealth's theory that Haley went to Gloria's apartment looking for Brenda. It was established at trial that at the time of the murder, Brenda was pursuing a divorce and had returned to Boston to meet with her lawyer and file papers. SMF ¶¶ 13, 35-36. Regardless of the July 10th encounter, Haley knew Brenda was in Boston because, upon returning to Boston on July 9th, Brenda spoke with Haley on the phone relative to the divorce filing. SMF ¶ 36. Indeed, there could have been any number of additional ways that Haley became aware that his wife had returned to Dorchester. SMF ¶ 37. One of their mutual friends could have been aware of her return or seen her walking around Dorchester during the two days prior to the murder and informed Haley.

On this record, Gloria and Brenda's statements did not "so fundamentally undermine the Commonwealth's theory of the underlying criminal case" as to amount to a constitutional deprivation sufficient to support § 1983 liability.  Rather, as already found by this court, "there is no reasonable probability that the production and use of Brenda's and Gloria's statements in cross examination at trial would have resulted in a different verdict."  Haley, 2010 WL 3198900 at *3.  As such, the statements are not material and the Plaintiff did not therefore suffer any constitutional deprivation.

**D.** **All claims against Detective Harrington must be dismissed because his death preceded any discovery obligations in the underlying criminal case.**

Detective Harrington died on November 29, 1971.  SMF ¶ 25.  Because Harrington's date of death occurred approximately one month before Plaintiff filed discovery motions and two months before Haley's motion to be furnished with favorable evidence was granted, and the beginning of Haley's trial, all claims against Harrington must be dismissed because his death preceded any discovery obligations in the underlying criminal case.

**E.** **Summary judgment is appropriate as to the individual defendants because all counts against Kelley and Harrington are time barred pursuant to M.G.L. c. 197, § 9.**

Individual Defendants Joseph Kelley and John B. Harrington were deceased prior to the filing of the instant action.  SMF ¶¶ 25, 68-69.  Their estates have never been served with process in this matter. Lack of timely service was raised as a defense within the Defendants' Rule 12 Motion to Dismiss [ECF docket #9]; however it was not addressed within the Court's Memoranda and Orders on the motion, because this court dismissed the claims against the individual Defendants on separate grounds.  See Haley v. City of Boston, 677 F.Supp.2d 379, (D. Mass. 2009), Haley v. City of Boston, 2010 WL 3198900 (D.Mass. Aug. 12, 2010).

Neither Kelley nor Harrington nor their respective former estates have filed answers in this matter and they are not proper parties to this action.

Further, the estates of the individual Defendants are closed and are not subject to liability. Pursuant to M.G.L. c. 197, § 9, "an executor or administrator shall not be held to answer an action by a creditor of the deceased unless such action is commenced within one year after the date of death of the deceased and unless" service of process is effectuated upon such executor or administrator prior to expiration of the one-year period.  Thus, pursuant to § 9, a complaint must be filed and served within one year after the date of death, "regardless of the statute of limitations of the underlying action." Mullins v. Garthwait, 875 F. Supp. 14, 17 (D. Mass. 1994).  Significantly, the plain language of § 9 leaves no room for application of the common law discovery rule or the doctrine of equitable tolling.  See M.G.L. c. 197, § 9; Crosslight Org., Inc. v. Williams, No. BRCV2000-01135, 2001 WL 888383, *4-5 (Mass. Super. July 30, 2001).

In this case, Plaintiff is a creditor as defined in M.G.L. c. 197, § 9, as Kelley died on June 21, 2002, and Harrington died on November 29, 1971.  See New England Trust Co. v. Spaulding, 310 Mass. 424, 429-430 (1941).  SMF ¶¶ 25, 65.  However, Plaintiff did not file the instant action until February 11, 2009 – over six years after Kelley's date of death and over thirty-seven years after Harrington's date of death.  Consequently, all Counts against Kelley and Harrington should be dismissed because Plaintiff failed to file and effectuate service of process of his claims against them within one year of their deaths.

Further, Plaintiff cannot rely on § 9A of M.G.L. c. 197 to avoid dismissal.  Section 9A provides that an action for personal injuries,

> if commenced more than one year after the date of death of the deceased, may
> be brought against said executor or administrator, provided that such action is

> commenced within three years next after the cause of action accrues, *and provided further that any judgment recovered in any action so brought may be satisfied only from the proceeds of a policy of insurance or bond, if any, and not from the general assets of the estate*."

(Emphasis added).  Here, there is no insurance or bond from which any judgment may be recovered.  As such, § 9A does not provide Plaintiff with relief from dismissal under § 9. See In re: Estate of Grabowski, 444 Mass. 715, 718 (2005); Tae v. Tae, No. 001111, 2001 WL 716846, *2 (Mass. Super. Mar. 19, 2001).

