## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **JAMES A. HALEY,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CITY OF BOSTON, Former Boston Police Sergeant** | )     **No.: 1:2009cv10197-RGS** |
| **Detective JOSEPH KELLEY, and Former Boston** | ) |
| **Police Detective JOHN B. HARRINGTON, as well** | ) |
| **as yet UNKNOWN EMPLOYEES OF THE CITY** | ) |
| **OF BOSTON,** | ) |
| **Defendants.** | ) |

_____

### DEFENDANTS' L.R. 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF SUMARY JUDGMENT

### I.     Murder and Investigation

1.     In the early morning of July 11, 1971, David Myers was stabbed and shot to death in the apartment he shared with Gloria Custis and their infant child at 33 Glenarm Street in Dorchester, Massachusetts. See Supreme Judicial Court Opinion in Commonwealth v. Haley, 563 Mass. 513 (1973), attached as **Exhibit 1** at p. 6.

2.     Gloria Custis ("Gloria") had a sister named Brenda ("Brenda") Haley who was married to the Plaintiff, James Haley. Id.

3.     At approximately 5:25 a.m., officers were dispatched to 33 Glenarm Street, where they spoke with Custis. She told them that she was asleep with Myers in their beroom when they were awakened from noises coming from the kitchen. Myers went to investigate and she heard sounds of scuffling and a shot fired. She observed Myers locked in combat with Haley in their bathroom. Haley was armed with a knife and gun and Myers was bleeding. Gloria fled her apartment and ran for help to a nearby apartment at 28 Glenway Street, where her brother George Custis lived with a woman named Helen Davis. Officers spoke with Custis when she returned to her apartment shortly thereafter with her brother. Myers was found dead, shot and stabbed in the bathroom. See July 11, 1971 Boston Police Department Incident Report, attached as **Exhibit 3.**

1

4.      Gloria also told the responding officers that she believed Haley entered through a kitchen window with the intention of killing her sister Brenda.  Id.

5.      A window in the kitchen was observed to be open with the screen pulled up approximately 1 to 1 ½ feet.  In the back yard, there was a small bucket turned upside down directly underneath the open window, about 5 feet below the window edge. See Commonwealth v. Haley Trial Transcript, attached as **Exhibit 2** at pages 523-24.

## II.      The Transcribed Witness Statements

6.      Defendant Boston Police Sergeant Detective Joseph Kelley and Detective John Harrington participated in the investigation.  On the morning of the murder, July 11, 1971, at 9:25 and 9:55 a.m., Sgt. Det. Kelley took the statements from witness Gloria Custis and her sister Brenda Haley at, 28 Glenway Street in Dorchester ("the statements").  Det. Harrington was present for the statements.  See Boston Police Department Homicide File: (2) Copies of Commonwealth v. Haley Statements of Witnesses Gloria Custis, Brenda Haley and James A. Haley, attached as **Exhibit 4**.

7.      The oral statements of Gloria and Brenda were transcribed by Boston Police Department Stenographer Harold Kraus.  Id

8.      The transcript of Gloria's statement clearly indicates that it began at 9:25 a.m.  Exhibit 4 at p. 1.[1]

9.      In the statement, Gloria told police that when Myers was in the bathroom, she heard him scream: "James stabbed me.  James stabbed me."  She again stated that she had witnessed Haley, armed with a knife and gun, struggling with Myers in the bathroom and that she heard a gunshot before fleeing, screaming for help.  The statement included:

---

[1] The first page of Gloria Custis's transcribed statement does not have a page number.

Q: Gloria, is there any doubt in your mind about the identity of the man who you saw
struggling with David Myers in your bathroom this morning?
A: No. I looked right at him, I looked dead in his face."
Q: And for the record, who was it?
A: It was James Haley. <u>Id</u>. at p. 5.

10.    When asked if she knew any reason why Haley came to her home that morning, Gloria

stated, "It could be because he thought Brenda was staying with me because after James

stabbed David, I heard David asking him why he stabbed him, 'Why did you stab me because

Brenda isn't here,' that she wasn't staying with us." <u>Id</u>.

11.    In her statement, Gloria stated also that the last time she saw Haley, prior to "this

morning," was "about last month." <u>Id</u>. at p. 6.

12.    Brenda Haley also gave a transcribed statement, in which she stated that she was

living with Haley until May 3, 1971.  On that date, he punched her, cutting her face, and

threatened to kill her, so she left to stay with her parents in Delaware. <u>Id</u>. at pp. 7-9.

13.    Brenda also stated that she was pursuing a divorce and that on Friday July 9, 1971, she

returned to Boston and spoke with Haley on the phone at her lawyer's advice relative to the

divorce filing.   When asked why Haley would have gone to Gloria's apartment early in the

morning, she replied, "I would assume that he was looking for me more than likely to kill me

instead of him." <u>Id</u>.

14.    Brenda also stated that the last time she had seen Haley was "last month walking down

the street but not to talk to him, from a distance." <u>Id</u>. at p. 7.

15.    The next day on July 12, 1971, Sgt. Det. Kelley also took a statement from James

Haley at police headquarters.  This statement was also transcribed by Stenographer Harold

Kraus. <u>Id</u>. at pp. 11-14.

16.     As part of the transcribed statement of James Haley, Sgt. Det. Kelley states to Haley "we have Gloria who gave a <u>full and complete statement to me</u> putting you in the apartment, struggling with the victim and she heard a gunshot." <u>Id</u>. at p. 14.

17.     The transcribed statement dated July 11th at 9:25 is the only statement given by Gloria to Sgt. Det. Kelly. <u>Id</u>. at p. 1.

18.     The transcribed statements taken from Gloria Custis, Brenda Haley and James Haley by the stenographer were combined into a single document. This document was paginated with Gloria Custis' statement contained in pages 1-6, Brenda Haley's statement contained in pages 7-10, and James Haley's statement contained in pages 11-14. The document is titled <u>Commonwealth v. James Haley</u> and contains a cover sheet/ index which lists the document's contents and the corresponding page numbers on which each witnesses' statement begins. <u>Exhibit 4</u>.

19.     At trial, Haley's defense counsel Alfred Farese had a copy the transcribed statement given by Haley to Sgt. Det. Kelly, which is both referenced Gloria's statement and is paginated with numbers 11-14 as part of the document that also contained Gloria and Brenda's transcribed statements. <u>Exhibit 2</u> at pp. 537-42; <u>Exhibit 4</u>.

20.     There is no evidence that the trial prosecutor Gerald Muldoon did not receive pages 1-10 of this document, which contained the statements of Gloria and Brenda.

