UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ESTATE OF JAMES HALEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:2009 CV 10197 |
| vs. | ) | |
| | ) | |
| CITY OF BOSTON, Former Boston Police | ) | |
| Officer, JOSEPH KELLEY, Former Boston Police | ) | JUDGE STEARNS |
| Officer, JOHN HARRINGTON, and as-of-yet | ) | |
| UNKNOWN EMPLOYEES OF THE CITY OF | ) | |
| BOSTON, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     SUMMARY OF THE RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     The Custis Witness Statements Were Sufficiently Material And Exculpatory
       That Their Suppression Undermined Confidence In The Outcome Of Haley's
       Criminal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    For Purposes Of This Summary Judgment Motion, The Custis
       Witness Statements Were Suppressed From The Criminal
       Justice System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.     The Evidence At Issue Was Not Disclosed To Haley's
              Criminal Defense Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       B.     The Evidence At Issue Also Was Not Disclosed To The Prosecutors    16

              1.     The Disclosure Of Haley's Own Statement Does Not
                     Prove That The Transcribed Custis Witness Statements
                     Were Ever Provided To The Prosecutor . . . . . . . . . . . . . . . . . . 20

              2.     The Fact That The Defendants Put The Custis Witness
                     Transcripts And Their Handwritten Notes Referencing Same
                     In The BPD's Internal Homicide File Does Not Prove That
                     The Transcribed Custis Witness Statements Were Ever
                     Provided To The Prosecutor . . . . . . . . . . . . . . . . . . . . . . . . . . 21

              3.     The Fact That Several References Were Made At Trial To A
                     Statement By Gloria Does Not Prove That The Transcribed
                     Custis Witness Statements Were Ever Provided To The
                     Prosecutor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

              4.     The So-Called "BPD Memorandum" Does Not Prove That The
                     Transcribed Custis Witness Statements Were Ever Provided To
                     The Prosecutor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i

5.      The "List Of Materials Submitted To The [District Attorney]" Does Not Prove That The Transcribed Custis Witness Statements Were Ever Provided To The Prosecutor  . . . . . . .  26

III.   Plaintiff's Evidence Establishes A Constitutional Injury For Which Qualified Immunity Is Not Applicable . . . . . . . . . . . . . . . . . . . . . . . . .  28

IV.   Defendants Have Failed To Justify Summary Judgment On The Basis          Of Their Statute Of Limitations Defense  . . . . . . . . . . . . . . . .  29

A.      Section 10 Provides a Viable Basis for Suing Kelley and Harrington  29

B.      Section 9A Provides an Independent Basis for Suing Kelley and Harrington . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

V.    Summary Judgment Is Also Unavailable On Plaintiff's *Monell* Claim Against The City Of Boston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

A.      Legal Standard Governing Plaintiff's *Monell* Claim  . . . . . . . . . . . .  32

B.      Haley Has Proffered Sufficient Evidence Of A BPD Policy (Or Nonpolicy) That Permitted Detectives To Systematically Withhold Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

C.      Independently, Haley Has Proffered Sufficient Evidence Of Deliberate Indifference To A Widespread Practice Of Withholding Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

D.      Independently, Haley Has Also Proffered Sufficient Evidence That The Wrongful Suppression Of Evidence In His Case Was Caused By A Failure To Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

## <u>TABLE OF AUTHORITIES</u>

*Armstrong v. Squadritto,* 152 F.3d 564 (7th Cir. 1998) . . . . . . . . . . . . . . . . . 33, 34

*Barbee v. Warden, Md. Penitentiary,* 331 F.2d 842 (4th Cir. 1964) . . . . . . . . . . . 42

*Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 44

*City of Canton v. Harris,* 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . 33, 34, 45

*City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988) . . . . . . . . . . . . . . . . . . . . . . 33

*Clarke v. Burke,* 440 F.2d 853 (7th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Commonwealth v. Haley,* 363 Mass. 513, 296 N.E.2d 20 (1973) . . . . . . . . . . . . . . . 6

*Coyne v. Taber Partners I,* 53 F.3d 454 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 16

*Curran v. Delaware,* 154 F. Supp. 27 (D. Del. 1957) . . . . . . . . . . . . . . . . . . . . . . . 42

*Curran v. State of Delaware,* 259 F.2d 707 (3rd Cir. 1958) . . . . . . . . . . . . . . . . . 42

*Downey v. Union Trust Co. of Springfield,* 312 Mass. 405 (1942) . . . . . . . . . . . . 29

*Evans v. Kropp,* 254 F. Supp. 218 (E.D. Mich. 1966) . . . . . . . . . . . . . . . . . 30, 42, 43

*Gates v. Reilly,* 453 Mass. 460 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932
    (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Haley v. City of Boston,* 2010 WL 3198900 (D. Mass. Aug. 12, 2010) . . . . . . . . . 10

*Haley v. City of Boston,* 657 F.3d 39 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 5

*Heck v. Humphrey,* 512 U.S. 477 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jewett v. Brady,* 534 F.3d 67 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Johnson v. Evans,* 223 F. Supp. 2d 357 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . 30

*Kyles v. Whitley,* 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Monell v. Department of Soc. Serv.,* 436 U.S. 658 (1978) . . . . . . . . . . . . . . . passim

*Mooney v. Holohan,* 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28, 29

*Mullins v. Garthwait,* 875 F. Supp. 14 (D. Mass. 1994) . . . . . . . . . . . . . . . . . . . . 29

*Napert v. Gov't Employees Ins. Co.,* No. 13-10530-FDS, 2013 WL 3989645
    (D. Mass. Aug. 1, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

*Owen v. City of Independence,* 445 U.S. 622 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Perez v. Volvo Car Corp.,* 247 F.3d 303 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 18

*Sims v. Mulcahy,* 902 F.2d 524 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Smith v. Cain,* 565 U.S., 132 S. Ct. 627 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith v. Florida,* 410 F.2d 1349 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . 42

*United States v. de la Cruz-Paulino,* 61 F.3d 986 (1st Cir. 1995) . . . . . . . . . . . . . 12

*Walker v. O.E. Bishop,* 295 F. Supp. 767 (E.D. Ark. 1967) . . . . . . . . . . . . . . . . . . 42

*Webster v. City of Houston,* 735 F.2d 838 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . 41

*Young v. City of Providence,* 404 F.3d 4 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 45

## STATUTES AND OTHER AUTHORITIES

Pattern Instruction § 3.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

M.G.L. c. 197, § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

M.G.L. c. 258 § 9A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

M.G.L. c. 258 § 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

iv

## Introduction

James Haley served 34 years in prison for a murder he did not commit. Throughout his wrongful incarceration, Haley consistently asserted his innocence and endeavored to prove it.   From his prison cell in 2005, he filed a request under the Massachusetts Public Records Act for all documents relevant to his case.  What he got back was extraordinary.  The Boston Police Department ("BPD") sent him a copy of its thin file, in which were two previously-undisclosed witness statements. This evidence fundamentally contradicted and undermined the theory of the case upon which his conviction was based.

Arguing that he had been denied due process because this newly-discovered evidence had been withheld from him at his 1972 criminal trial, Haley (now assisted by counsel) brought the evidence to the District Attorney's office and asked them to join a motion to vacate his conviction.  After careful review of this new evidence in the context of the facts of the case, the Commonwealth *filed its own motion to vacate Haley's conviction,* expressly acknowledging that Haley had been deprived of exculpatory evidence, evidence which arguably could have changed the result of the trial.  The court granted the Commonwealth's motion, Haley's conviction was overturned, and he was released from prison.

Although the Defendants continue to try to muddy the waters on this issue, what should not be in dispute, and certainly not for summary judgment purposes, is that Haley's rights were violated by the suppression of this exculpatory evidence. The Massachusetts criminal justice system has already considered that issue and concluded unambiguously that Haley's three-decade old conviction could and should not stand in the face of this newly discovered evidence.  At an absolute minimum, the Commonwealth agreed Haley was entitled to a new trial at which the jury would hear about this previously-suppressed evidence.

The real question facing this Court is whether a finder of fact could reasonably conclude based on the record before the Court that any of the Defendants are liable for the suppression of the witness statements. The answer is yes. Neither the City of Boston nor the detectives who possessed the exculpatory evidence are entitled to summary judgment because in the early 1970s, and for at least some period of time thereafter, the BPD had a policy and a practice of intentionally withholding evidence that was favorable to the accused, and the detectives here acted in accordance with that practice.

That proposition is far less controversial and provocative than it might seem at first blush. In the 1950s, for example, prior the Supreme Court's *Brady* decision, police departments and police officers were not the least bit inclined to turn over favorable evidence that might allow "criminals" to go free. Not surprisingly, it was the BPD's policy and practice during that time frame to withhold such evidence as a matter of course, as reflected in the Department's written manuals. The problem for Haley and other criminal defendants like him, however, is that ample evidence exists in the summary judgment record that even after *Brady* was decided in 1963, this suppression policy and practice persisted in Boston unabated for years until the mid-1970's, when a new Police Commissioner (who is Haley's expert witness in this litigation) updated the 1950s-era written manuals and implemented the changes necessary to bring the Department's policies and practices into compliance with the Constitution.

Until those changes, Boston police officers operated under the assumption that they had every right to withhold such evidence. Even now, in 2013, the Defendants' Brief is insistent that in 1972 there was no Constitutional duty to disclose things like the witness statements at issue, or assuming that there was, a police officer could not have been reasonably expected to know it. Over and over again, Boston's summary judgment brief argues that the Supreme Court case law in

2

1972 did not oblige it to turn over evidence of this nature to the prosecutors. The Defendants are obviously entitled to take that position, but they cannot expect to have it both ways. They obviously believe very deeply that there was no Constitutional obligation in 1972 to disclose such evidence. In their view, the law was clear that in 1972, this evidence could be legitimately suppressed. Which is precisely why Boston's policy was to affirmatively suppress it, or at the very least turn a blind eye when its detectives did just that.

Unfortunately for Boston, however, its then-prevailing (and present) belief that in 1972, exculpatory evidence such as the Custis witness statements could be withheld without violating anyone's rights is simply wrong. Accordingly, Boston's policy and practice (which embodied the suppression-permissive view of the law espoused so forcefully in its Brief) ran afoul of Constitutional protections, and unlike the individual Defendants, the City of Boston is not eligible for qualified immunity, a defense against liability for those who mistakenly violate the law in good faith. For the reasons discussed below, summary judgment is unavailable, and Defendants' motion should be denied.

## I.   SUMMARY OF THE RELEVANT FACTS

Sometime in the early morning hours of July 11, 1971, the police responded to a call for service at 33 Glenarm in Boston, where they found David Myers dying of a stab wound in his bed. See Plaintiff's Statement of Facts (hereafter, "PSOF") ¶ 9. Whoever committed the crime, it was not James Haley. *Id.* ¶ 14. Haley was completely innocent, and had nothing to do with Myers' murder. *Id.* ¶¶ 14-25.

