UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ESTATE OF JAMES HALEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:2009 CV 10197 |
| vs. | ) | |
| | ) | |
| CITY OF BOSTON, *et. al.*, | ) | JUDGE STEARNS |
| | ) | |
| Defendants. | ) | JURY TRIAL |

**PLAINTIFF'S L.R. 56.1 STATEMENT OF ADDITIONAL MATERIAL
FACTS NOT IN DISPUTE IN SUPPORT OF SUMMARY JUDGMENT**

## I.    James Haley

1.    In 1968 or 1969, James Haley and Brenda Haley began dating. *See* Exhibit 7, Whitehurst Dep. at 26.    Mr. Haley and Brenda Haley got married in 1970. *Id.* at 27; *see* Exhibit 1, Bettis Dep. at 57. The ceremony was held at Patricia Bettis' house in; Ms. Bettis is James Haley's sister. *See* Exhibit 1, Bettis Dep. at 18 (Patricia Bettis is Mr. Haley's sister); *id.* at 59 (wedding was at her house).

2.    During his marriage to Brenda Haley, Mr. Haley worked at the Massachusetts Institute of Technology. *See* Exhibit 7, Whitehurst Dep. at 29. Mr. Haley was a diligent worker who loved his job. *See id.* at 29; *see* Exhibit 1, Bettis Dep. at 77.

3.    Patricia (Mason) Bettis described James Haley's and Brenda Haley's relationship as "happy go lucky." Exhibit 1, Bettis Dep. at 60. Ms. Bettis further offered that "we all got along well." *Id.* (also explaining that she would stop by and visit with Brenda and James or go for dinner).

4.      The same was true for Ms. Haley's family.  James Haley got along well with Gloria Custis, Brenda Haley's sister, and with David Myers, the father of Gloria Custis' child.  *See* Exhibit 7, Whitehurst Dep. at 36-37; Exhibit 8, Custis Dep. at 56-57.  Mr. Haley and Mr. Myers were friends and neither Gloria Custis nor Brenda Haley ever witnessed any dispute between Mr. Haley and Mr. Myers.  *See id.*

5.      In fact, James Haley and Brenda Haley lived with Gloria Custis and David Myers for a period of time.  *See* Exhibit 8, Custis Dep. at 17; Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 355; Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 231 (Haley lived with her and David Myers "for about a month . . . [f]rom the end of February to the end of March").

6.      On May 3, 1971, Ms. Haley left Mr. Haley and returned to Delaware.  *See* Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 356.  Prior to Mr. Myer's murder, Mr. Haley learned that Ms. Haley had moved to Delaware.  *See* Exhibit 1, Bettis Dep. at 61 (prior to Myers' murder, Mr. Haley told her that Brenda had moved back to Delaware).

7.      Brenda Haley testified that she left Mr. Haley because she realized that James Haley was not right for her; that is, that they did not have anything in common.  Exhibit 7, Whitehurst Dep. at 329 (left Mr. Haley because she realized that "he wasn't for me"); *id.* at 34 (left Haley because "we really didn't have anything in common").

8.      In Delaware, Ms. Haley was living with her parents and they did not have a telephone.  *See* Exhibit 7, Whitehurst Dep. at 43 ("We did not have a telephone at the time.")  Ms. Haley had no contact with Mr. Haley between May 3, 1971 and July 11, 1971.  *See* Exhibit 12, Brenda Haley Testimony,

*Commonwealth v. Haley*, No. 58947, at 370-71 ("Q.  And you hadn't seen or heard from James in how long prior to July 10th?  A.  The last day I talked to James was May 3rd, prior to July 10th."); Exhibit 6, Brenda Haley Police Statement ("Q.  When was the last time you saw your husband James Haley?  A.  May 3rd.  Q.  And you haven't since him since then?  A.  I seen him last month walking down the street but not talk to him from a distance.").

## II.   <u>David Myers Murder</u>

9.     On July 11, 1971, at approximately 5:25 a.m., police were dispatched to 33 Glenarm.  Once inside, they located the unconscious body of a man, who was later pronounced dead.  *See* Exhibit 43, *Commonwealth v. Haley*, Testimony of Bernard Olsen, at 407-12.  The victim was identified as David Myers.  *See* Exhibit 44, *Commonwealth v.  Haley*, Testimony of Ruth Myers, at 510.

10.     Gloria Custis and David Myers were living together at the time of Mr. Myer's murder.  *See* Exhibit 8, Custis Dep. at 16 (lived with Myers at Glenarm Street).

11.     At the time of the murder, Gloria Custis had known David Myers for approximately a year-and-a-half, and they had a six-month old daughter, Patrice.  *See* Exhibit 8, Custis Dep. at 13; Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 256, 317.

12.     Prior to his murder, David Myers and Gloria Custis had been "disagreeing."  Mr. Myers had also struck Ms. Custis.  *See* Exhibit 8, Custis Dep. at 55-56; Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 259-60, 293, 295.

13.    Mr. Myers was "a large man."  Mr. Haley, by contrast, was "a thin man, skinny."  Exhibit 8, Custis Dep. at 66-67.

### III.    Mr. Haley is Absolutely Innocent of this Crime

14.    Mr. Haley had absolutely nothing whatsoever to do with Myers' murder.  *See* Exhibit 28, Haley Aff. dated Oct. 10, 2007 ("I am innocent of this charge and have never given up on obtaining judicial relief for my wrongful conviction."); *see also* Exhibit 1, Bettis Dep. at 133.  Indeed, Mr. Haley had an alibi for the murder – and even for his whereabouts earlier in the day.  *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day); Exhibit 19, Haley Aff. dated April 27, 1987 (explaining that at the time of the murder he was with Leon Beasley).

15.    In particular, on July 10, 1971, at approximately 4 p.m., Mr. Haley was at work at the Massachusetts Institute of Technology ("MIT").  *See* Exhibit 5, Haley Aff. dated Sept. 5, 1989, at 4-5; Exhibit 17, MIT Visitor's Log and authentication (noting that Haley was at work at MIT from 3:20 p.m. to 4:15 p.m.); Exhibit 2, Sultan Dep. at 78 ("Q.  [D]id he tell you what time he left work at MIT?  A.  I think it was – he said somewhere between 4:00 and 4:30").  After leaving MIT, Mr. Haley "walked across the Longfellow bridge to the Mass. General Hosp. to visit [his] mother who had just recently undergone surgery." Exhibit 20, Haley Aff. dated Sept. 5, 1989 at 4-5; *see also* Exhibit 1, Bettis Dep. at 86 ("my mom had surgery that Saturday"); Exhibit 2, Sultan Dep. at 77 ("He told me that he was at work at MIT.  Then he walked

to cross the bridge to Mass General Hospital where his mother had had surgery I believe earlier that day.").

16.     Mr. Haley was at the hospital visiting with his mother until at least 8:00 p.m. that evening.  *See* Exhibit 22, Barbara Lucas Testimony, *Commonwealth v. Haley*, No. 58947, at 624-25 (explaining that she went to visit Mr. Haley's mother at Massachusetts General Hospital after she got off of work at 6 p.m. and Mr. Haley was there, and that when she left around 7:30 or 8:00 p.m., Mr. Haley was still there); Exhibit 45, Jane Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 578-81 (James Haley came to visit her on July 10 at Mass General Hospital and left around 8:30 p.m.); Exhibit 2, Sultan Dep. at 77 (stating that Haley told him that he stayed at the hospital "until 8:00 or 8:30 I think").

17.     After visiting his mother, Mr. Haley went to the home of Patricia and Leon Beasley for a birthday party for Barbara Marsh.  Haley arrived around at the Beasley's home around 9 p.m.  *See* Exhibit 1, Bettis Dep. at 71, 72-73 (recalls Haley getting to the party "later" around 9 p.m.); Exhibit 46, Patricia (Mason) Bettis Testimony, *Commonwealth v. Haley*, No. 58947, at 587 ("Q. And do you know what time your brother got there?  A. Yes, I do.  Q. What time?  A.  Around nine."); *see also* Exhibit 47, Judith Russell Testimony, *Commonwealth v. Haley*, No. 58947, at 610-11 (recalls seeing Haley arrive at Barbara Marsh's barbeque-birthday party "in the evening . . . it was dark time, in the evening"); Exhibit 48, Patricia Beasley Testimony, *Commonwealth v. Haley*, No. 58947, at 631 (James Haley came back to her house to the party "[b]etween 8 and 9"); Exhibit 2, Sultan Dep. at 77-78 (And then as I recall, he said he took the T.  I'm not sure but I think he said he went home and then he got dressed and went to this party that he was at later that evening.");

18.     There were a number of people at the birthday party, including Patrica Beasley, Leon Beasley, Barbara Marsh, Alice Marsh, Philip Marsh, Judith Russell and Patricia (Mason) Bettis, and Anna Nelson.  *See* Exhibit 3, Beasley Dep. at 15; Exhibit 1, Bettis Dep. at 69-70 (20 to 25 people at the birthday party).

19.     At some point in the evening, the party moved from outdoors, where there was a pool and people were swimming, to inside the Beasleys' home.  *See* Exhibit 1, Bettis Dep. at 75-76; Exhibit 3, Beasley Dep. at 19 (party moved inside at some point when it got dark and Haley was still at the party once it moved inside).  Once inside, the party guests were playing a card game called Whist.  *See* Exhibit 3, Beasley Dep. at 19, 23.