Nor can Plaintiff rely on § 10 of M.G.L. c. 197 to avoid dismissal.  This is because the purpose of § 10 is to provide a remedy where required by justice and equity for a claim which might have been presented to the executor or administrator within the statutory period, but was not. See Ryan v. Lyon, 212 Mass. 416, (1912) (citing Spelman v. Talbot, 123 Mass. 489 (1878)).  Here, Plaintiff could not have presented his claims to the executor(s) or administrator(s) of Kelley or Harrington's respective estates within one year of their deaths because Plaintiff did not have a viable cause of action until during the relevant one-year time period.  As such, § 10 does not provide Plaintiff with relief from dismissal under § 9.  For these reasons, all Counts against Kelley and Harrington must be dismissed as time barred under M.G.L. c. 197, § 9, and because there is no statutory basis for avoiding dismissal.

**F.   The City of Boston is entitled to summary judgment on Plaintiff's Monell claim because Plaintiff has failed to demonstrate any underlying constitutional violation by either of the individual Defendants.**

The defense of qualified immunity does not apply to municipal defendants. Owen v. City of Independence, Mo., 445 U.S. 622, 657, (1980).  However, Section 1983 liability against a municipality must always be based on a proven underlying constitutional violation (typically by an individual officer).  Estate of Bennett v. Wainwright, 548 F.3d 155, 177 (1st Cir. 2008).  As set forth within Sections III(A) and (C) above, the Plaintiff cannot

demonstrate an underlying constitutional violation because he has failed to show that the witness statements were deliberately concealed or even withheld from the prosecutor by an individual defendant or that this evidence was material.  Therefore, Plaintiff's <u>Monell</u> claim against the City must be dismissed.  Also, as argued in Section III(A)(ii) above and at length in the Defendant's Motion to Dismiss [ECF #9], the applicable law at the time of Haley's criminal trial did not provide Plaintiff with any constitutional right to obtain the statements on which Haley's § 1983 claims are based.[4]

**G.  <u>The City of Boston is entitled to summary judgment on Plaintiff's Monell claim because Plaintiff has failed to produce any evidence of a widespread, well-settled unconstitutional custom or practice of police withholding of exculpatory evidence from the prosecution.</u>**

A §1983 claim against the City based on a theory of municipal policy is only viable "where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  <u>Monell v. Dep't of Soc. Servs. ., 436 U.S. 658 (1978).</u>  "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  <u>Id.</u> at 691.  Plaintiff does not allege that the City maintained a formal policy instructing its police officers to withhold evidence from prosecutors.  Rather, in support of his §1983 action, Plaintiff is alleging the existence of a de facto policy, based on a custom and practice of deliberate withholding.

---

[4] Because the Appeals Court granted qualified immunity on other grounds, it specifically did not decide whether in 1972 a no-fault non-disclosure of the statements by the Detectives would have implicated any constitutional right.  <u>Haley</u>, 657 F.3d at 48.  As argued below in Section III(H)(i), Plaintiff cannot base a viable <u>Monell</u> "failure to train" claim on the City's alleged failure to train its officers on their no-fault disclosure obligation under <u>Brady</u> because this duty did not apply to police officers at the time.  However, to the extent the Plaintiff is attempting to assert this as the basis for his <u>Monell</u> action, this Court has already decided that in 1972, a no-fault withholding of the statements, which did not constitute "evidence material either to guilt or to punishment" implicated no underlying existing constitutional right.  <u>Haley v. City of Boston</u>, 677 F.Supp.2d 379, 390-91 (D.Mass. Dec 31, 2009).  Since it is based on no cognizable underlying constitutional violation, Plaintiff's <u>Monell</u> action cannot succeed.

In order to support a § 1983 claim against the City based on a theory of municipal custom or practice, a plaintiff must demonstrate a practice by City officials which is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Id. at 690.  To establish municipal liability, a plaintiff must demonstrate not only that a custom caused a deprivation of his rights, but also that the challenged practices were "so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them." Bordanaro v. McLeod, 871 F.2d 1151, 1157 (1st Cir. 1989).  Municipal liability will be demonstrated by proof of a practice of particular city officials who repeatedly engaged, over a period of time, in exactly the same sort of unconstitutional behavior. Murray v. City of Boston, 104 F.3d 348 (1st Cir. 1996), citing Bordanaro, 871 F.2d at 1156.  The duration and frequency of the custom or practice must "be so well-settled and widespread that policymaking officials of the municipality can be said to have actual or constructive knowledge of the practice yet did nothing to end it." Walden v. City of Providence, R.I., 596 F.3d 38, 57-58 (1st Cir. 2010), citing Bordanaro, 871 F.2d at 1156.  In order to sustain a Monell action, the unconstitutional municipal custom must also be the cause of and the moving force behind the deprivation of the plaintiff's constitutional rights. Bordanaro, 871 F.2d at 1156.

Plaintiff has clearly failed to produce evidence to demonstrate the existence of a widespread, well-settled practice by police officers of withholding exculpatory evidence from prosecutors in the years leading up to Plaintiff's trial.  Plaintiff has also failed to produce any evidence that municipal policy makers who were in place at that time were aware or should have been aware of such a custom.