21.     On July 12, 1971 James Haley was arrested for the murder of David Myers.

**III.     <u>Criminal Proceedings</u>**

22.     A probable cause hearing was held on July 23, 1971, at which both Gloria and Brenda testified. <u>Exhibit 2</u> at pp. 267, 324-29, 363-66.

23.     James Haley was indicted by a grand jury for the first-degree murder of David Myers on September 13, 1971.  See <u>Commonwealth v. Haley Docket Sheet 1971 through 1993, attached as Exhibit 5</u>, at p. 1.

24.     Det. John Harrington graduated from law school prior to Haley's arrest.  See <u>Excerpt from Boston Police Department Personnel File of Detective John Harrington</u>, attached as **<u>Exhibit 33</u>**.

25.     On November 29, 1971, prior to the Haley's trial, Det. John Harrington died unexpectedly.  See <u>Death Certificate of John Harrington</u>, attached as **<u>Exhibit 20</u>**.

26.     Prior to trial, on or about December 30, 1971, Haley filed discovery motions, including a motion to be furnished with evidence favorable to the accused, seeking evidence that could be used to impeach the Commonwealth's witnesses, any inconsistent statements made to law enforcement officers, and prior inconsistent statements from those who testified during the trial, which was allowed at a pre-trial hearing on January 31, 1972.  <u>Exhibit 5</u> at pp. 3-5; <u>Commonwealth v. Haley Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment, dated August 26, 2008</u>, attached as **<u>Exhibit 6</u>** at p. 2; <u>Defendant's Motion to Be Furnished with Evidence Favorable to the Accused</u>, attached as **<u>Exhibit 7</u>**.

27.     Haley also filed a Motion to Inspect and Copy Statements Made by Defendant, which was also allowed at the pre-trial.  <u>Exhibit 5</u> at pp. 3-5; <u>Defendant's Motion to Inspect and Copy Statements Made by Defendant</u>, attached as **<u>Exhibit 8</u>**.

28.     Haley also filed a Motion to Inspect Statements of Commonwealth's Witnesses.  The Commonwealth did not assent to this motion at the pre-trial and the court deferred ruling on it to the trial judge.  Prior to empanelling the jury, the trial judge took up this motion and **denied** it.  <u>Exhibit 5</u> at pp. 3-5; <u>Exhibit 6</u> at p. 2; <u>Defendant's Motion to Inspect Statements of Commonwealth's Witnesses</u>, attached as **<u>Exhibit 9</u>**.

29.     Haley also filed a Motion to be Furnished with Statements Concerning Identification, and a Motion for Inspection of Grand Jury Minutes.  The Commonwealth did not assent to either of these motions at the January 31, 1972 pre-trial and the pre-trial judge also deferred ruling on them to the trial judge.  Prior to empanelment, the trial judge took up these motions.  Again, the Commonwealth did not assent.  The court <u>denied</u> Haley's motion for statements concerning identification, because Gloria "was virtually an eye witness to this affair, and that she is the sister-in-law of the defendant."  The court also <u>denied</u> Haley's motion for inspection of Grand Jury Minutes, "stating that the court would review the minutes and allow defense counsel to inspect them only if the Court determined that they contained matters which are material and important to the defense of the case."  <u>Exhibit 2</u> at pp. 5-8; <u>Exhibit 5</u> at pp. 3-5; <u>Exhibit 6</u> at p. 2

30.     Jury empanelment started on Monday, February 28, 1972 before Judge Roy.  Assistant District Attorney Gerald Muldoon represented the Commonwealth.  <u>Exhibit 2</u> at pp. 1,9.

31.     Haley was represented at trial by Attorney Alfred Farese.  Prior to empanelment, Attorney Farese requested a 48-hour continuance of the trial.  He stated that he had just completed another murder trial in Rhode Island two days earlier and that "by me being forced to trial today, I wouldn't have adequate time to prepare a case properly."  The judge denied the request to continue and empanelled the jury.  <u>Exhibit 2</u> at pp. 1,4-5.

32.     At trial it was established that Brenda and James Haley had lived together with Gloria Custis and David Myers at 33 Glenarm Street Apartment in February and March 1971.  <u>Exhibit 2</u> at pp. 229-31.

33.     Brenda testified that on May 3, 1971, she and Haley got in an argument, which involved Haley striking Brenda in the face and cutting her eye.  She left that same day on a bus to stay with her parents in Delaware.  <u>Id.</u> at pp. 356-59.

34.     On cross-examination, defense counsel quoted Brenda's testimony at Haley's probable cause hearing: "I left to leave James Haley [to go to Delaware], because when I left him, he

threatened me not to leave.  I thought the only way I could be safe from him was to leave the state." Id. at p. 365.

35.     Brenda returned to Dorchester on July 9, 1971, in order to obtain a divorce from Haley, at which time she stayed with her sister Barbara at 12 Mount Bowdoin Terrace.  Id. at pp. 358-61.

36.     Brenda testified that after she returned to Dorchester on July 9, 1971, she called Haley from Boston and spoke with him regarding the divorce.  Id. at pp. 359-61, 377.

37.     Brenda also testified that on Saturday, July 10th, while she was with Gloria, she saw Haley "in a food store at the corner of Glenarm and Washington and he had been in the store and out the store again when [she] saw him;" they did not speak to Haley, but she "guessed" Haley recognized them when he looked down the street because "he just stood there for a few minutes and then he walked along;" and when she saw Haley, "[i]t was in mid-afternoon, about maybe four or five, maybe six."  Exhibit 2 at pp. 354-78; Exhibit 6 at p. 8; Supreme Judicial Court Opinion in Commonwealth v. Haley, 413 Mass. 770 (1992), attached as **Exhibit 10** at page 8.

38.     Gloria also testified at length regarding the circumstances and events leading up to and after Myers' murder, including identifying Haley as the person she saw struggling with Myers in her apartment bathroom with a gun and knife, hearing one gunshot and hearing Myers stating that "James stabbed me."  She also testified to hearing Myers state, "why did you stab me, man? Brenda's not here."  Exhibit 2 at pp. 229-256; Exhibit 6 at pp. 11,18.

39.     Gloria also testified that on July 10, 1971, she saw Haley on the corner of Glenarm and Washington "late in the afternoon."  At that time, Haley "just looked at [them]."  Exhibit 2 at pp. 233-236, 270-73; Exhibit 6 at p. 3.

40.     Attorney Farese was Haley's counsel at the July 23, 1971 probable cause hearing.  He cross-examined both Gloria and Brenda at this hearing.  He also had a copy on the transcript

of Gloria and Brenda's probable cause hearing testimony, which he used it to impeach both witnesses at trial.  Exhibit 2 at pp. 267, 324-29, 363-66.