At the time of his death, Myers had been living with Gloria Custis, the sister of Haley's ex-wife. PSOF ¶ 10. Gloria became the key -- and basically only -- witness against Haley, but there were reasons to believe that Gloria herself might actually have been responsible for Myers' death. *Id.* ¶ 12. She and Myers had a violent relationship, and had been arguing a lot. *Id.* At Haley's criminal trial, she

3

was cross-examined about whether she stabbed Myers as revenge for hitting her;
whether she and Myers had been fighting because she had been dating another
man, as well as a dispute about who was the father of her child; whether she had
been fighting with Myers immediately prior to his murder; and why Gloria left her
baby behind and ran out of the apartment immediately after the murder, an action
seemingly inconsistent with her suggestion that an intruder had just stabbed her
boyfriend while looking for his ex-wife. PSOF ¶ 52. The defense's theory of the
case, in other words, was that Gloria was involved in the murder. *Id.*

Gloria told a different story. Gloria put the blame on her sister's ex-husband,
Haley, whom her sister, Brenda, had broken up with about nine weeks earlier.
PSOF ¶¶ 40-41. After a year of marriage, Brenda decided in early May of 1971 that
she and Haley "didn't have anything in common," and she moved back in with her
parents in Delaware. *Id.* ¶ 7. From the day she left Massachusetts on May 3, 1971,
Brenda and Haley had no contact with one another. *Id.* ¶ 8.

The Commonwealth's theory of the case was that on July 11, 1971, Haley
supposedly broke through a window and entered Gloria's Boston apartment, looking
for Brenda. According to Gloria, the only people home when Haley got there were
Gloria and Myers, the latter of whom Haley knew through his association with the
Custis sisters, and with whom he got along with quite well. PSOF ¶ 4. Gloria
claimed that Haley, wielding a gun and knife, supposedly demanded to know where
Brenda was. *Id.* ¶ 38. Gloria did not actually claim to have witnessed Haley
shooting and stabbing Myers, but claimed to have overheard Myers say: "Why did
you stab me man? Brenda's not here," as well as: "James stabbed me. James
stabbed me." Def. SMF ¶ 38.

The Commonwealth's theory of the case, which rested almost entirely on
Gloria's testimony that Haley came looking for Brenda on the day of the murder,
only makes sense if Haley had some reason to believe that he would in fact find

Brenda if he broke into Gloria's apartment that morning, nine weeks after his wife left town. To fill that gap, both Gloria and Brenda testified at Haley's criminal trial that they had been walking together on the street on the preceding day (July 10) and had seen Haley, who thus supposedly had a reason to break into Gloria's apartment that night looking to find his ex-wife. PSOF ¶ 40.[1]

What Haley, his lawyer, and the prosecutor who put on the Custis sisters at trial did not know at the time was that both Gloria and Brenda had previously given the Defendant detectives formal witness statements admitting they had not seen Haley on July 10, or anytime at all since the prior month. PSOF ¶¶ 48-58. Those admissions were transcribed by Defendant detectives Kelley and Harrington as part of formal Q&A witness statement transcripts. *Id.* ¶¶ 26-28 (Q: "When was the last time you saw your husband James Haley?" A: "May 3rd" Q: "And you haven't seen him since then?" A: "I seen him last month walking down the street but not talk to him."). The Custis sisters' admissions in these witness statements gut the case against Haley, not only by making his accuser into a liar, but more importantly, by eliminating any motive for Haley to have broken into Gloria's apartment that day in search of his ex-wife, who had left Massachusetts months earlier. *Haley v. City of Boston,* 657 F.3d 39, 52 (1st Cir. 2011) ("the prosecution's theory relied heavily on Haley's supposed sighting of the sisters on the day before the murder.").

Prior to the trial, Haley's criminal lawyer filed a motion seeking to require the prosecutor to turn over all exculpatory evidence favorable to the defense. PSOF ¶¶ 37-38. Although that motion was granted, the sisters' witness statements

---

[1]  As stated, Haley strongly disputes all of the following, and he had an alibi. He was at work at the Massachusetts Institute of Technology around the time that the sisters claim to have seen him on the street, and then stayed up with and in the presence of a number of friends through the period of time when the murder apparently occurred. PSOF ¶¶ 14-25.

containing the aforementioned admissions were never produced to Haley's criminal defense team. *Id.* ¶¶ 46-47.[2]

On the strength of Gloria's story, Haley was convicted of Myers' murder and sentenced to life in prison. PSOF ¶ 45. No physical evidence connected Haley to the events of July 11, 1971, and the case instead relied entirely on the Custis sisters' testimony. *Id.* ¶ 45.

Haley went to prison. Three decades passed. In 2005, long after exhausting his direct appeals, *see Commonwealth v. Haley,* 363 Mass. 513, 296 N.E.2d 20 (1973), Haley learned about the Massachusetts Public Records Act, pursuant to which he sent requests to the district attorneys' office and the BPD seeking documents relating to his case. PSOF ¶ 60. The district attorney's office had nothing responsive, but on February 14, 2006, the BPD sent Haley 60 pages of documents, included within which were redacted copies of Gloria's and Brenda's transcribed witness statements. *Id.* ¶ 61.

By this time, Haley began receiving assistance from a consortium of people who had befriended him during his prison odyssey. These individuals[3] paid $25,000 to hire an attorney, who pursued a motion for a new trial on Haley's behalf based on the newly-discovered evidence. In October of 2007, Haley's lawyer, James Sultan, took the unusual step of inviting former Assistant District Attorney David Meier to

---

[2] It is true, as Defendants point out, that the judge denied Haley's other motion to compel production of any witness statements. But as discussed below, there is no indication that the judge ever knew about the substance of, much less reviewed, the statements themselves, or had any reason to believe anything other than that the order requiring production of everything exculpatory was sufficient to ensure Haley's right to due process was protected.

[3] The people who took up his cause were an English professor from Worcester State College who met Haley while volunteering to help with a prison newspaper, and others Haley met through her, including a free lance photographer, a kindergarten teacher, and a physicist. PSOF ¶ 63.

speak with Haley without any restrictions or conditions.[4]  During the resulting meeting, Meier asked Haley if he would be willing to accept a plea bargain for manslaughter.  PSOF ¶ 69.  Despite having already lost more than three decades of his life, Haley refused.  *Id.*

On December 21, 2007, after carefully reviewing the record, the Commonwealth filed a motion to vacate Haley's conviction and grant him a new trial.  PSOF ¶ 70.  In relevant part, the Commonwealth's motion stated that "it appears the defendant [Haley] was deprived of certain exculpatory evidence at trial," and that Haley "was arguably prejudiced by such nondisclosure."  *Id.*

The Commonwealth's motion was granted.  PSOF ¶ 60.  Haley was released on bond, and went to live with the friends identified above in footnote 3.  *Id.* ¶ 71.  On June 27, 2008, Haley filed a motion to dismiss the indictment, which was granted.  *Id.* ¶ 73.  This lawsuit followed.

---

[4]  According to attorney Sultan, "I had never in my career of more than 30 years ever allowed a prosecutor to talk to one of my clients, unless it was a proffer session or something, I certainly wouldn't do that.  So this itself was a unique case and my only condition was that he would have to come by himself.  I didn't put any other limitations."  Sultan further explained why he made that decision:

> I felt Mr. Haley was an innocent man who had spent 35 years in prison for something he hadn't done.  That he was a victim of a gross injustice.  From longstanding [sic] with Mr. Meier, I knew him to be a prosecutor of high scruples and ethics and I believed that if he fully understood what happened in this case, that rather than taking the standard knee-jerk approach that most prosecutors would take and oppose any new trial motion filed by a defendant especially many many years after a first degree murder conviction that he would be open to taking a different position.  And I felt that if he had a chance to meet Mr. Haley in person that that would - such a meeting would help convince him to do the right thing.

*See* PSOF ¶ 68, citing Exhibit 2, Sultan Dep. 37-39.

## ARGUMENT

There is no dispute that Haley suffered an almost unfathomable injury. The vast majority of his adult life was stolen from him and he was forced to endure 34 years of pure hell, locked in a maximum security cage with the worst of the worst, some of the most evil and sadistic people on the planet. There is also no dispute that Haley's conviction was in fact a wrongful conviction; even the Commonwealth of Massachusetts acknowledged that his conviction was procured in violation of Haley's right to due process, and thus could not stand, because key exculpatory evidence was not disclosed to him.

This lawsuit makes the very serious claim that Haley's wrongful conviction was made possible because the BPD operated under the belief (the same very belief that the Defendants are still vigorously defending in their Rule 56 motion) that its police officers had every right during the relevant time period to withhold evidence along the lines of the Custis witness statements. In a nutshell, Boston failed to update its pre-*Brady* mindset, policies, and practices after *Brady* worked this important change in the law. As a result, in the words of the First Circuit, the "district attorney's office was unable to fulfill its salutary (and Constitutionally mandated) disclosure policy because the BPD failed to apprise it of the sisters' statements." *Haley,* 657 F.3d at 50 ("The end result was Haley's wrongful conviction.").

Defendants make a number of arguments in support of summary judgment, none of which have merit.

## I.   The Custis Witness Statements Were Sufficiently Material And Exculpatory That Their Suppression Undermined Confidence In The Outcome Of Haley's Criminal Trial

Defendants devote a substantial portion of their argument (*see* Def. Memo at 16-20) to their contention that the Custis witness statements were supposedly not sufficiently material or exculpatory to support a Constitutional violation. To

8

disprove Defendants' contention, Haley must demonstrate a "a reasonable probability of a different outcome" had the statements not been suppressed, but this "does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain,* 565 U.S. --, 132 S. Ct. 627, 629 (2012), citing *Cone v. Bell,* 556 U.S. 449 (2009). *See also Kyles v. Whitley,* 514 U.S. 419, 433-34 (1995) ("*Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

As they did in moving to dismiss the complaint back in 2010, the Defendants again maintain that the admissions contained in the Custis witness statements were not significant, such that their suppression was harmless. To that end, Defendants' summary judgment memorandum recycles the arguments from their appeal briefing about why other facts in the record (*e.g.,* that Haley and Brenda had spoken on the telephone about getting divorced) supposedly undermines the import of the admissions contained in the witness statements suggesting that the sisters appear to have fabricated the account about Haley having seen Brenda in Boston on the day before the murder. Defendants postulate that "there could have been any number of additional ways that Haley became aware that his wife had returned to Dorchester," and they speculate baldly, without any citation to the record, that perhaps "[o]ne of their mutual friends could have been aware of her return or seen her walking around Dorchester during the two days prior to the murder and

informed Haley." Def. Mem. at 19.[5]

Haley acknowledges that the Defendants previously persuaded the Court to adopt their position that the contradictions contained in the sisters' transcribed witness statements were not material as a matter of law. *See* Def. Mem. 17, citing and quoting *Haley v. City of Boston,* 2010 WL 3198900 at *3 n.4 (D. Mass. Aug. 12, 2010). After the last round of briefing, the Court also accepted Defendants' argument that the impeachment value would not have been apparent until after Gloria and Brenda testified at trial. *See* Def. Mem. 12, citing *id.* at *2. In Plaintiff's view, those conclusions could never be reconciled with the reality that the belated discovery of these previously-undisclosed witness statements was deemed sufficient to justify vacating Haley's conviction on that basis alone, and on the Commonwealth's own motion no less. But what really matters for present purposes is that any argument that the witness statements dealt with a "relatively minor" and "readily explainable" point of impeachment can no longer be maintained in light of the First Circuit's opinion on Haley's appeal. *See Haley,* 657 F.3d at 53 (referring to a "failure to disclose statements that clearly *would have undermined the prosecution's theory of the case*") (emphasis added).