20.     Sometime between 2:45 a.m. and 3:30 a.m., James Haley, Patricia Beasley, Leon Beasley and Judith Russell went to Walt's Roast Beef to get sandwiches.  They drove to Walt's Roast Beef in Judith Russell's car.  *See* Exhibit 3, Beasley Dep. at 20 (went to get sandwiches at Walt's Roast Beef with Judith, James and Leon in Judith's car); Exhibit 48, Patricia Beasley Testimony, *Commonwealth v. Haley*, No. 58947, at 632 ("Did you leave the premises at sometime?  A.  Yes, I did.  Q.  What time did you leave?  A.  I left between quarter past three and 3:30.  Q.  All right.  Who left with you?  A. James Haley, my husband Leon, Judith Russell, and myself.  Q.  And how did you leave the premises?  Did you walk?  A.  We walked downstairs and went to the car, Judith Russell's car.  Q.  Judy Russel's [*sic*] car.  Where did you go? A.  We went to Geneva Avenue, Geneva and Bowdoin Avenue, to Walt's Roast Beef.  Q.  And did you do anything when you went there?  A.  Yes.  Q.  What did you do?  A.  Judith and I sat in the car.  James and my husband went in and picked up sandwiches."); Exhibit 47, Judith Russell Testimony, *Commonwealth v. Haley*, No. 58947, at 611-12 (between 3:00 and 3:30 a.m.

left with James Haley, Leon Beasley and Patricia in her car to Walt's Roast Beef Sandwich place on Geneva Avenue).

21.     James Haley, Patricia Beasley, Leon Beasley and Judith Russell brought the sandwiches from Walt's Roast Beef home.  When they returned, everyone ate the sandwiches that they had bought in the Beasley's kitchen and continued to play Whist.  *See* Exhibit 3, Beasley Dep. at 21-23; *id.* at 24-25 (at time went to bed, Haley was stll there); Exhibit 48, Patricia Beasley Testimony, *Commonwealth v. Haley*, No. 58947, at 632-33 (after picked up sandwiches, went back to Beasley's home); *id.* at 633 (when she left at 4:30 to go to bed, Philip Marsh, Alice Marsh Leon Beasley, Patricia (Mason) Bettis and James Haley were all still in the kitchen); Exhibit 47, Judith Russell Testimony, *Commonwealth v. Haley*, No. 58947, at 612 (after they got the sandwiches, they returned back to the Beasley's apartment and "ate the sandwiches and played some cards . . . We played whist.").

22.     Between 5:15 and 5:30 a.m., Patricia (Mason) Bettis went upstairs in the Beasley home to go to bed.  *See* Exhibit 1, Bettis Dep. at 89-90.  Mr. Haley went upstairs with her.  *See id.* at 90.

23.     Ms. Bettis spoke to Mr. Haley for five to ten minutes once they were upstairs before going to bed.  They talked about visiting their mother in the hospital the next day.  *See* Exhibit 1, Bettis Dep. at 92-94 ("We just talked about what we were going to do the next morning.  You know, I mean to go see my mom."); *id.* at 132 (spoke to James Haley for no more than 10 minutes after they went upstairs to go to bed).

24.     Patricia (Mason) Bettis woke up around 9:00 a.m. the next morning.  *See* Exhibit 1, Bettis Dep. at 94.  When she woke up, Mr. Haley was still sleeping.  *See id.* at 95.  Ms. Bettis told Mr. Haley that they "were going down

to have breakfast." *Id.* Mr. Haley told Ms. Bettis that he was waking up and then came downstairs to the kitchen shortly thereafter. *Id.* at 96; *see also* Exhibit 3, Beasley Dep. at 26-27 (saw Haley later that morning in the kitchen after she got up between 7:30 a.m. and 8:00 a.m.).

25.     Patricia Beasley testified that when she saw Mr. Haley after she woke up on July 11, 1971, there was nothing unusual about his demeanor or appearance that gave her any cause for concern. Exhibit 3, Beasley Dep. at 62.

## IV.    Police Take Witness Statements From Gloria Custis and Brenda Haley

26.     Defendants Kelley and Harrington spoke with Brenda Haley and Gloria Custis on the morning of the murder (July 11, 1971). *See* Exhibit 4, Joseph Kelley Testimony, *Commonwealth v. Haley*, No. 58947, at 527; Exhibit 5, Gloria Custis Police Statement; Exhibit 6, Brenda Haley Police Statement.

27.     At that time, Defendants Kelley and Harrington took a transcribed statement from Gloria Custis. In that statement, Ms. Custis stated that the last time she saw Mr. Haley, prior to "this morning," was "about last month." Exhibit 5, Custis Police Statement at 6 ("Q. Prior to this morning, when was the last time you've seen James Haley? A. The last time I saw him was about last month."); Def's SOF ¶ 11.

28.     Defendants Kelley and Harrington also took a transcribed statement from Brenda Haley on the morning of the murder. In that statement, Brenda Haley stated that the last time she had seen Mr. Haley was "last month walking down the street but not to talk to him, from a distance." Exhibit 6, Brenda Haley Police Statement, at 7 ("Q. When was the last time you saw

your husband James Haley?  A. May 3rd.  Q.  And you haven't seen him since then?  A.  I seen him last month walking down the street but not to talk to him, from a distance."); Exhibit 7, Whitehurst Dep. at 135 ("I'm so serious, sir, when I say that if – whatever I gave here, it was fresh in my mind and it is the truth."); Def's SOF ¶ 14.

### V.    Gloria Custis and Brenda Haley Falsely Allege That They Saw James Haley the Afternoon Before the Murder at The Probable Cause Hearing

29.    On July 23, 1971, there was a probable cause hearing in *Commonwealth v. Haley*, No. 58947.  Both Gloria Custis and Brenda Haley testified at this hearing.  *See* Exhibit 49, Transcript, Motion for New Trial Hearing *Commonwealth v. Haley*, No. 58947, at 12-13 (May 17, 1990); Def's SOF ¶ 22.

30.    At the probable cause hearing, Brenda Haley and Gloria Custis testified to seeing James Haley on the street in Dorchester at 4 p.m. the day before the murder.  *See* Exhibit 49, Transcript, Motion for New Trial Hearing, *Commonwealth v. Haley*, No. 58947, at 12-13 (May 17, 1990) ("Prior to the trial, and Mr. Haley can so testify to this today, Your Honor, if it's required, but at the probable cause hearing the two key witnesses, which was Mr. Haley's estranged wife, Brenda Haley, and her sister Gloria Custis, who was the only alleged eye-witness in this case, testified to seeing Mr. Haley on the street in Dorchester at 4 o'clock.  Mr. Haley as he's being walked out of the probable cause hearing, and has finally Mr. Farese for ten minutes, says 'That is not true.  I was at work.  You notice there is a log, there is a visitor's log I signed in, I signed out.  I was at work at 4 o'clock.  I wasn't on the street. I couldn't have been.'").

31.     Al Farese represented Mr. Haley at the probable cause hearing.  *See id.*; *see also* Def's SOF ¶ 40.

32.     Al Farese had a copy of the transcript of Gloria and Brenda's probable cause hearing testimony.  *See* Def's SOF ¶ 40; *see also* Exhibit 15, Delcore Dep. at 28 ("Al would always have a stenographic recording of the probable cause where he would – they would cross examine and create an immediate story prior to trial.").

## VI.    <u>Mr. Haley's Criminal Trial</u>

### *The Attorneys*

33.     Al Farese represented Mr. Haley at trial.  Mr. Farese was a criminal defense attorney who had a reputation for his excellent cross-examination skills.  *See* Exhibit 14, Natola Report, at 4; Exhibit 10, Dwyer Dep. at 117; Exhibit 2, Sultan Dep. at 68-69 ("His reputation was that he was a phenomenal cross examiner.  He did not put a tremendous amount of preparation into the case, but if you handed him a police report, you handed him a witness, an inconsistent witness statement, he was a bulldog, he would attack the credibility of the witness effectively." *see id.* at 128-29 ("Mr. Farese's approach was to study the file and hone in on the stuff he could use to attack those key witnesses and attack, attack, attack.  And he by reputation won an awful lot of cases that way.").

34.     Former Assistant District Attorney Thomas Dwyer described Mr. Farese as "very smart, very smart and…I think he certainly was one of the most aggressive lawyers that I ever bumped into my careers six years in the D.A's Office."  *See* Exhibit 10, Dwyer Dep. at 117.

35.    Gerald Muldoon was the Assistant District Attorney who prosecuted Mr. Haley on behalf of the Commonwealth.  Mr. Dwyer met Mr. Muldoon very early on in Mr. Dwyer's tenure at the District Attorney's Office and came to know Mr. Muldoon "pretty well."  Exhibit 10, Dwyer Dep. at 111; Exhibit 30, Dwyer Aff. at ¶ 5 ("As an Assistant District Attorney for the Suffolk County, I came to know Gerald Muldoon well and worked with him often.").

36.    According to Mr. Dwyer, "if you had to pick an assistant in your entire tenure that was solid as a rock professionally and ethically, you know, he's probably number one.  He's probably number one.  I mean he's just – he would – I used to think he was like a priest, you know, you're just like, you know, he just had this whole demeanor.  And he's one of these guys that I thought lacked the capacity to be rogue when it came to hiding – you know, give somebody an unfair trial."   Exhibit 10, Dwyer Dep. at 112.; *id.* at 112-13 ("I mean I can tell you that I never heard of any problem having to do with Gerry Muldoon in any regard whatsoever.  I always said class act."); Exhibit 30, Dwyer Aff. at ¶ 5 ("Mr. Muldoon had an impeccable reputation for honesty and adhering to all of the ethical and legal requirements for prosecuting cases.").