24

As evidence of municipal custom, Plaintiff has identified only the following sources of evidence: the declaration of Mr. Robert DiGrazia, and copies of the judicial opinions in two criminal matters, Commonwealth v. Christopher Robinson and Commonwealth v. Joseph Meehan.[5]  See Commonwealth v. Robinson, Memorandum and Order on Defendant's Motion for a New Trial, dated August 31, 2006, attached as **Exhibit 37**.  Comm. v. Meehan, 377 Mass. 552 (1979).

    i    Declaration of Robert DiGrazia

Robert DiGrazia is an independent police consultant who joined the Boston Police Department as its Commissioner on November 1, 1972 and served in that capacity until November 1976.  SMF ¶ 135.  Mr. DiGrazia states that the Boston Police Department had no official policy regarding the disclosure or non-disclosure of exculpatory or impeachment evidence.  However, Mr. DiGrazia states that, "[i]n my personal experience, based on regular interactions with the superintendents, commanders, detectives and officers who served under me, it was standard practice at that time not to disclose exculpatory/ and or impeachment evidence to state prosecutors or to defendants."  If the Plaintiff was able to demonstrate facts to support the existence of such a standard practice leading up to the time of Plaintiff's trial, this would likely satisfy Plaintiff's necessary showing of a municipal custom or practice.  However, Mr. DiGrazia's declaration does not support this showing because it sets forth absolutely no factual basis for this statement and it applies only to a time period after Plaintiff's conviction.

---

[5] The Defendants have filed a separate motion to strike the declaration of Mr. DiGrazia.  As stated within this motion, the Defendants have been prevented from deposing Mr. DiGrazia in this matter and are therefore prevented from discovering what factual basis, if any, exists for Mr. DiGrazia's vague and unsupported claim of a standard municipal practice of withholding evidence.

In his declaration, Mr. DiGrazia does not identify or describe a single instance in which evidence was withheld.  He does not allege how many times or with what frequency any such instances occurred.  He provides no information regarding any police employee who may have participated in such a practice.  He provides no information regarding any criminal matter in which evidence was withheld and no information regarding any criminal defendant, prosecutor or any police employee who may have been aware of any such withholdings.[6]  He further fails to identify any of the "superintendents, commanders, detectives and officers who served under [him]," with whom he claims to have interacted in forming his opinion that any practice existed.[7]

Mr. DiGrazia's broad allegation regarding a municipal practice, without providing any factual support for its existence or identifying even a single representative instance cannot defeat summary judgment.  Indeed, this unsupported statement provides no greater specificity regarding the existence of an unconstitutional municipal custom or practice than the boilerplate language included within Plaintiff's complaint.  See Santiago v. Fenton, 891 F.2d 373, 380 (1st Cir. 1989) (boilerplate allegation of municipal custom and practice without identified specific incidents will not withstand a motion to dismiss).  Mr. DiGrazia's unsupported claim of municipal custom is exactly the type "formulaic recitation of the elements of a cause of action," which will not support a viable claim.  See Twombly, 550 U.S.

---

6  It is unclear whether the practice described by Mr. DiGrazia actually involved officers allegedly failing to disclose evidence to criminal defendants, as opposed to prosecutors.  In his declaration, Mr. DiGrazia writes that, "the officer and detective on a given case would even argue with the prosecutor over whether certain pieces of evidence needed to be turned over at all."  This statement appears to demonstrate that if any practice existed, it did not involve officers withholding evidence from the prosecutor, but rather taking the position that evidence disclosed to the prosecutor should not be further disclosed to criminal defendants.

7 .  Indeed, after joining the Boston Police Department, Commissioner DiGrazia wrote a special order entitled, "Greetings from Police Commissioner Robert DiGrazia," which was distributed to all members of the Department.  In this order, he remarked that "I find [the Department] to be professional with sophisticated programs and dedicated personnel.  If it is not now the best Department in the world, I know that we will all be working together to make it the best."  SMF ¶ 139.

544, 555 (1955).  "Simply because the plaintiff has managed to say the magic words 'custom'

and 'policy' does not mean that his complaint properly pleads municipal liability."  <u>Allen v.</u>

<u>York County Jail</u>, 2003 WL 221842, at *8 (D.Me., Jan 30, 2003).  Since the Plaintiff has

failed to identify even a single instance of police withholding exculpatory evidence from the

prosecution, other than the alleged withholding of statements in Plaintiff's case, he has failed

to establish the existence of a well-settled and widespread municipal custom of similar

behavior. [8]  Evidence of a single incident is insufficient, in and of itself, to establish a

municipal "custom or usage" within the meaning of Monell.  <u>Bordonaro</u>, at 1156-57; <u>City of</u>

<u>Oklahoma v. Tuttle</u>, 471 U.S. 808, 824 (1985).  Rather, a plaintiff must offer "considerably

more proof than a single incident ... to establish ... the requisite fault on the part of the

municipality."  <u>Id</u>.

 Even if Mr. DiGrazia did identify one or more instances of unconstitutional conduct of

which he was aware, which he does not, this would still not support Plaintiff's <u>Monell</u> claim.

In order to sustain a <u>Monell</u> action, the unconstitutional municipal custom must be the cause

of and the moving force behind the deprivation of a plaintiff's constitutional rights.