41.     Referring to her testimony at Haley's probable cause hearing, defense counsel inquired of Gloria:

> Q:  Now, on July 23rd of 1971 were you ever asked this question? "When did you see James that day for the first time."  Were you ever asked that question?
> …
> Q:  Wasn't your answer, "I didn't see him at all that day until he entered my house at five o'clock in the morning?"  Id. at pp. 328-29.

42.     Attorney Farese did not renew his Motion to Inspect Statements of Commonwealth Witnesses, or his Motion to be Furnished with Statements Concerning Identification, or his motion for inspection of Grand Jury Minutes either during or after the testimony of Brenda or Gloria.

43.     At trial, Sgt. Det. Kelley testified that on the morning of July 11, 1971, he went to 28 Glenway Street where he saw Gloria, Brenda and Helen Davis and spoke both Gloria and Brenda.  Id. at pp. 526-527.

44.     On cross-examination by defense counsel, Sgt. Det. Kelley testified:

> Q:  Now at some time you say you talked to Gloria Custis and Brenda Haley was there?
> A:  I did
> Q:  And this was the morning of the alleged incident?
> A:  Yes, sir.
> Q:  And Brenda was there at what street?
> A:  Glenway.
> Q:  Glenway Street.  And what time did this conversation take place?
> A:  About 9:30 a.m.
> Q:  Is there anything in your records to indicate what time it took place?
> A:  I have it in the statement, yes, 9:25 to be exact.  Id. at p. 542.
>
> Q:  Now do you have anything to indicate what time you went to the home of the Davis's?

A:  Yes.
Q:  And what time was that?
A:  9:25 a.m.  <u>Id</u>. at p. 544.

45.    Page one of Custis's transcribed statement clearly indicates that it was taken at 9:25 a.m. and it is the only document in the homicide file that references this time. <u>Exhibit 4</u> at p. 1.


46.    In his defense, Haley called Alice Marsh as an alibi witness who upon examination by Attorney Farese confirmed Haley had been in Dorchester in the afternoon of July 10, 1971. This *defense* witness testified she saw Haley at approximately 5:00 p.m. at 28 Richmond Street in Dorchester, which was just a few blocks from where Gloria and Brenda claimed to have seen him around this time.  <u>Exhibit 2</u> at pp. 639-643.


47.    On March 3, 1972, after 5 days of trial, the jury returned a guilty verdict of murder in the first degree.  Haley was sentenced to life in prison.  <u>Exhibit 1</u> at p. 6.


48.    Beginning in 1988, Haley sought post-conviction relief by way of several Motions for New Trial in Suffolk Superior Court and a Petition for Habeas Corpus in Federal Court, each alleging ineffective assistance of counsel by Attorney Farese.  In support his claim, Mr. Haley submitted affidavits which stated that Attorney Farese was clearly inadequately prepared for trial and that Haley had attempted both before and during trial to fire Farese.  He also stated that from the time of his arrest up until trial, he had attempted on multiple occasions to contact Farese to discuss his case and prepare for trial but Farese never returned his calls. Even during the trial, during recesses and breaks, Attorney Farese would not confer with Haley regarding defense strategy.  <u>Exhibit 5</u> at pp. 11-15; <u>Affidavit of James Haley in Support of Motion for a New Trial, dated April 27, 1987 and Affidavit of James Haley, undated</u>, attached as **<u>Exhibit 11</u>**.


49.    In support of his ineffective assistance of counsel defense, Haley submitted a letter from Attorney Tim Rieser of the Harvard Negotiation Project, who reviewed the transcript of Haley's trial, and wrote that "it is the most outrageous example of a defense attorney's

incompetence that I have seen.  It is truly horrifying that a lawyer can defend a first degree murder case that carries the death penalty with so little preparation."  "My own feeling is that a first year law student would have done better."  See Letter from Attorney Tim Rieser, Dated June 30, 1984, attached as **Exhibit 12.**

50.     In response to inquiries from Haley and ultimately the Board of Bar Overseers, in September 1982, Attorney Farese indicated that he had lost his entire file for the Haley case, perhaps in a flood.  See Letter from Attorney Alfred Farese, Dated September 7, 1982 and Letter from James Haley, Dated September 3, 1976, attached as **Exhibit 13.**

51.     Attorney Alfred Farese, Assistant District Attorney Gerald Muldoon and Judge Roy are all deceased.

**IV.     Post Conviction Proceedings**

52.     In 2006, Haley filed requests pursuant to the Public Records Act with the Suffolk County District Attorney and the Boston Police Department ("BPD"), seeking all documents in their possession concerning his case.  The District Attorney's Office responded that it was unable to locate any portion of Haley's case file.  Exhibit 6 at pp. 18-19.

53.     On February 14, 2006, the Boston Police Department sent Haley 60 pages of documents from the David Myers homicide file.  The file contains (2) separate copies of the Commonwealth v. Haley witness statements document, including the cover sheet/ index and the paginated transcribed statements of Gloria (pages 1-6), Brenda (7-10), and Haley (11-14).  Exhibit 6 at p. 19; Exhibit 4.

54.     In addition to the statements, the BPD file also included a form entitled  "City of Boston Police Department Bureau of Field Operations List of Material Submitted to the Office of the District Attorney," dated September 1, 1971.  It was prepared by Sgt. Det. Kelley for the Haley prosecution and, indicates that "Reports of Officers" and "Statements" were included among the materials submitted to the District Attorney.  See Boston Police Department Homicide File: City of Boston Police Department Bureau of Field Operations

List of Material Submitted to the Office of the District Attorney, Dated September 1, 1971, attached as **Exhibit 14**.

55.     The BPD file also included a memorandum summarizing Sgt. Det. Kelley's testimony before the grand jury on September 10, 1971, indicating that he "testified in essence to the statement of one Gloria Custis." See Boston Police Department Homicide File: Memo regarding Sgt. Det. Kelley's Testimony before the Grand Jury, attached as **Exhibit 15**.

56.     The BPD file also included Sgt. Det. Kelly's handwritten notes which indicate, "about 9:30 a.m. I went to 28 Glenway St. home of Helen Davis and talked to Gloria Custis and took a statement from her and also a statement from Brenda Haley." See Boston Police Department Homicide File: Sgt. Det. Kelley's Notes Regarding Witness Statements, attached as **Exhibit 16** at p. 2.