In analyzing Haley's claim, the First Circuit necessarily concluded that the suppression of the sisters' witness statements, if proven, rises to the level of a Constitutional violation. *Haley,* 657 F.3d at 50-51 (explaining that the "prosecution's case rested largely on the sisters' testimony," and the Defendant

---

[5] Defendants point out that Gloria was confronted on the stand with her testimony from the probable cause hearing wherein she testified that she had not seen Haley at any point on *the day of* the murder. *See* Def. Mem. at 19. That is neither here nor there. The key to the prosecution's case was the proposition that Gloria and Brenda ran into Haley the *day before* the murder, a claim that was contradicted by the suppressed witness statements. In fact, Judge Roy, who presided over Haley's criminal trial, found that Gloria's probable cause testimony about when she last saw Haley prior to Myers' murder was "perfectly consistent with what she has said here [at trial]." PSOF ¶ 47.

10

detectives "were aware that the prosecution's theory relied heavily on Haley's supposed sighting of the sisters on the day before the murder."). The First Circuit concluded: "We think that, even as far back as 1972, a reasonable officer in the circumstances alleged here would have understood" that intentionally withholding the witness statements "would contravene the Constitutional right limned in *Mooney* and its progeny." 657 F.3d at 51.[6]

At bottom, the Court of Appeals reversed and remanded Haley's *Brady* claim because, like the Massachusetts criminal courts, it found that the suppression of the Custis witness statements was sufficiently significant to implicate Haley's right to due process. *Haley,* 657 F.3d at 49-50. Defendants' present invitation to this Court to analyze that question as it did before the appeal, and come to a different conclusion than the First Circuit did, is misplaced. It should be rejected.

## II. For Purposes Of This Summary Judgment Motion, The Custis Witness Statements Were Suppressed From The Criminal Justice System

The BPD and the Defendant detectives definitely had access to the Custis witness statements, but the evidence in the record supports the inference that Haley's attorney and the criminal prosecutor did not. Haley begins with the former.

---

[6] The First Circuit further summarized:

> [C]ontrary to those initial [witness] statements, both women testified that, while walking back to the apartment that Gloria shared with Myers on the day before the murder, they had seen Haley shopping in the neighborhood. The prosecution built upon this testimony to construct a theory that Haley's sighting of the women on July 10 had alerted him to Brenda's return to Boston, and her presence in the neighborhood led him to suspect that she was staying with her sister. Distressed by her decision to divorce him, he broke into the apartment looking for Brenda and, when Myers confronted him, responded by using deadly force. Haley steadfastly denied that he had seen either sister on July 10. He maintained that he had no reason to suspect that Brenda might be at the apartment and, accordingly, had no reason to go there on July 11.

*Haley,* 657 F.3d at 44-45.

### A. The Evidence At Issue Was Not Disclosed To Haley's Criminal Defense Team

Defendants argue that Plaintiff has failed to identify evidence that the witness statements and their contents were never made available to Haley's criminal defense lawyer, Al Farese.  Def. Mem. 14-15.  Defendants' argument is without merit.

Plaintiff begins by acknowledging that direct evidence is no longer available on this point.  Both the prosecutor and defense counsel have died, and the defense attorney's file is long gone.  But there is obviously no rule requiring direct evidence on this point, or any other.  As is true for all Rule 56 motions, there are different ways to prove a given proposition, and different types of admissible evidence.  *See* Pattern Criminal Jury Instructions for District Courts of the First Circuit ("Pattern Instruction") § 3.05 Kinds of Evidence: Direct and Circumstantial ("The law permits you to give equal weight" to circumstantial and direct evidence).  Given the age of this case and the nature of the issue, circumstantial evidence is all that can be reasonably expected to exist, and the circumstantial evidence that exists is more than sufficient to create a question of fact for a jury.  *United States v. de la Cruz-Paulino,* 61 F.3d 986, 999 (1st Cir. 1995) ("circumstantial evidence is often very probative. . . Indeed, courts in general have recognized that circumstantial evidence may, in given settings, have equal if not greater weight than direct evidence") (internal quotations omitted).

Here, the circumstantial evidence that Farese did not have the Custis witness statements is overwhelming.  The criminal trial transcript reflects that Farese cross-examined the sisters at length on a wide range of subjects, PSOF ¶ 52, including the critical alleged encounter with Haley the day before the murder.  *Id.* Yet, Farese makes absolutely no reference to the damning admissions in the witness statements wherein Gloria and Brenda expressly contradicted themselves

on the most important fact in the case. *Id.* ¶ 46. Gloria's testimony that she and Brenda saw Haley on the street went uncontradicted.[7]

Moreover, the evidence establishes that Farese was hardly adverse to impeachment with prior statements, assuming he had access to them. For example, as discussed in the prior section, and as Defendants themselves point out, Farese cross-examined Gloria with her prior statement at the probable cause hearing that she had not previously seen Haley on *the day of* the murder. Def. Mem. at 19, citing SMF ¶ 41. Jurors could easily conclude that Farese would not have utilized this relatively meaningless impeachment, yet simultaneously declined to also elicit Gloria's prior statement that *actually did* contradict her critical trial testimony that she and her sister ran into Haley the day before. The only reasonable inference -- and certainly a fair one for Rule 56 purposes -- is that Farese did not know about the admissions in the witness statements.

Though that alone is sufficient, the strength of this inference is further bolstered by other evidence developed by Haley in the summary judgment record. According to the testimony of numerous lawyers familiar with Farese's work, Farese had a reputation for his "phenomenal" cross-examination skills, and dogged pursuit of points that contradicted the State's case. PSOF ¶ 33. For instance, a fellow criminal defense attorney familiar with Farese's work testified that: "if you handed [Farese] a police report, you handed him a witness, an inconsistent witness statement, he was a bulldog, he would attack the credibility of the witness effectively. . . . Mr. Farese's approach was to study the file and hone in on the stuff he could use to attack those key witnesses and attack, attack, attack. And he by reputation won an awful lot of cases that way." *Id.*

Along those same lines, attorney Joseph Delcore worked for Farese from 1970

---

[7] Farese questioned Gloria about whether she had given a statement to the police about the murder, which Gloria denied. PSOF ¶ 53.

through 1976, and he not only watched portions of Haley's criminal trial, but also wrote the briefs for Haley's direct appeal.  Delcore testified that Farese was "the kind of cross examiner that inevitably would persist and persist, persist to the point where finally some judge would stop him . . . he was a very good cross examiner. That was his forte."  PSOF ¶ 48 (citing Delcore's testimony that Farese was a "dogged criminal defense attorney and made sure to use all of the relevant impeachment material he had in his arsenal, particularly impeachment material that would undercut the credibility of the Commonwealth's witnesses and the Commonwealth's theory of the crime.").  At his deposition, Delcore testified that: "had Al Farese had those statements given to the police, he would have used them at length on cross examination to try to impeach the witnesses.  Because he never brought that up at cross examination, I can only assume he didn't have them because there's no opinion - there's no question in my mind that had he had them he would have used them."  PSOF ¶ 50 ("I can positively state that had Mr. Farese had in his possession the police statements given by Gloria Custis and Brenda Haley, he would have used them in his cross-examination of Ms. Custis and Ms. Haley.").  This testimony was based on Declore's personal observations of Farese at numerous trials, approximately five years of experience working directly with him, and reading transcripts in other cases defended by Farese to see what he would do. *Id.*

One of Farese's former adversaries, former Suffolk County Assistant District Attorney Thomas Dwyer, concurred.  In Dwyer's opinion, Farese "certainly was one of the most aggressive lawyers that I ever bumped into my [] six years in the D.A's Office," and if Farese had known of the transcribed witness statements of Gloria and Brenda, he would have used them to impeach the sisters regarding their alleged sighting of Haley on the day before the murder.  PSOF ¶ 34, citing Exhibit 10, Dwyer Dep. at 117 (if Farese had had the statements, "[h]e would have caused a

14

riot at the trial.  But he would have used them.  He wouldn't have used them - in my judgment he wouldn't have used them in a delicate Liacos Evidence Book way. He would use it like a hammer.").

Finally, attorney Michael Natola, who worked for and shared office space with Farese until his death in 1985, described Farese as "a fierce trial lawyer of the old-school variety . . . [H]is greatest skill was impeaching the credibility of witnesses on cross-examination.  His cross-examination skills were without peer. To say that he was determined, or aggressive, or relentless would be to do his skills an injustice.  He was as tenacious as a proverbial bulldog in cross-examining witnesses."  PSOF ¶ 49.  Natola reviewed the record from Haley's criminal trial and issued a report opining that "had he had the [witness statements], Farese would certainly have used it to impeach Ms. Custis and Ms. Haley on cross-examination at trial."  PSOF ¶ 50.  Natola explained that "such a cross-examination is consistent with the other attempts that Mr. Farese made to impeach both Gloria and Brenda at trial.  Mr. Farese's strategy was to try to undermine Gloria's and Brenda's credibility and point the finger at Gloria for the crime."  PSOF ¶ 51, citing Exhibit 14, Natola Report at 6.

Plaintiff acknowledges that Defendants have a different story to tell.  They offer evidence that Farese was busy and unprepared.  But all that Defendants' argument establishes is that a legitimate dispute of fact exists as to which inference the jury should draw about whether Farese was given the witness statements. Farese may well have been forced to defend Haley without as much preparation as he would have liked, but it is undeniable that he did proceed to cross-examine Gloria at length on all of the relevant issues in the case, using her prior statements (*e.g.,* probable cause hearing transcript) where available.  It is also undisputed that Farese specifically requested any and all witness statements and exculpatory evidence, and he clearly used whatever he had, consistent with his above-

documented reputation for doing so effectively.  Given the conflicting evidence, the finder of fact must decide which inference to draw.  *Coyne v. Taber Partners I,* 53 F.3d 454, 460-61 (1st Cir. 1995) ("[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage").[8]

### B.    The Evidence At Issue Also Was Not Disclosed To The Prosecutors

Defendants are making two arguments on this point.  On the one hand, they maintain with great passion that in 1972 there was no duty whatsoever for police officers to disclose this kind of "impeachment" evidence.  According to the Defendants, no reasonable police officer would have had any reason at all to believe they had any obligation to make this evidence known to the prosecutor's office. Defendants' other argument, of course, is that this Court must conclude as a matter of law (even absent any supporting direct testimony) that the Defendant detectives undoubtedly turned these statements over to the prosecutors.  Defendants are wrong on both counts.