### Mr. Haley's Pre-Trial Motions

37.    Prior to Mr. Haley's trial, Mr. Farese filed several pre-trial motions. *See* Exhibit 50, Docket, *Commonwealth v. Haley*, No. 58947.  Among those he filed was a Motion to Be Furnished With Evidence Favorable to the Accused. Exhibit 11, Motion to Be Furnished With Evidence Favorable to the Accused.

38.    In that Motion, Mr. Haley requested:

[A]ll evidence which is of an exculpatory nature, or which may favorable to the accused, which is within the possession, custody and control of or within the knowledge of the prosecuting officer . . . . Such

evidence includes but is not limited to:

1.  any evidence that can be used for the purpose of impeaching the credibility of witnesses that the Commonwealth intends to rely upon in support of the matters referred to in the indictment;

2.  statements which would reasonably tend to show that the accused did not commit the offense charged;

3.  evidence which would reasonably tend to show that the accused did not commit the offense charged;

4.  statements which are inconsistent with statements made by parties other than the declarant;

5.  inconsistent statements made by a declarant to law enforcement officers; and

6.  prior inconsistent statements from those testified to during the course of the trial.

Exhibit 11, Motion to Be Furnished With Evidence Favorable to the Accused.

39.   On January 31, 1972, the Court granted Mr. Haley's Motion to Be Furnished With Evidence Favorable to the Accused. *See id.*; *see also* Exhibit 50, Docket, *Commonwealth v. Haley*, No. 58947.

### Relevant Testimony at Trial

40.   At trial, Gloria Custis and Brenda Haley testified on behalf of the Commonwealth. Contrary to their statements to the police on the morning of the murder, both testified that they had seen Mr. Haley in the afternoon on July 10, 1971. *See* Exhibit 5, Gloria Custis Police Statement; Exhibit 6, Brenda Haley Police Statement, at 1; Exhibit 12, Brenda Haley Testimony,

*Commonwealth v. Haley*, No. 58947, at 361-63; Exhibit 13, Gloria Custis

Testimony, *Commonwealth v. Haley*, No. 58947, at 233.

41.     Brenda Haley testified that she as she was walking to Gloria Custis'

house on Glenarm Street, she saw Mr. Haley "in a food store at the corner of

Glenarm and he had been in the store and out the store again when I saw

him." Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No.

58947, at 362.  According to Ms. Haley, "[w]hen [James Haley] looked down

the street, and I guess he recognized us, he just stood there for a few minutes

and then he walked along." *Id.*  Brenda Haley testified that "[i]t was mid-

afternoon, about maybe four or five, maybe six" when she saw Mr. Haley.  *Id.*

at 363.

42.     Gloria Custis testified that "late in the afternoon" she was with Brenda

Haley when they saw Mr. Haley walking into a store on the corner of

Glenarm Street.  Exhibit 13, Gloria Custis Testimony, *Commonwealth v.

Haley*, No. 58947, at 233-34.  Ms. Cusits said that they were "[n]ot very close

at all" to Mr. Haley when they saw him.  *Id.* at 235.  According to Ms. Custis,

Mr. Haley "just looked at us"; neither she nor Brenda Haley had any

conversation with him.  *See id.* at 234, 273.

43.     Gloria Custis also testified that she never gave a statement to the

police about the murder.  Exhibit 13, Gloria Custis Testimony,

*Commonwealth v. Haley*, No. 58947, at 336 ("Q.  All right.  When you talked

to the officer outside, did you give him a story?  A statement?  A.  No."); *id.*

("THE COURT:  And then did you say anything about what happened before

you left the house to the police officers on the scene?  THE WITNESS:  No.  I

don't remember anyway."); *id.* at 341-42 ("Q.  Now, at the scene, when you got

back there, at your house, when you got back there on the morning of July

11th, were you taken from there to the police station?  At sometime that

morning?  A.  No.  Q.  Did you go to the police station at all that day?  A.  No.
Q.  Did you go any place to give a statement in writing?  A.  No.  Q.  At any
time?  A.  No.  Q.  Up to this day?  A.  No.").

44.    In closings, Mr. Muldoon argued that Mr. Haley went to Gloria Custis'
house looking for Brenda Haley because he had seen her earlier in the day
with Gloria Custis and thought that she was back in town and staying with
her sister.  *See* Exhibit 51, Commonwealth Closing Argument,
*Commonwealth v. Haley*, No. 58947, at 692-713.  In particular, Mr. Muldoon
argued:

> [O]n the following day, right on Glenarm Street, at the corner of
> Washington, around four o'clock or thereabouts in the afternoon,
> Brenda Haley and Gloria Custis tell you that they saw this defendant
> coming out of the store, standing there, staring at them as they walked
> down Glenarm Street to the apartment of Gloria Custis.
>
> Where did Haley think his wife, Brenda, was staying on that night of
> Saturday, July 10th, and the morning of July 11th?

*See id.* at 697.  Mr. Muldoon offered:  "I submit he went over, knowing that
his wife was staying with her sister Gloria . . . ." and "he went into that
apartment intending to get into that rear window as he did when he saw how
easily he could, he knew the dog, I submit, and he walked in and around
intending to go to the room where he, I submit, thought that his wife, Brenda
Haley, would have been sleeping."  *Id.* at 700, 701.

45.    Based largely on the testimony of Gloria Custis and Brenda Haley, Mr.
Haley was found guilty of murder and sentenced to life in prison.  *See* Exhibit
52, Verdict, *Commonwealth v. Haley*, No. 58947, at 752-54.

**VII.  Gloria Custis' and Brenda Haley's Statements Were Not Disclosed**

*Neither Gloria Custis Nor Brenda Haley Were Impeached at Trial Regarding Their Sighting of James Haley on July 10, 1971*

46.    Neither Gloria Custis' nor Brenda Haley's testimony about having last seen James Haley on July 10, 1971 prior to David Myers' murder was impeached.  *See* Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 363-380, 383; Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 256-349, 353.

47.    Judge Roy, who presided over Mr. Haley's criminal trial, found that Gloria Custis' probable cause testimony about when she last saw Mr. Haley prior to David Myers' murder was "perfectly consistent with what she has said here [at trial]."  *See* Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 328-29 ("THE COURT: When was the first time you saw James either on that Saturday or Sunday?  THE WITNESS: I saw him on that Saturday.  Q.  Now on July 23 of 1971 were you ever asked this question 'When did you see James that day for the first time?'  Where you asked that question.  THE COURT:  Well, what do you mean by 'that day'?  We've got two days here, July 10th, Saturday night, and July 11th, Sunday morning.  MR. FARESE:  All right.  If I read the answer, I'm sure it will show whether she understood the question.  Q.  Wasn't your answer, 'I didn't see him at all that day until he entered my house at five o'clock in the morning'?  THE COURT:  And that would be perfectly consistent with what she has said here and next question.").

### *Had Al Farese Had the Police Statements, He Would Have Impeached Gloria Custis and Brenda Haley With Them*

48.    Joseph Delcore began working for Mr. Farese in 1970 and continued through 1976.  Mr. Delcore not only watched portions of Mr. Haley's criminal trial, but also wrote the briefs for Mr. Haley's direct appeal.  Mr. Delcore explained that Mr. Farese was "the kind of cross examiner that inevitably would persist and persist, persist to the point where finally some judge would stop him . . . he was a very good cross examiner.  That was his forte."   See Exhibit 15, Delcore Dep at 9, 22-23, 30, 97; *see also* Exhibit 55, Delcore Aff. at ¶ 7 ("Mr. Farese was a dogged criminal defense attorney and made sure to use all of the relevant impeachment material he had in his arsenal, particularly impeachment material that would undercut the credibility of the Commonwealth's witnesses and the Commonwealth's theory of the crime."); *see also id.* at ¶ 3-4, 6-8.

49.    Michael Natola also worked for and shared office space with Al Farese; he worked for Mr. Farese from April 1979 until his death in June 1985. Mr. Natola described Mr. Farese as "a fierce trial lawyer of the old-school variety . . . [H]is greatest skill was impeaching the credibility of witnesses on cross-examination.  His cross-examination skills were without peer.  To say that he was determined, or aggressive, or relentless would be to do his skills an injustice.  He was as tenacious as a proverbial bulldog in cross-examining witnesses."  *See* Exhibit 14, Natola Report, at 4.

50.    Had Mr. Farese had the transcribed witness statements of Gloria Custis and Brenda Haley (appended to this Statement of Facts as Exhibits 5 and 6), he would have used them to impeach Ms. Custis and Ms. Haley regarding their sighting of Mr. Haley on July 10, 1971.  *See* Exhibit 10, Dwyer Dep. at 117 (if Mr. Farese had had the statements, "he would have

caused a riot.  He would have caused a riot at the trial.  But he would have used them.  He wouldn't have used them – in my judgment he wouldn't have used them in a delicate Liacos Evidence Book way.  He would use it like a hammer."); Exhibit 14, Natola Report, at 6 ("had he had the withheld evidence, Mr. Farese would certainly have used it to impeach Ms. Custis and Ms. Haley on cross-examination at trial."); *id.* at 9; Exhibit 15, Delcore Dep. at 75-76 ("[H]ad Al Farese had those statements given to the police, he would have used them at length on cross examination to try to impeach the witnesses.  Because he never brought that up at cross examination, I can only assume he didn't have them because there's no opinion – there's no question in my mind that had he had them he would have used them."); *id.* at 93 (his testimony is based on his observations of Mr. Farese at numerous trials, four-and-a-half to five years of experience working directly with Mr. Farese and reading transcripts in other cases defended by Mr. Farese to see what he would do); *id.* at 105-07 (stating that he is positive he would have used the statements to impeach the witness' credibility); Exhibit 55, Delcore Aff. at ¶ 6 ("I can positively state that had Mr. Farese had in his possession the police statements given by Gloria Custis and Brenda Haley, he would have used them in his cross-examination of Ms. Custis and Ms. Haley.").