<u>Bordanaro</u>, 871 F.2d at 1156 (internal citations omitted).  Mr. DiGrazia did not join the

Boston Police Department until after the Plaintiff's arrest, trial and conviction.  SMF ¶ 135.

Mr. DiGrazia's claim of an unconstitutional practice is based on his personal experience

interacting with unnamed police employees who served under him and extends only to the

time period in which he served as the Department's commissioner.  Mr. DiGrazia does not

---

[8] The basis for Mr. DiGrazia's unsupported claim of the existence of such a practice is utterly unclear in light of the testimony of Mr. Robert Wasserman.  Mr. Wasserman, who served as the Commissioner DiGrazia's Director of Training and Education from 1973 to 1976 testified that Mr. DiGrazia never once spoke with him regarding the topic of officers withholding exculpatory evidence from prosecutors and that Mr. DiGrazia never indicated that he was aware of any instance of this occurring.  Mr. Wasserman also testified that he was not aware of a single instance in which a police officer withheld exculpatory or impeachment evidence from the prosecution.

allege, nor could he allege, any instances of the unconstitutional withholding of evidence by police officers before he joined the Department.  Therefore, any instances which might have served as the basis for Mr. DiGrazia's claim of a standard practice of withholding took place after Plaintiff's conviction and could not have been the moving force behind the Defendants' alleged prior withholding.  See Connick v. Thompson, 131 S.Ct. 1350, 1364 (2011) (pattern of contemporaneous or subsequent conduct cannot serve as moving force).

Mr. DiGrazia's declaration also fails to demonstrate or even allege the necessary showing that municipal policymakers who were in place prior to the Plaintiff's trial had actual or constructive knowledge of any unconstitutional practice of withholding evidence or that they did nothing to stop such a practice.  Municipal liability under Monell requires not only that policymaking officials had knowledge of an unconstitutional practice, but also that they did nothing to end it.  Walden, 596 F.3d, 57-58, citing Bordanaro, 871 F.2d at 1156.  Edmund L. McNamara served as the Commissioner of the Boston Police Department from 1962 until May 1972.  SMF ¶ 133.  The summary judgment record, including Mr. DiGrazia's declaration, contains absolutely no evidence that Commissioner McNamara or any other municipal policymaker who was present prior to Plaintiff's conviction, was aware of or should have been aware of any instances of police withholding evidence from the prosecution.[9]  There is similarly no evidence in the summary judgment record to suggest that if Commissioner McNamara or any other policymakers who may have been aware of any unconstitutional behavior failed to take steps to correct it, such as disciplining the officers involved.

---

[9] Indeed, Plaintiff's witness Robert Wasserman, who joined the Department shortly after Commissioner DiGrazia testified that he had no information that Commissioner Edmund McNamara was aware of any instance in which a police officer withheld exculpatory or impeachment evidence.  SMF ¶ 134.

    ii   Commonwealth v. Robinson

In Commonwealth v. Robinson, the defendant Paul Robinson was convicted of first-degree murder by a Suffolk County jury for the 1968 shooting death of two drugstore employees.  See Exhibit 37 at p. 1.  In his sixth unsuccessful motion for a new trial, the defendant claimed that his defense counsel had not been provided with prior statements of some of the Commonwealth's trial witnesses, which could have been used to impeach these witnesses' testimony.  Id. at 1, 6.  Although the motion judge found that defense counsel had not received some prior witness statements before trial, he made no finding regarding whether these statements had been disclosed by police to the prosecutor.  Id. at 8, 11-14.  Indeed, some of the statements at issue were grand jury transcripts, which the prosecutor clearly would have possessed.  Id.  The judge did rule that none of the involved statements were material and denied the defendant's motion.  Id. at 11-16.

Even if Boston police officers had withheld witness statements which could have been used for impeachment purposes from the prosecution in the Robinson case, this single incident, which occurred four years prior to Plaintiff's trial would not establish a widespread well-settled custom or practice of similar withholdings.  Further, there is no evidence that any policymaker would have been aware of this alleged withholding of statements.  The first allegation by the defendant in Robinson that statements were not disclosed to his defense counsel was made as part of a motion for new trial filed in 2005.

    iii.  Commonwealth v. Meehan

The arrest and prosecution of Joseph Meehan did not involve any allegation of withholding exculpatory evidence by a police officer and therefore does not support Plaintiff's Monell claim.  Commonwealth v. Meehan, 387 Mass. 552 (1979).  The defendant

in Meehan was arrested and charged with murder by the Boston Police in 1976.  Id. at 553.

Statements were taken from eyewitnesses and Detective Joseph Kelley (Defendant in the

instant matter) interviewed Meehan.  Id. at  563. The Supreme Judicial Court ultimately

suppressed the defendant's interview confession, finding that "the Commonwealth had not

carried the heavy burden of establishing that it was voluntary.  Id.  The case did not involve

any allegation of withholding evidence.[10]  Since Plaintiff has failed to produce any evidence

of a widespread, well-settled unconstitutional custom or practice of police withholding of

exculpatory evidence from the prosecution, the City of Boston is entitled to summary

judgment.