57.     The BPD file also included a report and statement of a February 25, 1972 interview with Shirley Savage, who stated that on July 11, 1972, at about 5:00 a.m., she observed Gloria running up Glenarm Street yelling, "Help Me," and heard three gunshots fired fairly close together. See Boston Police Department Homicide File: Transcribed Statement of Shirley Savage, attached as **Exhibit 36**.

58.     In October 2007, Haley filed a motion for new trial on grounds that the Commonwealth's failure to disclose Gloria and Brenda's statements deprived him of due process. He also sought and was granted post-conviction discovery. On October 5, 2007, the Commonwealth informed Haley that it could not locate the trial or appellate files for his case. Exhibit 6 at p. 19.

59.     On December 21, 2007, the Commonwealth represented by Assistant District Attorney David Meier moved to vacate Haley's conviction and allow a new trial. See Commonwealth v. Haley, Commonwealth's Motion to Vacate Conviction and Grant New Trial, Dated December 21, 2007, attached as **Exhibit 17**.

60.     In its motion, the Commonwealth noted that Gloria and Brenda's transcribed statements neither exonerated Haley nor implicated a third-party in Myers' murder, and that the statements merely contained information that could have been used to impeach Brenda and Gloria at trial regarding certain factual issues.  The Commonwealth also noted that its review of the 1971 investigation and prosecution of Haley "does not exonerate him."  The motion was allowed.  Id. at p. 2.

61.     Thereafter, the Commonwealth indicated its intent to retry Haley on the murder charge.  On May 29, 2008, Haley filed a discovery motion seeking the grand jury minutes, the transcript of the probable cause hearing, exhibits introduced by the Commonwealth at the criminal trial, and other evidence relative to the investigation of Myers' murder.  By letter dated June 13, 2008, the District Attorney's Office notified Haley that its entire case file had been inadvertently lost or destroyed. Exhibit 6 at p. 19-20.

62.     Transcripts of the July 23, 1971 probable cause hearing and grand jury proceedings have never been located.

63.     On June 27, 2008, Haley moved to dismiss the indictment with prejudice.  On August 26, 2008, the Superior Court allowed Haley's motion without prejudice.  In doing so, the court found that Haley "cannot prove that Gloria and Brenda's police statements were in fact withheld from the grand jury because all records of the grand jury proceedings have been inadvertently lost or destroyed by the Commonwealth."  Id. at pp. 20, 23,38.

64.     The Court found that Haley showed prejudice by loss of grand jury minutes and the unavailability of Shirley Savage, and that it is extraordinary for a defendant to face retrial without the benefit of the original trial file.  The court found that Gloria and Brenda's statements were only significant in that they could be interpreted to mean that the July 10, 1971 encounter with Haley did not occur, thus undermining Gloria's credibility.  The court found that the statements did not alter or qualify Gloria's identification of Haley as Myers' assailant; nor did the statement suggest anyone else as the assailant.  The Commonwealth did not re-indict Haley.  Id. at pp. 28-34.

65.     Former Assistant District Attorney David Meier testified at his deposition that he had no knowledge whether or not Gloria's and Brenda's statements were contained in the District Attorney's files or whether or not the BPD provided the statements to the District Attorneys' Office.  Attorney Meier also confirmed that the trial and appellate file in Commonwealth v. Haley was lost or inadvertently destroyed.  See Deposition Transcript of Attorney David Meier, attached as **Exhibit 18** at pp. 30, 72-74.

66.     Attorney Thomas Dwyer, a purported witness for the Plaintiff, testified at his deposition that he started as an assistant district attorney in Suffolk County in the spring or early summer of 1972.  He noted that the Suffolk County District Attorneys' Office had a policy at the time to not disclose witness statements and grand jury minutes**.**  See Deposition Transcript of Attorney Thomas Dwyer, attached as **Exhibit 19** at pp. 11, 79-80.

67.     In addition, Mr. Dwyer stated that when he arrived in the District Attorneys' Office they "did not have a consistent practice with respect to the disclosure of exculpatory evidence." Id. at pp. 89-90.

68.     On June 21, 2002, Sgt. Det. Joseph Kelley died.  See Death Certificate of Joseph Kelley and Norfolk Probate and Family Court Filings and Docket, attached at **Exhibit 21**.

69.     Joseph Kelley's estate was probated and subsequently closed on May 5, 2009.  Id.

**V.      Boston Police Department Training Regarding Disclosure of Evidence Prior to Plaintiff's 1972 Trial**

70.     In the late 1960's and early 1970's prior to Plaintiff's criminal trial, the Boston Police Department operated the Boston Police Training Academy, the satisfactory completion of which was mandatory for all new Boston police recruits.  See Deposition Transcript of Robert Wasserman, attached as **Exhibit 22** at p. 41.

71.     The Training Academy was approximately sixteen weeks in duration.  See Deposition Transcript of Thomas Miller, attached as **Exhibit 23** at p. 35; Deposition Transcript of Paul Evans, attached as **Exhibit 24** at pp. 6-7.

72.     In the late 1960's and early 1970's, prior to Plaintiff's criminal trial, the Training Academy curriculum involved instruction on multiple topics including constitutional law, criminal law, report writing and courtroom procedure. Exhibit 22 at p. 61; Exhibit 23 at p. 35. Deposition Transcript of Robert Dunford, attached as **Exhibit 25** at p. 15.

73.     The curriculum for the topic of courtroom procedure consisted of instruction on the make-up of the court system, the differing roles of the police, prosecutor and defense attorney, the proper presentation of the government's case in court and instruction on testifying in court as a witness.  This training stressed the importance of police witnesses being honest at all times.  Exhibit 22 at pp. 62-63; Selected 1968 Boston Police Department Academy Training Materials, attached as **Exhibit 26.**

74.     The Training Academy's courtroom procedure curriculum also involved the recruits engaging in mock-trials. Exhibit 22 at pp. 62-63; Exhibit 26.

75.     Local Judges also lectured to recruits regarding law and courtroom procedures and recruits spent time observing actual court sessions.  Deposition Transcript of Herbert Spellman, attached as **Exhibit 27** at pp. 36-38; Exhibit 26.

76.     The Academy's training regarding report writing instructed officers to take statements from witnesses and to include all of these statements within their written report, regardless of whether the statements were exculpatory.  Officers were also trained to turn all of the reports they created to the detective assigned to the case.  Exhibit 22 at pp.6 1-62, 84-85, 109-10.

77.     Prior to 1973, Boston Police Captain William Hogan served as the Commanding Officer at the Boston Police Academy and oversaw its operations.  Id. at p. 33.

78      The Training Academy's constitutional law curriculum was taught by Captain William Hogan.  Id. at p. 44.

79.     Captain Hogan was well respected for his abilities as a police legal instructor.  Id. at p. 129; Exhibit 25 at p. 81-82.)