Taking a step back, Defendants do not, and cannot, dispute that the individual Defendants detectives who investigated the murder possessed the Custis witness statements.  PSOF ¶ 26-27.  The transcribed statements state on their face that they were given to Defendant Kelley in the presence of Defendant Harrington. *Id.* ¶ 26, citing Exhibits 5 & 6.  Defendant Kelley proceeded to sit at counsel's table for Haley's criminal trial, where he had a front row seat as Gloria testified that Haley had seen his ex-wife on the street shortly before the murder, thereby giving

---

[8]  Defendants take Farese to task for failing to renew his motion to compel the witness statements "after hearing the content of Gloria and Brenda's testimony at trial."  Def. Mem. at 13.  The hole in that reasoning is that Farese had no knowledge of the content of the disputed witness statements.  Unlike the Defendants, Farese had no way to know that Gloria's witness statement was entirely incompatible with her trial testimony, or that such a statement even existed.

Haley a purported motive to break in looking for Brenda the following day. *Id.* ¶¶ 40-42, 59.

There thus can be no dispute that Kelley subjectively **knew** that Gloria's damning testimony was false -- or, at the very least, was flatly contradicted by what Gloria had originally described to him in a formal witness statement. The relevant question is whether Kelley disclosed his knowledge of Gloria's admission to the prosecutor, or whether he instead intentionally suppressed the relevant evidence.

Defendants move for summary judgment on this point despite the absence of any direct evidence that Kelley did disclose the statements. To accept that proposition as a matter of law, the Court would have to believe that the Assistant District Attorney who prosecuted Haley's case, Gerald Muldoon, knowingly put on perjurious testimony, a violation of the ethical cannons of his profession. That aside, the record contains sufficient evidence from which a jury could reasonably infer that Muldoon, like Farese, was in the dark on this point. And at this stage, all such reasonable inferences are to be drawn in Plaintiff's favor. *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 937 (1st Cir. 1987) (where the evidence conflicts, "the ultimate arbiter of the persuasiveness of the proof must be the factfinder, not the lawgiver").

Haley's position relies upon the opinion testimony of former Assistant District Attorney Thomas Dwyer. Dwyer met Muldoon very early on in Dwyer's tenure at the District Attorney's Office, and became familiar with him and his professional practices. PSOF ¶ 35 ("As an Assistant District Attorney for the Suffolk County, I came to know Gerald Muldoon well and worked with him often."). According to Dwyer, "in my personal experience, based on repeated dealings with and observations of Mr. Muldoon during the time period at issue, it was Mr. Muldoon's standard practice to disclose any exculpatory evidence, including impeachment evidence, to defense counsel prior to trial if Mr. Muldoon had that

17

evidence in his possession." PSOF ¶ 55. In fact, Dwyer was never aware of any case in which Muldoon ever withheld exculpatory or impeachment evidence from a defense attorney. *Id.* ¶ 58. *See also id.,* citing Exhibit 30, Delcore Aff. ¶ 6 ("I am not aware of any occasion when Mr. Muldoon intentionally withheld exculpatory evidence."). Based on his repeated interactions with Muldoon, as well as his regular involvement in personally addressing any problems that arose in the District Attorney's Office, Dwyer testified that "the notion that [Muldoon] would have gotten a report with exculpatory evidence with the police department and hid it in his own pocket, could not have happened in my judgment." *Id.* ¶ 55. The same would be true for impeachment evidence. *Id. See also Perez v. Volvo Car Corp.,* 247 F.3d 303, 316 (1st Cir. 2001) (holding that statements based on personal knowledge are properly considered for summary judgment purposes).[9]

    Dwyer's testimony is sufficient to avoid summary judgment. Granted, Muldoon is no longer around to answer the question directly, but Dwyer opines unequivocally that Muldoon would have disclosed the Custis witness statements if he had known of them. Because Dwyer undoubtedly has an adequate foundation of personal knowledge of Muldoon's practices based on personal experience, and because a jury would be entitled to credit this testimony, summary judgment is unavailable on this issue. *See* Pattern Instruction § 3.05 ("Circumstantial evidence is indirect evidence, that is proof of a fact or facts from which you could draw the

------

    [9] Dwyer's opinion is based in part on his view of Muldoon's ethics. As Dwyer summarized: "[I]f you had to pick an assistant in your entire tenure that was solid as a rock professionally and ethically, you know, he's probably number one. He's probably number one. I mean he's just - he would - I used to think he was like a priest, you know, you're just like, you know, he just had this whole demeanor. And he's one of these guys that I thought lacked the capacity to be rogue when it came to hiding - you know, give somebody an unfair trial." PSOF ¶ 36 (citing Dwyer's deposition testimony: "I mean I can tell you that I never heard of any problem having to do with Gerry Muldoon in any regard whatsoever. I always said class act." and Dwyer's Affidavit: "Mr. Muldoon had an impeccable reputation for honesty and adhering to all of the ethical and legal requirements for prosecuting cases.").

inference, by reason and common sense, that another fact exists, even though it has not been proven directly.")[10]

Faced with Dwyer's totally-unrebutted testimony, Defendants ask the Court to conclude as a matter of law that no reasonable jury could ever conclude anything but that Muldoon possessed the witness statements. Given the ambiguity, resolution of the dispute would require the Court to choose from among competing inferences, rending summary judgment inappropriate. Indeed, the only thing that is undisputed is that no clear and unequivocal statement exists anywhere -- in any deposition, trial transcript, or document -- establishing that the witness statements at issue were in fact disclosed to the Commonwealth. In fact, Haley's affirmative request to compel production of witness statements at the criminal trial was denied on the record. Left unable to rely upon anything definitive establishing a disclosure, Defendants instead point the Court to a number of circumstantial clues, things that they claim support the inference that the detectives produced the witness statements. The problem with their argument is that these tidbits are

---

[10] Def. Mem. 10-12 goes on a lengthy tangent on this point, attempting to establish that neither Supreme Court precedent nor Massachusetts rules *required* Muldoon to disclose the witness statements in 1972. Following Defendants' logic, because Muldoon was (supposedly) not obligated to turn over the witness statements, Defendants ask the Court to surmise that his failure to disclose them does not necessarily mean that he never had them, but rather that maybe he did have them and simply did not turn them over. There are two holes in that argument. First, as the First Circuit made abundantly clear, there *was* an obligation in 1972 to disclose this evidence, a duty so clearly established that qualified immunity is inapplicable. *Haley,* 657 F.3d at 49-50. And in any event, Rules aside, the criminal judge ordered Muldoon to turn over anything exculpatory in his possession. That problem guts the entire premise of Defendants' argument. Second, even assuming *arguendo* that there was no legal requirement to disclose the witness statements, Plaintiff's evidence (in the form of Dwyer's testimony) proves that Muldoon would have turned over anything exculpatory anyway. If anything, Defendants are blind to the irony: they argue that the law at the time did not obligate the detectives to disclose the statements, yet simultaneously insist that the Court should infer that they did exactly that anyway. Plaintiff -- the nonmovant -- is certainly entitled to the analogous inference with respect to Muldoon, especially because, unlike the Defendants, Plaintiff has supplied an evidentiary basis (Dwyer's testimony) to support his position.

anything but definitive, and the only way to draw the conclusion Defendants seek to draw would be to (improperly) resolve disputed inferences in Defendants' favor.

      1.    **The Disclosure Of Haley's Own Statement Does Not Prove That The Transcribed Custis Witness Statements Were Ever Provided To The Prosecutor**

For starters, Defendants point out that the evidence is undisputed that Haley's own witness statement -- as distinct from the Custis' statements -- was in the possession of the prosecutor and was provided to Farese. That hardly proves the Defendants' point. Quite the opposite, the contrast is telling. There is uncontrovertible proof that Haley's statement was disclosed, whereas there is no such proof as to the Custis statements. That juxtaposition hardly helps the Defendants' cause. In any event, the Defendants' willingness to disclose Haley's own statement to him and to the Commonwealth (presumably so they could use it to impeach him) says very little, if anything, about Defendants' willingness to disclose inconsistent statements made by key prosecution witnesses.[11]

---

[11] Defendants contend that the prosecutor's opposition to Haley's motion to disclose witness statements should lead the Court to draw the inference that the prosecutor did possess the Custis statements. Otherwise, by their reasoning, Muldoon "would likely have assented to the motion." Def. Mem. at 9. *See also id.* at 10 ("It is entirely likely" that the prosecutor had but did not turn over the sisters' statements); *id.* at 10 ("[I]t is entirely likely that given the existing law in 1972, a prosecutor would not have produced the statements in response to this motion."). Defendants' use of the phrase "likely" three times in the span of less than a page betrays the extent to which their argument depends improperly on having the inferences drawn in their favor, but their reasoning is not persuasive in any event. Indeed, it is equally "likely" that the prosecutor opposed the motion to produce statements because he did not possess any and did not want to have to investigate further as to whether any existed. Or perhaps it was simply his office's policy at the time to oppose such motions. The point is, summary judgment is an inappropriate vehicle to resolve the issue of which among competing possible hypotheses is the "most likely."

**2. The Fact That The Defendants Put The Custis Witness Transcripts And Their Handwritten Notes Referencing Same In The BPD's Internal Homicide File Does Not Prove That The Transcribed Custis Witness Statements Were Ever Provided To The Prosecutor**

Defendants also make the curious argument that it is illogical that a detective would (a) take notes referencing that he took the witness statements, (b) transcribe the witness statements, and (c) put the notes and transcripts in the Police Department's permanent homicide file, yet simultaneously fail to disclose these witness statements to the prosecutor. In addition to being poorly suited for summary judgment -- after all, the Defendants are basically asking the Court to draw a pro-movant inference -- the argument is unpersuasive. There is nothing counter-intuitive about the notion that the detectives would have both (a) memorialized the Custis' versions and kept evidence of the same in their police file, yet simultaneously (b) failed to divulge any of these notes, statements, transcripts to the District Attorney's Office. By suggesting otherwise, Defendants appear to be misunderstanding Haley's allegations. Haley is not claiming that Boston police detectives declined to memorialize exculpatory information in order to frame suspects. Haley is claiming that in the early 1970s, Boston detectives did not perceive any policy or practice requiring them to share their files, notes, and exculpatory documentation with the prosecutors. *See also* PSOF ¶¶ 101-02 (citing deposition testimony from former ADA Thomas Dwyer and former BPD Commissioner Paul Evans that BPD detectives did not feel obligated to disclose their personal notes to the prosecution); P. Resp. to SMF ¶ 76 (same).[12]

---

[12] Defendants seem to believe it significant that at least one copy of the Boston set of documents appears to have pagination on them. There has been no foundation provided for when, why, or by whom those page numbers were added, or why they are significant. Defendants also fail to support with any admissible evidence their contention that the version of Haley's statement in Farese's possession had the page numbers "11-14" on it. *See* P. Resp. to SMF ¶ 19.