51.    "Such a cross-examination is consistent with the other attempts that Mr. Farese made to impeach both Gloria and Brenda at trial.  Mr. Farese's strategy was to try to undermine Gloria's and Brenda's credibility and point the finger at Gloria for the crime."  Exhibit 14, Natola Report, at 6; *see id.* at 7 (identifying all of the subjects on which Mr. Farese tried to impeach Ms. Custis).

52.    Mr. Farese's cross-examination of Gloria Custis was very lengthy and he attempted to challenge her credibility by raising a number of matters, including:

i.   Whether Ms. Custis intended to get revenge on David Myers for striking her.;

ii.   Whether Mr. Myers was upset with Ms. Custis because she was dating another man;

iii.   Whether she had fought with Mr. Myers just prior to his murder;

iv.   Whether Ms. Custis had told welfare, which she was then collecting, who the father of her child was;

v.   The fact that Ms. Custis ran out of the apartment leaving her baby behind in her crib with the killer;

vi.   The time of day that she saw Mr. Haley on July 10, 1971;

vii.   The fact that Mr. Haley did not say anything to either Gloria Custis or Brenda Haley when they saw him;

viii.   The fact that Mr. Haley never asked Ms. Custis to help him get Ms. Haley back;

ix.   Whether Ms. Custis committed the murder;

x.   The fact that she had previously testified at the probable cause hearing that she had never had any trouble with Mr. Haley but was at trial alleging that she had had a problem with him one time;

xi.   The fact that she did not go upstairs to ask for help from her neighbor after the murder but instead went to conspire with her brother; and

xii.   What Mr. Haley was wearing on the night of the murder, contrasting her trial testimony with her testimony at the probable cause hearing.

*See* Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947,

at 260-63, 270-73, 275-77, 279-80, 286, 292-97, 324-25; Exhibit 14, Natola
Report, at 6-7.

53.     In addition, Mr. Farese questioned Gloria Custis about whether she
gave a written statement to the police.  *See* Exhibit 13, Gloria Custis
Testimony, *Commonwealth v. Haley*, No. 58947, at 336-45.  Ms. Custis
eventually admitted to speaking with the police on the morning of the
murder, but nonetheless asserted on cross-examination that she never gave a
statement to the police about the murder.  *Id.*   "Had Mr. Farese had Gloria
Custis transcribed police statement, he could have easily impeached her on
this issue."  Exhibit 14, Natola Report, at 7.

54.     Mr. Farese also attempted to challenge Ms. Haley's credibility and
undermine the State's theory of the case by (a) impeaching Ms. Haley's
testimony about why she left Mr. Haley; (b) questioning her testimony that
she returned to Boston on July 9, 1971 to get a divorce since she still had not
filed for divorce as of the time of the trial; (c) questioning her about the fact
that Mr. Haley had not tried to call her while she was in Delaware (and in
fact, they had not spoken since Ms. Haley left on May 3); and (d) confirming
through her testimony that David Myers and James Haley were friends.  *See*

Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at
363-67, 371, 373.

### Had Gerald Muldoon Had the Police Statements of Gloria Custis and Brenda Haley He Would Have Disclosed Them

55.     Based on his repeated interactions with Mr. Muldoon, Mr. Dwyer
further testified that "the notion that [Mr. Muldoon] would have gotten a
report with exculpatory evidence with the police department and hid it in his
own pocket, could not have happened in my judgment."  Exhibit 10, Dwyer

Dep. at 113-14.  Mr. Dwyer said that the same would be true for impeachment evidence.  *Id.* at 114; *see also* Exhibit 30, Dwyer Aff. at ¶ 7 ("[I]n my personal experience, based on repeated dealings with and observations of Mr. Muldoon during the time period at issue, it was Mr. Muldoon's standard practice to disclose any exculpatory evidence, including impeachment evidence, to defense counsel prior to trial if Mr. Muldoon had that evidence in his possession.").

56.    Starting in January or February 1973 through 1978, while he was an Assistant District Attorney, Thomas Dwyer participated in meetings with then-District Attorney Garrett Byrne and Assistant District Attorney Jack Gaffney at 4:00 p.m., when Mr. Byrne would return from the health club.  *See* Exhibit 10, Dwyer Dep. at 6, 56-57, 82-83.  During those meetings, they would address a "myriad amount of problems" that had arisen in cases being litigated by Assistant District Attorneys.  *Id.*; *see also id.* at 82 ("one half of these four o'clock meetings which I never liked had to deal with exculpatory . . . or a witness who would lack credibility, you know, or an assistant the judge thought was playing a game . . . ."); *id.* at 83, 110.   In that "troubleshooting role," Mr. Dwyer "had a very good idea of what goes on – what went on in the office and who was reliable and then who wasn't."  *Id.* at 57.

57.    Mr. Dwyer does not remember Mr. Muldoon's name or any problem having to do with Mr. Muldoon ever being brought up in the four o'clock meetings.  Exhibit 10, Dwyer Dep. at 112.

58.    In fact, Mr. Dwyer is not aware of any instance in which Gerald Muldoon ever withheld exculpatory or impeachment evidence from a defense attorney.  Exhibit 10, Dwyer Dep. at 128; *see also* Exhibit 30, Dwyer Aff. at ¶ 6 ("I am not aware of any occasion when Mr. Muldoon intentionally withheld exculpatory evidence.").

*Defendant Kelley Was Present At Counsel Table At Trial*

59.    Defendant Kelley was in charge of the investigation into David Myers'
death.  *See* Exhibit 53, Henry Berlo Testimony, *Commonwealth v. Haley*, No.
58947, at 447 ("Q.  At no time were you in charge [of the investigation]?  A.
No, sir.  Q.  And you followed orders of a superior?  A.  That's correct.  Q.  And
would that be Sergeant Kelley?  A.  Yes, sir.").  Defendant Kelley was present
for and sitting at counsel's table with Mr. Muldoon during Mr. Haley's trial.
*See* Exhibit 54, Joseph Polcari Testimony, *Commonwealth v. Haley*, No.
58947, at 225 ("Q.  Now, Mr. Witness, at any time that you took these
pictures was this officer there?  What's his name?  Sitting next to Mr. ⋯  A.
Sgt. Kelley.  Q.  Sergeant Kelley.  Was he present?")

## VII.    <u>Mr. Haley's Exoneration</u>

60.    In 2005, James Haley made a request under the Massachusetts Public
Records Act to the Boston Police Department and Suffolk County District
Attorney's Office for documents relating to his case.  *See* Group Exhibit 23,
Letters Relating to Public Records Request.

61.    On February 14, 2006, the Boston Police Department provided Mr.
Haley with 60 pages of documents, including redacted copies of the
transcribed witness statements of Brenda Haley and Gloria Custis.  *See*
Group Exhibit 23, Letter from Office of Legal Advisor to James Haley dated
2/14/06; Group Exhibit 56, Redacted Police Statements of Gloria Custis and
Brenda Haley.

62.    In July 2007, Maureen Blasco contacted James Sultan about reviewing
Mr. Haley's case to see if there was a meritorious issue to be raised in post-
conviction proceedings.  Exhibit 2, Sultan Dep. at 10.

63.    Maureen Blasco, Richard Driver, Linda Haas and Josna Rege were friends who were trying to help Mr. Haley appeal his conviction.  *See* Exhibit 59, Driver Dep. at 52-53; Exhibit 57, Haas Dep. at 20.  Ms. Rege, an English professor at Worcester State College, met Mr. Haley in 1980 when she was volunteering in a prison on a newspaper that he was working on.  *See* Exhibit 57, Haas Dep. at 16; Exhibit 58, Rege Letter to Judge Hinkle dated 12/16/07. Ms. Haas, a freelance photographer and part-time photography instructor, met Mr. Haley through Ms. Rege when Mr. Haley was released from prison for a short time in the late 1980s and early 1990s.  *See* Exhibit 57, Haas Dep. at 16.  Mr. Driver is a physicist who got to know Mr. Haley in the late 1990s through his wife, Linda Haas.  *See* Exhibit 59, Driver Dep. at 6, 8, 10-11.  Ms. Blasco, a kindergarten teacher, was introduced to Mr. Haley through Ms. Rege in the mid-1980s.  *See* Exhibit 60, Letter from Blasco to Judge Hinkle dated 12/11/07.

64.    Ms. Blasco, Mr. Driver, Ms. Haas and Ms. Rege paid Mr. Sultan approximately $25,000 to $30,000 to represent Mr. Haley in his motion for a new trial and any subsequent proceedings.  *See* Exhibit 2, Sultan Dep. at 131; Exhibit 57, Haas Dep. at 56; Exhibit 59, Driver Dep. at 52-53.

65.    Mr. Sultan testified that the "fact that these people who seemed like very ordinary intelligent upstanding members of the community were that devoted to this person on a personal basis as well as to his cause and they were willing to devote time, energy and money to trying to gain the relief had an impact on me."  Exhibit 2, Sultan Dep. at 131.

66.    On October 23, 2007, Mr. Haley filed a motion for a new trial based on the fact the failure to disclose the transcribed police statements of Gloria

Custis and Brenda Haley deprived him of a fair trial.  *See* Exhibit 61, Defendant's Motion for New Trial; Response to Def's SOF ¶ 58.