### H. The City of Boston is also entitled to summary judgment on Plaintiff's Monell claim to the extent it is based on a policy of deliberate indifference by the City toward training its officers.

The Plaintiff has failed to demonstrate any failure to train by the Boston Police

Department, let alone a failure that amounts to deliberate indifference by municipal

policymakers to the rights of citizens.  "A municipality's culpability for a deprivation of rights

is at its most tenuous where a claim turns on a failure to train."  Connick, 131 S.Ct. at 1359,

citing Tuttle, 471 U.S. at 822–823 ("[A] 'policy' of 'inadequate training' " is "far more

nebulous, and a good deal further removed from the constitutional violation, than was the

policy in Monell").  The Supreme Court has therefore set out a "high standard" for a finding

---

10 Indeed, the facts in Meehan serve to support the City's position that no widespread, well-settled practice of withholding existed at the time.  After the murder, police investigators took statements from multiple witnesses to the crime, one of whom made a subsequent identification of the defendant as the perpetrator.  Id. at 554-555. This identifying witness gave an initial statement to Detective Kelley, describing the perpetrator as a white male, eighteen or nineteen years old, five-feet six-inches tall, wearing a print shirt.  Id. at 555, 563.  This description matched the defendant exactly.  Id. at 556.  However, investigators also took a statement from another eyewitness who described the perpetrator as five-feet ten-inches tall and in his mid-twenties.  Id. at 554.  This potentially exculpatory witness statement was recorded by investigators and produced to the prosecution.  Id. at 555.  Detective Kelley also interviewed and recorded the statement of another witness who described the perpetrator as wearing no shirt.  Id. at 555, 563.  This potentially exculpatory witness statement was also recorded and produced to the prosecution.  Id.

of municipal liability based on inadequate training of police officers.  Santiago, 891 F.2d at 381.

      With respect to a failure to train claim, only if the "municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  City of Canton v. Harris, 489 U.S. 378, 389 (1989).  A city's policy of inadequately training its police force can serve as a basis for § 1983 liability only if the city's failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Id. at 388.  " 'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregard a known or obvious consequence of his action."  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997).  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' … can a city be liable for such a failure under § 1983."  Santiago, 891 F.2d at 381, quoting Tuttle, 471 U.S. 808, 823.  Deliberate indifference requires a showing that a city made "conscious policy to train inadequately; a showing of simple or even heightened negligence will not suffice."  Santiago, 891 F.2d at 381; Bd. of County Comm'rs., 520 U.S. at 409.

      The Plaintiff must also prove that the challenged custom or policy was "the moving force" behind his alleged violation.  Polk County v. Dodson, 454 U.S. 312, 326 (1981).  There must be an "affirmative link" between the custom or policy and the subsequent violation; mere but-for causation will not suffice.  Tuttle, 471 U.S. at 823.  The challenged policy decision must be one that made the ultimate violation " 'almost bound to happen, sooner or later', rather then merely 'likely to happen in the long run.' "  Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987).

     i.   <u>Because Brady's no-fault disclosure obligation did not apply to police officers in 1972, Plaintiff's failure to train claim must be based on a failure to train officers not to deliberately conceal evidence.</u>

Plaintiff's failure to train claim appears to be based on the argument that prior to Plaintiff's 1972 conviction, the Boston Police Department failed to train its officers to recognize exculpatory and impeachment evidence and to understand the disclosure requirements imposed upon them by <u>Brady v. Maryland</u> and other cases.  This argument simply will not sustain a <u>Monell</u> action because in 1972, police officers were not subject to <u>Brady</u>'s no-fault duty to disclose exculpatory or impeachment evidence.  <u>Haley v. City of Boston</u>, 657 F.3d 39, 48-49 (1st Cir. 2011).  The only constitutional duty applicable to police officers prior to Plaintiff's 1972 conviction was the duty not to intentionally conceal evidence through deliberate deception in an effort to secure a wrongful conviction.  <u>Id</u>. at 49, citing <u>Mooney</u>, 294 U.S. 103 (1935).

    "By its terms, Brady applied only to prosecutors."  <u>Haley</u>, 657 F.3d at 48, citing <u>Brady</u> 373 U.S. at 87-88.  "The Court's decision [in <u>Brady</u>] contained no discussion of independent disclosure obligations that might affect police officers."  <u>Haley</u>, 657 F.3d at 48.  "The justices did not clarify that the <u>Brady</u> duty imposed on prosecutors bore any relationship to disclosure by police officers until more than twenty years after the jury convicted Haley.  Even then, the described relationship was indirect."  <u>Id</u>. 48-49.  In 1995, the Court held for the first time that the disclosure obligation imposed by Brady extends to evidence known only to police officers, but also held that "the responsibility for obtaining and disclosing such evidence remains the duty of the prosecutor, and not the police officer."  <u>Id</u>., citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995).  Also, the no-fault disclosure obligation which <u>Brady</u> created

for prosecutors did not yet extend to impeachment evidence, but rather "only 'evidence [that] is material to guilt or to punishment." <u>Haley</u>, 657 F.3d at 48, quoting <u>Brady</u> 373 U.S. at 87.