80.     Captain Hogan also stressed ethics and the importance of honesty, integrity and always telling the truth within his training on the law.  Exhibit 22 at pp. 44, 54 119; Exhibit 24 at pp. 109-10); Exhibit 25 at p. 33.

81.     As part of the Academy's constitutional law curriculum, Captain Hogan instructed recruits regarding the content and application of the United States Constitution and its Amendments, including the Fourth and Fourteenth Amendments, and the right to Due Process of Law. Exhibit 22 at p. 53-54; Exhibit 26.

82.     As part of the constitutional law curriculum, Captain Hogan also instructed all recruits regarding protecting the civil rights of the accused.  Exhibit 25 at pp.15-16; Exhibit 26.

83.     As part of the Academy instruction on constitutional law, Captain Hogan focused on major cases and recent cases that had come out to ensure recruits understood what they had to do under those rules. Exhibit 22 at p. 49; Exhibit 26.

84.     Recruits were given written examinations with regard to topics at the academy, including constitutional law, due process protection and civil rights.  Exhibit 22 at p. 56

85.     The Academy training, including Captain Hogan's law curriculum, instructed officers to turn over all evidence, including exculpatory and impeachment evidence to the prosecutor and not to withhold any evidence regardless of whether it would aid the defense.  Multiple former Boston Police employees police who graduated from the Training Academy prior to 1972 were deposed in this matter and all testified regarding their training with respect to

turning over all evidence to the prosecutor. Relevant excerpts of their testimony on this topic are included below.

86.      Edward McNelley is an attorney and retired Boston Police Lieutenant Detective. He earned his law degree in 1989. He graduated from the Boston Police Training Academy and began serving as a patrolman in 1970. He was promoted to Detective in 1974 and Lieutenant in 1983 before retiring in 2003 as a Captain Detective. <u>Deposition Transcript of Edward McNelley</u>, attached as **Exhibit 28** at pp. 6, 10, 21, 29, 109.

87.      Former Captain Detective McNelley testified to the following:

> Q: Now, when you received your training at the Boston Police Department Academy in 1970, were you trained about the disclosure of evidence?
> A. Yep.
> Q. What were you trained?
> A. That we were to turn everything over that we had, both pro and con to the district attorney or to the prosecuting officer. <u>Id</u>. at p. 69.

> Q: So going back to your training at the police academy, you said you were trained to turn everything over pro and con?
> A. That's correct.
> Q. When did you receive that training?
> A. 1970.
> Q. And in what course did you receive that training?
> A. It was either criminal law or constitutional law or both. I mean, it was brought up numerous, numerous times during the academy.
> Q. And when you say "brought up numerous, numerous times," in multiple courses or within the same course?
> A. In multiple courses. I mean, it was a subject matter that they emphasized to you. You have basically no interest in the outcome of a case.
> Q. And you believe that came up either in criminal law or constitutional law?
> A. It did.
> Q. It came up in both?
> A. Well, I mean, you know, the courses, I mean, it wasn't we're going to stop criminal law and we're going into constitutional law and you didn't talk about criminal. I mean, they went back and forth. Hogan generally was the instructor. Now, specifically, did other people come in and talk, I don't remember, but Hogan was generally the instructor. So I mean, you can't isolate a concept because you're in criminal law as opposed to constitutional law. It just kind of runs through it. <u>Id</u>. at pp. 72-74.

Q. Well, in your in-service training between 1970 and 1973, did you receive updates on the law?

A. We did. I did.

Q. And in your in-service training between 1970 and 1973, were you ever trained or instructed about the disclosure of impeachment evidence?

A. We were always trained that all evidence is turned over, all evidence. Now, I mean, did they specifically break it down between this kind of evidence and this, it was all evidence. There was nothing that was excluded. Id. at p. 89.

88.    Robert Dunford completed the Academy and began serving as a patrolman in 1970. He was promoted to Sergeant in 1975 and Lieutenant in 1978. He served as the Department's Manager of its Division of Training and Education from 1983-1991. He subsequently served as the Superintendent in Chief of the Department from 2007 until he retired in September 2009. He currently teaches police tactics through the Massachusetts Municipal Police Training Counsel. Exhibit 25 at pp. 7, 10-11.

89.    Former Superintendent Dunford testified to the following:

Q: When did you first receive training on turning over impeachment evidence?

A. In the basic academy.

Q. So that's during that what you called phase one?

A. Yeah. And I only use the phases to describe the difference between going for eight weeks --

Q. Right.

A. -- and then going -- so. We were trained to turn over all evidence, whatever we found, good or bad, indifferent, to turn it over. Id. at p. 37.

Q.  And you said -- it's your testimony also that you were trained to turn over impeachment evidence as part of your initial academy training?

A.  Well, I wouldn't say that we called it impeachment evidence. We were trained to turn over all evidence whether it was good, bad or indifferent.

Q. Just to be clear and I think you've answered this indirectly. So were you trained on the difference between exculpatory and impeachment evidence?

A. When?

Q. During your academy training, let's start with that.

A. I would have to say yes. I can't remember specifically, but again we were trained to collect evidence, protect the crime scene and to turn everything that we found over to the investigating officers. So you know, if somebody came in and said you did something and then somebody else said no, that he does have a description, I had to submit both of those, both that somebody identified you and somebody else said no, that you didn't and that went into the form 26 that went to the detectives and the district attorney. Id. at pp. 38-39.

Q. To the best of your recollection, when did you first receive training on turning over exculpatory evidence?

A. Probably as soon as I went to the academy. We talked about report writing, and the duties and responsibilities of patrolmen.

Q. So is it your testimony that training on turning over exculpatory information -- or evidence was part of the report writing training?

A. It was part of -- I mean it was part of the duties and responsibilities of a patrolman. For example in report writing, we were instructed to put everything into the reports. There were two reports. The first one is called a 78. It was an IBM card and that's where it got the name 78 and that was a basic summary of what took place. Then we did what we call a form 26 which is a -- it's called a form 26 because that's the form that was written on, it's a to/from/subject slip, and that's where the detailed information that you received was put into the report. And the original of that report went to the detectives and you kept a copy for your case file. In preparing for court for example, we were instructed that we would remain neutral. We were not to take a side. That we were to present to the Court all evidence that we had whether it supported our hypothesis or the probable cause we'll say that you committed the crime or any evidence that we found that may show that you didn't commit a crime. And Captain Hogan continually stressed our ethical responsibility as law enforcement officers. <u>Id</u>. at pp. 31-33.