### 3. The Fact That Several References Were Made At Trial To A Statement By Gloria Does Not Prove That The Transcribed Custis Witness Statements Were Ever Provided To The Prosecutor

Defendants next suggest that there were two references known to Haley suggesting that Gloria made "statements" to the police. For example, Defendants note that during his interrogation, Haley was confronted with the fact that Gloria gave a "full and complete statement" to Defendant Kelley putting Haley in the apartment struggling with the victim.

This proves nothing, and certainly not the point in contention, *i.e.,* that the Custis typed witness statements (or even the information within them) was ever provided to the Commonwealth. First, as Defendants are forced to acknowledge, the "statement" by Gloria of which Haley was apprised concerned her account of the murder itself, not the earlier encounter on the street. Statements concerning the murder notwithstanding, there is no reference in the exhibit cited by Defendant (the Haley interview), or anywhere else, suggesting that Haley was made aware of the existence of a written statement contradicting Gloria on the alleged encounter the preceding day.

Upon closer examination, it becomes clear that Defendants are making much about nothing. It was hardly a revelation to Haley or anyone else that Gloria did in fact give statements (or even that she "made a statement") to the police about the murder itself: her words were literally the only reason Haley was being prosecuted for the crime. The news that Gloria made a "full and complete" statement to the police "putting you [Haley] in the apartment struggling with the victim" was not news at all. What was missing, and what was never disclosed, was the additional disclosure that there was a statement containing exculpatory -- as opposed to inculpatory -- information.

Any doubt that the disclosure of the mere fact that Gloria gave a statement to the police about the murder is insufficient to establish definitively that Muldoon got the transcribed Custis witness statements is erased by the reality that there are other documents memorializing Gloria's statement about the murder.  For instance, Plaintiff's Exhibit 70 is a police report containing a statement by Gloria that matches the description provided to Haley by Kelley, namely, "putting you [him] in the apartment struggling with the victim."  Similarly, Plaintiff's Exhibits 71 and 72 both contain statements of Gloria taken by Sgt. Chandler in which she describes how she supposedly saw Haley scuffling with Myers.  *See* Exhibit 71 ("[Gloria] *states* about 5:15 a.m. while asleep with [Myers] in the bedroom they were awakened by noises" and later "heard sounds of scuffling" and found Haley armed with a gun and knife) (emphasis added); Exhibit 72 (same).  Meanwhile, Plaintiff's Exhibit 73 is a yet another statement by Gloria to Deputy Sergeant Conway to similar affect.[13]

Each of these witness statements is inculpatory.  None contain anything exculpatory.  The prosecutor, the criminal defense lawyer, and the court would have had every reason to believe that these were the "witness statements" Kelley was referencing when he told Haley during interrogation that he had the goods on him.  The contrary inference upon which Defendants' argument depends (that Kelley was actually confronting Haley with, and thereby disclosing the existence of, a different statement containing *exculpatory* information) is not even a particularly reasonable interpretation, much less the only reasonable one.  Defendants have thus fallen well short of proving for summary judgment purposes that Muldoon necessarily possessed the transcribed versions containing the sisters' admission.

---

[13]  The heavily redacted versions of these exhibits were provided by the City of Boston, and are being reproduced as Plaintiff's exhibits in the same form in which it was produced to Plaintiff.

23

Defendants only other reference on this point concerns Kelley's testimony on the witness stand that he had the time of his conversation with Gloria and Brenda "in the statement." Def. Mem. 7-8 (asking the Court to accept Defendants' speculation that this testimony means Kelley "likely had it on the stand with him"). According to their argument, Defendants made no attempt to conceal anything, because Kelley was willing to reference a statement by Gloria.

Even with drawing inferences in Defendants' own favor, the most they have shown is that Haley was on notice that Gloria might have given a statement to the police. On the record, Gloria denied having done that, which is really the end of the matter in a summary judgment posture because Haley would have been entitled to rely on that. But regardless, even if there had been sufficient grounds to suspect Gloria was lying about having not given a statement, that knowledge would not have assisted Haley anyway, at least not without the additional knowledge that Gloria had contradicted herself on the key point of the trial. The fact is, Haley's counsel specifically asked the judge for any witness statements, but he was rebuffed on the grounds that the judge's order that Haley receive anything "exculpatory" was sufficient due process protection. In other words, knowing about a statement and asking for a copy was insufficient for Haley's purposes. Haley needed, but never got, knowledge that the witness statement was exculpatory. The prosecutor was on notice that he had to disclose anything exculpatory, and the fact that he did not turn over the Custis transcribed witness statements provides more than reasonable grounds to conclude he did not have it. Defendants are entitled to a different view, but that is why cases are resolved by juries.

### 4.   The So-Called "BPD Memorandum" Does Not Prove That The Transcribed Custis Witness Statements Were Ever Provided To The Prosecutor

Defendants' Exhibit 15 is a one-page, untitled, undated, unsigned document. There is no indication in the record as to who created it, or when, or for what

purpose.  See P. Resp. to SMF ¶ 55.  Defendants characterize the document as a "BPD memorandum" allegedly contained in their homicide file, but they have failed even to attempt to lay an evidentiary foundation to support that description.

In claiming this document entitles them to summary judgment, Defendants rely upon the representation within the document that Kelley purportedly testified before the grand jury "in essence to the statement of one Gloria Custis."  *See* Def. Exh. 15.  There are several flaws in Defendants' argument.

The most obvious problem is hearsay.  *Jewett v. Brady,* 534 F.3d 67, 72 (1st Cir. 2011) ("The evidence that Jewett argued undermined McGilvray's testimony, thereby supporting his [] claims, consisted of two handwritten notes and a typed police report, all of which were hearsay.").  Also, assuming Defendants could surmount the hearsay issue, which they cannot, their position would nonetheless succumb to the foundation objection.  Defendants' failure even to attempt to lay a proper foundation is, at a minimum, a waiver.  *E.g., Napert v. Gov't Employees Ins. Co.,* 13-10530-FDS, 2013 WL 3989645 (D. Mass. Aug. 1, 2013).

Finally, even were the Court to overlook the admissibility barriers, the representation in the document that Kelley supposedly testified "in essence" to Gloria's statement cannot possibly compel the conclusion that the prosecutor and court were necessarily aware of the exculpatory admission in her statement.  The "in essence" qualifier renders it impossible to conclude as a matter of law that Kelley unquestionably included the exculpatory information in his grand jury testimony, as opposed to just the inculpatory part -- particularly where Haley never would have been indicted by the grand jury in the first place had Kelley come clean about Gloria's admission.  When it comes down to it, Kelley testified to Gloria's statement "in essence" at the criminal trial too without managing to mention that Haley never really did see the sisters on the street after all.  As with Defendants' other points, only a jury can properly decide which inference to draw.

25

> **5.** **The "List Of Materials Submitted To The [District Attorney]" Does Not Prove That The Transcribed Custis Witness Statements Were Ever Provided To The Prosecutor**

Finally, Defendants' Exhibit 14 purports to be an unsigned checklist prepared by Kelley as to items submitted to the prosecutor's office. There might be no need for any jury trial if the document was clear, one way or the other, whether the documents at issue were disclosed or were not disclosed. But the document is not clear. It simply contains an "x" checkmark on the line opposite the word "statements." And contrary to Defendants' contention, that "x" notation does not justify summary judgment in Defendants' favor on the issue of whether Muldoon received the Custis witness statements.

All of that assumes there actually was a signature on the line denoting "received at the Office of the District Attorney," which there is not. *See* Def. Exh. 14. In fact, the document contains no signatures at all, including Kelley's, and there is no evidence in the record that Kelley even created it, let alone actually transmitted any of the information described in Exhibit 14 to the District Attorney. Along the same lines, Defendants have again failed to address the glaring hearsay problem. They do not even attempt to identify an applicable hearsay exception, nor could they, as both Detective Miller and former Commissioner Evans testified at their depositions that this type of document was not one that was created in the ordinary course of business; in fact, it is not something they have ever seen before. P. Resp. to SMF ¶ 54.

Even were the Court to accept to accept the document at face value, it still fails to get Defendants where they are trying to go. Without more, this document is insufficient to prove that "statements" purportedly provided to Muldoon included the Custis transcribed witness statements. For summary judgment purposes, the "statements" provided by Kelley could have been some of the other four statements described above (Plaintiff's Exhibits 70-73) wherein Gloria describes how Haley

supposedly committed the murder.  And there are still other witness statements as well.  For example, Plaintiff's Exhibit 73 is a witness statement taken by Defendant Kelley of a neighbor who apparently observed through her window as Gloria fled the apartment after the murder.  On the record before the Court, it would be impossible to conclude as a matter of law that "statements" disclosed by Kelley necessarily included the ones containing the sisters' damning admissions.  Defendants' argument thus fails.[14]

\* \* \* \*

In summary, Plaintiff has proffered Dwyer's qualified opinion testimony that Muldoon's practice would have been to voluntarily disclose all things like the exculpatory Custis witness statements if he had access to them, and here, Muldoon was also under court order to turn over anything exculpatory.  A reasonable jury could conclude that his failure to provide them to the defense, coupled with his decision to put Gloria on the stand to testify differently on a critical point in the case, amply supports the inference that he did not know about them.  Summary judgment on this point is thus inappropriate.

---

[14]  Equally unavailing is Defendants' contention that the ADA who took over the case in 2007, some 35 years after Haley's criminal trial, did not "have any basis of knowledge that [Brenda and Gloria's] statements were not contained" in the original file.  *See* Def. Mem. at 8-9.  That is obviously not the kind of evidence that supports summary judgment, but to clarify, ADA Meier testified that after "do[ing] their] best to evaluate th[e] issue looking at as many possible factors as [they] could," the Commonwealth reached a conclusion that "the defendant was deprived of certain exculpatory evidence at trial."  PSOF ¶ 65.  As Meier explained, "it wasn't my priority in appearing before Judge Hinkle and trying to meet the hearing dates and make professional decisions collectively to conduct an investigation into whether the statements at issue had been turned over to the D.A.'s Office or not been turned over to the D.A.'s Office.  Our focus which was our professional collective priority was to try as best we could to determine whether or not the statements had been turned over to Mr. Haley's attorney."  *Id.*

27

### III.   Plaintiff's Evidence Establishes A Constitutional Injury For Which Qualified Immunity Is Not Applicable

In an attempt to pretend as though the appeal never occurred, Defendants half-heartedly asks this Court to reject the First Circuit's holding that Haley's allegations, if accepted by a finder of fact, give rise to a due process violation for which there is no qualified immunity.  According to Defendants, "[e]ven if the Defendants had purposefully withheld the statement from the prosecutor, they are still entitled to qualified immunity because this would not rise to the level of unconstitutional behavior outlawed under *Mooney v. Holohan,* 294 U.S. 103, 112 (1935)."  Def. Me. at 15-16.