67.     Mr. Sultan invited former Assistant District Attorney David Meier to speak with Mr. Haley, and Mr. Haley met with Mr. Meier on December 14, 2007.  *See* Exhibit 2, Sultan Dep. at 34, 36.

68.     Mr. Sultan explained his reasoning behind permitting Mr. Meier to speak with Mr. Meier:

> I felt Mr. Haley was an innocent man who had spent 35 years in prison for something he hadn't done.  That he was a victim of a gross injustice.  From longstanding [*sic*] with Mr. Meier, I knew him to be a prosecutor of high scruples and ethics and I believed that if he fully understood what happened in this case, that rather than taking the standard knee-jerk approach that most prosecutors would take and oppose any new trial motion filed by a defendant especially many many years after a first degree murder conviction that he would be open to taking a different position.  And I felt that if he had a chance to meet Mr. Haley in person that that would – such a meeting would help convince him to do the right thing.

*See* Exhibit 2, Sultan Dep. at 37; *id.* at 39 ("I had never in my career of more than 30 years ever allowed a prosecutor to talk to one of my clients, unless it was a proffer session or something, I certainly wouldn't do that.  So this itself was a unique case and my only condition was that he would have to come by himself.  I didn't put any other limitations.").

69.     During the meeting with James Haley, David Meier asked Mr. Haley if he would be willing to plead to manslaughter and Mr. Haley said no.   *See* Exhibit 2, Sultan Dep. at 38 ("During that meeting he did ask Haley if he would be willing to plead to basically resolve the case through a plea[] of manslaughter under which he would get time served and be immediately released from prison before Christmas and Mr. Haley said that he was not interested in that.").

70.     On December 21, 2007, the Commonwealth filed a Motion to Vacate Conviction and Grant New Trial.   *See* Exhibit 25, Commonwealth's Motion to Vacate Conviction & Grant New Trial (Dec. 21, 2007).   Among other things, that Motion stated that "[a]s grounds therefore, the Commonwealth respectfully states that after a careful and thorough review of the facts and circumstances surrounding the investigation and prosecution of the defendant James Haley for the July 11, 1971 murder of David Myers in Roxbury, it appears that (1) the defendant was deprived of certain exculpatory evidence at trial and (2) the defendant was arguably prejudiced by such nondisclosure."   *Id.* at 1; *see also id.* at 2 ("the Commonwealth's review suggests that the defendant was deprived of certain transcribed statements of the two primary witnesses against him at trial . . . The statements . . . contain information that could have been used by the defendant to impeach the testimony of the two witnesses regarding certain significant factual issues at trial.").

71.     On December 26, 2007, Mr. Haley filed a Motion for Release on Bail. *See* Group Exhibit 61, Motion for Release on Bail & Clerk's Notice.   That motion was allowed on January 18, 2008.   *Id.*

72.     After his release from prison, James Haley lived with Maureen Blasco and then part-time with Linda Haas and Richard Driver.   *See* Exhibit 57,

Haas Dep. at 60-61 (explaining that he was living with Ms. Blasco but would come stay with her and Mr. Driver when he needed to go to the doctors in Boston).

73.    On June 27, 2008, Mr. Haley filed a motion to dismiss the indictment. By memorandum order dated August 26, 2008, the Superior Court granted the motion to dismiss without prejudice.  *See* Exhibit 62, Motion to Dismiss Indictment; Exhibit 63, Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment.

## IX.    Policy to Deliberately Suppress Evidence

### *Robert DiGrazia and Robert Wasserman*

74.    From November 1, 1972 to November 15, 1976, Robert DiGrazia served as the Commissioner of the Boston Police Department ("BPD").  *See* Exhibit 37, DiGrazia Report at 2.  As the Commissioner, DiGrazia was "primarily responsible for administering and setting all BPD policies."  *Id.*  DiGrazia was also responsible for training Boston police officers.  *Id.*

75.    When Mr. DiGrazia became the Commissioner, he made significant changes to the BPD in an effort to modernize the Department, including changing the training that officers received and placing a "tremendous emphasis on, you know, ethics and integrity, that type of thing."  *See* Exhibit 35, Evans Dep. at 23; *id.* at 21 ("There was kind of a modernization of the department at that time."); *id.* at 18-24; Exhibit 37, DiGrazia Report, at 3.

76.    From 1973 through 1976, Robert Wasserman served as the Director of Training and Education for the Boston Police Department and then, from 1976 through 1978, as the Assistant to the Commissioner for Operations.  *See*

Exhibit 36, Wasserman Report, at ¶ 13; *see* Exhibit 32, Wasserman Dep. at 33-34.  As the Director of Training and Education, Mr. Wasserman oversaw the Boston Police Academy and the Police Department's training programs at the recruit, in-service, supervisory and management levels.  *See* Exhibit 36, Wasserman Report. at ¶ 14.

77.    When Mr. Wasserman joined the BPD, he met with the police staff and police officers to better understand how the BPD worked, address deficiencies in the training, and review and update the training materials that had been used.  *See* Exhibit 32, Wasserman Dep. at 37 (when he joined the Department, "I did an inventory of what was there and what was going on.  I met with staff.  I started doing staff meetings with them.  We talked about what the deficiencies were and about the things that had to be done over the coming year or two to begin to get a sense of order of training in the Department"); *id.* at 37 (describing early meetings with academy staff, Wasserman explained: "They were pretty open discussions, and we laid out strategies for where things had to go and there were a lot of things that had to be done.  Materials were outdated . . . The materials that were being presented to students were old and ragged and not - - many of them had not been revised for years."); *id.*at 43 (describing the training materials in use prior to his arrival as "very old and I was rather concerned about that.  It was not a real process of updating the handouts for members of the class"); *id.* at 47 ("I looked at all the materials for every class that were being used and I reached the decision that we had to redo all of the materials, and we held a lot of staff meetings about it and everybody got to work in bringing things up to date."); *id.* at 50 ("I remember having discussions with [Hogan] about how far in-depth he was going with his training, and as we talked about expanding the law, I had a lot of discussions with him about how that expansion ought to take place."); *id.* at 50-51 (spoke to police officers to find out how topics they learned about in the academy were being applied to the

field); *id.* at 76-78 (describing all the changes to the training program that he made while Director, including that changes were made to constitutional law by creating "more materials" and "the entire curriculum was updated"); *id.* at 127 (explaining that he became aware that the duty to disclose exculpatory evidence was not being taught by "look[ing] at the materials that were being handed out" and "discussions with [Hogan]"); *id.* at 130 (when he took over the Academy, did an extensive review of all the training and training materials that then-existed); *id.* at 130-31(had extensive knowledge of the training in the Boston Police Department at that time); *id.* at 131 (describing steps he took to review the training materials, including with staff and with the outside assistance of a psychologist and law professor Sheldon Krantz who had written the ABA standards).

78.    Mr. Wasserman also communicated regularly with Mr. DiGrazia. During those communications, Mr. DiGrazia expressed concern that "officers were not being completely truthful about what they had . . . It was just a concern of his and reflected the need to make sure we updated our training and we had to do something about improving the quality of supervision." Exhibit 32, Wasserman Dep. at 110-11; *see also id.* at 113 ("Q.  I'm talking about conversations with regard to officers withholding exculpatory or impeachment evidence in an effort to secure an arrest or prosecution.  Do you remember particular conversations regarding that topic with Commissioner DiGrazia?  A.  I remember that he raised that issue with me . . . . Q.  Do you remember how many times he raised that issue?  A.  Oh, I think he raised it once with me in the discussion about the need to get an investigative manual out that set the standards that we had."); *id.* at 114 (DiGrazia "told [him] that he was concerned about those kind of practices"); *id.* at 115 ("Q.  Were you ever made aware of any particularized instance of that for purposes of future training?  A.  No, I was just aware that it was an issue that needed to be addressed."); Exhibit 36, Wasserman Report, at ¶ 28 ("While I was the

Director of Police Training, I communicated regularly with then-Commissioner DiGrazia.  Commissioner DiGrazia recognized that there was a widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution.").

### Policy to Withhold Exculpatory and/or Impeachment Evidence

79.     Police department policies are "designed to provide guidance to police officers about how to do their jobs.  Policies and any training that is provided in conjunction with those policies are also one of the primary ways that the police learn about what is permitted and required by the law; you cannot expect police officers to know this otherwise."  Exhibit 37, DiGrazia Report, at 4.  "Moreover, to be effective, policies have to be reasonably detailed to provide the officer with fair notice of his responsibilities under the law."  *Id.*

80.     Mr. DiGrazia has stated that "based on my observations and personal experiences as the Commissioner of the BPD from 1972 to 1976, to a reasonable degree of professional certainty, I can aver that there was no policy or practice in the BPD at that time requiring the disclosure of exculpatory and/or impeachment evidence to state prosecutors or to defendants."  *Id.* at 4.

81.     Like Mr. DiGrazia, Mr. Wasserman has testified that there was "no policy that required [exculpatory and/or impeachment evidence] to be turned over."  Exhibit 36, Wasserman Report at ¶ 29(a).

### Rule 43 Did Not Address the Disclosure of Exculpatory and/or Impeachment Evidence

82.     At the time that Mr. Haley was arrested and prosecuted, the BPD was still operating under its Rules and Regulations from 1950.  *See* Exhibit 37,

DiGrazia Report, at 7. "These Rules were outdated, at best." *Id.*

83.    The Rules did not address in any way the disclosure of exculpatory and/or impeachment evidence. *See* Exhibit 37, DiGrazia Report, at 7 ("Nothing in Rule 43 (or any of the other rules) from the 1950 department rules and regulations manual required the turning over of exculpatory and/or impeachment evidence.").