The City cannot be expected to have trained police officers regarding a no-fault duty to disclose exculpatory or impeachment evidence in 1972 because no such duty applied to police at that time. The City certainly cannot be considered to have been deliberately indifferent toward training police officers regarding this duty, which was not yet established.

Even though police officers were not subject to <u>Brady</u>'s no-fault duty to disclose exculpatory or impeachment evidence in 1972, it was clear prior to 1972 that police officers had a constitutional obligation not to intentionally conceal evidence through deliberate deception in an effort to secure a wrongful conviction. <u>Haley</u>, 657 F.3d at 49, citing <u>Mooney</u>, 294 U.S. 103. In order to succeed in his failure to train claim, Plaintiff must therefore demonstrate that the City failed to train its officers not to deliberately conceal evidence through deception and that a failure to train the individual Defendants in this regard was the moving force behind Plaintiff's alleged deprivation.

The absurdity of such a claim is readily apparent, as the duty not to frame innocent people through the purposeful concealment of evidence would be clear to any police officer without instruction. Also, if an officer set out to obtain a false conviction through deception, it is clear that no amount of proper training would dissuade such malicious unlawful behavior. This is even more apparent in this matter as one of the Defendants, Det. Harrington was an attorney. Regardless, as set forth below, it is undisputed that the City not only trained police officers not to deliberately conceal evidence in order to secure false convictions, but it also affirmatively trained officers to disclose all evidence to the prosecutor.

ii.   There is no genuine dispute of fact regarding whether the Boston Police
Department trained its employees to disclose all evidence, including exculpatory
and impeachment evidence to the prosecuting attorney.

The Boston Police Department not only trained its employees on their constitutional

duty not to deliberately conceal evidence, but it also trained officers to turn over all evidence,

regardless of its bearing on guilt, to the prosecuting attorney.  In the late 1960's and early

1970's, prior to Plaintiff's criminal trial, the Boston Police Department operated the Boston

Police Training Academy, the satisfactory completion of which was mandatory for all new

Boston police recruits.   SMF ¶ 70.  The Training Academy's sixteen-week curriculum

involved instruction on ethics, constitutional law, criminal law, report writing and courtroom

procedure.  SMF ¶¶ 71-73.  The Academy training continually stressed honesty, integrity and

the ethical responsibilities of law enforcement officers.  SMF ¶ 80.  The Academy training on

courtroom procedures involved the recruits engaging in mock-trials and stressed the

importance of police witnesses being honest at all times.  SMF ¶¶ 73-74.  The Academy's

training regarding report writing instructed officers to take statements from witnesses and to

include all of these statements within their written reports, regardless of whether the

statements were exculpatory.  SMF ¶ 76.

Prior to 1973, Boston Police Captain William Hogan served as the Commanding

Officer at the Academy and oversaw its operations.  SMF ¶ 77.  Captain Hogan also taught

the constitutional law curriculum at the Academy and was nationally recognized for his

abilities as a police legal instructor.  SMF ¶ 78-79.  Captain Hogan stressed ethics and the

importance of honesty, integrity and always telling the truth within his training on the law.

SMF ¶ 80.  He also instructed all recruits regarding the content and application of the United

States Constitution and its Amendments, the right to due process of law and protecting the

civil rights of the accused.  SMF ¶¶ 81-83.  Recruits were administered written examinations testing their understanding of training topics, including constitutional law, due process protections and individual civil rights.  SMF ¶ 84.

It is undisputed that the Academy training, including Captain Hogan's law curriculum, instructed officers to turn over all evidence, including exculpatory and impeachment evidence to the prosecutor and not to withhold any evidence regardless of whether it would aid the defense.  SMF ¶ 85.  Every individual with direct knowledge of the Boston Police Department's training practices who has testified in this matter, including multiple officers who graduated from the Training Academy prior to 1973, concur that the Department trained officers to disclose all evidence to the prosecutor, including evidence which would be considered exculpatory of relevant to impeachment.  SMF ¶¶ 87, 89, 91, 93, 95.  Discovery has yielded no evidence which would create a genuine dispute of fact regarding the content or adequacy of the Department's training in this area.

The Plaintiff has produced the declaration of the Department's former Director of Training and Education Robert Wasserman in order to attempt to dispute the established fact that in the years leading up to Plaintiff's conviction, police officers were trained to disclose exculpatory evidence.  However, it is clear that no genuine dispute exists.  Although Mr. Wasserman claims that the Department did not train its officers regarding a duty to disclose evidence to prosecutors prior to Plaintiff's 1972 conviction, he did not join the Boston Police Department until 1973.  SMF ¶¶ 111, 114.  Mr. Wassermann had no involvement whatsoever with the Department's training academy prior to 1973 and he had no direct knowledge as to what police training was being conducted by the Department prior to his arrival.  SMF ¶¶ 115-116.