90.     Thomas Miller graduated the Academy and began serving as a patrolman in 1970. He was promoted to Detective in 1983 and was assigned to the Homicide Division in 1990. He served as an instructor for the Massachusetts Criminal Justice Training Counsel in the 1980's and at the Training Academy in the 1990's. At the time of his retirement in 2002, he was assigned as a Sergeant Detective within the Division of Internal Affairs. <u>Exhibit 23</u> at pp. 5-6, 9-10, 45, 63.

91.     Former Sergeant Detective Miller testified to the following:

Q. So when you were a police trainee, for lack of a better term, in 1970, were you taught anything specific about turning over reports to the prosecutor?

A. Specifically, just you turn everything over, everything you acquire during your investigation, if you did an investigation, or anything you acquire as a first responder. <u>Id</u>. at pp. 45-46.

Q. Now, you said that it was a hard-and-fast rule that you turned over evidence.

A. Yes.

Q. What is the source of that hard-and-fast rule?

A. It would have been from the academy training. <u>Id</u>. at p. 53.

Q. Okay. Again, during the course of your training at the academy, were you trained that if you had evidence or information that went to an accused's innocence, that you had an obligation to turn that information over to the district attorney's office?

A. Absolutely. <u>Id</u>. at p. 87

Q Were you ever taught that evidence that would undermine the credibility of a witness, say, for example, because they gave two conflicting statements, had to be disclosed to the prosecutor?

A. Yeah. Oh, sure.

Q. But you were never actually taught what the definition of impeachment evidence was?

A. No, I didn't know in what context you were using it. I know what the word "impeachment" means. But in that context, oh, yeah, absolutely you turn it over.

Q. And that was based on what obligation? What's the basis for that requirement?

A. The basic concept of fairness. <u>Id</u>. at pp. 88-89.

92.     Herbert Spellman graduated from the Academy and began serving as a patrolman in 1968. He was promoted to Detective in 1974 and to Sergeant in 1988. He worked as a homicide investigator beginning in 1991. <u>Exhibit 27</u> at p. 11.

93.     Former Sergeant Detective Spellman testified to the following:

Q. And what do you remember Captain Hogan teaching you about Brady during your academy training?

A. I think there was a requirement that you'd turn over all reports to defense counsel. <u>Id</u>. at p. 45

Q. Sure. Do you remember being tested about the duty to disclose evidence to either defense counsel or the district attorney's office when you were a recruit --

A. I believe that was part of Captain Hogan's lecture. <u>Id</u>. at p. 49.

Q. Do you recall ever getting in-service training about the duties to disclose documents to a defense attorney?

A. We had that at the academy by Captain Hogan and Judge Adlow. <u>Id</u>. at p. 53.

Q.  Do you recall receiving any special orders while you were a police officer in Roxbury relating to Brady?

A. None that I can recall.

Q. Do you recall receiving any special orders when you were a police officer in Roxbury about the duties to disclose evidence?

A. Oh, yes.

Q. What do you recall about those special orders?

A. To turn everything you have over to the defense counsel, and the district attorney's office when they were there. We were told not to hold anything back, whether it went to the guilt or innocence, just to turn everything over.

Q. And that information was contained in the special order?

A. Yes.

Q. Do you remember what year you received that special order?

A. That would be in the academy. That was after Captain Hogan started.

Q. So would the training that you received on whether to disclose evidence, or to disclose evidence, that would be at the police academy?

A. Yes. Id. at pp. 56-57.

Q. And what do you recall being trained when you were a detective?

A. To disclose everything we had to the assistant district attorney. Id. at pp. 66-67.

Q. So again, when you came on to the Boston Police Department and went through the academy with Captain Hogan, you were taught that if you had information that went to the guilt or the innocence of the accused, you were to provide it to the court and to the DA?

A. That's correct. Id. at p. 141.

94.     Paul Evans is an attorney and retired Boston Police Commissioner. He earned his law degree in 1987. He graduated from the Academy and began serving as a patrolman in approximately April 1971. He was promoted to Lieutenant in 1978 and was appointed Deputy Superintendent in 1980. He served as the Commissioner of the Boston Police Department from 1994 until 2003. Exhibit 24 at pp. 5-7, 64-65.

95.     Former Commissioner Evans testified to the following:

Q. So you don't know how a detective would disclose evidence to a prosecutor in a homicide case between 1970 and 1972.

A. Well, I know that they'd hand over everything -- we all had to hand over everything we had. If I made the arrest and homicide came in later and I was actually the arresting officer in a homicide, then whatever I had, I'd turn it over actually to the DA or make sure that the homicide people did. It depended on the role you played in a case as to what you did.

Q. And you said, "I know that they would turn over everything." How do you know that they would turn over everything?

A. Well, they were required to.

Q. Outside of the requirement to hand over everything, do you have any knowledge that detectives handed over everything to prosecutors between 1970 and 1972 in homicide cases?

A. Rules, training and policy required them to do so. Whether they individually did so, I don't know. But I know what the policies were. Id. at pp. 134-35.

96.     There was no policy at the Boston Police Department that instructed Police Officers not to turn over exculpatory evidence.  Exhibit 22 at p. 119.

97.     From 1950 up through 1972, the Boston Police Department maintained and updated its Rules and Regulations.  See Rules and Regulations of the Boston Police Department of the City of Boston, attached as **Exhibit 29**.

98.     Recruits were provided with a copy of the Department's Rules and Regulations at the Academy and these rules were incorporated into their training and instruction.  Exhibit 25 at p. 19; Exhibit 26.

99.     Rule 43 of the Rules and Regulations of the Boston Police Department is entitled "Courts, Evidence" and was in effect in from 1950-1972.  It states that a police officer "shall give evidence with the strictest accuracy, confining himself to the case then before the court, neither suppressing nor overstating the slightest circumstance with a view to favoring and person, or from ill will to either side."  Exhibit 29.

100.    Rule 43 further states, "[w]hen cross-examined, he shall answer with the same readiness and civility as when giving evidence in support of the charge, remembering that the ends of justice will be best served by  desire  simply to tell the whole truth, whether in favor of or against the prisoner."  "A police officer who is criticized by the court because of his testimony or behavior, or for giving improper or unsatisfactory evidence, shall make a report of the facts to his commanding officer who in turn will report to the superintendent."  Exhibit 29.

101.    Officers were trained on Rule 43 and understood Rule 43's direction to give evidence with the strictest accuracy, neither suppressing nor overstating the slightest circumstance with a view to favoring and person, or from ill will to either side as consistent with their academy training that exculpatory evidence must be disclosed and not withheld from the prosecuting attorney and criminal defendant.  Exhibit 24 at pp. 105-108; Exhibit 25 at pp. 37-39; Exhibit 28 at pp. 82-86; Exhibit 29.