There is no room for that argument in light of the First Circuit's opinion.  The Court of Appeals was clear that if a jury decided to credit Haley's allegations, then the type of misconduct Haley identifies not only violated the Constitution, but did so plainly that qualified immunity is unavailable.  *Haley,* 657 F.3d at 49-50 ("There is no doubt that this due process protection applies to police officers who deliberately keep the defense in the dark about important evidence.  Haley has brought himself within the encincture of this protection. ... We think that, even as far back as 1972, a reasonable officer in the circumstances alleged here would have understood that parlous behavior of the sort described in Haley's complaint would contravene the constitutional right limned in *Mooney* and its progeny.").

As discussed, Haley has established -- for Rule 56 purposes -- all the elements necessary to support a *Mooney*-based *Brady* claim.  The Defendants possessed the witness statements.  The witness statements fundamentally contradicted the Commonwealth's theory of the case, and thus were material and exculpatory.  So much so, in fact, that when they surfaced for the first time three decades later, the Commonwealth voluntarily moved to vacate Haley's conviction on that basis alone.  Kelley, who helped prepare the case against Haley and sat through the trial at counsel table, was subjectively aware of the significance of the statements.

The only real question, therefore, is whether the Defendants shared this evidence with the prosecutor, or whether, as Haley contends, Defendants simply kept it to themselves.  If the jury decides they did the latter, then the Constitutional right identified in *Mooney* has been violated.  Because Plaintiff's evidence suffices to support that inference, summary judgment and qualified immunity are unavailable.

## IV.   Defendants Have Failed To Justify Summary Judgment On The Basis Of Their Statute Of Limitations Defense

Defendants allege that all counts against Defendants Kelley and Harrington are time-barred pursuant to M.G.L. c. 197, § 9 ("Section 9") because Plaintiff's cause of action did not accrue (with the overturning of his conviction) until long after they were dead, and certainly more than one year.  Defendants' argument fails because M.G.L. §§ 9A and 10 ("Section 9A" and "Section 10") provide safe harbors, both of which apply here.

### A.   Section 10 Provides a Viable Basis for Suing Kelley and Harrington

Section 10 allows claims against an estate more than a year after the decedent's death "where required by justice and equity," provided the creditor is "not chargeable with culpable neglect."  *Mullins v. Garthwait,* 875 F.Supp. 14 (D. Mass. 1994); *Gates v. Reilly,* 453 Mass. 460, 468-69 (2009); *In the Estate of Grabowski,* 444 Mass. 715, 718-22 (2005).

As to the first requirement, Massachusetts courts have long held that justice and equity favor recognizing a creditor's time-barred claims where the claims are meritorious.  *E.g., Downey v. Union Trust Co. of Springfield,* 312 Mass. 405 (1942).  As set forth in this Memorandum, Haley's claims against Defendants Kelley and Harrington are well-supported by both the facts and law governing this case, and justice and equity compel that there be a remedy.  In fact, it would be the opposite of justice if Haley were denied a remedy simply because it took so many years for his conviction to be recognized as wrongful that, in the meantime, the alleged malfeasants who violated his rights had retired and died.  Especially where, as

here, the very nature of the contention is that the truth was suppressed by the same Defendants who now seek refuge behind the time bar, justice and equity strongly favor recognition of a timely cause of action. *Mullins,* 875 F. Supp. at 25-26.

With regard to the latter requirement addressing culpable neglect, where the cause of action did not accrue until more than one year after the death of the defendant, the plaintiff cannot be charged with culpable neglect. *Cf. Gates,* 453 Mass. at 468 ("To be entitled to relief under § 10, a creditor must establish that his failure to file suit within the one-year limitations period 'was not due to his carelessness or any lack of diligence for which he might properly be censured or blamed.'"). That is the circumstance present here. While Haley's claims arise from events transpiring long ago, it is well-settled that the cause of action based on the wrongful conviction did not accrue until the conviction was invalidated. *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994) ("[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed . . . ."); *Johnson v. Evans,* 223 F. Supp. 2d 357, 360-61 (D. Mass. 2002) (denying motion to dismiss arising from claims that BPD withheld exculpatory evidence).

**B.    Section 9A Provides an Independent Basis for Suing Kelley and Harrington**

Section 9A provides another, independent exception to the one-year limitations period. Pursuant to Section 9A, a claim may be brought against an estate "within three years next after the cause of action accrues . . . provided . . . that any judgment recovered in any action so brought may be satisfied only from the proceeds of a policy of insurance or bond, if any, and not from the general assets of the estate."

Defendants argue that "[t]here is no insurance or bond from which any judgment may be recovered." Defs. Mem. at 10. Not exactly true. State police officers, for example, are indemnified for civil rights actions up to one million dollars. M.G.L. c. 258 § 9A. Municipalities, such as Boston, may similarly indemnify police officers. M.G.L. c. 258 § 13. That certainly appears to be the case here: the City of Boston has retained counsel to represent both the City and the individual Defendants.

In practice, the City of Boston stands behind its officers and indemnifies them for liabilities arising in the scope of their employment. There is no reason why this case should not follow a similar pattern.[15]

## V.    Summary Judgment Is Also Unavailable On Plaintiff's *Monell* Claim Against The City Of Boston

In a very real sense, Boston is the party that is truly responsible for the tragedy of Haley's wrongful conviction. Even if the individual Defendants had never been part of the case, Haley can still recover on his *Monell* claims against the City of Boston.

To be clear, Haley fully understands that when the First Circuit remanded Haley's claims for further proceedings, that was not the same thing as ruling that Haley's allegations had factual support. Rather, the appellate court merely gave Haley an opportunity to try to come up with evidence tending to establish a municipal policy and practice that effectively discouraged police disclosure of exculpatory evidence. The First Circuit was clear that Haley was going to have to support his allegation with testimony of intentional institutional suppression if the case was going to survive for trial.

Haley has more than met that challenge. As far as *Monell* claims go, Haley has proffered evidence of the most powerful nature possible. Former Commissioner

---

[15]  As Defendants point out, Harrington died months before Haley's criminal trial. As such, Plaintiff does not oppose his dismissal.

of the BPD (1972-76) Robert DiGrazia, the BPD Director of Training and Education Robert Wasserman, and former Assistant District Attorney Thomas Dwyer have all provided lengthy declarations and extensive deposition testimony describing the Department's deliberate indifference to a policy and practice that encouraged Boston detectives to believe that they were supposed to avoid helping the "bad guys" by disclosing exculpatory evidence. According to the picture painted by these top officials, people in the very best position possible to know, the BPD remained stuck in a pre-*Brady* mindset for a period of time that lasted until after Haley's conviction. The net result, according to these witnesses, was a policy and practice of indifference to the problem of rampant suppression.

If there was better evidence in support of a *Monell* claim, it is difficult to conceive of what that evidence might look like. If one were to hypothesize about the best available testimony to prove Haley's *Monell* claim, one could no better than what Haley uncovered here. And the reason Haley was able to develop this evidence from top Boston officials is because Haley happens to be correct. The BPD did have a very real problem in the 1960s and early 1970s: its policymakers turned a blind eye to the fact that its detectives felt entitled to hold back evidence that might damage criminal cases. It was not until later, in the mid-1970s, that the BPD got serious about dragging its rules and practices into the post-*Brady* era of more open disclosure. That change, however, came too late for Haley and others like him, who were convicted as a direct result of the prior policies and practices.

## A.    Legal Standard Governing Plaintiff's *Monell* Claim

Municipalities are not vicariously liable under section 1983 for the actions of their non-policymaking employees. *Haley,* 657 F.3d at 52. Under familiar principles, a municipality can be liable under §1983 where a constitutional violation resulted from a municipal policy or practice. *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 694 (1978). In addition to establishing an offending policy, plaintiffs

can prevail by demonstrating a widespread practice sufficiently well-settled to constitute a "custom or usage." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988). Finally, municipalities can also be liable for failure to train, where the need for more or better training is sufficiently obvious, and where the lack thereof causes injury. *City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989).[16]

The defense of qualified immunity is unavailable to municipalities. *Owen v. City of Independence,* 445 U.S. 622, 657 (1980). Moreover, *Monell* claims "of this nature are measured under current law, without regard to whether the municipality's legal obligations were clearly established when the alleged malfeasance occurred." *Haley,* 657 F.3d at 51, citing *Barber v. City of Salem,* 953 F.2d 232, 237-38 (6th Cir.1992).

### B.  Haley Has Proffered Sufficient Evidence Of A BPD Policy (Or Nonpolicy) That Permitted Detectives To Systematically Withhold Exculpatory Evidence

The policy claim alleged here is essentially the absence of a policy where the need for one was plain. A municipality may be held liable under Section 1983 for its failure to implement a policy in "a situation that demands a policy" and that the failure to implement a policy "ignored a plainly obvious danger." *Armstrong v. Squadritto,* 152 F.3d 564, 577-78 (7th Cir. 1998). In *City of Canton v. Harris,* 489 U.S. 378 (1989), the Supreme Court "distinguished between a city's deliberate or conscious choice not to have a policy, which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise

---

[16] The Supreme Court teaches that §1983 policy and practice claims against municipalities serve an important function in our Constitutional system. While "[a] damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, [] the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed." *Owen v. City of Independence,* 445 U.S. 622, 650 (1980) ("How 'uniquely amiss' it would be, therefore, if the government itself -- the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct -- were permitted to disavow liability for the injury it has begotten. . .").

sound program." *Id.* (internal citations and quotation marks omitted). "[M]unicipal liability under Section 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *City of Canton,* 489 U.S. at 388-89, quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-484 (1986).

In order to prevail on such a claim, Plaintiff must show the city failed to establish a "policy in a situation that demands such a policy." *Armstrong,* 152 F.3d at 577-78. A municipality may also be held liable under Section 1983 for failure to implement a policy in situations that call for procedures, rules or regulations. *Sims v. Mulcahy,* 902 F.2d 524, 543 (7th Cir. 1990) (citing *Harris v. City of Marion,* 79 F.3d 56, 58-59 (7th Cir. 1996) (failure to implement policy is actionable); *Armstrong,* 152 F.3d at 579 ("While the Constitution does not impose an affirmative duty on jail officials, it does hold them responsible when their failure to devise adequate policies results in an injury.").