84.    In particular, Rule 43 "does not deal with exculpatory and/or impeachment evidence. " *See* Exhibit 37, DiGrazia Report, at 7. Rather, Rule 43 instructed police officers on how to testify. *See id.*; Exhibit 36, Wasserman Report at ¶ 24; Exhibit 32, Wasserman Dep. at 121-22; Exhibit 31, Dunford Dep. at 60-61.

85.    Former Superintendent and Chief of the BPD Robert Dunford joined the BPD in October 1970. *See* Exhibit 31, Dunford Dep. at 10-11. Dunford testified that Rule 43 "just says I have to testify truthfully." Exhibit 31, Dunford Dep. at 61.

86.    Indeed, "[t]o the extent that police officers were taught about Rule 43 in the Academy prior to or during [Robert Wasserman's] tenure as Director of Training (they would not be taught about Rule 43 outside the recruit Academy unless changes were made to the Rule), the training was that officers were to testify truthfully – *i.e.*, answer questions in a clear, concise and truthful manner – and to make a good impression on the judge or jury. Evan as that, Rule 43 left much to the discretion of the individual police officer." Exhibit 36, Wasserman Report, at ¶ 24; *see also* Exhibit 32, Wasserman Dep. at 121-22 (Rule 43 focused on an officer's testimony; "you can try to make the rule what everyone wants it to be, but this deals with how he testifies. The issue in this case, it seems to me, was that they did not

provide information that was supposed to be – that should be turned over. It's not about what they testified to; it's what they did or did not provide. That rule does not cover that.").

87.    Moreover, as Mr. Wasserman explained, "[i]f Rule 43 was designed to direct officers to disclose exculpatory or impeachment evidence, which it was not, it was similarly inadequate."  Exhibit 36, Wasserman Report at ¶ 25.  In particular, Rule 43:

> did not identify what exculpatory or impeachment evidence was; it did not even use the words exculpatory or impeachment evidence.  It also said nothing about disclosing or withholding evidence, how evidence should be disclosed, when it could be withheld, and the repercussions if an officer should withhold information from a prosecutor.  Given the changing nature of the law on this topic during the 1960s and 1970s, if Rule 43 were designed to mandate disclosure of evidence, it was woefully inadequate to do so and should have been regularly updated to keep up with the law on this issue.

Exhibit 36, Wasserman Report, at ¶ 25.

### There Were No General Orders or Special Orders Issued On the Requirement to Disclose Exculpatory and/or Impeachment Evidence

88.    "[A]ny major changes in the law or in procedure would have first been issued in a General Order . . . ."  Exhibit 37, DiGrazia Report, at 5; *see also id.* ("General Orders were used to announce changes in the law, they were not used to train officers.").

89.     "A general order was a change in the police manual.  It used to be in the Department before Bob DiGrazia that they had a book of procedures, and whenever there was a change in the book of procedures, a little yellow insert with glue on the side was submitted to everybody and they were to take their manual of procedure and past it over the change.  A ridiculous system.  I think there were only two or three of those manuals in the Department that contained all of those stickers."  Exhibit 32, Wasserman Dep. at 97.

90.     General orders would be posted on the bulletin board at the police station and it was up to the individual police officer to read it.  *See* Exhibit 34, Spellman Dep. at 60.  No copies were made of general orders at that time. *See id.*

91.     "A special order was an order that had a limited time frame about an event, about something that had to happen, but that was not a part of the overall police manual."  Exhibit 32, Wasserman Dep. at 98.

92.     There was no General Order regarding the disclosure of exculpatory or impeachment evidence issued during Mr. DiGrazia's tenure with the BPD. Nor were any General Orders on this topic disclosed in discovery in this litigation.  *See* Exhibit 37, DiGrazia Report, at 5; *see also* Exhibit 36, Wasserman Report at ¶ 26 ("To the best of my knowledge, no such Orders and no such training ever existed); Exhibit 34, Spellman Dep. at 62-63 (does not recall getting a general order that described a police officer's obligation under *Brady v. Maryland*, *Giglio v. United States* or to disclose exculpatory and/or impeachment evidence).

**X.**    **The BPD Practice Was to Deliberately Suppress Exculpatory and/or Impeachment Evidence**

*The Practice was to Suppress Evidence*

93.    Mr. DiGrazia has explained that "[t]he obvious problem with the BPD having no policy on the disclosure of exculpatory and/or impeachment evidence is that it left it up to the individual officer to figure out what he had to disclose.  In other words, it gave far too much discretion to individual officers to determine whether to turn over exculpatory and/or impeachment evidence."  Exhibit 37, DiGrazia Report, at 4.  "That discretion permitted officers to deliberately suppress exculpatory and/or impeachment evidence without violating the BPD's policies; indeed, without repercussion as he would be in violation of no rule."  *See id.* at 4.

94.    As the former Commissioner, Robert DiGrazia, has explained, that discretion indeed led to a widespread practice of withholding exculpatory and/or impeachment evidence.  *See* Exhibit 37, DiGrazia Report, at 5.  ("In my personal experience, based on regular interactions with the superintendents, commanders, detectives, and officers who served under me, it was standard practice at that time *not* to disclose exculpatory and/or impeachment evidence to state prosecutors or to defendants.").

95.    Indeed, Mr. DiGrazia explained that "[t]he reality is that at that time the feeling among police officers and detectives in the department was that they were in the business of arresting potential criminals, not helping them.  If officers felt that they had their man, they were not going to do anything to help the defendant or his attorney."  Exhibit 37, DiGrazia Report, at 5.

96.    Mr. Wasserman observed the same practice:  "There was a sense within the Department that officers were not in the business of helping out

persons they perceived to be criminals." Exhibit 36, Waserman Report at ¶ 28.

97.    Mr. DiGrazia spoke with Mr. Wasserman about the fact that there was a practice within the BPD in which officers were withholding exculpatory and/or impeachment evidence. *See* Exhibit 32, Wasserman Dep. at 110-13. According to Mr. Wasserman, "[t]here was a sense that officers were not being completely truthful about what they had." *Id.* at 110.

98.    In fact, Mr. DiGrazia expressed to Mr. Wasserman that he was concerned with "[o]fficers not being truthful, officers not doing quality investigations; that's why we put together the Task Force to create – with B.U. to create an investigative manual.  He thought the investigative process in the Department was sloppy and problematic." Exhibit 32, Wasserman Dep. at 111; *see also id.* at 112 ("[DiGrazia] came to every in-service class once we started them up, and he would stop in my office for a while and sit down and we'd talk about things, and that was certainly the subject a few times as he reflected on concerns about investigations.  It then would come up when I was in his office and it might have come up at one of the command staff meetings in his office.  I don't remember exactly."); *id.* at 113 ("Q.  "I'm talking about conversations you had with regard to officers withholding exculpatory or impeachment evidence in an effort to secure an arrest or prosecution.  Do you remember particular conversations regarding that topic with Commissioner DiGrazia?  A.  I remember that he raised that issue with me; I don't know exactly when he did it.").

99.    Thomas Dwyer, a former Assistant District Attorney in Suffolk County from 1972 to 1978, also testified that the District Attorney's Office experienced problems with the Boston Police Department turning over exculpatory evidence to the prosecutors.  According to Mr. Dwyer, "I know

from both stories that I had to deal with at the four o'clock meetings I've talked about before and stories that I had to deal with outside of the four o'clock meetings that the district attorney would bring me in to help solve, and I know from stories from Jack Gaffney, who was the assistant who probably attended more of the four o'clock meetings than I did, you know, I know that this was a problem getting the Boston police officers to get everything into their reports and get it right and including exculpatory was a problem."  Exhibit 10, Dwyer Dep. at 92; *see also id.* at 96-97 ([T]here was a natural reluctance coming from the old days of doing anything – putting anything in a report that could hurt your case period.  That's the way it was. And I know from the game that's the way it was in the 50's, the 60's, and that's the way it was in the 70's too is the natural reluctance from the Boston Police to put everything into a report, particularly exculpatory."); *see* Exhibit 30, Dwyer Aff. at ¶ 8 ("[During my tenure as an Assistant District Attorney in Suffolk County, the District Attorney's Office experienced some problems with Boston police detectives who were less sensitive than they should have been to the constitutional due process rights of criminal defendants.  This included the detectives failing to turn over exculpatory evidence, including impeachment evidence.").

100.    Mr. Dwyer further testified that if an Assistant District Attorney ("ADA") in Suffolk County in 1972 got an inconsistent statement, that statement would be turned over.  "But the problem is how often did you actually get such a report."  Exhibit 10, Dwyer Dep. at 105-06; *id.* at 107 ("There always was a tension between the police and the D.A.'s Office as to whether or not you got all of the information.  A lot of it I think depended upon the individual detectives.  Sometimes you'd get the file, everything would be right there, everything would be organized, all the bases would be covered.  Sometimes you don't.  Sometimes in the middle of a recess you have to turn to the detectives and say what is going on here.  And then the

detective says oh, this, you know, oh, yeah, okay, I'll call over and see if we can get that report for you.  It happened all the time.").

101.    Similarly, Mr. Dwyer testified that he would never get notes that police officers made during their investigation of a crime.  *See* Exhibit 10, Dwyer Dep. at 80.