Robert Wasserman's conclusion that Boston police officers were not trained to disclose exculpatory evidence leading up to 1972 is based entirely on the fact that after he joined the Department in 1973, he reviewed the written training materials that were being used at the academy and he "is not aware of" materials which expressly dealt with turning over exculpatory or impeachment evidence.  SMF ¶¶ 118, 119.  Mr. Wasserman has no other direct or indirect knowledge regarding whether officers were trained to disclose exculpatory evidence.  SMF ¶ 116.  While serving as Director of Training and Education, he never once spoke with anyone, including the Academy's prior Commanding Officer and law instructor, Captain Hogan about whether the duty to document or disclose exculpatory evidence was taught or trained.  SMF ¶¶ 117, 119.

"By its very terms, the [Rule 56(c)] standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added).  "Summary judgment will not lie only if the dispute about a material fact is 'genuine,' that is, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' "  Id. at 248.  In order to create a dispute which is genuine, he must proffer "significant probative evidence tending to support the complaint."  Id. at 249, citing National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968).  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249, citing Cities Service, 391 U.S. at 288-9.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249, citing Dombrowski v. Eastland, 387 U.S. 82, 84 (1967).

Here, the mere fact that Mr. Wasserman is "not aware of" a direct reference to training on disclosing evidence to prosecutors in the Academy materials certainly does not amount to significant probative evidence, which would create a genuine dispute of fact as to whether this concept was trained. Indeed, it would not be at all surprising if no direct reference existed in the materials. As demonstrated by the testimony of every witness who completed the Training Academy prior Plaintiff's trial, officers were trained to disclose all evidence to the prosecutor during multiple areas of their Academy instruction, including the constitutional law curriculum. Although discovery has yielded only partial copies of some pre-1972 academy training materials, these documents are replete with references constitutional law concepts that may have included training on disclosing evidence. SMF ¶121.

The Training Academy's written materials demonstrate that recruits received training on the United States Constitution, the Fourth and Fourteenth Amendments, due process protection, the Massachusetts Constitution, individual civil rights, relevant state statutes, and updated judicial decisions in these areas. SMF ¶¶ 81-83. The materials also demonstrate that recruits received training regarding courtroom procedures, the presentation of the government's case at trial, the rules of evidence and criminal procedure. SMF ¶¶ 73, 75, 124. The training materials also reflect instruction on taking statements from witnesses and the importance of complete, accurate and truthful report writing. SMF ¶ 75. The materials further reference training regarding the Department's rules and regulations. SMF ¶¶ 97-102.

It could have been under all or any one of these references within the training materials that the deponents received their training to disclose all evidence to the prosecutor. The mere fact that Mr. Wasserman, who did not join the Department until 1973 is "not aware of" a direct reference to this training in the materials does not create a genuine dispute as to

whether this topic was trained.  Indeed, Mr. Wasserman does not even know whether the updated Academy training materials that were created after he became Director of Training and Education expressly referenced training on disclosure of evidence.  SMF ¶ 120.

As part of their training, recruits were also provided with a copy of the Department's rules and regulations, which were incorporated into their Academy  training and instruction. SMF ¶ 120.  Boston Police Department Rule 43, which was in effect in from 1950 through 1972 required that a police officer "give evidence with the strictest accuracy, confining himself to the case then before the court, neither suppressing nor overstating the slightest circumstance with a view to favoring and person, or from ill will to either side."  SMF ¶ 99. The rule also states that "justice will be best served by a desire simply to tell the whole truth, whether in favor of or against the prisoner" and that "a police officer who is criticized by the court because of his testimony or behavior, or for giving improper or unsatisfactory evidence, shall make a report of the facts to his commanding officer who in turn will report to the superintendent."  SMF ¶ 100.  Boston Police Department Rule 34, which was also in effect, echoed this theme; "[i]n the performance of his duty, a member of the force must … be truthful at all times whether under oath or not."  SMF ¶ 102.  In addition to their Academy training regarding disclosure of evidence, officers were trained on Rule 43 and understood its direction to give evidence with the strictest accuracy, neither suppressing nor overstating circumstances with a view to favoring either side as consistent with their Academy training on this topic.  SMF ¶ 101.

Further, the Academy's Commanding Officer and law instructor, Captain Hogan remained available to all officers after graduation from the Academy to provide advice and answers to questions regarding any legal issues that arose during their duties in the field.

SMF ¶ 104.  Police officers received additional continued training and support after completion of the Academy, including the assignment of an experienced field training officer, regular mandatory in-service trainings, educational incentives such as access to the Department's Baccalaureate Program and the opportunity to receive continued training from the Command Training Institute at Babson College and other outside sources.  SMF ¶¶ 103, 105, 107, 108-110.  The Department's commitment to legal training was further underscored by its   requirement that all officers seeking promotion to higher ranks pass written promotional examinations testing knowledge of the law.  SMF ¶ 104.  Since there is no genuine dispute of fact that the Boston Police Department trained its employees to turn over all evidence, including exculpatory and impeachment evidence to the prosecuting attorney and not to deliberately conceal evidence in order to manufacture false convictions, Plaintiff's failure to train claim must be dismissed.

        iii**.** The Plaintiff cannot prove deliberate indifference without proof of a pattern of
            similar constitutional violations by police officers prior to Plaintiff's trial.