102.    Rule 34 of the Rules and Regulations is entitled "Conduct, Deportment, and General Provisions" and was in effect in from 1950-1972.  It states that "[i]n the performance of his duty, a member of the force must display the following qualifications: be truthful at all times whether under oath or not." Exhibit 29.

103.    After completing the Academy, officers were required to complete a one-year probationary period.  They were also assigned to work with an experienced officer who served as a field training officer for a period of weeks after completing the academy.  Exhibit 22 at pp. 73-74; Exhibit 23 at pp. 43-44.

104.    After graduation from the Training Academy, Captain Hogan remained available to all members of the Department to provide advice and answer questions regarding any issues in the law that arose during their duties.  Many officers took advantage of Captain Hogan's availability to answer their questions while in the field and he was very responsive to these requests.  Exhibit 22 at p. 59.

105.    In 1971 and 1972, the Boston Police Department held regular in-service trainings for patrolmen.  These trainings lasted for one approximately one week and were held approximately once each year.  The Police Department also held in-service trainings for detectives.  See 1971 Boston Police Department Special Orders, attached as **Exhibit 30**, at pp. 3, 9,11,16; 1972 Boston Police Department Special Orders, attached as **Exhibit 31** at p. 8; Exhibit 23 at p. 47; Exhibit 25 at pp. 23-25.

106.    Officers seeking promotion to higher ranks, such as sergeant, captain or lieutenant were required to pass written promotional examinations.  These examinations mainly tested knowledge of the law.  Exhibit 22 at p. 106; Exhibit 30 at pp. 5,7.

107.    Beginning in 1968 and continuing through 1972, the Boston Police Department offered the Police Baccalaureate Program.  This program involved a full-time four-year program, through which active police officers would study programs relevant to law

enforcement and earn a Bachelor of Arts or Bachelor of Science degree from Boston State College. Approximately twenty-five officers entered into the program each year. These officers were released early from their tour of duty to attend class. In 1972, the first class of the Baccalaureate Program graduated, with nineteen Boston Police Officers receiving either a B.S or B.A. Exhibit 30 at pp. 4,6,8; Exhibit 31 at pp. 3,5-7,9.

108. In 1972, the Collective Bargaining Agreement between the Boston Police Department and the Patrolman's Union included an education incentive clause which paid monetary incentives to all officers to enroll in higher education programs, including master's degree and juris doctorate programs in fields of study related to law and law enforcement. Exhibit 31 at pp. 9,11.

109. Beginning in 1967 and continuing through 1972, the Command Training Institute at Babson College, which was directed by retired Boston Police Superintendent John Howland, and sponsored by the New England Association of Chiefs of Police offered a three week training to Boston police officers with command or supervisory responsibilities. The Department advertised this opportunity to all its employees and encouraged participation. Exhibit 30 at p. 10.

110. The Department also advertised additional outside educational opportunities to its officers, such as adult education programs designed for police. Exhibit 31 at pp. 2,4,12.

111. Robert Wasserman joined the Boston Police Department as a civilian in early 1973 when he became the Department's Director of Training and Education. He served in this capacity until 1976. In this position, he oversaw Department's Training Academy as well as all other trainings at the recruit, in-service, supervisory and management levels. Exhibit 22 at p. 32.

112. From 1976 to 1978, Mr. Wasserman served as the Assistant to the Police Commissioner for Operations, where he was in charge of overseeing all the operations of the Police Department. Exhibit 22 at p. 34.

113.    Mr. Wasserman now manages a small private police consulting group.  Id. at p. 13.

114.    In his declaration, Mr. Wasserman opines that Boston police officers did not receive any training regarding the duty to disclose exculpatory or impeachment evidence to the prosecution as of 1972.  See Declaration of Robert Wasserman, attached as **Exhibit 32**.

115.    Robert Wassermann had no involvement whatsoever with the Boston Police Department's training academy prior to joining the Department in 1973.   He also had no knowledge as to what police training was being conducted by the Department prior to joining in 1973.  Exhibit 22 at pp. 27-28.

116.    Robert Wasserman has no direct knowledge as to whether the duty to disclose exculpatory evidence was taught at the academy prior to joining the Department in 1973.  Id. at pp. 27-28, 126-27.

117.    While serving as Director of Training and Education, he never once spoke with the Academy's prior Commanding Officer, Captain Hogan about whether the duty to document or disclose exculpatory evidence was taught or trained.  He was never informed by Captain Hogan that this duty was not taught and trained.  Id.

118.    Robert Wasserman bases his entire opinion that police officers were not trained to disclose exculpatory evidence leading up to 1972 on the fact that when he joined the Department in 1973, he reviewed the written training materials that were being used at the Academy and is not aware that these materials expressly dealt with turning over exculpatory or impeachment evidence.  Id. at pp. 126-27, 130-31.

119.    Regarding the basis for his belief that this topic as not instructed prior to his arrival, Mr. Wasserman testified:

Q. Is it fair to say that when you took over as director of training and education at the Boston Police Department in 1973 that you did an extensive review of all the training and training materials as it existed in the Boston Police Department at that time?

A. I did.

Q. So is it fair to say that you had extensive knowledge of the training in the Boston Police Department at that time?

A. I did.

Q. Is it fair to say that you had extensive knowledge of the training materials that existed at that time?

A. I did.

Q. To the best of your knowledge, did any of those training materials deal with turning over exculpatory or impeachment evidence?

A. Not that I'm aware of. Id. at pp. 130-31.

Q. Did you ever talk with Captain Hogan about whether he taught the duty to document exculpatory evidence?

A. No, I did not talk with him about that.

Q. Did you ever talk with him about whether or not he taught the duty to disclose exculpatory evidence?

A. I did not.

Q. You did not become aware from conversations with him that those topics were not taught?

A. I did not have those discussions with him.

Q. How did you become aware that those topics were not taught by him prior to you coming to the Police Department?

A. Because when I looked at the materials that were being handed out, they were very -- to recruits, because that is who was being trained at that stage, it was not as well organized as it ought to be, and I did have discussions with him about the problem of recruits learning things in the classroom and then going out into the field and being told to do things in a very different way.