Haley meets that test here. As stated, he relies primarily on the testimony of Robert DiGrazia and Robert Wasserman. DiGrazia served as the Commissioner of the BPD from November 1, 1972 to November 15, 1976, in which capacity he was "primarily responsible for administering and setting all BPD policies," and was also responsible for training Boston police officers. *Id.* ¶ 74. Wasserman served as the BPD's Director of Training and Education from 1973 through 1976. *Id.* ¶ 76.

As DiGrazia summarized, police department policies are "designed to provide guidance to police officers about how to do their jobs. . . [T]o be effective, policies have to be reasonably detailed to provide the officer with fair notice of his responsibilities under the law." PSOF ¶ 79. At the time Haley was arrested and prosecuted, the BPD was still operating under its Rules and Regulations **from 1950.** *Id.* ¶ 126. These policies obviously pre-dated *Brady*, and "were outdated, at best." The Department's Rules did not, for example, address in any way the disclosure of

exculpatory and/or impeachment evidence.  *Id.* ¶ 83, citing Exhibit 37, DiGrazia
Report at 7 ("Nothing in Rule 43 (or any of the other rules) from the 1950
department rules and regulations manual required the turning over of exculpatory
and/or impeachment evidence.").  *See Bordanaro v. McLeod,* 871 F.2d 1151, 1159 -
1160 (1st Cir.1989)  ("The City of Everett was operating under a set of rules and
regulations promulgated in 1951 and last distributed to the officers in the mid-
sixties. The Rules and Regulations of the Everett Police Department ... failed to
address contemporary law enforcement issues and lacked sufficient detail to serve
as the operating directives of a modern police force. Specifically, they failed to
address up-to-date standards governing search and seizure, hot pursuit and the use
of deadly force.").

Based on his "observations and personal experiences as the Commissioner of
the BPD from 1972 to 1976," DiGrazia testified to a "reasonable degree of
professional certainty" that "there was no policy or practice in the BPD at that time
requiring the disclosure of exculpatory and/or impeachment evidence to state
prosecutors or to defendants."  PSOF ¶ 80.  Corroborating DiGrazia, Wasserman too
testified that there was "no policy that required [exculpatory and/or impeachment
evidence] to be turned over."  *Id.* ¶ 81.[17]

In support of summary judgment, Defendants rely on BPD Rule 43, which
they claim required its detectives to comply with *Brady.*  The evidence on that point
is disputed.  According to DiGrazia and Wasserman, Rule 43 did not address the
disclosure of exculpatory and/or impeachment evidence.  PSOF ¶¶ 83-84 (Rule 43
"does not deal with exculpatory and/or impeachment evidence").  Rather, Rule 43
instructed police officers on how to testify.  *Id.* ¶ 85 (citing deposition testimony of

---

[17]  The BPD had no manual governing investigative procedure until later in the
1970s, when DiGrazia put together a Task Force to create one as part of
Wasserman's and DiGrazia's efforts to modernize the internal processes of the
Department.  PSOF ¶¶ 98, 118.

former Superintendent and Chief of the BPD Robert Dunford).  Indeed, "[t]o the extent that police officers were taught about Rule 43 in the Academy prior to or during [Wasserman's] tenure as Director of Training (they would not be taught about Rule 43 outside the recruit Academy unless changes were made to the Rule), the training was that officers were to testify truthfully - *i.e.,* answer questions in a clear, concise and truthful manner - and to make a good impression on the judge or jury.  Evan at that, Rule 43 left much to the discretion of the individual police officer."  *Id.* ¶ 86 (citing Wasserman's deposition testimony that the rule did not cover disclosure of exculpatory evidence).[18]

Equally problematic on the policy front was the conspicuous absence at the time of any General Orders or Special Orders requiring the disclosure of exculpatory and/or impeachment evidence.  PSOF ¶¶ 88-92; *see also id.* ¶ 82. "[A]ny major changes in the law or in [BPD] procedure would have first been issued in a General Order. . ."  Wasserman described the pre-DiGrazia approach for organizing the detectives' procedural manuals as a "ridiculous system."  *Id.* ¶ 89 ("I think there were only two or three of those manuals in the Department that contained all of those stickers.").  No copies of general orders were made or distributed.  *Id.* ¶ 90.  In any event, there was no General Order regarding the disclosure of exculpatory or impeachment evidence issued during DiGrazia's tenure

---

[18]  As Wasserman further explained, "[i]f Rule 43 was designed to direct officers to disclose exculpatory or impeachment evidence, which it was not, it was similarly inadequate."  *Id.* ¶ 87.  In his words, Rule 43

> did not identify what exculpatory or impeachment evidence was; it did not even use the words exculpatory or impeachment evidence.  It also said nothing about disclosing or withholding evidence, how evidence should be disclosed, when it could be withheld, and the repercussions if an officer should withhold information from a prosecutor.  Given the changing nature of the law on this topic during the 1960s and 1970s, if Rule 43 were designed to mandate disclosure of evidence, it was woefully inadequate to do so and should have been regularly updated to keep up with the law on this issue.

*Id.* ¶ 87, citing Exhibit 36, Wasserman Report at ¶ 25.

with the BPD.  *Id.* ¶ 92 ("To the best of my knowledge, no such Orders and no such training ever existed), citing Exhibit 34, Spellman Dep. at 62-63 (does not recall any general orders describing a police officer's obligation under *Brady* to disclose exculpatory and/or impeachment evidence).  Nor did the Defense provide any General Orders or other relevant documentation to support their position during discovery.  *Id.* ¶ 92.

In sum, there is ample evidence in the record to permit a jury to conclude that it was the BPD's policy not to require disclosure of exculpatory evidence.  From there, it is a short step to causation.  DiGrazia explained that "[t]he obvious problem with the BPD having no policy on the disclosure of exculpatory and/or impeachment evidence is that it left it up to the individual officer to figure out what he had to disclose.  In other words, it gave far too much discretion to individual officers to determine whether to turn over exculpatory and/or impeachment evidence."  PSOF ¶ 93.  "That discretion permitted officers to deliberately suppress exculpatory and/or impeachment evidence without violating the BPD's policies; indeed, without repercussion as he would be in violation of no rule."  *Id.  See also Bordanaro*, 871 F.2d at 1160 ("Since few rules or guideposts for conduct were in force, the organization of the police department placed too much discretion at all operating levels.").[19]

---

[19] There were no changes made to Rule 43 between 1950 and 1972.  PSOF ¶ 126 ("At the time that Mr. Haley was arrested and prosecuted, the department was still operating under the BPD's Rules and Regulations manual from 1950.").  In fact, the BPD did not adopt a Rule requiring disclosure to prosecutors until Rule 320 was enacted in 1992.  *Id.* ¶ 131.

C.     **Independently, Haley Has Proffered Sufficient Evidence Of Deliberate Indifference To A Widespread Practice Of Withholding Exculpatory Evidence**

It should hardly come as a surprise that the aforementioned BPD's policy gave rise to a widespread practice of suppressing exculpatory and/or impeachment evidence.  PSOF ¶¶ 94, 124.  According to no less an authority than the former BPD Commissioner: "In my personal experience, based on regular interactions with the superintendents, commanders, detectives, and officers who served under me, it was standard practice at that time [1972] not to disclose exculpatory and/or impeachment evidence to state prosecutors or to defendants."  *Id.*

The Defendants disagree.  But instead of citing any dispositive testimony or documents, their Memo sweepingly dismisses any suggestion that Haley could satisfy the legal claim defined by the First Circuit's *Haley* opinion, namely, that there was indifference to a practice of "deliberately concealing evidence through deception" resulting in false convictions.  Def. Mem. at 33, citing *Haley,* 657 F.3d at 49.  Defendants call the very suggestion that such a practice could have existed an "aburdity."  Def. Mem. At 33.

The First Circuit did not find it absurd.  Not in the least.  In rejecting Defendants' *Twombly/Iqbal* challenge, Judge Selya's opinion had no trouble finding that proposition plausible:

> Given the volume of cases involving nondisclosure of exculpatory information and the instant failure to disclose statements that clearly would have undermined the prosecution's theory of the case, we think that the municipal liability claims pleaded by Haley step past the line of possibility into the realm of plausibility. [Citing *Iqbal*].  Indeed, if the detectives intentionally suppressed the discoverable statements even when such activity was condemned by the courts (as Haley has alleged), it seems entirely plausible that their conduct was encouraged, or at least tolerated, by the BPD.

*Haley,* 657 F.3d at 53.

It turns out that Haley's evidence bears out the First Circuit's suspicion.  When DiGrazia took over the BPD later in 1972, he confronted a Department still

operating under policy manuals dating from the 1950s.  PSOF ¶ 126.  DiGrazia describes a prevailing attitude and widespread practice of evidence suppression.  *Id.* ¶ 95 ("The reality is that at that time the feeling among police officers and detectives in the department was that they were in the business of arresting potential criminals, not helping them.  If officers felt that they had their man, they were not going to do anything to help the defendant or his attorney.").  Wasserman observed the same practice: "There was a sense within the Department that officers were not in the business of helping out persons they perceived to be criminals."  *Id.* ¶ 96.[20]

The perception of policymaker indifference to the problem was corroborated from the prosecutor perspective.  Former ADA Dwyer testified that the District Attorney's Office experienced regular problems with the BPD turning over exculpatory evidence to the prosecutors during his tenure in Suffolk County (1972-78).  PSOF ¶ 99 ("This included the detectives failing to turn over exculpatory evidence, including impeachment evidence.").  As Dwyer explained at this deposition, "there was a natural reluctance coming from the old days of doing anything - putting anything in a report that could hurt your case period.  That's the way it was.  And I know from the game that's the way it was in the 50's, the 60's, and that's the way it was in the 70's too is the natural reluctance from the Boston Police to put everything into a report, particularly exculpatory."  *Id.*  Dwyer personally participated in regular meetings at the DA's office during these years, giving him first-hand observations that "this was a problem getting the Boston

---

[20]   In trying to rebut Plaintiff's evidence, Defendants rely on deposition testimony from BPD police officers Herbert Spellman, Edward McNelley, Robert Dunford, and Thomas Miller.  The problem with Defendants' position is that each of these men was a patrol officer during the Haley investigation, and not a detective.  PSOF ¶ 105.  As patrol officers, they would not have any significant contact with detectives, and thus have no foundation to describe detective practices, as several candidly concede.  *See id.* ¶ 106.  But regardless, the best that Defendants can establish is a dispute of fact.

police officers to get everything into their reports and get it right and including exculpatory was a problem." *Id.* ¶ 99.[21]

Faced with this devastating evidence provided by precisely the witnesses who had the most knowledge, Defendants make several responses, none of which are persuasive. First, Defendants challenge DiGrazia's basis to opine on the state of BPD practices and indifference at the time of Haley's trial in early 1972 because he did not take over until November of 1972. The criticism fails to withstand scrutiny. DiGrazia's opinions about the existence of deliberate indifference to the suppression practice certainly permits a fair inference that the problem did not spontaneously arise in November of 1972. The Department's policy manuals and practices were rooted in the 1950s. If Defendants are going to insist that the suppression problem was actually under control in the early 1970s but did not come into being until November 1972, that is an argument they should have to make to a jury.