102.    Former Police Commissioner Paul Evans joined the Boston Police Department on December 30, 1970.  *See* Exhibit 35, Evans Dep. at 5.   Mr. Evans stated that when he was a young officer, he was instructed to keep a bluebook with his own notes about the cases he was working on.  *See id.* at 42; *id.* at 44 ("if you ran into anything of significance, you're expected to document them"); *id.* at 45 ("when I came out of the academy, I was issued a blue book.  I never got issued another blue book, so I'd use other things to --- anything of significance.  If I knew I was going to court, that was documented.").  Mr. Evans explained that when he spoke with an ADA about any given case he "might reference my notes, but I wouldn't turn them over." *See id.* at 42.

### Other Instances of Suppressing Evidence

103.    Laurence Adams was prosecuted in 1974.   In that that prosecution, the police withheld exculpatory evidence, including witness statements, which would have impeached the credibility of the State's witnesses and exculpated Mr. Adams.  Exhibit 67, *Commonwealth v. Adams*, No. 74652, 2004 WL 1588108, at \*7-\*10 (Mass. Super. May 20, 2004); *id.* at \*1 ("While this is not the first Motion For New Trial filed by Mr. Adams, he has for the first time presented newly discovered evidence in the form of the prior criminal records of Commonwealth witnesses, police notes and reports showing prior inconsistent statements of a key Commonwealth witness, and witness statements that were previously unavailable to the defendant, none

of which were part of the original record in this case. A review of the full record leads this Court to conclude that the convictions for murder in the first degree and armed robbery must be vacated, and a new trial must be ordered.").

104.    Similarly, in *Commonwealth v. Robinson*, Edward Sullivan, who represented defendant Robinson, testified that he was not provided certain witness statements when he defended Mr. Robinson in 1969.  *See* Exhibit 64, Motion for New Trial Hearing, *Commonwealth v. Robinson*, No. 69-40114-17 (Aug. 15, 2005), at 4 -10 (tried case in 1969 and received no witness statements; ADA Jack Gaffney asserted that he had no exculpatory evidence in his possession in 1969); *see also* Exhibit 65, Motion for New Trial Hearing, *Commonwealth v. Robinson*, No. 69-40114-17 (Aug. 2, 2005), at 17-27 (James O'Donovan, who represented George McGrath, Mr. Robinson's co-defendant, testified that he did not receive any of the witness statements or police documents at issue in the motion for new trial prior to Mr. McGrath's trial).

### The Defendants' Witnesses Have No Relevant Knowledge As to the Practices of  the BPD

105.    Paul Evans was a patrol officer in 1971 to 1975.  *See* Exhibit 35, Evans Dep. at 7, 10.   Herbert Spellman, Edward McNelley, Robert Dunford, and Thomas Miller were also patrol officers during the Haley investigation.  *See* Exhibit 24, Miller Dep. at 10 (patrolman from 1970 until 1983); Exhibit 31, Dunford Dep. at 10-11 (patrolman from 1970 to 1975); Exhibit 33, McNelley Dep. at 10, 21, 34-35 (patrol officer from 1970 to 1973); Exhibit 34, Spellman Dep. at 11-12 (patrol officer from 1968 to 1970).

106.    As patrol officers, Mr. Evans, Mr. Spellman, Mr. McNelley, Mr. Dunford and Mr. Miller would not have any significant contact with detectives.  *See* Exhibit 35, Evans Dep. at 48 ("if it was a homicide, the

homicide detectives would have the case. So basically I didn't personally have a lot of interaction with homicide detectives. If I had something, I would turn it over to the duty supervisor."). Therefore, none of Mr. Evans, Mr. Spellman, Mr. McNelley, Mr. Dunford or Mr. Miller have any knowledge of what BPD detectives practices were in 1971 and 1972 regarding the disclosure of exculpatory and/or impeachment evidence. *See id.* at 48-49 (does not know what forms Boston police detectives used in the early 1970s or what detectives' practices were regarding document evidence).

### XI.    The Policy and Practice of Withholding Was a Direct Result of the Lack of Training

107.    Training police officers is an important part of ensuring that officers are not only doing their job, but also doing it properly and in compliance with the law. The purpose of police training is to develop the necessary skills to enable officers of all ranks to undertake their roles and responsibilities; for that reason, there must be training at the recruit level to teach officers the basics of policing, and also at the detective level, as detectives will be speaking with witnesses and suspects. *See* Exhibit 36, Waserman Report, at ¶ 11.

108.    When Robert Wasserman took over the police academy in 1973, "[i]t was a very bizarre time in history in that academy." Exhibit 32, Wasserman Dep. at 36. For example, one of the instructors was called "the lamb who taught the lamb chop about how to use your baton; that's what he called it." *Id.* There was also "a slot machine upstairs in the academy that the staff liked to play all the time." *Id.* at 37.

109.    The infrastructure of the academy needed to be updated. *See* Exhibit 32, Wasserman Dep. at 131-32. So too did the training materials. *Id.*

110.    After he took over the Academy, Robert Wasserman undertook an extensive review of all training and training materials that were being used by the academy.  *See* Exhibit 32, Wasserman Dep. at 130.

111.    This review included meeting with the police staff at the academy, speaking with police officers, and reviewing the training materials that had been used.  *See* Exhibit 32, Wasserman Dep. at 37 (when he joined the Department, "I did an inventory of what was there and what was going on.  I met with staff.  I started doing staff meetings with them.  We talked about what the deficiencies were and about the things that had to be done over the coming year or two to begin to get a sense of order of training in the Department"); *id.* at 37 (describing early meetings with academy staff, Wasserman explained: "They were pretty open discussions, and we laid out strategies for where things had to go and there were a lot of things that had to be done.  Materials were outdated . . . The materials that were being presented to students were old and ragged and not - - many of them had not been revised for years."); *id.* at 43 (describing the training materials in use prior to his arrival as "very old and I was rather concerned about that.  It was not a real process of updating the handouts for members of the class"); *id.* at 47 ("I looked at all the materials for every class that were being used and I reached the decision that we had to redo all of the materials, and we held a lot of staff meetings about it and everybody got to work in bringing things up to date."); *id.* at 50 ("I remember having discussions with [Hogan] about how far in-depth he was going with his training, and as we talked about expanding the law, I had a lot of discussions with him about how that expansion ought to take place."); *id.* at 50-51 (spoke to police officers to find out how topics they learned about in the academy were being applied to the field); *id.* at 130 (when he took over the Academy, did an extensive review of all the training and training materials that then-existed); *id.* at 130-31(had

extensive knowledge of the training in the Boston Police Department at that time); *id.* at 131 (describing steps he took to review the training materials, including with staff and with the outside assistance of a psychologist and law professor Sheldon Krantz who had written the ABA standards).

112.    Mr. Wasserman also communicated regularly with Mr. DiGrazia. *See* Exhibit 36, Wasserman Report, at ¶ 28 ("While I was the Director of Police Training, I communicated regularly with then-Commissioner DiGrazia. Commissioner DiGrazia recognized that there was a widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution.").

113.    After undertaking this review, Mr. Wasserman determined that there was no training on the duty to disclose exculpatory and/or impeachment evidence at the academy.  *See* Exhibit 32, Wasserman Dep. at 126-27; *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence.  Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence).

114.    Mr. DiGrazia reached a similar finding; that is, that the duty to disclose exculpatory and/or impeachment evidence was not taught at the

academy or otherwise.  *See* Exhibit 37, Digrazia Report, at 5 ("I can say for
certain that at that time officers were not trained to turn over exculpatory
and/or impeachment evidence.  Nor was there any training on how to
recognize the difference between exculpatory and impeachment evidence.");
*id.* at 5-7 (explaining that the training materials disclosed in this litigation
corroborate his finding and recollection that officers were not trained to
disclose evidence).

115.    Similarly, former Commissioner Evans, former Sergeant Detective
Miller and former Sergeant Detective Spellman testified that there was no
training at the academy on *Brady v. Maryland* or the duty to disclose
evidence to the prosecutor. *See* Exhibit 24, Miller Dep. at 44 (no training on
*Brady v. Maryland* at the academy); Exhibit 35, Evans Dep. at 85-86 (does
not remember learning about the requirements of police officers to disclose
evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving
any training between 1970 and 1972 on the disclosure of witness statements
to the prosecutor); *id.* at 30 (does not remember if he received any training at
the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does
not think that Hogan taught him at the academy about whether or not he had
to disclose certain documents to the D.A.'s office); *id.* at 11, 64 (does not
remember getting any training bulletins on *Brady v. Maryland*, *Giglio v.
United States* or the duty to disclose evidence while he was a patrol officer in
Roxbury after he joined the Boston Police Department in 1968).

116.    In fact, recruits were not even taught the difference between
exculpatory and impeachment evidence at the police academy prior to Mr.
Wasserman's tenure as its Director.  *See* Exhibit 24, Miller Dep. at 88 (never
taught what impeachment evidence was at the academy and he does not
know what impeachment evidence is); Exhibit 34, Spellman Dep. 43 (does not

think that Hogan ever taught the difference between exculpatory and impeachment evidence).

117.   Instead, training in the law was primarily focused on definitions of various crime types, the elements of an offense and for procedures for making arrests and documenting the offense.  *See* Exhibit 36, Wasserman Report, at ¶ 18.

118.   There was no manual of investigative procedure until late in the 1970s and this was developed as a continuation of Mr. Wasserman's and Mr. DiGrazia's efforts to modernize the internal processes of the department.  *See* Exhibit 36, Wasserman Report, at ¶ 18; *see also* Exhibit 32, Wasserman Dep. at 88 (newly-created investigative training would have reflected duty to disclose); *see id.* at 93-95 (got funding for creation of investigative manual); *id.* at 113 (DiGrazia raised his concern about need to train on duty to disclose evidence ;in the discussion about the need to get an investigative manual out that sets the standards that we had.").