      Even if the Plaintiff was able to demonstrate that officers were not trained turn over exculpatory evidence to the prosecutor, he has failed to demonstrate that this alleged lack of training would have amounted to deliberate indifference by the municipality.   This is because Plaintiff has failed to demonstrate a pattern of similar constitutional deprivations that would have put municipal policymakers on notice of the alleged inadequacy of officer training prior to Plaintiff's trial.  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  Connick, 131 S.Ct. at 1360, citing Bryan Cty., 520 U.S. at 409.  "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their

action—the 'deliberate indifference'—necessary to trigger municipal liability.' " <u>Connick</u>, 131 S.Ct. at 1360, citing <u>Bryan Cty</u>., 520 U.S. at 407. "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." <u>Connick</u>, 131 S.Ct. at 1360.

As set forth above, the Plaintiff has not identified a single instance prior to Plaintiff's trial where police withheld evidence from a prosecuting attorney. In <u>Connick</u>, the plaintiff was convicted in 1985 of murder after the Office of Orleans Parish District Attorney's Office failed to disclose exculpatory evidence in violation of <u>Brady</u> disclosure requirements. <u>Id</u>. at 1355-57. The plaintiff bought a <u>Monell</u> claim against the District Attorney's Office based on a theory that the Office had failed to train its prosecutors on <u>Brady</u> disclosure requirements. <u>Id</u>. The Supreme Court held that without a demonstrated pattern of similar prior Brady violations, and proof that the District Attorney's Office was aware of such a pattern, the Office could not be deliberately indifferent to an obvious need for more or different <u>Brady</u> training. <u>Id</u>. at 1359-60. In the ten years prior to the plaintiff's conviction, Louisiana courts had overturned four convictions obtained by the Office because of <u>Brady</u> violations. <u>Id</u>. at 1360. The Supreme Court held that these four instances were not sufficient to constitute a pattern of conduct necessary to support a failure to train claim. <u>Id</u>. The Plaintiff in the instant case, who has failed to identify even one similar allegation of withholding evidence also cannot demonstrate a pattern of similar constitutional violations by untrained police employees necessary to support his claim.

iv. <u>The Plaintiff has failed prove deliberate indifference because he has introduced no evidence regarding what level of police training on disclosure of evidence was standard in 1972</u>.

The Plaintiff has failed to present any evidence whatsoever regarding what level of police training on disclosure of evidence would have been constitutionally required in 1972. In order to demonstrate deliberate indifference in training, a plaintiff must typically demonstrate that training was inferior by the standards of the profession. See <u>Whitfield v. Melendez–Rivera</u>, 431 F.3d 1, 12 (1st Cir. 2005); <u>Santiago</u>, 891 F.2d at 382.

Evidence of what police training on the topic of disclosure of evidence would have been standard or adequate in the 1960's and early 1970's is especially crucial here since the no-fault duty to disclose evidence did not even apply to police officers at that time. Without some evidence regarding what level of training was standard among police departments at the time, the Plaintiff has failed to show that the BPD's training fell significantly below this standard and thereby amounted to deliberate indifference.

The only evidence regarding other departments' training on <u>Brady</u> and disclosure requirements demonstrates that the Boston Police Department's training was sufficient, and indeed ahead of its time. The International Association of Chiefs of Police (IACP) and the National Law Enforcement Policy Center (NLEPC) assist law enforcement agencies across the country in developing and refining law enforcement policies. SMF ¶ 129. These model law enforcement policies are utilized by more than five hundred law enforcement agencies as a basis for their own internal policies. SMF ¶ 129. The NLEPC and IACOP did not create a model policy regarding <u>Brady</u> disclosure requirements and their applicability to police officers until April 2009. SMF ¶ 130.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants respectfully requests that this Court grant summary judgment on all claims remaining claims against him as alleged in the Plaintiff's Complaint.

RESPECTFULLY SUBMITTED,

**Defendants,**
**THE CITY OF BOSTON,**
**JOSEPH KELLEY, and**
**JOHN B. HARRINGTON,**

By their attorneys,

/s/ Hugh R. Curran
Hugh R. Curran, BBO# 552623
hcurran@bletzerlaw.com
Bletzer & Bletzer, P.C.
300 Market Street
Brighton, MA 02135
(617) 254-8900

/s/ Evan C. Ouellette
Evan C. Ouellette, BBO# 665943
Brody, Hardoon, Perkins &Kesten, LLP
One Exeter Plaza, 12th Floor
Boston, MA 02116
(617) 880-7100
eouellette@bhpklaw.com

DATED: August 2, 2013

## DEFENDANT'S CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)

I, Evan C. Ouellette, hereby certify pursuant to Local Rule 7.1(A)(2) that counsel for the Defendants, has conferred with counsel for the Plaintiff in the above-entitled action, in a good faith attempt to resolve or narrow the issues raised by the instant motion.

/s/ Evan C. Ouellette
Evan C. Ouellette

## <u>CERTIFICATE OF SERVICE</u>

I, Evan C. Ouellette, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 1, 2013.

<u>/s/ *Evan C. Ouellette*</u>
Evan C. Ouellette