Q. Other than reviewing his materials, is there any other way that you -- is there any other basis for your conclusion that Captain Hogan didn't teach the duty to disclose exculpatory evidence and document exculpatory evidence --

A. No.

Q. -- during his --

A. No.

Q. -- law practices class --

A. No.

Q. -- or in any other aspects of the police academy training?

A. No. Id. at pp. 126-27.

120. Mr. Wasserman does not know whether the updates to existing Academy training materials that were made when he was Director of Training and Education expressly deal with

turning over exculpatory or impeachment evidence whether the new Academy training materials that were introduced when he was Director expressly dealt with turning over such evidence.  Id. at p. 88.

121.    As part of discovery in this matter, the Defendants conducted a diligent search for pre-1972 Academy training materials.  However discovery has only yielded a partial copy of the Academy's 1968 training materials.  The Training Academy's written materials from 1968 contain an index of "The Big Ten" training topics to be covered.  This index includes, "Familiarization with the U.S. and Mass Constitutions," "Emphasis on 1st -- 4th – 5th – 6th – Amendments to the U.S. Constitution," and "Civil Rights –Mass Statutes – Department Rules – Prisoners."  The index states that instruction on each of these topics will include, Academy Lectures on Subjects Matter – Visual Aids – Handout Materials."  Exhibit 26

122.    The training materials related to the Constitutional Law curriculum also list as major topics to be covered, "Civil Rights - and Rights by Mass. Statutes," "Understanding of 1st -- 4th – 5th – 6th –Amendments to the U.S. Constitution," "Updated knowledge of Judicial Decisions on pertinent issues." "Courts, functions – powers procedures," and "Arrests … statements – victims – witnesses – suspects – attorneys."  These materials also state that "police officers should strive at all times to observe zealously the fundamental rights of a person lawfully avail to him." Exhibit 26

123.    The constitutional law training materials also address the 14th Amendment and the due process rights of individuals.  Exhibit 26

124.    The training materials relating to instruction on the topic of courtroom procedures, cover presentation of the government's case, including rules of evidence and criminal procedure.  Exhibit 26

125.    The training materials relating to instruction on the topic of report writing, stress that reports from officers need to contain complete, accurate and truthful information.  Exhibit 26

126.    As Director of Training and Education, Mr. Wasserman assisted in development of a investigative manual which was subsequently used to train Boston police detectives in proper investigative procedures.  He does not know whether this training material expressly addressed the duty to disclose exculpatory or impeachment evidence to the prosecution. Exhibit 22 at p. 111.

127.    Captain Hogan continued to instruct all recruits in constitutional law and to answer the legal questions of recruits in the field after Mr. Wasserman took over as Director of Training and Education in 1973.   Id. at pp. 81-83.

128.    Beginning in 1973, The Boston Police Department began operating a Regional Basic Recruit School which served as the training academy for other smaller municipalities in Massachusetts, such as Brookline, Quincy and Lynn.  Captain Hogan was selected by Robert Wasserman to teach the Constitutional Law curriculum at this regional academy.   Id.

129.    The International Association of Chiefs of Police (IACP) and the National Law Enforcement Policy Center (NLEPC) assist law enforcement agencies across the country in developing and refining law enforcement policies.  The model law enforcement policies created by the NLEPC are utilized by more than five hundred law enforcement agencies as a basis for their own internal policies.  See Affidavit of Philip Lynn and National Law Enforcement Policy Center Model Policy Regarding Brady Disclosure Requirements, attached as **Exhibit 34**.

130.    The NLEPC and IACOP did not create a model policy regarding Brady disclosure requirements and their applicability to police officers until April 2009.

**VI.    Lack of Evidence Regarding a Boston Police Custom or Practice of Withholding Evidence**

131.    Robert Wasserman is not aware of a single instance in which a police officer withheldexculpatory or impeachment evidence in an effort to secure an arrest or prosecution. Id. at pp. 113-14.

132.     Robert Wasserman has no knowledge as to whether Captain William Hogan was ever aware of even a single instance in which a police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution. <u>Id</u>. at pp. 116-17.

133.     Edmund L. McNamara served as the Commissioner of the Boston Police Department from 1962 until May 1972.

134.     Robert Wasserman has no knowledge as to whether Commissioner Edmund McNamara was ever aware of even a single instance in which a police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution. <u>Id</u>. at pp. 116.

135.     Robert J. DiGrazia served as the Commissioner of the Boston Police Department from November 1972 until November 1976.

136.     Robert Wasserman has no knowledge as to whether Commissioner Robert DiGrazia knew of any instances in which any police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution. <u>Id</u>. at p. 114.

137.     Commissioner DiGrazia spoke frequently with Mr. Wasserman at command staff meetings and at in-service classes which Mr. DiGrazia visited. <u>Id</u>. at p. 112.

138.     Although Commissioner DiGrazia spoke with Robert Wasserman regarding detectives generally failing to follow their training, completing sloppy investigations and being untruthful, Commissioner DiGrazia never once spoke with Robert Wasserman regarding the topic of officers withholding exculpatory evidence from the prosecutor or indicated that he believed this was a problem in the Department. <u>Id</u>. at pp. 111-13, 118, 125-26, 133-34.

139.     On November 27, 1972, after joining the Boston Police Department, Commissioner DiGrazia wrote a special order entitled, "Greetings from Police Commissioner Robert

DiGrazia," which was distributed to all members of the Department. In this order, he remarked that "I find [the Department] to be professional with sophisticated programs and dedicated personnel. If it is not now the best Department in the world, I know that we will all be working together to make it the best." See Boston Police Department Special Order, "Greetings from Police Commissioner Robert DiGrazia," Dated November 27, 1972, attached as **Exhibit 35**.

140.    Attorney Thomas Dwyer testified that in 1972, Assistant District Attorneys in Suffolk County did not receive any formal training relative to their obligations to disclose materially exculpatory evidence. Exhibit 19 at pp. 84-90.

<div style="margin-left: 40%;">

RESPECTFULLY SUBMITTED,

**Defendants,
THE CITY OF BOSTON,
JOSEPH KELLEY, and
JOHN B. HARRINGTON,**

By their attorneys,

/s/ Hugh R. Curran
Hugh R. Curran, BBO# 552623
hcurran@bletzerlaw.com
Bletzer & Bletzer, P.C.
300 Market Street
Brighton, MA 02135
(617) 254-8900

/s/ Evan C. Ouellette
 Evan C. Ouellette, BBO# 665943
 Brody, Hardoon, Perkins &Kesten, LLP
 One Exeter Plaza, 12th Floor
 Boston, MA 02116
 (617) 880-7100
 eouellette@bhpklaw.com

</div>

DATED: August 2, 2013

## CERTIFICATE OF SERVICE

I, Evan C. Ouellette, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 1, 2013.

/s/ *Evan C. Ouellette*
Evan C. Ouellette