Defendants also quibble with the fact that DiGrazia does not identify specific cases, quantify with precise numeric frequency, or list names of specific offending officers.[22] These are classic subjects for cross-examination, but Defendants cite no

---

[21] Dwyer further testified that if an ADA in Suffolk County in 1972 got an inconsistent statement, that statement would be turned over. "But the problem is how often did you actually get such a report." PSOF ¶ 100 ("There always was a tension between the police and the D.A.'s Office as to whether or not you got all of the information. A lot of it I think depended upon the individual detectives. Sometimes you'd get the file, everything would be right there, everything would be organized, all the bases would be covered. Sometimes you don't. Sometimes in the middle of a recess you have to turn to the detectives and say what is going on here. And then the detective says oh, this, you know, oh, yeah, okay, I'll call over and see if we can get that report for you. *It happened all the time.*") (emphasis added).

[22] Actually, multiple reported cases from that time period do provide examples of the BPD suppression problem. *See* PSOF ¶¶ 104-05. On that subject, however, Defendants place unjustified reliance on cases holding to the effect that a relatively small pattern of occurrences is insufficient in and of itself to permit an inference of a widespread practice. What Plaintiff has provided here is very powerful *direct evidence* of the widespread practice. This extraordinary testimony from the top official of the BPD and its director of training, corroborated by a respected ADA with personal knowledge of the problem, is submitted in lieu of the more difficult proposition of trying to prove the existence of a widespread pattern through specific examples of misconduct.

40

case law suggesting that the DiGrazia evidence can be disregarded wholesale on that basis.  Along similar lines, there is also no merit to Defendants' claim that DiGrazia's report is supposedly a "formulaic recitation of the elements of a cause of action" containing the "magic words" and nothing more.  Def. Mem. at 26-27.  Any fair reading of DiGrazia's Report reveals it to be legally-satisfactory (and devastating) testimony about deliberate indifference to a serious Constitutional deficiency in the BPD's practices of at time.  *See* Plaintiff's Exhibit 37.

Defendants also argue that DiGrazia's declaration fails to demonstrate actual or constructive knowledge of the offending practice, but it most certainly suffices for the latter.  Because policymakers are often disinclined to make damaging admissions about having turned blind eyes, the case law permits the inference of constructive knowledge where, as here, there is evidence that the problem is sufficiently widespread.  In this Circuit, as elsewhere, constructive knowledge "may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them."  *Bordanaro v. McLeod,* 871 F.2d 1151, 1157 (1st Cir. 1989), citing, *inter alia, Spell v. McDaniel,* 824 F.2d at 1387; *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984) (*en banc*).

### D.   Independently, Haley Has Also Proffered Sufficient Evidence That The Wrongful Suppression Of Evidence In His Case Was Caused By A Failure To Train

At the outset, there can be no dispute that the need for adequate training on this issue was sufficiently "obvious" within the meaning of the case law.  The *Haley* appellate opinion forecloses any suggestion that a police department in 1972 lacked notice that there would be a Constitutional problem if police officers (as opposed to prosecutors) were not trained to avoid intentional suppression of exculpatory evidence.  In *Haley,* the First Circuit held not only that police who withhold exculpatory impeachment evidence violated the Constitution, but, more to the point,

41

that qualified immunity was unavailable for such a claim because no police officer in 1972 could have thought otherwise in good faith. *Haley,* 657 F.3d at 49-51. *See also Barbee v. Warden, Md. Penitentiary,* 331 F.2d 842, 846 (4th Cir. 1964); *Smith v. Florida,* 410 F.2d 1349, 1351 (5th Cir. 1969); *United States v. Bryant,* 439 F.2d 642, 648 n.11 (D.C. Cir. 1971); *Curran v. State of Delaware,* 259 F.2d 707, 713 (3rd Cir. 1958) (opinion below 154 F.Supp. 27); *Clarke v. Burke,* 440 F.2d 853, 855 (7th Cir. 1971); *Evans v. Kropp,* 254 F.Supp. 218, 222 (E.D. Mich. 1966); *Curran v. Delaware,* 154 F.Supp. 27, 31 (D. Del. 1957); *Walker v. O.E. Bishop,* 295 F.Supp. 767, 775 (E.D. Ark. 1967).

Applying the law to the record, it is an easy call that Haley has a viable claim against Boston for failure to train. For police detectives, as for many other professions, training plays a critical function in ensuring that detectives not only do their job, but also do it properly and in compliance with the law. PSOF ¶ 107. As DiGrazia summarized:

> Training is one of the primary ways that a police officer learns how to do his job and in particular, learns about the law. Although some police officers have graduate education in the law, most do not and it is certainly was neither expected nor required for them at that time. As a result, police officers learn the law on the job through training. Although training cannot touch upon every single issue that an officer will face in his or her job, it is particularly important that it address the more fundamental legal issues as well as complex and nuanced legal concepts such as the disclosure of evidence to the prosecutor. Without this training, an officer could not be expected to know that he was required to turn over exculpatory and/or impeachment evidence; indeed, he might not even know what evidence constituted exculpatory evidence and what constituted impeachment evidence.

PSOF ¶ 125, citing Exhibit 37, DiGrazia Report at 6.

In support of their motion, Defendants place heavy reliance on the training provided at the academy, but at best they have created a dispute of fact. Plaintiff's competing evidence suggests that the academy was actually part of the problem, rather than the solution.

When Wasserman took over the police academy in 1973, "[i]t was a very bizarre time in history in that academy." PSOF ¶ 108. Upon an extensive review of

all training and training materials, Wasserman concluded that the infrastructure of the academy was badly in need of an update, as were the training materials, which had to be totally redone.  *Id.* ¶¶ 109-11.  After undertaking this review, Wasserman determined that there was no training at the Academy on the duty to disclose exculpatory and/or impeachment evidence.  *Id.* ¶ 113.  DiGrazia concurred that the duty to disclose exculpatory and/or impeachment evidence to the prosecutor was not taught at the academy, *id.* ¶ 114, as did Former Commissioner Evans, former Sergeant Detective Miller and former Sergeant Detective Spellman.  *Id.* ¶ 115.

As for the Department itself, DiGrazia testified that there was no such training at the BPD either.  PSOF ¶ 114 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *see also id.*, citing Digrazia Report at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence).

When he took over in 1972, the BPD's failure to train police officers about their obligation to disclose evidence to the prosecutor was of significant concern to DiGrazia, and he raised that issue with Wasserman.  PSOF ¶ 119.  This concern extended to both young police officers and detectives.  *Id.* ¶ 120.  As to the latter, Wasserman explained that "[w]hat happens is that when you become a detective, which is the investigator role, you learned from your peers, and therefore there were past practices in the Department that were of concern to the administration, and those past practices may well have been different from what was required under the law."  *Id.* ¶ 120 ("[W]hat happens is after people are on the job for a few years, they start to feel a part of the prosecution team instead of maintaining their neutrality.").

43

Wasserman's concerns were particularly acute because prior to his arrival at the academy in 1973, there was no in-service training and no additional training once an officer became a detective.  PSOF ¶¶ 121-23.  With no training at the BPD in 1971 and 1972 on the requirement to disclose exculpatory and/or impeachment evidence, there was no guidance to detectives about what to do with such evidence. *Id.*  Nor would detectives have any notice of this legal requirement.  *Id.* ¶ 123 ("I think you have to train and I think you have to supervise, and we certainly had questions about the quality of supervision throughout the Department, which is why we then instituted a supervisory training program.").  *See Bordanaro,* 871 F.2d at 1160 ("Aside from emergency medical instruction, Everett officers received little or no formal training after completing their initial police academy courses. The officers thus lacked up-to-date direction in many police procedures, including the proper use of force.").

In Wasserman's opinion, the absence of training on turning over exculpatory and/or impeachment evidence led to a policy and practice in the Department of not disclosing this type of evidence to prosecutors or defendants.  PSOF ¶ 124.  "In fact, because the only training on this issue was informal-on-the-job training, the policy and practice of the Department of withholding evidence became reinforced: younger officers probably learned to withhold evidence by watching more senior officers do the same."  *Id. See also id.* ¶ 124, citing Exhibit 37, DiGrazia Report at 6 ("The absence of training on the disclosure of exculpatory and/or impeachment evidence is directly linked to the practice of the department at the time; that is, to withhold exculpatory and/or impeachment evidence.").  *Bordanaro,* 871 F.2d at 1160 ("There was no supervisory or command training required upon promotion to a higher rank. Supervisory officers, therefore, lacked the basic training due all officers and the command training necessary to effectively supervise and operate a police force.").

44

As stated above, the BPD's policy manual dated from the 1950s, and prior to DiGrazia's arrival, the Department made no changes to training on the duty to disclose exculpatory and/or impeachment evidence.  PSOF ¶¶ 82, 126.  DiGrazia "oversaw a major overhaul of the rules and regulations of the BPD starting in 1972, and as to the changes, which he "considered to be fairly basic and obviously necessary in light of the law, there was a tremendous amount of pushback from those members of the department."  *Id.* ¶ 128.

Based on the foregoing, Haley has established an archetypal failure to train claim.  *City of Canton,* 489 U.S. at n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the Constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.") (internal citation omitted).  Haley's claim is corroborated by the Defendants' own witnesses, the people in the best position to know the truth.  Given their extraordinarily candid and forthright admissions that training was a serious problem in the early 1970s, summary judgment is unavailable on this claim as well.  *Young v. City of Providence,* 404 F.3d 4 (1st Cir. 2005) (finding that allegations that shooting of plaintiff's son by a police officer was due to the city's lack of training, which allegedly caused the officer-defendant to take actions that were objectively unreasonable, sufficient to state *Monell* claim).

## Conclusion

Plaintiff suspects that when the Court picked up this Memorandum, it may well have been skeptical about whether Haley could overcome summary judgment. It turns out, however, that Plaintiff obtained extremely powerful testimony from the former Superintendent of the BPD, as well as its Director of Training and other insiders with personal knowledge.  These witnesses were willing to corroborate the existence of a widespread pattern and practice, and summary judgment is thus inappropriate.

Respectfully Submitted,

/s/Jon Loevy

Jon Loevy
Gayle Horn
Vince Field
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, IL 60607