119.   The failure to train police officers about their obligation to disclose evidence to the prosecutor was of significant concern to Mr. DiGrazia and he raised that issue with Mr. Wasserman.  *See* Exhibit 32, Wasserman Dep. at 114 (DiGrazia "told [him] that he was concerned about those kind of practices"); *id.*at 110-11 (describing conversations he had with DiGrazia regarding officers withholding evidence where DiGrazia expressed "a sense that officers were not being completely truthful about what they had . . . It was just a concern of his and reflected the need to make sure we updated our training and we had to do something about improving the quality of supervision."); *id.* at 113 (recalling that DiGrazia raised the issue of officers withholding exculpatory or impeachment evidence with him).

120.    This concern extended to both young police officers and detectives.  As to the latter, Mr. Wasserman also explained that "[w]hat happens is that when you become a detective, which is the investigator role, you learned from your peers, and therefore there were past practices in the Department that were of concern to the administration, and those past practices may well have been different from what was required under the law."  Exhibit 32, Wasserman Dep. at 71; *see also* Exhibit 24, Miller Dep. at 51 ("[W]hat happens is after people are on the job for a few years, they start to feel a part of the prosecution team instead of maintaining their neutrality.").

121.    Mr. Wasserman's concerns were particularly acute because prior to his arrival at the academy in 1973, there was no in-service training for police officers and no additional training once an officer became a detective.  *See* Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); *id.* at 63 ("[W]hen you became a detective, you did not go to special training"); *id.* at 105 ("Q.  Were there any trainings that were offered for detectives specifically by the Department prior to 1973?  A.  Not that I'm aware of."); Exhibit 36, Wasserman Report at ¶ 18 ("Police officers promoted to detective did not have training in investigative procedure, but rather had to learn from their peers. ").

122.    As a result, "apart from the early Academy training, almost all training when [Mr. Wasserman] took over in 1973 was on-the-job training."  Exhibit 36, Wasserman Report at ¶ 18.

123.    With no training on officers' requirements to disclose exculpatory and/or impeachment evidence in the BPD in 1971 and 1972, there was no guidance to officers about what to do with such evidence.  Nor would officers have any notice of this legal requirement.  *See* Exhibit 36, Wasserman

Report at ¶ 29(c); Exhibit 32, Wasserman Dep. at 73 ("I think you have to train and I think you have to supervise, and we certainly had questions about the quality of supervision throughout the Department, which is why we then instituted a supervisory training program.").

124.    The absence of training on turning over exculpatory and/or impeachment evidence led to a policy and practice in the Department of not turning over this type of evidence to prosecutors or defendants.  *See* Exhibit 36, Wasserman Report at ¶ 29(e).  "In fact, because the only training on this issue was informal-on-the-job training, the policy and practice of the Department of withholding evidence became reinforced:  Younger officers probably learned to withhold evidence by watching more senior officers do the same."  *Id.* at ¶ (f); *see also* Exhibit 32, Wasserman Dep. at 71 (detectives learning from peers to adopt past practices that may be different than what is required under the law); *id.* at 50 ("[T]he biggest issue we were concerned about and I was particularly concerned about was the fact that when recruits came out of the academy and went into the field they were told by their field training officers and their peers, It's forget the stuff in the academy, let me tell you how it's actually done, and for us and for Bob DiGrazia that was a big challenge, and I tried a number of ways to overcome that."); *see also* Exhibit 37, DiGrazia Report, at 6 ("The absence of training on the disclosure of exculpatory and/or impeachment evidence is directly linked to the practice of the department at the time; that is, to withhold exculpatory and/or impeachment evidence.").

125.    Similarly, as Mr. DiGrazia explained

> Training is one of the primary ways that a police officer learns
> how to do his job and in particular, learns about the law.
> Although some police officers have graduate education in the

law, most do not and it is certainly was neither expected nor required for them at that time.  As a result, police officers learn the law on the job through training.  Although training cannot touch upon every single issue that an officer will face in his or her job, it is particularly important that it address the more fundamental legal issues as well as complex and nuanced legal concepts such as the disclosure of evidence to the prosecutor.  Without this training, an officer could not be expected to know that he was required to turn over exculpatory and/or impeachment evidence; indeed, he might not even know what evidence constituted exculpatory evidence and what constituted impeachment evidence.

*See* Exhibit 37, DiGrazia Report, at 6.

## XII.   Failure to Take Any Action to Remedy the Problem

126.   There were no changes made to Rule 43 between 1950 and 1972.  *See* Def's SOF; Exhibit 37, DiGrazia Report, at 7 ("At the time that Mr. Haley was arrested and prosecuted, the department was still operating under the BPD's Rules and Regulations manual from 1950.").

127.   Nor were there any changes made to include training on the duty to disclose exculpatory and/or impeachment evidence, on *Brady v. Maryland* or *Giglio v. United States* before Mr. DiGrazia's and Mr. Wasserman's tenure. *See* Exhibit 24, Miller Dep. at 44 (no training on *Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements

of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

128.    Mr. DiGrazia "oversaw a major overhaul of the rules and regulations of the BPD starting in 1972 but the major issues at that time were dealing with *Miranda*, new procedures regarding the execution of search warrants brought about by *Mapp v. Ohio*, and with issues involving the deadly use of force . . . Even as to those changes, which I considered to be fairly basic and obviously necessary in light of the law, there was a tremendous amount of pushback from those members of the department." Exhibit 37, DiGrazia Report, at 7.

129.    It was not until 1995 that the Department adopted Rule 113. *See* Exhibit 35, Evans Dep. at 77. Rule 113 includes the Canon of Ethics. *See* Exhibit 68, Rule 113, Section 5.

130.    Canon Ten states in relevant part: "Police officers shall exhibit the utmost respect for the legal rights of all. They shall not falsify evidence nor deny to anyone the equal protection of the law . . . Police reports and records shall adequately reflect the truth as it is known to the officer at the time they are created." *See* Exhibit 68, Rule 113, Section 5, Canon Ten.

131.    Likewise, the Department did not adopt Rule 320 until March 8, 1992. *See* Exhibit 69, Rule 320.  Section 8 directs that "[a] police officer shall immediately notify the prosecutor of a case in which he is involved of all material facts which could affect the prosecution of the case as soon as such facts become known to him.  *See id.*

### XIII.  <u>Damages</u>

132.    James Haley spent 34 years incarcerated for a crime that he did not commit.  *See* PSOAF, at ¶¶, *supra* (explaining Mr. Haley's innocence – and alibi for the time of the murder); *See* Exhibit 50, Docket, *Commonwealth v. Haley*, No. 58947, at 1 (requesting writ to bring Mr. Haley to court in 1971 from M.C.I. Walpole); Exhibit 61, Motion for Release on Bail & Clerk's notice (granting Mr. Haley bail in 2008); *See* Exhibit 1, Bettis Dep. at 120, 122 (Haley was out of prison for a period of time after his motion for new trial was granted).

133.    Mr. Haley's incarceration for the Myers murder was very difficult for him; "it was a hard adjustment for him [because] [h]e felt like he shouldn't have been there . . . ."  *See* Exhibit 1, Bettis Dep. at 132; *id.* at 128-29.  In addition, Mr. Haley had a lot of health problems that were difficult to get addressed while incarcerated.  *See* Exhibit 2, Sultan Dep. at 101 (Haley had a kidney transplant, urostomy and problems with his thyroid); Exhibit 1, Bettis Dep. at 128.  Finally, Mr. Haley was incarcerated with one of David Myers' brothers, who he was trying to avoid.  *See* Exhibit 1, Bettis Dep. at 128-29.

134.    Upon his release in 2008, Mr. Haley had "good days and bad days." Exhibit 2, Sultan Dep. at 104.  In addition to his physical ailments, Mr.

Haley had "a lot of difficulties adjusting to being in the free world, that he was having trouble sleeping." *Id.*; *see also id.* at 104-05 ("Well, pretty much every time I saw him or spoke to him I kind of asked him how he was doing and he told me it was difficult.  That he was having a very hard time adjusting to being a free man after so many years in prson.  That he had trouble sleeping.  That he had mood swings.  That he was happy to be out, but it was really – it was very very – it was much harder than he expected is basically what he communicated to me."); *id.* at 112 ("[I]t had been really an ordeal to be locked up for so long as an innocent person and not being able to get anybody to pay attention to his plight.").

135.    Because of his health problems, it was very difficult for Mr. Haley to find work upon his release in 2008.  *See* Exhibit 2, Sultan Dep. at 109.  Nonetheless, Mr. Haley volunteered at an office that provided legal services to elders.  *Id.* at 109-110.

136.    Mr. Sultan, Mr. Haley's criminal defense attorney, spoke to Mr. Haley "not infrequent[ly]" after his release.  *See* Exhibit 2, Sultan Dep. at 96.  As Mr. Sultan described Mr. Haley:  "I think he was a wonderful person who had – who showed tremendous perseverance and courage in the face of multiple decades in prison and had miraculously endured."  *Id.* at 127.

RESPECTULLY SUBMITTED,

/s/ Jon Loevy

Jon Loevy
Gayle Horn
Vince Field
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, IL 60607

### CERTIFICATE OF SERVICE

I, Jon Loevy, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 26, 2013.

RESPECTULLY SUBMITTED,


/s/ Jon Loevy_____