UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ESTATE OF JAMES HALEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:2009 CV 10197 |
| vs. | ) | |
| | ) | |
| CITY OF BOSTON, et al., | ) | |
| | ) | JUDGE STEARNS |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINITFF'S RESPONSE TO DEFENDANTS' L.R. 56.1 STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF
<u>SUMARY JUDGMENT</u>**

<u>Murder and Investigation</u>

1.    In the early morning of July 11, 1971, David Myers was stabbed and shot to
      death in the apartment he shared with Gloria Custis and their infant child
      at 33 Glenarm Street in Dorchester, Massachusetts.  See <u>Supreme Judicial
      Court Opinion in Commonwealth v. Haley, 563 Mass. 513 (1973)</u>, attached
      as **<u>Exhibit 1</u>** at p. 6.

**RESPONSE:**

      Admit statement of fact but object to use of *Commonwealth v. Haley*, 563
Mass. 513 (1973) as support for facts in this litigation.  Once a conviction is
overturned, as was Mr. Haley's, any subcomponents of the conviction, including
findings of fact in prior opinions, lose all preclusive effect.  *See Dodrill v. Ludt*, 764
F.3d 442, 444 (6th Cir. 198) (*per curiam*) ("If a judgment could be entirely vacated
yet preclusive effect still given to issues determined at trial but not specifically

appealed , appellants would generally feel compelled to appeal every contrary factual determination.  Such inefficiency neither lawyers nor judges out to court");  *Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006) (refusing to attach preclusive effect to prior court's rulings where convictions were overturned and witness' "deposition testimony [in civil action] provides additional new evidence of the defendants' activities, unknown at the time of the motion to suppress").

Even if that were not the case, Exhibit 1 is hearsay that cannot be admitted for the truth of the matter asserted.  *See, e.g., International Land Acquisitions, Inc. v. Fausto*, No. 01-2386, 2012 WL 1428264, at *4 (3rd Cir. 2002) (finding that judicial opinion is hearsay); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (finding that judicial findings are inadmissible hearsay that cannot be corrected under Rule 803(8)); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1185 (E.D.Pa.1980), *aff'd in part and rev'd on other grounds in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 275 (3rd Cir. 1983), *rev'd sub nom. Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (concluding that prior judicial findings were not admissible under Rule 803(8)(C), and that the trustworthiness analysis required under Rule 803(8)(C) would be unsuited to evaluating judicial findings because a judge is not a proper witness under Rule 605).

2.   Gloria Custis ("Gloria") had a sister named Brenda ("Brenda") Haley who was married to the Plaintiff, James Haley.  Id.

**RESPONSE:**

Admit.

3.   At approximately 5:25 a.m., officers were dispatched to 33 Glenarm Street, where they spoke with Custis.  She told them that she was asleep with Myers in their bedroom when they were awakened from noises coming from

the kitchen.  Myers went to investigate and she heard sounds of scuffling and a shot fired.  She observed Myers locked in combat with Haley in their bathroom.  Haley was armed with a knife and gun and Myers was bleeding.  Gloria fled her apartment and ran for help to a nearby apartment at 28 Glenway Street, where her brother George Custis lived with a woman named Helen Davis.  Officers spoke with Custis when she returned to her apartment shortly thereafter with her brother.  Myers was found dead, shot and stabbed in the bathroom.  See <u>July 11, 1971 Boston Police Department Incident Report</u>, attached as **Exhibit 3**.

**RESPONSE:**

Admit that at approximately 5:25 a.m., officers were dispatched to 33 Glenarm Street where they spoke with Custis but deny the remainder of the Statement.  Exhibit 3, which this Statement relies on for factual support, is a police report authored by Sgt. Otis Chandler.  Although the police report may be admissible under Fed. R. Evid. 803(8) as a business record, "hearsay statements by third persons ... are not admissible under this exception merely because they appear within public records." *United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997).  As such, "[b]ecause Officer [Chandler] merely recited [Custis'] statements, and their content was not based on [Chandler's] own observations, [but instead on Custis'], the statements do not fall within any recognizable hearsay exception . . . ." *Nna v. American Standard*, Inc., 630 F. Supp. 2d 115, 125 (D. Mass. 2009); *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir.1991) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted *but that statements made by third persons under no business duty to report may not.*") (quoting *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983)) (emphasis added in *Parsons*); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

In addition, deny the veracity of this statement.  Mr. Haley is innocent of the

murder of David Myers.  *See* Exhibit 28, Haley Aff. dated Oct. 10, 2007 ("I am innocent of this charge and have never given up obtaining judicial relief for my wrongful conviction.").   At the time of the murder, Mr. Haley was with his sister, Patricia Bettis (nee Mason), and her children, and his friends, at Patricia Beasley's home.  *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day).

4.      Gloria also told the responding officers that she believed Haley entered through a kitchen window with the intention of killing her sister Brenda.  Id.

**RESPONSE:**

Deny.  Exhibit 3, which this Statement relies on for factual support, is a police report authored by Sgt. Otis Chandler.  Although that police report may be admissible under Fed. R. Evid. 803(8) as a business record, "hearsay statements by third persons ... are not admissible under this exception merely because they appear within public records." *United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997).  As such, "[b]ecause Officer [Chandler] merely recited [Custis'] statements, and their content was not based on [Chandler's] own observations, the statements do not fall within any recognizable hearsay exception . . . ." *Nna v. American Standard*, Inc., 630 F. Supp. 2d 115, 125 (D. Mass. 2009); *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir.1991) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted *but that statements made by third persons under no business duty to report may not.*" ) (quoting *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983)) (emphasis added in *Parsons*); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a

motion for summary judgment.").

In addition, deny the veracity of this statement. Mr. Haley is innocent of the murder of David Myers. *See* Exhibit 28, Haley Aff. dated Oct. 10, 2007 ("I am innocent of this charge and have never given up obtaining judicial relief for my wrongful conviction."). At the time of the murder, Mr. Haley was with his sister, Patricia Bettis (nee Mason), and her children, and his friends, at Patricia and Leon Beasley's home. *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day); Exhibit 19, Haley Aff. dated April 27, 1987 (explaining that at the time of the murder he was with Leon Beasley).

5.  A window in the kitchen was observed to be open with the screen pulled up approximately 1 to 1 ½ feet. In the back yard, there was a small bucket turned upside down directly underneath the open window, about 5 feet below the window edge. See <u>Commonwealth v. Haley Trial Transcript</u>, attached as **<u>Exhibit 2</u>** at pages 523-24.

**RESPONSE:**

Admit but clarify that Defendant Kelley made these observations at approximately 7:30 a.m., when he went to 33 Glenarm. *See* Exhibit 4, Kelley Testimony, *Commonwealth v. Haley*, No. 58947, at 521-22.

## II.   <u>The Transcribed Witness Statements</u>

6.  Defendant Boston Police Sergeant Detective Joseph Kelley and Detective John Harrington participated in the investigation. On the morning of the murder, July 11, 1971, at 9:25 and 9:55 a.m., Sgt. Det. Kelley took the statements from witness Gloria Custis and her sister Brenda Haley at, 28 Glenway Street in

Dorchester ("the statements"). Det. Harrington was present for the statements. See <u>Boston Police Department Homicide File: (2) Copies of</u> <u>Commonwealth v. Haley</u> <u>Statements of Witnesses Gloria Custis, Brenda Haley and James A.</u> <u>Haley</u>, attached as **Exhibit 4**.

**RESPONSE:**

Admit that Defendants Kelley and Harrington participated in the investigation. Admit that Kelley took statements from Gloria Custis and Brenda Haley at 28 Glenway Street and that Defendant Harrington was present for those statements. Admit that the statements state 9:25 a.m. and 9:55 a.m., but deny to the extent that implies that that is when Defendants Kelley and Harrington began speaking with Ms. Custis and Ms. Haley. There is no indication as to what 9:25 a.m. and 9:55 a.m. mean. For example, the statements may not have been contemporaneously transcribed. *See* Exhibit 7, Whitehurst Dep. at 81 (does not remember a stenographer taking down a statement that she gave to police).

7.     The oral statements of Gloria and Brenda were transcribed by Boston Police Department Stenographer Harold Kraus. <u>Id</u>.

**RESPONSE:**

Admit.

8.     The transcript of Gloria's statement clearly indicates that it began at 9:25 a.m. <u>Exhibit 4</u> at p. 1.

**RESPONSE:**

Admit that the transcript states "9:25 a.m." but deny that Exhibit 4 "clearly indicates" that Gloria's statement began at 9:25 a.m. Exhibit 4 does not provide any information about what 9:25 a.m. means nor does it state anywhere that Gloria's statement began at 9:25 a.m. *See* Def. Exhibit 4. In addition, there is no indication that the statement was contemporaneously transcribed: For example, Gloria

Custis' statement could have been taken earlier in the morning but transcribed by Mr. Kraus later that morning, at 9:25 a.m.

In addition, deny that Exhibit 4 can be used to demonstrate the truth of the matter asserted therein as it is hearsay not subject to any exception for the purposes sought in the above statement of fact. *See*, *e.g.*, *Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

9.     In the statement, Gloria told police that when Myers was in the bathroom, she heard him scream: "James stabbed me. James stabbed me." She again stated that she had witnessed Haley, armed with a knife and gun, struggling with Myers in the bathroom and that she heard
a gunshot before fleeing, screaming for help. The statement included:

> Q:    Gloria, is there any doubt in your mind about the identity of the man who you saw struggling with David Myers in your bathroom this morning?
>
> A:    No. I looked right at him, I looked dead in his face."
>
> Q:    And for the record, who was it?
>
> A:     It was James Haley. Id. at p. 5.

**RESPONSE:**

Admit that the transcribed statement contains the factual information included in this Statement of Fact but deny that that information can be admitted for its veracity as it is hearsay not subject to any exception. *See*, *e.g.*, *Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

In addition, deny the veracity of the Gloria Custis' statements to the police. Mr. Haley is innocent of the murder of David Myers. *See* Exhibit 28, Haley Aff. dated Oct. 10, 2007 ("I am innocent of this charge and have never given up on

obtaining judicial relief for my wrongful conviction."). At the time of the murder, Mr. Haley was with his sister, Patricia Bettis (nee Mason), and her children, and his friends, at Patricia and Leon Beasley's home. *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day); Exhibit 19, Haley Aff. dated April 27, 1987 (explaining that at the time of the murder he was with Leon Beasley).

10.     When asked if she knew any reason why Haley came to her home that morning, Gloria stated, "It could be because he thought Brenda was staying with me because after James stabbed David, I heard David asking him why he stabbed him, 'Why did you stab me because Brenda isn't here,' that she wasn't staying with us." Id.

**RESPONSE:**

Admit that the transcribed statement contains the factual information included in this Statement of Fact but deny that that information can be admitted for its veracity as it is hearsay not subject to any exception. *See*, *e.g.*, *Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

In addition, deny the veracity of Gloria Custis' statements to the police. Mr. Haley is innocent of the murder of David Myers. *See* Exhibit 28, Haley Aff. dated Oct. 10, 2007 ("I am innocent of this charge and have never given up obtaining judicial relief for my wrongful conviction."). At the time of the murder, Mr. Haley was with his sister, Patricia Bettis (nee Mason), and her children, and his friends, at Patricia and Leon Beasley's home. *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was

at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day); Exhibit 19, Haley Aff. dated April 27, 1987 (explaining that at the time of the murder he was with Leon Beasley).

Moreover, Mr. Haley would have had no reason on July 11, 1971 to believe that Brenda Haley was back in Boston after she left on May 3, 1971 for Delaware because Mr. Haley had not seen Brenda Haley in over a month. *See* Exhibit 5, Statement of Gloria Custis at 6 ("Q. Prior to this morning, when was the last time you've seen James Haley? A. The last time I saw him was about last month."); Exhibit 6, Statement of Brenda Haley at 1 ("Q. When was the last time you saw your husband James Haley? A. May 3rd. Q. And you haven't seen him since then? A. I seen him last month walking down the street but not to talk to him, from a distance."); Exhibit 7, Whitehurst Dep. at 91, 135 (told the police the truth when she spoke to them right after the murder); *id.* at 137 (admitting that although she does not remember but "if I said it, I saw him a month ago").

11.     In her statement, Gloria stated also that the last time she saw Haley, prior to "this morning," was "about last month." Id. at p. 6.

**RESPONSE:**

Admit.

12.     Brenda Haley also gave a transcribed statement, in which she stated that she was living with Haley until May 3, 1971. On that date, he punched her, cutting her face, and threatened to kill her, so she left to stay with her parents in Delaware. Id. at pp. 7-9.

**RESPONSE:**

Admit that the transcribed statement says that Brenda Haley was living with James Haley until May 3, 1971. Also admit that statement says that Mr. Haley cut

Brenda Haley's face and threatened to kill her, but deny the veracity of those facts. *See* Exhibit 20, Haley Aff. dated Sept. 5, 1989, at 6 ("About a year after my conviction, Caroline Hunter of the Prisoner's Rights Project, during an investigation of my conviction, talked with Daniel Clifford through Gabriel Green (Clifford's rental agent) and Clifford verified that he and the workmen were [at his apartment repairing a bedroom ceiling] on the morning of May 3, 1971, and that he did not see Brenda Haley beaten and bleeding, nor was she emotionally upset."). Also deny that the statement says that the reason Brenda Haley left for Delaware was because Mr. Haley punched her, cut her and threatened to kill her. *See also* Exhibit 7, Whitehurst Dep. at 34 (left Mr. Haley because she realized that "he wasn't for me"); *id.* at 34 (left Haley because "we really didn't have anything in common"). Admit that the statement says that Brenda Haley left Boston on May 3, 1971 to stay with her parents in Delaware.

Deny that any of the information in this Statement of Fact can be admitted for its veracity as it is hearsay not subject to any exception. *See*, *e.g.*, *Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

13.     Brenda also stated that she was pursuing a divorce and that on Friday July 9, 1971, she returned to Boston and spoke with Haley on the phone at her lawyer's advice relative to the divorce filing.   When asked why Haley would have gone to Gloria's apartment early in the morning, she replied, "I would assume that he was looking for me more than likely to kill me instead of him." Id.

**RESPONSE:**

Deny that the Brenda Haley told the police that she returned to Boston on Friday July 9, 1971.  That fact is not contained anywhere in Exhibit 4.  Moreover, Ms. Haley has testified that she called Mr. Haley only once in between May 3rd and Mr. Myers' murder but she does not recall whether that call was made from Delaware or Boston.  *See* Exhibit 7, Whitehurst Dep. at 55.  In addition, Ms.

Whitehurst has no recollection of having any phone contact with Mr. Haley when she was coming back to Boston or regarding the divorce proceedings. *See* Exhibit 7, Whitehurst Dep. at 53-54, 60; *see also* Exhibit 20, Haley Aff. dated Sept. 5, 1989, at 6 (noting no record in Boston Legal Assistance regarding Brenda Haley inquiring about a divorce).

Admit that the statement says that Brenda Haley spoke to Mr. Haley on Friday over the phone at the advice of her lawyer relative to the divorce but deny the veracity of that statement. *See* Exhibit 7, Whitehurst Dep. at 53-55; *see also* Haley Aff. dated Sept. 5, 1989, at 6 (noting no record in Boston Legal Assistance regarding Brenda Haley inquiring about a divorce).

Admit that the statement says that Brenda told the police that she assumes that Mr. Haley was looking for her not Mr. Myers but deny the veracity of that statement. Mr. Haley is innocent of the murder of David Myers. At the time of the murder, Mr. Haley was with his sister, Patricia Bettis (nee Mason), and her children, and his friends, at Patricia and Leon Beasley's home. *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day); Exhibit 19, Haley Aff. dated April 27, 1987 (explaining that at the time of the murder he was with Leon Beasley).

Deny that any of the information in this Statement of Fact can be admitted for its veracity as it is hearsay not subject to any exception. *See*, *e.g.*, *Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

14.     Brenda also stated that the last time she had seen Haley was "last month walking down the street but not to talk to him, from a distance." Id. at p. 7.

**RESPONSE:**

    Admit.

15.    The next day on July 12, 1971, Sgt. Det. Kelley also took a statement from James Haley at police headquarters.  This statement was also transcribed by Stenographer Harold Kraus.  Id. at pp. 11-14.

**RESPONSE:**

    Admit.

16.    As part of the transcribed statement of James Haley, Sgt. Det. Kelley states to Haley "we have Gloria who gave a <u>full and complete statement to me</u> putting you in the apartment, struggling with the victim and she heard a gunshot." Id. at p. 14.

**RESPONSE:**

    Admit that the transcribed statement contains the quotation included in the statement above.

    Deny that any of the information in this Statement of Fact can be admitted for its veracity as it is hearsay not subject to any exception. *See, e.g., Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

17.    The transcribed statement dated July 11th at 9:25 is the only statement given by Gloria to Sgt. Det. Kelly.  Id. at p. 1.

**RESPONSE:**

    Deny.  Exhibit 4, which the Defendants have cited for the above-proposition, does not support the position that the transcribed statement was the only statement given by Gloria Custis to Defendant Kelley, only that it was one

statement given by Gloria Custis to Defendant Kelley that was transcribed by Stenographer Kraus. For example, Exhibit 4 does not eliminate the possibility that Ms. Custis had oral communications and made oral statements to Defendant Kelley regarding the murder of David Myers. *See* Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 338-39 (does not remember is she spoke to Kelley at the scene); Exhibit 8, Custis Dep. at 63 (no memory of conversations with police); Exhibit 9, Police Notes, at 45 (indicating Kelley had conversations with Brenda Haley and Gloria Custis). Likewise, Ms. Custis gave oral statements to other police officers. *See* Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 338-39 (explaining that once she returned to her home at 33 Glenarm, a police officer asked her who she was and what happened); Exhibit 9, Police Reports, at Bates 28 (recounting oral statement by Custis to David Regan); 72 (recounting oral statement by Custis to Sgt. Otis Chandler).

18.     The transcribed statements taken from Gloria Custis, Brenda Haley and James Haley by the stenographer were combined into a single document. This document was paginated with Gloria Custis' statement contained in pages 1-6, Brenda Haley's statement contained in pages 7-10, and James Haley's statement contained in pages 11-14. The document is titled <u>Commonwealth v. James Haley</u> and contains a cover sheet/ index, which lists the document's contents and the corresponding page numbers on which each witnesses' statement begins. <u>Exhibit 4</u>.

**RESPONSE:**

    Object because no foundation has been laid for this exhibit. Also deny that any of the information in this Statement of Fact can be admitted for its veracity as it is based on a document that is hearsay not subject to any exception for the purposes in the statement of fact above. *See, e.g., Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within

any exception and was therefore not admissible."); *Nna v. American Standard, Inc.*, 630 F. Supp. 2d 115, 125 (D. Mass. 2009).

19.     At trial, Haley's defense counsel Alfred Farese had a copy the transcribed statement given by Haley to Sgt. Det. Kelly, which is both referenced Gloria's statement and is paginated with numbers 11-14 as part of the document that also contained Gloria and Brenda's transcribed statements.  <u>Exhibit 2</u> at pp. 537-42; <u>Exhibit 4</u>.

**RESPONSE:**

Admit that Mr. Farese had a copy of the transcribed statement given by Haley to Sgt. Det. Kelley.  Deny that the copy that Mr. Farese had of that statement was paginated 11-14.  The evidence cited above does not support that proposition.

20.     There is no evidence that the trial prosecutor Gerald Muldoon did not receive pages 1-10 of this document, which contained the statements of Gloria and Brenda.

**RESPONSE:**

Deny.  The Defendants have cited no evidence for this proposition whatsoever. *See Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008) ("under Local Rule 56.1, a party moving for summary judgment must provide a concise statement of the relevant, material facts as to which there is no genuine issue, *supported by citations to the record*."). (emphasis added).

Plaintiff further denies this statement because there is ample evidence in the record that Mr. Muldoon did not receive the witness statements of Gloria Custis and Brenda Haley.  As (former Assistant District Attorney ("ADA")Tom Dwyer testified, he worked with Mr. Muldoon and came to know him very well. *See* Exhibit 10, Dwyer Dep. at 111.  Mr. Muldoon has the utmost reputation for honesty and integrity while he was an Assistant District Attorney. *Id.* at 111 ("If you had to pick an assistant in your entire tenure that was solid as a rock

professionally and ethically, you know, he's probably number one."). "[T]he notion that [Mr. Muldoon] would have gotten a report with exculpatory evidence with the police department and hid it in his own pocket, could not have happened in my judgment." *Id.* at 114; *id.* (same is true for impeachment evidence). As such, if Mr. Muldoon had had the witness statements of Gloria Custis and Brenda Haley, he would have disclosed them. This is particularly true because Mr. Haley filed a motion to be furnished with evidence favorable to the accused that included a request for impeaching evidence and inconsistent statements, which was allowed – and to which Gloria Custis' and Brenda Haley's witness statements would have been responsive. *See* Exhibit 11, Motion to Be Furnished with Evidence Favorable to the Accused (granted January 31, 1972).

That Mr. Muldoon did not have the witness statements is borne out by the fact that Al Farese did not use either to impeach Ms. Custis or Ms. Haley regarding the last time they had seen Mr. Haley at trial. *See* Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58497, at 363-80, 383; Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58497, at 256-349 (Feb. 29, 1972); Exhibit 14, Natola Expert Report, at 5-7, 9. Had Mr. Farese had the witness statements, "he would have used the evidence to devastating effect to impeach the credibility of Glroia Custis and Brenda Haley." Exhibit 14, Natola Report, at 9; *see also* Exhibit 10, Dwyer Dep. at 117 (had Mr. Farese had the statements, "he would have caused a riot . . . he would have used them. He wouldn't have used them – in my judgment he wouldn't have used them in a delicate Liacos Evidence Book way. He would use it like a hammer."); Exhibit 15, Delcore Dep. at 75-76 ("had Al Farese had those statements given to the police, he would have used them at length on cross examination to try to impeach the witnesses. Because he never brought that up at cross examination, I can only assume he didn't have them because there's no opinion – there's no question in my mind that had he had them he would have used them.").

21.     On July 12, 1971 James Haley was arrested for the murder of David Myers.

**RESPONSE:**

        Admit.

## III.     Criminal Proceedings

22.     A probable cause hearing was held on July 23, 1971, at which both Gloria and Brenda testified. Exhibit 2 at pp. 267, 324-29, 363-66.

**RESPONSE:**

        Admit.

23.     James Haley was indicted by a grand jury for the first-degree murder of David Myers on September 13, 1971. See Commonwealth v. Haley Docket Sheet 1971 through 1993, attached as Exhibit 5, at p. 1.

**RESPONSE:**

        Admit.

24.     Det. John Harrington graduated from law school prior to Haley's arrest. See Excerpt from Boston Police Department Personnel File of Detective John Harrington, attached as **Exhibit 33**.

**RESPONSE:**

        Deny.  The evidence that the Defendants cite neither supports this proposition nor is admissible summary judgment evidence.  First, the evidence includes a "news release," regarding a polygraph grant, which alleges that Boston Police Officer, John B. Harrington, who is the recipient of that grant, is a

"law school graduate." This "news release," which includes crossed out type and handwritten edits is not admissible summary judgment evidence. *See United States v. Washington*, No. 10-cv-39-JL, 2013 WL 1314420, at *6 (D.N.H. March 28, 2013) ("As an initial matter, there is no competent evidence of a servicing relationship between those entities, only news articles, which are hearsay, *see* Fed. R. Evid. 801, that cannot be considered on summary judgment, *see, e.g., Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011)).

Second, and similarly, the evidence includes a self-reporting "Examination of Applicants," for Mr. Harrington, which lists his education as including "Law School 4 years." That does not provide admissible summary judgment evidence that Defendant Harrington graduated from law school prior to Mr. Haley's arrest. *See Dávila v. Corporación de P.R. Para La Difusión Pública*, 498 F.3d 9, 17 (1st Cir. 2007) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment" for the truth of the matter asserted.)

25. On November 29, 1971, prior to the Haley's trial, Det. John Harrington died unexpectedly. See <u>Death Certificate of John Harrington</u>, attached as **Exhibit 20**.

**RESPONSE:**

Admit.

26. Prior to trial, on or about December 30, 1971, Haley filed discovery motions, including a motion to be furnished with evidence favorable to the accused, seeking evidence that could be used to impeach the Commonwealth's witnesses, any inconsistent statements made to law enforcement officers, and prior inconsistent statements from those who testified during the trial, which was allowed at a pre-trial hearing on January 31, 1972. <u>Exhibit 5</u> at pp. 3-5; <u>Commonwealth v. Haley Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment, dated August 26, 2008</u>, attached as **Exhibit 6** at p.

2; Defendant's Motion to Be Furnished with Evidence Favorable to the Accused, attached as **Exhibit 7**.

**RESPONSE:**

Admit but clarify that motion to be furnished with evidence favorable to the accused, which was granted by the court, included six categories of documents: "1. any evidence that can be used for the purpose of impeaching the credibility of witnesses that the Commonwealth intends to rely upon in support of the matters referred to in the indictment, 2. statements which would reasonably tend to show that the accused did not commit the offense charged, 3. evidence which would reasonably tend to show that the accused did not commit the offense charged, 4. statements which are inconsistent with statements made by parties other than the declarant, 5. inconsistent statements made by a declarant to law enforcement officers, and 6. prior inconsistent statements from those testified to during the course of the trial." *See* Exhibit 11, Motion to Be Furnished With Evidence Favorable to the Accused.

27.     Haley also filed a Motion to Inspect and Copy Statements Made by Defendant, which was also allowed at the pre-trial. Exhibit 5 at pp. 3-5; Defendant's Motion to Inspect and Copy Statements Made by Defendant, attached as **Exhibit 8**.

**RESPONSE:**

Admit but clarify that the Motion to Inspect and Copy Statements Made by Defendant requested "all statements, both written and transcriptions or oral statements made by the said defendant, which statements, 1) were considered by the Grand Jury, which returned this Indictment. 2) have been relied upon by the Commonwealth in support of the indictment. 3) are intended to be offered in evidence at the trial of the indictment. 4) are intended by the Commonwealth to constitute evidence as to the guilt or innocence of the defendant on the charge

contained in the indictment." Exhibit 16, Motion to Inspect and Copy Statements Made by Defendant.

28.     Haley also filed a Motion to Inspect Statements of Commonwealth's Witnesses. The Commonwealth did not assent to this motion at the pre-trial and the court deferred ruling on it to the trial judge. Prior to empanelling the jury, the trial judge took up this motion and **denied** it. Exhibit 5 at pp. 3-5; Exhibit 6 at p. 2; Defendant's Motion to Inspect Statements of Commonwealth's Witnesses, attached as **Exhibit 9**.

**RESPONSE:**
        Admit that Mr. Haley filed a Motion to Inspect Statements of Commonwealth's Witnesses. Admit that the court deferred the motion to the trial judge for ruling. Deny the remainder of this statement of facts because it is not supported by the evidence cited by the Defendants.

29.     Haley also filed a Motion to be Furnished with Statements Concerning Identification, and a Motion for Inspection of Grand Jury Minutes. The Commonwealth did not assent to either of these motions at the January 31, 1972 pre-trial and the pre-trial judge also deferred ruling on them to the trial judge. Prior to empanelment, the trial judge took up these motions. Again, the Commonwealth did not assent. The court denied Haley's motion for statements concerning identification, because Gloria "was virtually an eye witness to this affair, and that she is the sister-in-law of the defendant." The court also denied Haley's motion for inspection of Grand Jury Minutes, "stating that the court would review the minutes and allow defense counsel to inspect them only if the Court determined that they contained matters which are material and important to the defense of the case." Exhibit 2 at pp. 5-8; Exhibit 5 at pp. 3-5; Exhibit 6 at p. 2.

**RESPONSE:**

Deny that the Commonwealth did not assent to Mr. Haley's Motion to Be Furnished With Statements Concerning Identification and Motion for Inspection of Grand Jury Minutes because the evidence cited by the Defendants does not support that proposition. Neither the trial transcripts nor the docket identify the Commonwealth's position as to either of these motions at either the pretrial hearing or prior to empanelment. Nor does the Memorandum of Decision and Order on Defendant's Motion to Dismiss Indictment.

Admit the remainder of this statement.

30. Jury empanelment started on Monday, February 28, 1972 before Judge Roy. Assistant District Attorney Gerald Muldoon represented the Commonwealth. <u>Exhibit 2</u> at pp. 1,9.

**RESPONSE:**

Admit.

31. Haley was represented at trial by Attorney Alfred Farese. Prior to empanelment, Attorney Farese requested a 48-hour continuance of the trial. He stated that he had just completed another murder trial in Rhode Island two days earlier and that "by me being forced to trial today, I wouldn't have adequate time to prepare a case properly." The judge denied the request to continue and empanelled the jury. <u>Exhibit 2</u> at pp. 1,4-5.

**RESPONSE:**

Admit.

32. At trial it was established that Brenda and James Haley had lived together with Gloria Custis and David Myers at 33 Glenarm Street Apartment in February and March 1971. <u>Exhibit 2</u> at pp. 229-31.

**RESPONSE:**

Admit that at trial, Brenda Haley and Gloria Custis testified that James Haley and Brenda Haley lived with Gloria Custis and David Myers at 33 Glenarm Street but deny that they did so for two months. Ms. Haley testified that they lived with Ms. Custis and Mr. Myers sometime after she and Mr. Haley were married. *See* Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 355. James Haley and Brenda Haley were married on March 28, 1978. *Id.* Likewise, Ms. Custis testified that her sister and Mr. Haley lived with her and David Myers "for about a month . . . [f]rom the end of February to the end of March." Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 231.

33. Brenda testified that on May 3, 1971, she and Haley got in an argument, which involved Haley striking Brenda in the face and cutting her eye. She left that same day on a bus to stay with her parents in Delaware. Id. at pp. 356-59.

**RESPONSE:**

Admit that Brenda Haley testified that on May 3, 1971, she and Mr. Haley got into an argument but deny that she testified that he struck her in the face and cut her eye. According to Ms. Haley's testimony, Mr. Haley "hit [her] and cut [her] over the eye." Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 357. Deny the veracity of Ms. Haley's testimony that Mr. Haley physically assaulted her in any manner. *See* Exhibit 20, Haley Aff. dated Sept. 5, 1989, at 6 ("About a year after my conviction, Caroline Hunter of the Prisoner's Rights Project, during an investigation of my conviction, talked with Daniel Clifford through Gabriel Green (Clifford's rental agent) and Clifford verified that he and the workmen were [at his apartment repairing a bedroom ceiling] on the morning of May 3, 1971, and that he did not see Brenda Haley beaten and bleeding, nor was she emotionally upset.").

Admit that Brenda Haley left the same day to live with her parents in Delaware.

34.     On cross-examination, defense counsel quoted Brenda's testimony at Haley's probable cause hearing: "I left to leave James Haley [to go to Delaware], because when I left him, he threatened me not to leave. I thought the only way I could be safe from him was to leave the state." Id. at p. 365.

**RESPONSE:**

Admit.

35.     Brenda returned to Dorchester on July 9, 1971, in order to obtain a divorce from Haley, at which time she stayed with her sister Barbara at 12 Mount Bowdoin Terrace. Id. at pp. 358-61.

**RESPONSE:**

Admit that Brenda testified that she returned to Dorchester on July 9 and that she stayed with her sister Barbara at 12 Mount Bowdowin Terrace but deny that she testified that she returned to obtain a divorce because it is not supported by the citation identified above. *See also* Exhibit 20, Haley Aff. dated Sept. 5, 1989, at 6 (noting no record in Boston Legal Assistance regarding Brenda Haley inquiring about a divorce).

36.     Brenda testified that after she returned to Dorchester on July 9, 1971, she called Haley from Boston and spoke with him regarding the divorce. Id. at pp. 359-61, 377.

**RESPONSE:**

Admit that Brenda testified at trial that she called Mr. Haley from Boston, but deny the veracity of that statement. *See* Exhibit 7, Whitehurst Dep. at 54

(does not remember having a vocal conversation with Mr. Haley when she returned to Boston); *id.* at 55 (does not remember whether she spoke to Mr. Haley from Boston or Delaware); Exhibit 2, Sultan Dep. at 83 ("He told me on July 9th Brenda called him at work. The call was taken by their after school intern. The intern told Haley that someone was calling long distance for him. Haley got o the phone. Brenda accused him of taking her income tax refund check. Haley responded that he had deposited in the bank and asked her if she wanted him to give it to Peaches which was the nickname for Gloria or Barbara Ann, Brenda's other sister. Brenda said she would call Haley back and tell him what to do with the check.").

Deny that Brenda Haley testified that she spoke with Mr. Haley on July 9, 1971. Exhibit 12, Brenda Haley Testimony, *Commonwealth v. Haley*, No. 58947, at 370-71 ("Q. And you hadn't seen or heard from James in how long prior to July 10th? A. The last day I talked to James was May 3rd, prior to July 10th.").

Deny that Brenda testified at trial that she called Mr. Haley and spoke with him regarding the divorce. There was no testimony to that effect in any of the pages cited by the Defendants.

37.     Brenda also testified that on Saturday, July 10th, while she was with Gloria, she saw Haley "in a food store at the corner of Glenarm and Washington and he had been in the store and out the store again when [she] saw him;" they did not speak to Haley, but she "guessed" Haley recognized them when he looked down the street because "he just stood there for a few minutes and then he walked along;" and when she saw Haley, "[i]t was in mid-afternoon, about maybe four or five, maybe six." Exhibit 2 at pp. 354-78; Exhibit 6 at p. 8; Supreme Judicial Court Opinion in Commonwealth v. Haley, 413 Mass. 770 (1992), attached as **Exhibit 10** at page 8.

**RESPONSE:**

Admit that Brenda gave the above-cited testimony at trial but deny its

veracity. *See* Exhibit 6, Statement of Brenda Haley at 1 ("Q. When was the last time you saw your husband James Haley? A. May 3rd. Q. And you haven't seen him since then? A. I seen him last month walking down the street but not to talk to him, from a distance."); Exhibit 7, Whitehurst Dep. at 91, 135 (told the police the truth when she spoke to them right after the murder); *id.* at 137 (admitting that although she does not remember but "if I said it, I saw him a month ago"); Exhibit 20, Haley Aff. dated Sept. 5, 1989, at 4-5 (explaining that "at 4 p.m. of July 10th I was at my place of employment at M.I.T. From there I walked across the Longfellow bridge to the Mass. General Hosp. to visit my mother who had just recently undergone surgery."); Exhibit 17, MIT Visitor's Log (noting that Haley was at work at MIT from 3:20 p.m. to 4:15 p.m.); Exhibit 22, Barbara Lucas Testimony, *Commonwealth v. Haley*, No. 58947, at 624-25 (explaining that she went to visit Mr. Haley's mother at Massachusetts General Hospital after she got off of work at 6 p.m. and Mr. Haley was there, and that when she left around 7:30 or 8:00 p.m., Mr. Haley was still there); *see also* Exhibit 7, Whitehurst Dep. at 62-63 (says that when she saw Haley he was not walking down the street nor did he stand there and walk along; she recalls Haley being on a bus and they made eye contact);

38.     Gloria also testified at length regarding the circumstances and events leading up to and after Myers' murder, including identifying Haley as the person she saw struggling with Myers in her apartment bathroom with a gun and knife, hearing one gunshot and hearing Myers stating that "James stabbed me." She also testified to hearing Myers state, "why did you stab me, man? Brenda's not here." Exhibit 2 at pp. 229-256; Exhibit 6 at pp. 11,18.

**RESPONSE:**

Admit that at trial, Gloria Custis identified Haley as the person she saw struggling with Myers in her apartment bathroom, testified that she heard one gunshot and testified that she heard Myers stating "James stabbed me." Admit

that Gloria Custis also testified that she heard Myers state "why did you stab me" but clarify that she heard Myers say this right after she heard the gunshot. Exhibit 13, Gloria Custis Testimony, *Commonwealth v. Haley*, No. 58947, at 285.

Deny the veracity of Gloria Custis' testimony at trial. *See* Exhibit 8, Custis Dep. at 25 (cannot say that Haley had anything in his hands when she saw him and Myers struggling over the bathtub); *id.* at 26 (stating that she knows that a gunshot was fired but that she "do[esn't] hear it in her mind"). Mr. Haley is innocent of the murder of David Myers. *See* Exhibit 28, Haley Aff. dated Oct. 10, 2007 ("I am innocent of this charge and have never given up obtaining judicial relief for my wrongful conviction."). At the time of the murder, Mr. Haley was with his sister, Patricia Bettis (nee Mason), and her children, and his friends, at Patricia and Leon Beasley's home. *See* Exhibit 1, Bettis Dep. at 89-93 (Haley was playing a card game with Ms. Bettis and their friends, and then Haley went to bed shortly after 5:30 a.m.); Exhibit 2, Sultan Dep. at 88-89 (Haley told him that he was at a party all night with friends and family); Exhibit 3, Beasley Dep. at 23-25, 27 (Haley was playing cards, went to sleep in the living room, saw Haley in the kitchen the next day); Exhibit 19, Haley Aff. dated April 27, 1987 (explaining that at the time of the murder he was with Leon Beasley).


39.     Gloria also testified that on July 10, 1971, she saw Haley on the corner of Glenarm and Washington "late in the afternoon." At that time, Haley "just looked at [them]." Exhibit 2 at pp. 233-236, 270-73; Exhibit 6 at p. 3.


**RESPONSE:**

Admit that Gloria Custis testified at Mr. Haley's criminal trial that she saw Haley on the corner of Glenarm and Washington "late in the afternoon" and that at that time Haley "just looked at them," but deny the veracity of this statement. *See* Exhibit 5, Statement of Gloria Custis at 6 ("Q. Prior to this morning, when was the

last time you've seen James Haley?  A.  The last time I saw him was about last month."); Exhibit 20, Haley Aff. dated Sept. 5, 1989, at 4-5 (explaining that "at 4 p.m. of July 10th I was at my place of employment at M.I.T.  From there I walked across the Longfellow bridge to the Mass. General Hosp. to visit my mother who had just recently undergone surgery."); Exhibit 17, MIT Visitor's Log (noting that Haley was at work at MIT from 3:20 p.m. to 4:15 p.m.); Exhibit 22, Barbara Lucas Testimony, *Commonwealth v. Haley*, No. 58947, at 624-25 (explaining that she went to visit Mr. Haley's mother at Massachusetts General Hospital after she got off of work at 6 p.m. and Mr. Haley was there, and that when she left around 7:30 or 8:00 p.m., Mr. Haley was still there); *see also* Exhibit 8, Custis Dep. at 21, 62 (remembers seeing Haley on July 10, 1971 not going into a store at the corner of Glenarm and Washington as she testified to at trial but on an MBTA bus from Codman Square toward Grove Hall).

40.    Attorney Farese was Haley's counsel at the July 23, 1971 probable cause hearing.  He cross-examined both Gloria and Brenda at this hearing.  He also had a copy on the transcript of Gloria and Brenda's probable cause hearing testimony, which he used it to impeach both witnesses at trial.  Exhibit 2 at pp. 267, 324-29, 363-66.

**RESPONSE:**

    Admit.

41.    Referring to her testimony at Haley's probable cause hearing, defense counsel inquired of Gloria:

    Q:  Now, on July 23rd of 1971 were you ever asked this question?  "When did you see James that day for the first time."  Were you ever asked that question?
    …
    Q:  Wasn't your answer, "I didn't see him at all that day until he entered my house at five o'clock in the morning?"  Id. at pp. 328-29.

**RESPONSE:**

      Admit.

42.     Attorney Farese did not renew his Motion to Inspect Statements of Commonwealth Witnesses, or his Motion to be Furnished with Statements Concerning Identification, or his motion for inspection of Grand Jury Minutes either during or after the testimony of Brenda or Gloria.

**RESPONSE:**

      Deny. Farese renewed his motion for inspection of Grand Jury minutes after the testimony of Gloria and Brenda:

> Mr. Farese:  Your Honor, while we're waiting for the Officer, while we're waiting for the Officer, at your convenience may I see the Grand Jury minutes?
>
> The Court.  In respect of what witness?
>
> Mr. Farese: In respect to the testimony of Gloria and Brenda.
>
> The Court:  You completed your cross examination.
>
> Mr. Farese: I realize it, but I have a right to call –
>
> The Court: I will take it up with you.
>
> Mr. Farese: Thank you.

*See* Exhibit 42, *Commonwealth v. Haley*, No. 54987 at 406.  Admit the remainder of this statement of fact.

43.     At trial, Sgt. Det. Kelley testified that on the morning of July 11, 1971, he went to 28 Glenway Street where he saw Gloria, Brenda and Helen Davis and spoke both Gloria and Brenda.  <u>Id</u>. at pp. 526-527.

**RESPONSE:**

      Admit.

44.     On cross-examination by defense counsel, Sgt. Det. Kelley testified:

     Q:    Now at some time you say you talked to Gloria Custis and
             Brenda Haley was there?
     A:    I did
     Q:    And this was the morning of the alleged
             incident?
     A:    Yes, sir.
     Q:    And Brenda was there at what
             street?
     A:    Glenway.
     Q:    Glenway Street.  And what time did this conversation
             take place?
     A:    About 9:30 a.m.
     Q:    <u>Is there anything in your records to indicate what time it
             took place?</u>
     A:    <u>I have it in the statement, yes, 9:25 to be exact</u>.  <u>Id</u>. at p.
             542.

     Q:    Now do you have anything to indicate what time you went to the home
             of the Davis's?
     A:    Yes.
     Q:    And what time was that?
     A:  9:25 a.m.  <u>Id</u>. at p. 544.

**RESPONSE:**

      Admit.

45.     Page one of Custis's transcribed statement clearly indicates that it was taken at 9:25 a.m. and it is the only document in the homicide file that references this time. <u>Exhibit 4</u> at p. 1.

**RESPONSE:**

      Deny that Custis' transcribed statement "clearly" indicates that it was taken at 9:25 a.m.  Although the time 9:25 a.m. appears on the first page of her statement, it is not clear what 9:25 a.m. refers to.  Nor is

there any indication that the statement was contemporaneously transcribed: For example, Gloria Custis' statement could have been taken earlier in the morning but transcribed by Mr. Kraus later that morning, at 9:25 a.m.

Deny that any of the information in this Statement of Fact can be admitted for its veracity as it is hearsay not subject to any exception. *See, e.g., Evans v. Verdini*, 466 F.3d 141, 148 (1st Cir. 2006) (witnesses "prior statement [to police] was hearsay not within any exception and was therefore not admissible.").

46. In his defense, Haley called Alice Marsh as an alibi witness who upon examination by Attorney Farese confirmed Haley had been in Dorchester in the afternoon of July 10, 1971. This *defense* witness testified she saw Haley at approximately 5:00 p.m. at 28 Richmond Street in Dorchester, which was just a few blocks from where Gloria and Brenda claimed to have seen him around this time. Exhibit 2 at pp. 639-643.

**RESPONSE:**

Admit that Ms. Marsh testified that she saw Mr. Haley at 5:00 p.m. at Patricia and Leon Beasley's home for a party for Barbara Marsh.

Deny that 28 Richmond Street is "just a few blocks from" the intersection of Glenarm and Washington Streets, where Brenda Haley and Gloria Custis alleged to have seen Mr. Haley. This assertion is not supported by the record cite provided nor is it supported otherwise. *See* Exhibit 18, Google Map Directions from 28 Richmond Street to the Intersection of Glenarm & Washington Streets (identifying the distance between the two locations as being approximately 2.5 miles); *see Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ("We may, of course, take judicial notice of geography.").

47.    On March 3, 1972, after 5 days of trial, the jury returned a guilty verdict of murder in the first degree.  Haley was sentenced to life in prison.  Exhibit 1 at p. 6.

**RESPONSE:**

Admit.

48.    Beginning in 1988, Haley sought post-conviction relief by way of several Motions for New Trial in Suffolk Superior Court and a Petition for Habeas Corpus in Federal Court, each alleging ineffective assistance of counsel by Attorney Farese.  In support his claim, Mr. Haley submitted affidavits which stated that Attorney Farese was clearly inadequately prepared for trial and that Haley had attempted both before and during trial to fire Farese.  He also stated that from the time of his arrest up until trial, he had attempted on multiple occasions to contact Farese to discuss his case and prepare for trial but Farese never returned his calls. Even during the trial, during recesses and breaks, Attorney Farese would not confer with Haley regarding defense strategy.  Exhibit 5 at pp. 11-15; Haley Aff. in Support of Motion for a New Trial, dated April 27, 1987 and Haley Aff., undated, attached as **Exhibit 11**.

**RESPONSE:**

Admit that Haley began seeking post-conviction for relief in Suffolk Superior Court beginning in 1987 and that he alleged, among other errors, ineffective assistance of counsel.  Admit that Mr. Haley executed the two affidavits included in Exhibit 11, which stated that he had made several attempts to contact Mr. Farese to no avail, that Mr. Farese would not confer regarding trial strategy and that Mr. Farese told the court that he was unprepared for trial.  *See* Exhibit 19, Haley Aff. dated April 27, 1987; Exhibit 21, Haley Aff. (undated); Def. Exhibit 5 (indicating that in 1987 Haley moved *pro se* for a new trial); *see also* Def. Exhibit 6, at 18 ("In 1987, Haley moved *pro se* for a new trial").

Deny the remainder of this statement because it is unsupported by the evidence cited by the Defendants.

49.     In support of his ineffective assistance of counsel defense, Haley submitted a letter from Attorney Tim Rieser of the Harvard Negotiation Project, who reviewed the transcript of Haley's trial, and wrote that "it is the most outrageous example of a defense attorney's incompetence that I have seen.  It is truly horrifying that a lawyer can defend a first degree murder case that carries the death penalty with so little preparation."  "My own feeling is that a first year law student would have done better."  See <u>Letter from Attorney Tim Rieser, Dated June 30, 1984</u>, attached as <u>**Exhibit 12**</u>.

**RESPONSE:**

Admit that Haley submitted the June 30, 1984 letter of Attorney Tim Reiser in support of his motion for a new trial but deny the remainder of this statement because it is based on inadmissible hearsay.  *See DiRico v. City of Quincy*, 404 F.3d 464, 468 n.11 (1st Cir. 2005) ("We note that the letters from Di Natale and Goyette contained hearsay evidence and were subject to exclusion from the case against McNeil on that ground alone."); *United States v. Reeder*, 170 F.3d 93, 108 (1st Cir. 1999) (upholding exclusion of letter as "inadmissible hearsay with respect to the facts contained within it").

50.     In response to inquiries from Haley and ultimately the Board of Bar Overseers, in September 1982, Attorney Farese indicated that he had lost his entire file for the Haley case, perhaps in a flood.  See <u>Letter from Attorney Alfred Farese, Dated September 7, 1982 and</u> <u>Letter from James Haley, Dated September 3, 1976</u>, attached as <u>**Exhibit 13**</u>.

**RESPONSE**

Admit.

51.     Attorney Alfred Farese, Assistant District Attorney Gerald Muldoon and Judge Roy are all deceased.

**RESPONSE:**

Admit.

**IV.     Post Conviction Proceedings**

52.     In 2006, Haley filed requests pursuant to the Public Records Act with the Suffolk County District Attorney and the Boston Police Department ("BPD"), seeking all documents in their possession concerning his case.  The District Attorney's Office responded that it was unable to locate any portion of Haley's case file.  Exhibit 6 at pp. 18-19.

**RESPONSE:**

Admit that Mr. Haley filed a request pursuant to the Public Records Act with the Suffolk County District Attorney ("DA") and Boston Police Department ("BPD") seeking all documents in their possession concerning his case, but clarify that those requests were made in 2005.  *See* Group Exhibit 23, Haley's MPRA Request to the BPD and DA.  Admit that the DA's Office responded on June 27, 2005, that it was still looking for his file but due to a "clerical error . . . locating [his] file is proving to be rather difficult."  *See* Group Exhibit 23, Letters from DA's Office Responding to Public Records Request No 050223A .

Admit that the District Attorney's Office could not locate Mr. Haley's file.

53.     On February 14, 2006, the Boston Police Department sent Haley 60 pages of documents from the David Myers homicide file.  The file contains (2) separate copies of the Commonwealth v. Haley witness statements document, including the cover sheet/ index and the paginated transcribed statements of Gloria (pages 1-6), Brenda (7-10), and Haley (11-14).  Exhibit 6 at p. 19; Exhibit 4.

**RESPONSE:**

Admit that on February 14, 2006, the Boston Police Department sent Mr. Haley 60 pages of documents from the David Myers homicide file, but clarify that those documents were heavily redacted.  *See* Def. Exhibit 6, at 19; Group Exhibit 23, Letter from BPD to James Haley dated January 17, 2006.

Admit that the BPD file sent to Mr. Haley contains the transcribed witness statements of Gloria Custis, Brenda Haley and James Haley.

Deny the remainder of this statement of fact as it is not supported by the evidence cited by the Defendants above.  Neither Exhibit 6 nor Exhibit 4 makes any mention of the file containing two copies of the witness statements in *Commonwealth v. Haley*, nor anything regarding the cover sheet/index. Moreover, Exhibit 6 is hearsay that cannot be relied on for the truth of the matter asserted.  *See, e.g., International Land Acquisitions, Inc. v. Fausto*, No. 01-2386, 2012 WL 1428264, at *4 (3rd Cir. 2002) (finding that judicial opinion is hearsay); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (finding that judicial findings are inadmissiable hearsay that cannot be corrected under Rule 803(8)); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1185 (E.D.Pa.1980), *aff'd in part and rev'd on other grounds in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 275 (3rd Cir. 1983), *rev'd sub nom. Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (concluding that prior judicial findings were not admissible under Rule 803(8)(C), and that the trustworthiness analysis required under Rule 803(8)(C) would be unsuited to evaluating judicial findings because a judge is not a proper witness under Rule 605).

54.     In addition to the statements, the BPD file also included a form entitled "City of Boston Police Department Bureau of Field Operations List of Material Submitted to the Office of the District Attorney," dated September 1, 1971.  It was prepared by Sgt. Det. Kelley for the Haley prosecution and, indicates that "Reports of Officers" and "Statements" were included among the materials submitted to the District Attorney.  See <u>Boston Police Department Homicide File: City of Boston Police Department Bureau of Field Operations List of Material Submitted to the Office of the District Attorney, Dated September 1, 1971</u>, attached as **Exhibit 14**.


**RESPONSE:**

Admit that the Defendants produced Exhibit 14 in this litigation but deny the remainder of this statement of fact.

The Defendants do not cite any evidence that Exhibit 14 was part of the BPD file for the Myers homicide in 1971 and 1972.  Nor can this unsigned hearsay document be admitted for the truth of the matter asserted as the Defendants are seeking to do.  *See Jewett v. Brady*, 534 F.3d 67, 72 (1st Cir. 2011) ("The evidence that Jewett argued undermined McGilvray's testimony, thereby supporting his misconduct and ineffective assistance claims, consisted of two handwritten notes and a typed police report, all of which were hearsay.").  Indeed, the Defendants have made no effort to introduce this document under any hearsay exception nor could they.  As both Detective Miller and former Commissioner Evans testified at theirs depositions, this type of document was not one that was created in the ordinary course of business; in fact, it is not something he has ever seen before.  *See* Exhibit 24, Miller Dep. at 72; Exhibit 35, Evans Dep. at 128-30.  Moreover, there is no foundation for Exhibit 14:  This document is not signed by Detective Kelley, and the Defendants have cited no evidence (because there is none) demonstrating that Defendant Kelley filled out Exhibit 14, let alone actually transmitted any of the information in Exhibit 14 to the District Attorney.

55.    The BPD file also included a memorandum summarizing Sgt. Det. Kelley's testimony before the grand jury on September 10, 1971, indicating that he "testified in essence to the statement of one Gloria Custis."  See <u>Boston Police Department Homicide File: Memo</u> <u>regarding Sgt. Det. Kelley's Testimony before the Grand Jury</u>, attached as **<u>Exhibit 15</u>**.

**RESPONSE:**

Admit that the Defendants produced Exhibit 15 in this litigation but deny the remainder of this statement of fact.

The Defendants do not cite any evidence that Exhibit 15 was part of the BPD file for the Myers homicide in 1971 and 1972.  Nor can this memorandum be admitted for the truth of the matters asserted as the Defendants are seeking to do.  *See Jewett v. Brady*, 534 F.3d 67, 72 (1st Cir. 2011) ("The evidence that Jewett argued undermined McGilvray's testimony, thereby supporting his misconduct and ineffective assistance claims, consisted of two handwritten notes and a typed police report, all of which were hearsay.").  Indeed, the Defendants have made no effort to introduce this document under any hearsay exception nor could they as it is inadmissible hearsay.  *Id.*  Nor have the Defendants provided any foundation for this Exhibit.

56.    The BPD file also included Sgt. Det. Kelly's handwritten notes which indicate, "about 9:30 a.m. I went to 28 Glenway St. home of Helen Davis and talked to Gloria Custis and took a statement from her and also a statement from Brenda Haley."  See <u>Boston Police</u> <u>Department Homicide File: Sgt. Det. Kelley's Notes Regarding Witness Statements</u>, attached as **<u>Exhibit 16</u>** at p. 2.

**RESPONSE:**

Admit that the Defendants produced Exhibit 16 in this litigation but deny the remainder of this statement of fact.

The Defendants do not cite any evidence that Exhibit 16 was part of the BPD file for the Myers homicide in 1971 and 1972. Nor can these handwritten notes be admitted for the truth of the matters asserted as the Defendants are seeking to do. *See Jewett v. Brady*, 534 F.3d 67, 72 (1st Cir. 2011) ("The evidence that Jewett argued undermined McGilvray's testimony, thereby supporting his misconduct and ineffective assistance claims, consisted of two handwritten notes and a typed police report, all of which were hearsay."). Indeed, the Defendants have made no effort to introduce this document under any hearsay exception nor could they as it is inadmissible hearsay. *Id.* Nor have the Defendants laid any foundation for the admission of Exhibit 16.

57.     The BPD file also included a report and statement of a February 25, 1972 interview with Shirley Savage, who stated that on July 11, 1972, at about 5:00 a.m., she observed Gloria running up Glenarm Street yelling, "Help Me," and heard three gunshots fired fairly close together. See <u>Boston Police Department Homicide File: Transcribed Statement of Shirley</u> Savage, attached as **Exhibit 36**.

**RESPONSE:**

Admit that the Defendants produced Exhibit 36 in this litigation but deny the remainder of this statement of fact.

The Defendants do not cite any evidence that Exhibit 36 was part of the BPD file for the Myers homicide in 1971 and 1972. Nor can Shirley Savage's statements, which were made in a police report not authored by her and where she was under no duty to report be admitted for the truth of the matter asserted. *See United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) ("hearsay statements by third persons such as Munichiello are not admissible under this exception merely because they appear within public records"); *Nna v. American Standard*, Inc., 630 F. Supp. 2d 115, 125 (D. Mass. 2009); *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir.1991) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be

admitted *but that statements made by third persons under no business duty to report may not.*" ) (quoting *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983)) (emphasis added in *Parsons*); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

58.     In October 2007, Haley filed a motion for new trial on grounds that the Commonwealth's failure to disclose Gloria and Brenda's statements deprived him of due process.  He also sought and was granted post-conviction discovery.  On October 5, 2007, the Commonwealth informed Haley that it could not locate the trial or appellate files for his case. <u>Exhibit 6</u> at p. 19.

**RESPONSE:**

  Admit that Mr. Haley filed a motion for new trial based on the fact that the witnesss statemens of Gloria Custis and Brenda Haley were withheld.  Also admit that Mr. Haley moved for post-conviction discovery in October 2007, but clarify that the discovery that Mr. Haley was seeking was "unredacted copies of the transcribed statements."  *See* Exhibit 26, Defendant's Motion for Post-Conviction Discovery, at ¶ 2.

  Admit that on October 5, 2007, the Commonwealth informed Mr. Haley that it could not locate the trial or appellate files for this case but clarify that the Commonwealth stated that it would "continue our efforts to locate the file." *See* Exhibit 27, Letter from David Meier to James Sultan dated Oct. 5, 2007.

59.     On December 21, 2007, the Commonwealth represented by Assistant District Attorney David Meier moved to vacate Haley's conviction and allow a new trial. See <u>Commonwealth v. Haley, Commonwealth's Motion to Vacate Conviction and Grant New Trial, Dated</u> <u>December 21, 2007</u>, attached as <u>**Exhibit 17**</u>.

**RESPONSE:**

    Admit.

60.    In its motion, the Commonwealth noted that Gloria and Brenda's transcribed statements neither exonerated Haley nor implicated a third-party in Myers' murder, and that the statements merely contained information that could have been used to impeach Brenda and Gloria at trial regarding certain factual issues. The Commonwealth also noted that its review of the 1971 investigation and prosecution of Haley "does not exonerate him." The motion was allowed. <u>Id</u>. at p. 2.

**RESPONSE:**

    Object to the use of the Commonwealth's motion to demonstrate the truth of the matters asserted therein because the motion is hearsay. *See Boston Beverage Corp. v. Turner*, 81 B.R. 738, 747 (D. Mass. 1987) ("If introduced to demonstrate the truth of the allegations contained therein, the pleadings would clearly have been hearsay.").

    Admit that in its motion, the Commonwealth noted that the statements "neither exonerate the defendant nor implicate a third party," but deny that the Commonwealth's motion states that statements "merely" contained impeaching information as to "certain factual issues." Rather, the motion indicates that the statements "contain information that could have been used by the defendant to impeach the testimony of the two witnesses regarding *certain significant factual issues* at trial" and that "[g]iven the Commonwealth's theory at trial – as reflected in its opening statements, case-in-chief and closing argument – and the nature of the defense," it cannot state that Mr. Haley received a fair trial. Exhibit 25, Commonwealth Motion to Vacate at 1-2.

    Admit that the Commonwealth's motion stated that its review of the 1971 investigation and prosecution does not exonerate him, but clarify that the "Commonwealth specifically state[d] that it does not now comment on the factual

guilt or innocent of the defendant of the crime charged." *Id.* at 2. The Commonwealth's review, however, "establish[ed] that [Haley] did not receive a fair trial. *Id.*

61.     Thereafter, the Commonwealth indicated its intent to retry Haley on the murder charge.  On May 29, 2008, Haley filed a discovery motion seeking the grand jury minutes, the transcript of the probable cause hearing, exhibits introduced by the Commonwealth at the criminal trial, and other evidence relative to the investigation of Myers' murder.  By letter dated June 13, 2008, the District Attorney's Office notified Haley that its entire case file had been inadvertently lost or destroyed. Exhibit 6 at p. 19-20.

**RESPONSE:**

     Admit that the District Attorney's Office cannot find its case file.  Object to the remainder of this statement as irrelevant and inadmissible.  Object to the remainder of this statement of fact as irrelevant and inadmissible.  Judicial "findings" are hearsay not admissible for the truth of the matter asserted under any hearsay exception.  *See*, *e.g.*, *International Land Acquisitions, Inc. v. Fausto*, No. 01-2386, 2012 WL 1428264, at *4 (3rd Cir. 2002) (finding that judicial opinion is hearsay); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (finding that judicial findings are inadmissiable hearsay that cannot be corrected under Rule 803(8)); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir.1993) ("Rule 803(8)(C), on its face, does not apply to judicial findings of fact; it applies to 'factual findings resulting from an investigation made pursuant to authority granted by law.' Fed. R. Evid. 803(8)(C). A judge in a civil trial is not an investigator, rather a judge."); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1185 (E.D.Pa.1980), *aff'd in part and rev'd on other grounds in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 275 (3rd Cir. 1983), *rev'd sub nom. Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (concluding that prior judicial findings were not admissible under Rule 803(8)(C),

and that the trustworthiness analysis required under Rule 803(8)(C) would be unsuited to evaluating judicial findings because a judge is not a proper witness under Rule 605).

62.     Transcripts of the July 23, 1971 probable cause hearing and grand jury proceedings have never been located.

**RESPONSE:**

Admit that the transcripts of the probable cause hearing and grand jury proceedings were not located during Mr. Haley's post-conviction proceedings in 2007 nor have they been located in this case.

63.     On June 27, 2008, Haley moved to dismiss the indictment with prejudice. On August 26, 2008, the Superior Court allowed Haley's motion without prejudice. In doing so, the court found that Haley "cannot prove that Gloria and Brenda's police statements were in fact withheld from the grand jury because all records of the grand jury proceedings have been inadvertently lost or destroyed by the Commonwealth." Id. at pp. 20, 23,38.

**RESPONSE:**

Admit that on June 27, 2008 Haley moved to dismiss the indictment with prejudice.

Also admit that on August 26, 2008, the Superior Court allowed Haley's motion without prejudice.

Object to the remainder of this statement of fact as irrelevant and inadmissible. Judicial "findings" are hearsay not admissible for the truth of the matter asserted under any hearsay exception. *See, e.g., International Land Acquisitions, Inc. v. Fausto*, No. 01-2386, 2012 WL 1428264, at *4 (3rd Cir. 2002) (finding that judicial opinion is hearsay); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (finding that judicial findings are inadmissiable hearsay that

cannot be corrected under Rule 803(8)); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir.1993) ("Rule 803(8)(C), on its face, does not apply to judicial findings of fact; it applies to 'factual findings resulting from an investigation made pursuant to authority granted by law.' Fed. R. Evid. 803(8)(C). A judge in a civil trial is not an investigator, rather a judge."); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1185 (E.D.Pa.1980), *aff'd in part and rev'd on other grounds in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 275 (3rd Cir. 1983), *rev'd sub nom. Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (concluding that prior judicial findings were not admissible under Rule 803(8)(C), and that the trustworthiness analysis required under Rule 803(8)(C) would be unsuited to evaluating judicial findings because a judge is not a proper witness under Rule 605).

Nor is Mr. Haley collaterally estopped from challenging the alleged findings of fact made by the Superior Court. Not only were the findings of fact related to whether Mr. Haley could prove that the statements were withheld from the grand jury immaterial to the decision and not fully litigated – no live evidence was presented on that issue but instead a determination was made on the pleadings – but also and more importantly, that finding was not appealable. It is black letter law preclusion does not attach that where "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action" Restatement (Second) of Judgments § 28; *see also* Comment a to § 28 ("If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of § 27 is inapplicable by its own terms.").

64.     The Court found that Haley showed prejudice by loss of grand jury minutes and the unavailability of Shirley Savage, and that it is extraordinary for a defendant to face retrial without the benefit of the original trial file. The court found that Gloria and Brenda's statements were only significant in that they could be interpreted to mean that the July 10, 1971 encounter with Haley did not occur, thus undermining Gloria's credibility. The court found that the

statements did <u>not</u> alter or qualify Gloria's identification of Haley as Myers' assailant; nor did the statement suggest anyone else as the assailant. The Commonwealth did not re-indict Haley. <u>Id</u>. at pp. 28-34.

**RESPONSE:**

Deny. The Superior Court's findings are hearsay that are not admissible in this action for the truth of the matter asserted. *See, e.g., International Land Acquisitions, Inc. v. Fausto*, No. 01-2386, 2012 WL 1428264, at *4 (3rd Cir. 2002) (finding that judicial opinion is hearsay); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (finding that judicial findings are inadmissible hearsay that cannot be corrected under Rule 803(8)); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir.1993) ("Rule 803(8)(C), on its face, does not apply to judicial findings of fact; it applies to 'factual findings resulting from an investigation made pursuant to authority granted by law.' Fed. R. Evid. 803(8)(C). A judge in a civil trial is not an investigator, rather a judge."); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1185 (E.D.Pa.1980), *aff'd in part and rev'd on other grounds in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 275 (3rd Cir. 1983), *rev'd sub nom. Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (concluding that prior judicial findings were not admissible under Rule 803(8)(C), and that the trustworthiness analysis required under Rule 803(8)(C) would be unsuited to evaluating judicial findings because a judge is not a proper witness under Rule 605).

Nor is Mr. Haley collaterally estopped from challenging the alleged findings of fact made by the Superior Court. Not only are the findings of fact related to whether Mr. Haley was prejudiced by the unavailability of evidence immaterial to this action and not fully litigated – no live evidence was presented on that issue but instead a determination was made on the pleadings – but also and more importantly, that finding was not appealable. It is black letter law preclusion that does not attach that where "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action."

Restatement (Second) of Judgments § 28; *see also* Comment a to § 28 ("If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of § 27 is inapplicable by its own terms.").

65.     Former Assistant District Attorney David Meier testified at his deposition that he had no knowledge whether or not Gloria's and Brenda's statements were contained in the District Attorney's files or whether or not the BPD provided the statements to the District Attorneys' Office.  Attorney Meier also confirmed that the trial and appellate file in Commonwealth v. Haley was lost or inadvertently destroyed.  See <u>Deposition Transcript of Attorney David</u> <u>Meier</u>, attached as **<u>Exhibit 18</u>** at pp. 30, 72-74.

**RESPONSE:**

        Admit but clarify that after "do[ing their] best to evaluate th[e] issue looking at as many possible factors as [they] could," Mr. Meier testified that the Commonwealth reached a conclusion that "the defendant was deprived of certain evidence exculpatory evidence at trial."  Exhibit 29, Meier Dep. at 84, 105; *see also id.* at 103 (moving to vacate murder conviction not something that he or his office took lightly).  Mr. Meier explained that "it wasn't my priority in appearing before Judge Hinkle and trying to meet the hearing dates and make professional decisions collectively to conduct an investigation into whether the statements at issue had been turned over to the D.A.'s Office or not been turned over to the D.A.'s Office.  Our focus which was our professional collective priority was to try as best we could to determine whether or not the statements had been turned over to Mr. Haley's attorney." *Id.* at 82.

66.     Attorney Thomas Dwyer, a purported witness for the Plaintiff, testified at his deposition that he started as an assistant district attorney in Suffolk County in the spring or early summer of 1972.  He noted that the Suffolk County District

Attorneys' Office had a policy at the time to <u>not</u> disclose witness statements and grand jury minutes. See <u>Deposition</u> <u>Transcript of Attorney Thomas Dwyer</u>, attached as **<u>Exhibit 19</u>** at pp. 11, 79-80.

**RESPONSE:**

Deny that Mr. Dwyer started working as an Assistant District Attorney in the Spring or Summer of 1972. Dwyer testified that he was honorably discharged from the Navy on April 1 or 2, 1972 and went to work for the D.A.'s Office a week later. *See* Exhibit 10, Dwyer Dep. at 6.

Deny that the Suffolk County District Attorneys' Office had a policy at the time to not disclose witness statements. *See* Exhibit 10, Dwyer Dep. at 99 (no written policy at the time as to what to do with inconsistent statements or impeachment evidence); *id.* at 104-05 (DA's were well aware of their obligations to disclose exculpatory and impeachment evidence and would disclose that evidence as a matter of practice); *id.* at 105-06 (explaining that it was "extraordinarily common" among the Assistant District Attorneys to disclose witness statements "[b]ut the problem is how often did you actually get such a report."); Exhibit 30, Dwyer Aff. at ¶ 4 ("In 1972, based on my observations and personal experiences, the prosecutors in the Suffolk County District Attorney's Office operated under the consistent understanding that they had obligations under *Brady v. Maryland* and other case law (*e.g.*, *Napule v. Illinois* and *Giglio v. United States*) to disclose exculpatory evidence, including impeachment evidence, to defense counsel prior to trial. These disclosures were standard practice for the Office during that time period.").

Admit the remainder of the statement to the extent that the grand jury minutes were not exculpatory or impeaching.

67. In addition, Mr. Dwyer stated that when he arrived in the District Attorneys' Office they "did not have a consistent practice with respect to the disclosure of exculpatory evidence." <u>Id</u>. at pp. 89-90.

**RESPONSE:**

Deny. Exhibit 10, Dwyer Dep. at 105 ("Q. So would you say that going back to that sentence that that is in fact accurate, that prosecutors would as a general matter turn over exculpatory evidence in 1972? A. As a general matter, the answer to that is yes."); Exhibit 30, Dwyer Aff. at ¶ 4 ("In 1972, based on my observations and personal experiences, the prosecutors in the Suffolk County District Attorney's Office operated under the consistent understanding that they had obligations under *Brady v. Maryland* and other case law (*e.g.*, *Napule v. Illinois* and *Giglio v. United States*) to disclose exculpatory evidence, including impeachment evidence, to defense counsel prior to trial. These disclosures were standard practice for the Office during that time period.").

68.     On June 21, 2002, Sgt. Det. Joseph Kelley died. See <u>Death Certificate of Joseph Kelley and Norfolk Probate and Family Court Filings and Docket</u>, attached at **Exhibit 21**.

**RESPONSE:**

Admit.

69.     Joseph Kelley's estate was probated and subsequently closed on May 5, 2009. <u>Id</u>.

**RESPONSE:**

Admit.

## V.     <u>Boston Police Department Training Regarding Disclosure of Evidence Prior to Plaintiff's 1972 Trial</u>

70.     In the late 1960's and early 1970's prior to Plaintiff's criminal trial, the Boston Police Department operated the Boston Police Training Academy, the satisfactory completion of which was mandatory for all new Boston police recruits. See <u>Deposition Transcript of Robert Wasserman</u>, attached as **Exhibit 22** at p. 41.

**RESPONSE:**

  Admit.

71. The Training Academy was approximately sixteen weeks in duration.  See
<u>Deposition</u> <u>Transcript of Thomas Miller</u>, attached as <u>**Exhibit 23**</u> at p. 35;
<u>Deposition Transcript of Paul</u> <u>Evans</u>, attached as <u>**Exhibit 24**</u> at pp. 6-7.

**RESPONSE:**

  Deny.  *See* Exhibit 31, Dunford Dep. at 14 (describing the Academy as
providing 12 weeks of training); Exhibit 34, Spellman Dep. at 100 (same).

72. In the late 1960's and early 1970's, prior to Plaintiff's criminal trial, the
Training Academy curriculum involved instruction on multiple topics including
constitutional law, criminal law, report writing and courtroom procedure. <u>Exhibit
22</u> at p. 61; <u>Exhibit 23</u> at p. 35. <u>Deposition Transcript of Robert Dunford</u>, attached
as <u>**Exhibit 25**</u> at p. 15.

**RESPONSE:**

  Admit that training included constitutional law, criminal law, and report
writing but deny that it included courtroom procedures.  *See* Exhibit 33,
McNelley Dep. at 37-38 (stating that in his 1970 recruit class there was no class
on courtroom procedures at the Academy).

73. The curriculum for the topic of courtroom procedure consisted of instruction
on the make-up of the court system, the differing roles of the police, prosecutor and
defense attorney, the proper presentation of the government's case in court and
instruction on testifying in court as a witness.  This training stressed the
importance of police witnesses being honest at all times.  <u>Exhibit 22</u> at pp. 62-63;

Selected 1968 Boston Police Department Academy Training Materials, attached as **Exhibit 26**.

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the curriculum for the topic of courtroom procedure. Exhibit 26, which are the 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").

Notwithstanding that objection Plaintiff denies that there was a class on courtroom procedures. *See* Exhibit 33, McNelley Dep. at 37-38 (McNelley was in the 1970 recruit class; when asked "whether there was a class on courtroom procedures," McNelley answered "I don't know if there was or not. I really don't believe there was . . . .").

74. The Training Academy's courtroom procedure curriculum also involved the recruits engaging in mock-trials. Exhibit 22 at pp. 62-63; Exhibit 26.

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the curriculum for the topic of courtroom procedure. Exhibit 26, which are the 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it

for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").

Notwithstanding that objection Plaintiff denies. *See* Exhibit 33, McNelley Dep. at 37-38 (stating that in his 1970 recruit class there was no class on courtroom procedures at the Academy).

75.   Local Judges also lectured to recruits regarding law and courtroom procedures and recruits spent time observing actual court sessions. Deposition Transcript of Herbert Spellman, attached as **Exhibit 27** at pp. 36-38; Exhibit 26.

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the curriculum for the topic of courtroom procedure. Exhibit 26, which are the 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadimissible hearsay under 802 . . . Defendants are correct.").

Notwithstanding that objection, Plaintiff denies that there was a class on courtroom procedures at the Academy. *See* Exhibit 33, McNelley Dep. at 37-38 (stating that in his 1970 recruit class there was no class on courtroom procedures at the Academy).

76.     The Academy's training regarding report writing instructed officers to take statements from witnesses and to include all of these statements within their written report, regardless of whether the statements were exculpatory. Officers were also trained to turn all of the reports they created to the detective assigned to the case. Exhibit 22 at pp.6 1-62, 84-85, 109-10.

**RESPONSE:**

Admit that in the Academy, recruits were trained on report writing, including on taking statements from witnesses. Also admit that patrol officers were trained to turn all of their formal reports in, but clarify that officers would turn in their reports to supervisors and not the detectives assigned to the case. *See* Exhibit 24, Miller Dep. at 14-15 (would leave your incident report to the lieutenant at the desk); Exhibit 34, Spellman Dep. at 19-20 (after writing reports, would turn them into the front desk); Exhibit 35, Evans Dep. at 48 (on homicide case, if he had documents, would turn them over to the duty supervisor). Further clarify that officers would not turn over their notes. *See* Exhibit 35, Evans Dep. at 42 ("I might reference my notes but I wouldn't turn them over.").

Deny that officers were trained to include all of the witness statements within their written report, regardless of whether the statements were exculpatory before 1973. *See* Exhibit 32, Wasserman Dep. at 109 (explained that he did not know how (or if) police officers were trained pre-1973 to include exculpatory statements in their reports); *id.* at 67 (no training for investigators on whether they should write down or stenographically record statements).

77.     Prior to 1973, Boston Police Captain William Hogan served as the

Commanding Officer at the Boston Police Academy and oversaw its operations. Id. at p. 33.

**RESPONSE:**

Admit.

78    The Training Academy's constitutional law curriculum was taught by Captain William Hogan. Id. at p. 44.

**RESPONSE:**

Admit that Captain Hogan taught the "law." Deny that the citation supports that Hogan taught "constitutional law." *See* Exhibit 32, Wasserman Dep. at 44 (as cited above) ("Q. You mentioned law as one of the topics. A. Yes, Captain Hogan taught the law by himself.").

79.    Captain Hogan was well respected for his abilities as a police legal instructor. Id. at p. 129; Exhibit 25 at p. 81-82.)

**RESPONSE:**

Deny that Captain Hogan was "well-respected." *See* Exhibit 32, Wasserman Dep. at 129 (describing Captain Hogan as "competent" although "[h]e was not a lawyer"); *see also id.* at 47 (reviewed Academy materials and "reached the decision that we had to redo all of the materials . . . ."); *id.* at 76 (completely restructured curriculum when he arrived); *See* Exhibit 36, Wasserman Report, at ¶ 17 (training materials "out of date" under Hogan); *id.* at ¶ 19 ("The law instructor in the Academy, Captain William Hogan, was a career officer who was a *self-proclaimed* expert on the law.") (emphasis added).

80.    Captain Hogan also stressed ethics and the importance of honesty, integrity and always telling the truth within his training on the law. Exhibit 22 at pp. 44, 54 119; Exhibit 24 at pp. 109-10); Exhibit 25 at p. 33.

**RESPONSE:**

Admit that Hogan taught recruits that they were "to testify accurately and honestly." *See* Exhibit 32, Wasserman Dep. at 54; *see also* Exhibit 31, Dunford Dep. at 33. Admit that Paul Evans testified that he was taught at the Academy and elsewhere to tell the truth "in regard to how you present yourself in [court] and just how you conduct yourself." Deny the remainder of the statement of facts as not supported by the evidence cited by the Defendants. Also deny the remainder of the statement because "Captain Hogan's training on the law was primarily focused on 'Hogan's Hand' and the elements of crimes for which officers were to make arrests" and not on ethics. *See* Exhibit 36, Wasserman Report, at ¶ 23; Exhibit 32, Wasserman Dep. at 47 (does not remember a specific course on honesty and integrity prior to when he took over the Academy in 1973); *id.* at 48-49 (not sure how much honesty and integrity were trained before he took over).

81.     As part of the Academy's constitutional law curriculum, Captain Hogan instructed recruits regarding the content and application of the United States Constitution and its Amendments, including the Fourth and Fourteenth Amendments, and the right to Due Process of Law. Exhibit 22 at p. 53-54; Exhibit 26.

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Captain Hogan's constitutional law course. Exhibit 26, which are 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City &*

*County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *.i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").

Admit that Captain Hogan instructed recruits on the content of the Amendments to the United States Constitution although "probably less so" "the right to a fair trial." *See* Exhibit 32, Wasserman Dep. at 54-55. Deny the remainder of this statement as it is not supported by any admissible evidence.


82.     As part of the constitutional law curriculum, Captain Hogan also instructed all recruits regarding protecting the civil rights of the accused. Exhibit 25 at pp.15-16; Exhibit 26.


**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Captain Hogan's constitutional law course. Exhibit 26, which are 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *.i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").

Notwithstanding that objection, Plaintiff denies this statement of fact. *See* Exhibit 36, Wasserman Report at ¶ 23 ("Captain Hogan provided officers with no training on the disclosure requirements under *Brady v. Maryland*, 373 U.S. 83

(1963) or any of the earlier cases.  In fact, police recruits received no training whatsoever on what information had to be disclosed to prosecutors and/or to defendants or defense counsel."); Exhibit 32, Wasserman Dep. at 52 ("There began to be discussions of civil rights issues in the academy after I came.  I don't think it was a major topic before I was there.").

83.     As part of the Academy instruction on constitutional law, Captain Hogan focused on major cases and recent cases that had come out to ensure recruits understood what they had to do under those rules. Exhibit 22 at p. 49; Exhibit 26.

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Captain Hogan's constitutional law course.  Exhibit 26, which are 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here:  the truth of the matter asserted.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").

Notwithstanding that objection, admit that Captain Hogan taught Massachusetts case law, but deny that he taught federal case law.  *See* Exhibit 32, Wasserman Dep. at 49-50 ("Q.  Did Captain Hogan teach United States Case Law, Federal Case Law?  A.  Probably only to a limited degree.  Q.  How do you know that?  A.  Because I remember having discussions with him about how far in-depth he was going with his training, and as we talked about expanding the law, I had a lot of discussions with him about how that expansion ought to take place.").

84.     Recruits were given written examinations with regard to topics at the academy, including constitutional law, due process protection and civil rights.  Exhibit 22 at p. 56.

**RESPONSE:**

Admit that recruits were given written examinations on topics at the academy including constitutional law but deny that they were given examinations on due process protection and civil rights because those topics were not discussed at the academy.  *See* Exhibit 32, Wasserman Dep. at 52 (stating that civil rights was not "a major topic" before he arrived at the academy in 1973); *id.* at 54-55 (explaining that Hogan did not address the right to a fair trial because it was not something that was applicable to recruits who were going to be patrol officers);  *id.* at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught after reviewing Hogan's materials); Exhibit 36, Wasserman Report, at ¶ 23 (recruits not trained at the academy on disclosure obligations).

85.     The Academy training, including Captain Hogan's law curriculum, instructed officers to turn over all evidence, including exculpatory and impeachment evidence to the prosecutor and not to withhold any evidence regardless of whether it would aid the defense.  Multiple former Boston Police employees who graduated from the Training Academy prior to 1972 were deposed in this matter and all testified regarding their training with respect to turning over all evidence to the prosecutor.  Relevant excerpts of their testimony on this topic are included below.

**RESPONSE:**

Deny this statement of fact because the Defendants have cited no evidence in support of it.

Deny that the Academy training, including Captain Hogan's law

curriculum, instructed officers to turn over all evidence, including exculpatory and impeachment evidence, to the prosecutor and not to withhold any evidence regardless of whether it would aid the defense. *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught at the academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on *Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the academy and he does not know what impeachment evidence is); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment

evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

86.     Edward McNelley is an attorney and retired Boston Police Lieutenant Detective.  He earned his law degree in 1989.  He graduated from the Boston Police Training Academy and began serving as a patrolman in 1970.  He was promoted to Detective in 1974 and Lieutenant in 1983 before retiring in 2003 as a Captain Detective.  Deposition Transcript of Edward McNelley, attached as **Exhibit 28** at pp. 6, 10, 21, 29, 109.

**RESPONSE:**

Admit that Edward McNelley is an attorney but clarify that he received his law degree in 1988.  *See* Def. Exhibit 28, at 10.  Also admit that Edward McNelley is a retired Boston police officer, but clarify that he retired as a Captain Detective.  *See* Def. Exhibit 28, at 21.  Admit the remainder of this statement.

87.     Former Captain Detective McNelley testified to the following:

Q:     Now, when you received your training at the Boston Police Department Academy in 1970, were you trained about the disclosure of evidence?
A.     Yep.
Q.     What were you trained?
A.     That we were to turn everything over that we had, both pro and con to the district attorney or to the prosecuting officer.  Id. at p. 69.

Q:     So going back to your training at the police academy, you said you were trained to turn everything over pro and con?
A.     That's correct.
Q.     When did you receive that training?
A.     1970.
Q.     And in what course did you receive that training?
A.     It was either criminal law or constitutional law or both. I mean, it was brought up numerous, numerous times during the academy.

Q. And when you say "brought up numerous, numerous times," in multiple courses or within the same course?

A. In multiple courses. I mean, it was a subject matter that they emphasized to you.
You have basically no interest in the outcome of a case.

Q. And you believe that came up either in criminal law or constitutional law?

A. It did.

Q. It came up in both?

A. Well, I mean, you know, the courses, I mean, it wasn't we're going to stop criminal law and we're going into constitutional law and you didn't talk about criminal. I mean, they went back and forth. Hogan generally was the instructor. Now, specifically, did other people come in and talk, I don't remember, but Hogan was generally the instructor. So I mean, you can't isolate a concept because you're in criminal law as opposed to constitutional law. It just kind of runs through it. Id. at pp. 72-74.

Q. Well, in your in-service training between 1970 and 1973, did you receive updates on the law?

A. We did. I did.

Q. And in your in-service training between 1970 and 1973, were you ever trained or instructed about the disclosure of impeachment evidence?

A. We were always trained that all evidence is turned over, all evidence. Now, I mean, did they specifically break it down between this kind of evidence and this, it was all evidence. There was nothing that was excluded. Id. at p. 89.

**RESPONSE:**

Admit that McNelley gave the above quoted testimony on pages 69, and 72-74 of his deposition but deny the substance of his statements.

In particular, deny that there was any training at the academy in 1970 that instructed recruits to disclose evidence to the prosecutor. *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught at the academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing

how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on *Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the academy and he does not know what impeachment evidence is); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

In addition, deny that there was any in-service training in 1970 through 1973 at all, let alone in-service training that addressed the duty to disclose evidence. *See* Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department).

88.     Robert Dunford completed the Academy and began serving as a patrolman in 1970. He was promoted to Sergeant in 1975 and Lieutenant in 1978.  He served as the Department's Manager of its Division of Training and Education from 1983-1991.  He subsequently served as the Superintendent in Chief of the Department from 2007 until he retired in September 2009.  He currently teaches police tactics through the Massachusetts Municipal Police Training Counsel.  <u>Exhibit 25</u> at pp. 7, 10-11.

**RESPONSE:**

Admit all of the above but clarify that Robert Dunford testified only that he was scheduled to teach a class – his first – on community policing and problem solving for the Massachusetts Municipal Training Counsel, not that he currently teaches police tactics.  *See* Exhibit 31, Dunford Dep. at 7-8.

89.     Former Superintendent Dunford testified to the following:

> Q:     When did you first receive training on turning over impeachment evidence? A.  In the basic academy.
> Q.     So that's during that what you called phase one?
> A.      Yeah. And I only use the phases to describe the difference between going for eight weeks --
> Q.     Right.
> A.      -- and then going -- so. We were trained to turn over all evidence, whatever we found, good or bad, indifferent, to turn it over.  <u>Id</u>. at p. 37.
>
> Q.     And you said -- it's your testimony also that you were trained to turn over impeachment evidence as part of your initial academy training?
> A.     Well, I wouldn't say that we called it impeachment evidence. We were trained to turn over all evidence whether it was good, bad or indifferent.
> Q.     Just to be clear and I think you've answered this indirectly. So were you trained on the difference between exculpatory and impeachment evidence?
> A.     When?

Q. During your academy training, let's start with that.

A. I would have to say yes. I can't remember specifically, but again we were trained to collect evidence, protect the crime scene and to turn everything that we found over to the investigating officers. So you know, if somebody came in and said you did something and then somebody else said no, that he does have a description, I had to submit both of those, both that somebody identified you and somebody else said no, that you didn't and that went into the form 26 that went to the detectives and the district attorney. Id. at pp. 38-39.

Q. To the best of your recollection, when did you first receive training on turning over exculpatory evidence?

A. Probably as soon as I went to the academy. We talked about report writing, and the duties and responsibilities of patrolmen.

Q. So is it your testimony that training on turning over exculpatory information -- or evidence was part of the report writing training?

A. It was part of -- I mean it was part of the duties and responsibilities of a patrolman.
For example in report writing, we were instructed to put everything into the reports. There were two reports. The first one is called a 78. It was an IBM card and that's where it got the name 78 and that was a basic summary of what took place. Then we did what we call a form 26 which is a -- it's called a form 26 because that's the form that was written on, it's a to/from/subject slip, and that's where the detailed information that you received was put into the report. And the original of that report went to the detectives and you kept a copy for your case file. In preparing for court for example, we were instructed that we would remain neutral. We were not to take a side. That we were to present to the Court all evidence that we had whether it supported our hypothesis or the probable cause we'll say that you committed the crime or any evidence that we found that may show that you didn't commit a crime. And Captain Hogan continually stressed our ethical responsibility as law enforcement officers. Id. at pp. 31-33.

**RESPONSE:**

Admit that Dunford gave the above quoted testimony on pages 31-33 and 37-39 of his deposition but deny the substance of his statements.

In particular, deny that recruits were trained to turn over all evidence, including exculpatory and impeachment evidence at the academy (or otherwise) in

1970 when Dunford joined the police force. *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught at the academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on *Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the academy and he does not know what impeachment evidence is); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

Deny that recruits were taught the difference between impeachment and exculpatory evidence at the academy. *See* Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the academy and he does not know what impeachment evidence is); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence.").

90.    Thomas Miller graduated the Academy and began serving as a patrolman in 1970. He was promoted to Detective in 1983 and was assigned to the Homicide Division in 1990. He served as an instructor for the Massachusetts Criminal Justice Training Counsel in the 1980's and at the Training Academy in the 1990's. At the time of his retirement in 2002, he was assigned as a Sergeant Detective within the Division of Internal Affairs.   Exhibit 23 at pp. 5-6, 9-10, 45, 63.

**RESPONSE:**
    Admit.

91.    Former Sergeant Detective Miller testified to the following:

    Q.    So when you were a police trainee, for lack of a better term, in 1970, were you taught anything specific about turning over reports to the prosecutor?
    A.    Specifically, just you turn everything over, everything you acquire during your investigation, if you did an investigation, or anything you acquire as a first responder. Id. at pp. 45-46.

    Q.    Now, you said that it was a hard-and-fast rule that you turned over evidence.
    A.    Yes.
    Q.    What is the source of that hard-and-fast rule?
    A.    It would have been from the academy training. Id. at p. 53.

Q. Okay. Again, during the course of your training at the academy, were you trained that if you had evidence or information that went to an accused's innocence, that you had an obligation to turn that information over to the district attorney's office?

A. Absolutely. Id. at p. 87

Q Were you ever taught that evidence that would undermine the credibility of a witness, say, for example, because they gave two conflicting statements, had to be disclosed to the prosecutor?

A. Yeah. Oh, sure.

Q. But you were never actually taught what the definition of impeachment evidence was?

A. No, I didn't know in what context you were using it. I know what the word "impeachment" means. But in that context, oh, yeah, absolutely you turn it over. Q. And that was based on what obligation? What's the basis for that requirement?

A. The basic concept of fairness. Id. at pp. 88-89.


**RESPONSE:**

Admit that Miller gave the above quoted testimony on pages 45-46, 53, 87 and 88-89 of his deposition but deny the substance of his statements.

In particular, deny that recruits were taught to turn over all evidence to the prosecutor, including exculpatory and impeachment evidence at the academy (or otherwise) when Miller joined the police force in 1970. *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught at the academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials

disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on *Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the academy and he does not know what impeachment evidence is); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

92.     Herbert Spellman graduated from the Academy and began serving as a patrolman in 1968.  He was promoted to Detective in 1974 and to Sergeant in 1988. He worked as a homicide investigator beginning in 1991.  <u>Exhibit 27</u> at p. 11.

**RESPONSE:**

        Admit but clarify that Spellman testified that "I think it was in 1990 that I went to the homicide unit, not '91." Def's Exhibit 21, at 11.

93.     Former Sergeant Detective Spellman testified to the following:

        Q.     And what do you remember Captain Hogan teaching you about Brady during your academy training?

A.  I think there was a requirement that you'd turn over all reports to defense counsel.  <u>Id</u>. at p. 45

Q.  Sure. Do you remember being tested about the duty to disclose evidence to either defense counsel or the district attorney's office when you were a recruit –

A.  I believe that was part of Captain Hogan's lecture.  <u>Id</u>. at p. 49.

Q.  Do you recall ever getting in-service training about the duties to  disclose documents to a defense attorney?

A.  We had that at the academy by Captain Hogan and Judge Adlow.  <u>Id</u>. at p. 53.

Q.  Do you recall receiving any special orders while you were a police officer  in Roxbury relating to Brady?

A.  None that I can recall.

Q.  Do you recall receiving any special orders when you were a police officer  in Roxbury about the duties to disclose evidence?

A.  Oh, yes.

Q.  What do you recall about those special orders?

A.  To turn everything you have over to the defense counsel, and the district attorney's office when they were there. We were told not to hold anything back, whether it went to the guilt or innocence, just to turn everything over.

Q.  And that information was contained in the special order?

A.  Yes.

Q.  Do you remember what year you received that special order?

A.  That would be in the academy. That was after Captain Hogan started.

Q.  So would the training that you received on whether to disclose evidence, or  to disclose evidence, that would be at the police academy?

A.  Yes.  <u>Id</u>. at pp. 56-57.

Q.  And what do you recall being trained when you were a detective?

A.  To disclose everything we had to the assistant district attorney. <u>Id</u>. at pp. 66-67.

Q.  So again, when you came on to the Boston Police Department and went through the academy with Captain Hogan, you were taught that if you had information that went to the guilt or the innocence of the accused, you were to provide it to the court and to the DA?

A.  That's correct.  <u>Id</u>. at p. 141.

**RESPONSE:**

Admit that Spellman gave the above quoted testimony on pages 45, 49, 53, 56-57, 66-67 and 141 of his deposition but deny the substance of his statements.

In particular, deny that recruits were taught by Hogan (or anyone else) to turn over all evidence to the prosecutor, including exculpatory and impeachment evidence at the academy (or otherwise) in 1968 when Spellman joined the police force. *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught at the academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on *Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the academy and he does not know what impeachment evidence is); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught

him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

In addition, deny that there was any in service training prior to 1973, let alone in-service training by Captain Hogan and Judge Adlow on the duty to disclose evidence. *See* Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department).

Also, deny that there were any special orders issued on the duty to disclose evidence. *See* Exhibit 37, DiGrazia Report, at 5-6 (no General Order turned over in discovery in this case identifying the requirement to disclose exculpatory or impeachment evidence; "This is important because any major changes in the law would have been first issued in a General Order and shortly thereafter it would be in the BPD's training materials (and reflected in the training provided to BPD academy cadets, as well as in-service training and supervisory training."); Exhbiit HH, Spellman Dep. at 56-57 (does not recall receiving a special order on either *Brady v. Maryland* or *Giglio v. United States*). In fact, deny that special orders were ever used to announce changes in law. Exhibit 37, DiGrazia Report, at 6 (General Orders used to announce changes in the law; special orders used to address "issues of everyday policing like assigning officers to a funeral detail or letting officers know that the governor or some other official was in the Boston area"); Exhibit 32, Wasserman Dep. at 97-98 ("A special order was an order with a limited time frame about an event, about something that had to happen, but that was not a part of the overall police manual"); *id.* at 99 (does not think that special orders were used to advise officers as to changes in the law prior to 1973). Deny that any general order issued on the duty to disclose evidence. *See* Exhibit 34, at

62-64 (does not recall getting a general order that described police officers'
obligation to disclose evidence).

94.     Paul Evans is an attorney and retired Boston Police Commissioner.  He
earned his law degree in 1987.  He graduated from the Academy and began
serving as a patrolman in approximately April 1971.  He was promoted to
Lieutenant in 1978 and was appointed Deputy Superintendent in 1980.  He served
as the Commissioner of the Boston Police Department from 1994 until 2003.
<u>Exhibit 24</u> at pp. 5-7, 64-65.

**RESPONSE:**

        Admit that Evans is an attorney and retired Boston Police Commissioner.
Admit that Evans earned his law degree, but clarify that he did so in 1978 and not
1987.  *See* Defs. Exhibit 24, at 5. Admit that Evans served as the Commissioner of
the Boston Police Department from 1994 until 2003.  Deny the remainder of this
statement of facts because it includes facts that are not supported by the evidence
cited by the Defendants.

95.     Former Commissioner Evans testified to the following:

    Q.  So you don't know how a detective would disclose evidence to a
        prosecutor in a homicide case between 1970 and 1972.
    A.  Well, I know that they'd hand over everything -- we all had to hand
        over everything we had. If I made the arrest and homicide came in
        later and I was actually the arresting officer in a homicide, then
        whatever I had, I'd turn it over actually to the DA or make sure that
        the homicide people did. It depended on the role you played in a case as
        to what you did.
    Q.  And you said, "I know that they would turn over everything." How do
        you know that they would turn over everything?
    A.  Well, they were required to.
    Q.  Outside of the requirement to hand over everything, do you have any
        knowledge that detectives handed over everything to prosecutors
        between 1970 and 1972 in homicide cases?
    A.  Rules, training and policy required them to do so.  Whether they

individually did so, I don't know.  But I know what the policies were.
Id. at pp. 134-35.


**RESPONSE:**

Admit that Evans gave the above quoted testimony on pages 134-35 of his
deposition but deny the substance of his statements.

In particular, deny that training required detectives to disclose all evidence
to the prosecutor.  *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that
the duty to disclose evidence to the District Attorney was not being taught at the
academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an
extensive review of the training materials when he took over the academy in 1973
and none of the materials addressed in any fashion the disclosure of exculpatory
and impeachment evidence to the prosecutor); *id.* at 105 (prior to 1973, there was
no specific training offered by the Department or outside of the Department for
detectives); *id.* at 107 (detective training began only in 1976); Exhibit 36,
Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at
the academy or otherwise, and no rules that required the disclosure of evidence);
Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers
were not trained to turn over exculpatory and/or impeachment evidence.  Nor was
there any training on how to recognize the difference between exculpatory and
impeachment evidence."); *id.* at 5-7 (explaining that the training materials
disclosed in this litigation corroborate his finding and recollection that officers were
not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on
*Brady v. Maryland* at the academy; that was not done until later in-service
training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in
1971 or 1972; he started an in-service training program for the police department);
Exhibit 24, Miller Dep. at 88 (never taught what impeachment evidence was at the
academy and he does not know what impeachment evidence is); Exhibit 35, Evans
Dep. at 85-86 (does not remember learning about the requirements of police officers
to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall

receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 43 (does not think that Hogan ever taught the difference between exculpatory and impeachment evidence); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

Also deny that the Boston Police Department policy required officers to turn over all evidence, including exculpatory and impeachment evidence, to the prosecutor. *See* Exhibit 36, Wasserman Report, at ¶ 29 ("There was no training on turning over exculpatory and/or impeachment evidence in the BPD in 1971-72, and no policy that required such evidence to be turned over"); Exhibit 37, DiGrazia Report, at 4 ("[B]ased on my observations and experiences as the Commissioner of the BPD from 1972 to 1976, to a reasonable degree of professional certainty, I can aver that there was no policy or practice in the BPD at that time requiring the disclosure of exculpatory and/or impeachment evidence to state prosecutors or defendants."); *id.* at 8 ("There was no policy, written or otherwise, in the Boston Police Department in 1971 and 1972 dealing with the turning over of exculpatory and/or impeachment evidence . . . .").

Finally, deny that the Boston Police Department Rules required officers to turn over all evidence, including exculpatory and impeachment evidence, to the prosecutor. *See* Exhibit 36, Wasserman Report, at ¶ 21 ("[T]here is nothing in the Rules and Regulations that addresses the requirement that police officers disclose impeachment and/or exculpatory evidence."); *id.* at ¶ 24 ("Although the defendants in this case have pointed to Rule 43 as requiring the disclosure of evidence, it did not. To the extent that police officers were taught about Rule 43 in the Academy prior to or during my tenure as Director of Training (they would not be taught about Rule 43 outside the recruit Academy unless changes were made to the Rule),

the training was that officers were to testify truthfully – *i.e.*, answer questions in a clear, concise and truthful manner – and to make a good impression on the judge or jury.  Evan as that, Rule 43 left much to the discretion of the individual police officer."); *id.* at ¶ 26 ("during the early 1970s, there was no training and no rules requiring the disclosure of impeachment or exculpatory evidence within the Boston Police Department"); Exhibit 32, Wasserman Dep. at 121-22 (Rule 43 related to how officers should testify in court not about whether to disclose evidence); Exhibit 24, Miller Dep. at 60-61 (admitting that nothing in Rule 43 beyond testifying truthfully at trial).

96.     There was no policy at the Boston Police Department that instructed Police Officers not to turn over exculpatory evidence.  <u>Exhibit 22</u> at p. 119.

**RESPONSE:**

Admit that there was no written policy at the Boston Police Department that instructed police officers to withhold exculpatory evidence but deny that there was no unwritten policy.  *See* Exhibit 37, Digrazia Report, at 4 ("The obvious problem with BPD having no policy on the disclosure of exculpatory and/or impeachment is that it left it up to the individual officer to figure out what he had to disclose.  In other words, it gave far too much discretion to individual officers to determine whether to turn over exculpatory and/or impeachment evidence.  That discretion permitted officers to deliberately suppress exculpatory and/or impeachment evidence without violating BPD's policies; indeed, without repercussion as he would be in violation of no rule."); *id.* at 5 ("it was standard practice at that time *not* to disclose exculpatory and/or impeachment evidence to state prosecutors or to defendants"); *id.* ("The reality is that at that time the feeling among police officers and detectives in the department was that they were in the business of arresting potential criminals, not helping defendants.  If the officers felt that they had their man, they were

not going to do anything to help the defendant or his attorney."); Exhibit 36, Wasserman Report, at ¶ 29(e) ("Not surprisingly, the absence of a policy and training on turning over exculpatory and/or impeachment evidence – meaning officers and detectives were provided with no guidance or notice on this legal requirement – led to a policy and practice on the Department of not turning over this type of evidence to prosecutors or defendants."); Exhibit 32, Wasserman Dep. at 110-11 (spoke to DiGrazia about the fact that officers were not being truthful about the evidence they had); *id.* at 113 (raised the concern about the need to disclose evidence in the context of creating an investigative manual for detectives); *id.* at 71 ("What happens is that when you became a detective, which is the investigator role, you learned from your peers, and therefore there were past practices in the Department that were of concern to the administration, and those past practices may well have been different from what was required under the law.").

97.     From 1950 up through 1972, the Boston Police Department maintained and updated its Rules and Regulations.  See <u>Rules and Regulations of the Boston Police Department of the City of Boston</u>, attached as **Exhibit 29**.

**RESPONSE:**

    Admit that Boston Police Department had Rules and Regulations but deny that they were "maintained and updated."  There is no support for that proposition in the evidence cited by the Defendants.  Rather, that hearsay document – a copy of the "Rules and Regulations of the Boston Police Department of the City of Boston" – merely indicates that the Rules and Regulations were issued in 1950.

98.     Recruits were provided with a copy of the Department's Rules and Regulations at the Academy and these rules were incorporated into their training and instruction.  <u>Exhibit 25</u> at p. 19; <u>Exhibit 26</u>.

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Academy training and instruction. Exhibit 26, which consists of 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *.i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").

Notwithstanding that objection, Plaintiff admits this statement of fact.

99.    Rule 43 of the Rules and Regulations of the Boston Police Department is entitled "Courts, Evidence" and was in effect in from 1950-1972. It states that a police officer "shall give evidence with the strictest accuracy, confining himself to the case then before the court, neither suppressing nor overstating the slightest circumstance with a view to favoring and person, or from ill will to either side." Exhibit 29.

**RESPONSE:**

Admit that a portion of paragraph 4 of Rule 43 of the Rules and Regulations as written in Exhibit 29 is properly quoted above, but clarify that the above-quotation is preceded in paragraph 4 by the sentence: "A police officer, when giving evidence, shall speak calmly and explicitly, in a clear, distinct and audible tone." *See* Exhibit 38, Boston Police Department Rule 43 at ¶ 4.

Admit that Rule 43 was in effect from 1950 to 1972.

100.    Rule 43 further states, "[w]hen cross-examined, he shall answer with the same readiness and civility as when giving evidence in support of the charge, remembering that the ends of justice will be best served by  desire  simply to tell the whole truth, whether in favor of or against the prisoner."  "A police officer who is criticized by the court because of his testimony or behavior, or for giving improper or unsatisfactory evidence, shall make a report of the facts to his commanding officer who in turn will report to the superintendent."  <u>Exhibit 29</u>.

**RESPONSE:**
    Admit that a portion of paragraph 4 and paragraph 6 of Rule 43 of the Rules and Regulations as written in Exhibit 29 is properly quoted above.

101.    Officers were trained on Rule 43 and understood Rule 43's direction to give evidence with the strictest accuracy, neither suppressing nor overstating the slightest circumstance with a view to favoring and person, or from ill will to either side as consistent with their academy training that exculpatory evidence must be disclosed and not withheld from the prosecuting attorney and criminal defendant. <u>Exhibit 24</u> at pp. 105-108; <u>Exhibit 25</u> at pp. 37-39; <u>Exhibit 28</u> at pp. 82-86; <u>Exhibit 29</u>.

**RESPONSE:**
    Deny that officers were trained on Rule 43.  *See* Exhibit 35, Evans Dep. at 110 (no specific recollection of being trained on Rule 43).

    Deny that officers understood Rule 43 to be consistent with their academy training that exculpatory evidence must be disclosed.  Rule 43 instructed police officers on how to testify.  *See* Exhibit 36, Wasserman Report, at ¶ 24 ("Although the defendants in this case have pointed to Rule 43 as requiring the disclosure of

74

evidence, it did not. To the extent that police officers were taught about Rule 43 in the Academy prior to or during my tenure as Director of Training (they would not be taught about Rule 43 outside the recruit Academy unless changes were made to the Rule), the training was that officers were to testify truthfully – *i.e.*, answer questions in a clear, concise and truthful manner – and to make a good impression on the judge or jury. Evan as that, Rule 43 left much to the discretion of the individual police officer."); Exhibit 32, Wasserman Dep. at 121-22; Exhibit 37, DiGrazia Report, at 7 ("Rule 43 does not deal with exculpatory and/or impeachment evidence. Instead Rule 43 was about testifying truthfully and about police officers making a good impression in the courtroom by being punctual, properly attired, and testifying in a clear manner if called upon to do so."); Exhibit 31, Dunford Dep. at 60-61 (stating that Rule 43 "just says I have to testify truthfully").

Moreover, police officers were not given any training at the academy on disclosing exculpatory evidence. *See* Exhibit 32, Wasserman Dep. at 126-27 (became aware that the duty to disclose evidence to the District Attorney was not being taught at the academy after he reviewed Hogan's training materials); *id.* at 130-31, 134 (did an extensive review of the training materials when he took over the academy in 1973 and none of the materials addressed in any fashion the disclosure of exculpatory and impeachment evidence to the prosecutor); *id.* at 105 (prior to 1973, there was no specific training offered by the Department or outside of the Department for detectives); *id.* at 107 (detective training began only in 1976); Exhibit 36, Wasserman Report at ¶¶ 22, 23, 26 & 29 (describing how there was no training at the academy or otherwise, and no rules that required the disclosure of evidence); Exhibit 37, Digrazia Report, at 5 ("I can say for certain that at that time officers were not trained to turn over exculpatory and/or impeachment evidence. Nor was there any training on how to recognize the difference between exculpatory and impeachment evidence."); *id.* at 5-7 (explaining that the training materials disclosed in this litigation corroborate his finding and recollection that officers were not trained to disclose evidence); Exhibit 24, Miller Dep. at 44 (no training on

*Brady v. Maryland* at the academy; that was not done until later in-service training); Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department); Exhibit 35, Evans Dep. at 85-86 (does not remember learning about the requirements of police officers to disclose evidence to the prosecutor at the Academy); *id.* at 87 (does not recall receiving any training between 1970 and 1972 on the disclosure of witness statements to the prosecutor); *id.* at 30 (does not remember if he received any training at the academy on *Brady v. Maryland*); Exhibit 34, Spellman Dep. at 42-43 (does not think that Hogan taught him at the academy about whether or not he had to disclose certain documents to the D.A.'s office); *id.* at 11, 64 (does not remember getting any training bulletins on *Brady v. Maryland*, *Giglio v. United States* or the duty to disclose evidence while he was a patrol officer in Roxbury after he joined the Boston Police Department in 1968).

102.   Rule 34 of the Rules and Regulations is entitled "Conduct, Deportment, and General Provisions" and was in effect in from 1950-1972.  It states that "[i]n the performance of his duty, a member of the force must display the following qualifications: be truthful at all times whether under oath or not."  Exhibit 29.

**RESPONSE:**

Admit that Rule 34 of the Rules and Regulations is entitled "Conduct, Deportment and General Provisions," and that part of the Rule is properly quoted above.

Deny that Rule 34 was in effect from 1950 to 1972.  Exhibit 29, which the Defendants have cited for this proposition, offers no support for it.

103.   After completing the Academy, officers were required to complete a one-year probationary period.  They were also assigned to work with an experienced officer who served as a field training officer for a period of weeks after completing the academy.  Exhibit 22 at pp. 73-74; Exhibit 23 at pp. 43-44.

**RESPONSE:**

Deny.  *See* Exhibit 34, Spellman Dep. at 50 ("Q.  [W]as there a period of time when you were on probation before you became a full-time officer?  A.  No.  Back then, once you graduated, you were a full patrolman.  There were no training officers like they have now.").

104.    After graduation from the Training Academy, Captain Hogan remained available to all members of the Department to provide advice and answer questions regarding any issues in
the law that arose during their duties.  Many officers took advantage of Captain Hogan's availability to answer their questions while in the field and he was very responsive to these requests.  Exhibit 22 at p. 59.

**RESPONSE:**

Admit.

105.    In 1971 and 1972, the Boston Police Department held regular in-service trainings for patrolmen.  These trainings lasted for one approximately one week and were held approximately once each year.  The Police Department also held in-service trainings for detectives.  See 1971 Boston Police Department Special Orders, attached as **Exhibit 30**, at pp. 3, 9,11,16; 1972 Boston Police Department Special Orders, attached as **Exhibit 31** at p. 8; Exhibit 23 at p. 47; Exhibit 25 at pp. 23-25.

**RESPONSE:**

Object to the Defendants' use of Exhibits 30 and 31 to demonstrate that there was in-service training for patrol officers and detectives.  Exhibits 30 and 31, for which the Defendants have offered no foundation, are a selection of Boston Police

Department Special Orders, which are out-of-court statements being offered for the truth of the matters asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

Notwithstanding that objection, deny. *See* Exhibit 32, Wasserman Dep. at 89-90 (there was no in-service training in 1971 or 1972; he started an in-service training program for the police department).

106.    Officers seeking promotion to higher ranks, such as sergeant, captain or lieutenant were required to pass written promotional examinations. These examinations mainly tested knowledge of the law. <u>Exhibit 22</u> at p. 106; <u>Exhibit 30</u> at pp. 5,7.

**RESPONSE:**

Object to the Defendants' use of Exhibit 30 to demonstrate that officers seeking promotion were required to pass written promotional exams, which mainly tested on knowledge of the law. Exhibit 30, which lacks any foundation, is a series of Boston Police Department Special Orders, which are out-of-court statements being offered for the truth of the matters asserted therein. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

Notwithstanding that objection, deny. *See* Exhibit 35, Evans Dep. at 19-20 (prior to DiGrazia's tenure, "the way the promotions were done, a lot of it was based on seniority so that most promotions didn't happen until you were probably 20 years on the job or something like that" but when DiGrazia came in it "was exam based on far different subject matter").

107.    Beginning in 1968 and continuing through 1972, the Boston Police Department offered the Police Baccalaureate Program. This program involved a full-time four-year program, through which active police officers

would study programs relevant to law enforcement and earn a Bachelor of Arts or Bachelor of Science degree from Boston State College. Approximately twenty-five officers entered into the program each year. These officers were released early from their tour of duty to attend class. In 1972, the first class of the Baccalaureate Program graduated, with nineteen Boston Police Officers receiving either a B.S or B.A. <u>Exhibit 30</u> at pp. 4,6,8; <u>Exhibit 31</u> at pp. 3,5-7,9.

**RESPONSE:**

Object to the use of Exhibits 30 and 31 to demonstrate the practices of the Boston Police Department with regard to the Police Baccalaureate Program. Exhibits 30 and 31, for which the Defendants have offered no foundation, are special orders that are hearsay subject to no exception for the purposes for which the Defendants are attempting to use them. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

108. In 1972, the Collective Bargaining Agreement between the Boston Police Department and the Patrolman's Union included an education incentive clause which paid monetary incentives to all officers to enroll in higher education programs, including master's degree and juris doctorate programs in fields of study related to law and law enforcement. <u>Exhibit 31</u> at pp. 9,11.

**RESPONSE:**

Object to the use of Exhibit 31 to demonstrate that the Collective Bargaining Agreement contained an incentive clause, which paid monetary incentives to officers enrolled in higher education programs. Exhibit 31 lacks foundation and the best evidence of the Collective Bargaining Agreement is the Agreement itself not a special order.

Notwithstanding that objection, Plaintiff admits that in October 1972 a

special order was issued describing a new collective bargaining agreement that created an incentive plan for Boston police officers who are enrolled in higher education programs related to policing.  *See* Defs. Exhibit 31, at 11.  Deny the remainder of this statement of facts as it is not supported by admissible evidence.

109.    Beginning in 1967 and continuing through 1972, the Command Training Institute at Babson College, which was directed by retired Boston Police Superintendent John Howland, and sponsored by the New England Association of Chiefs of Police offered a three week training to Boston police officers with command or supervisory responsibilities.  The Department advertised this opportunity to all its employees and encouraged participation. Exhibit 30 at p. 10.

**RESPONSE:**

Object to the use of Exhibit 30 to demonstrate that the Command Training Institute, run by retired Boston Police Superintendent John Howland, offered a three-week training from 1967 through 1972 for Boston police officers with command or supervisory responsibilities.  Exhibit 30, for which the Defendants have offered no foundation, is a special order, which is inadmissible for the truth of the matters asserted therein.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

Notwithstanding that objection, admit that Exhibit 30 is a special order describing the Command Training Institute.  Deny the remainder of this statement of fact as it is unsupported by any admissible evidence.

110.    The Department also advertised additional outside educational opportunities to its officers, such as adult education programs designed for police. Exhibit 31 at pp. 2,4,12.

**RESPONSE:**

Object to use of Exhibit 31, which lacks foundation.

Notwithstanding that objection, Plaintiff admits that pages 2, 4 and 12 of Exhibit 31 are special orders issued in 1972 advertising programs for education in foreign languages and writing, including creative writing and giving speeches.

111.    Robert Wasserman joined the Boston Police Department as a civilian in early 1973 when he became the Department's Director of Training and Education. He served in this capacity until 1976.  In this position, he oversaw Department's Training Academy as well as all other trainings at the recruit, in-service, supervisory and management levels.  Exhibit 22 at p. 32.

**RESPONSE:**

Admit.

112.    From 1976 to 1978, Mr. Wasserman served as the Assistant to the Police Commissioner for Operations, where he was in charge of overseeing all the operations of the Police Department. Exhibit 22 at p. 34.

**RESPONSE:**

Admit.

113.    Mr. Wasserman now manages a small private police consulting group.  Id. at p. 13.

**RESPONSE:**

Admit but clarify that Mr. Wasserman does not "manage" Strategic Policy Partnership, a small police consulting firm, but is instead its "chairman."  *See* Defs. Exhibit 22, at 13.

114.    In his declaration, Mr. Wasserman opines that Boston police officers did not receive any training regarding the duty to disclose exculpatory or impeachment evidence to the prosecution as of 1972.  See <u>Declaration of Robert Wasserman</u>, attached as **Exhibit 32**.

**RESPONSE:**

Admit but clarify that Mr. Wasserman's expert opinion expressed in his declaration was based on both his role as Director of Training in 1973 and on his review of the materials in this litigation.  *See* Exhibit 36, Wasserman Report at ¶¶ 1-10, 29.

115.    Robert Wassermann had no involvement whatsoever with the Boston Police Department's training academy prior to joining the Department in 1973.   He also had no knowledge as to what police training was being conducted by the Department prior to joining in 1973.   <u>Exhibit 22</u> at pp. 27-28.

**RESPONSE:**

Admit that Mr. Wasserman had no involvement with the Boston Police Department's training academy prior to joining the Department in 1973.

Deny that Mr. Wasserman has no knowledge as to what police training was being conducted by the Department prior to joining in 1973.

116.    Robert Wasserman has no direct knowledge as to whether the duty to disclose exculpatory evidence was taught at the academy prior to joining the Department in 1973.  <u>Id</u>. at pp. 27-28, 126-27.

**RESPONSE:**

Deny.  The evidence cited by the Defendants does not support the proposition for which it is cited.

Also deny because Mr. Wasserman testified that when he joined the

Department, he met with staff to address deficiencies in the training, undertook a comprehensive review and updating of the training materials that had been used, and spoke with police officers about their training and experience in the field. *See* Exhibit 32, Wasserman Dep. at 37 (when he joined the Department, "I did an inventory of what was there and what was going on. I met with staff. I started doing staff meetings with them. We talked about what the deficiencies were and about the things that had to be done over the coming year or two to begin to get a sense of order of training in the Department"); *id.* at 37 (describing early meetings with academy staff, Wasserman explained: "They were pretty open discussions, and we laid out strategies for where things had to go and there were a lot of things that had to be done. Materials were outdated . . . The materials that were being presented to students were old and ragged and not - - many of them had not been revised for years."); *id.* at 43 (describing the training materials in use prior to his arrival as "very old and I was rather concerned about that. It was not a real process of updating the handouts for members of the class"); *id.* at 47 ("I looked at all the materials for every class that were being used and I reached the decision that we had to redo all of the materials, and we held a lot of staff meetings about it and everybody got to work in bringing things up to date."); *id.* at 50 ("I remember having discussions with [Hogan] about how far in-depth he was going with his training, and as we talked about expanding the law, I had a lot of discussions with him about how that expansion ought to take place."); *id.* at 50-51 (spoke to police officers to find out how topics they learned about in the academy were being applied to the field); *id.* at 76-78 (describing all the changes to the training program that he made while Director, including that changes were made to constitutional law by creating "more materials" and "the entire curriculum was updated"); *id.* at 127 (explaining that he became aware that the duty to disclose exculpatory evidence was not being taught by "look[ing] at the materials that were being handed out" and "discussions with [Hogan]"); *id.* at 130 (when he took over the Academy, did an extensive review of all the training and training materials that then-existed); *id.* at 130-31(had extensive knowledge of the training in the Boston Police Department at that time);

*id.* at 131 (describing steps he took to review the training materials, including with staff and with the outside assistance of a psychologist and law professor Sheldon Krantz who had written the ABA standards).

117.    While serving as Director of Training and Education, he never once spoke with the Academy's prior Commanding Officer, Captain Hogan about whether the duty to document or disclose exculpatory evidence was taught or trained.  He was never informed by Captain Hogan that this duty was not taught and trained.  Id.

**RESPONSE:**

Deny that Wasserman was never informed by Captain Hogan that the duty to document or disclose evidence was not taught or trained.  This fact is not supported by the evidence cited above.

Deny that Wasserman never spoke with Captain Hogan about whether the duty to disclose exculpatory evidence was being taught.  Wasserman testified that he learned through "discussions" with Hogan about recruits going out into the field and doing things differently from the way they were taught in the academy that this topic was not trained on.  *See* Exhibit 32, Wasserman Dep. at 126-27 ("Q.  How did you become aware that those topics were not taught by [Hogan] prior to you coming to the Police Department.  A.  . . . . I did give discussions with him about the problem of recruits learning things in the classroom and going out into the field and being told to do things in a very different way"); *see also id.* at 50 (spoke with Hogan about expanding the law training)/

118.    Robert Wasserman bases his entire opinion that police officers were not trained to disclose exculpatory evidence leading up to 1972 on the fact that when he joined the Department in 1973, he reviewed the written training materials that were being used at the Academy and is not aware that these materials expressly

dealt with turning over exculpatory or impeachment evidence.  Id. at pp. 126-27, 130-31.

**RESPONSE:**

Deny.  Wasserman based his opinion that police officers were not trained to disclose exculpatory evidence leading up to 1972 on the review of the record produced in this litigation, conversations with staff, including "discussions" with Captain Hogan, conversations with police officers, practices in the Department, and his review of the training materials.  *See* Exhibit 32, Wasserman Dep. at 37, 43, 47-48, 50-51, 71, 76, 78, 126-27, 130-31, 134; Exhibit 36, Wasserman Report at ¶¶ 9, 29.

119.    Regarding the basis for his belief that this topic as not instructed prior to his arrival, Mr. Wasserman testified:

> Q.    Is it fair to say that when you took over as director of training and education at the Boston Police Department in 1973 that you did an extensive review of all the training and training materials as it existed in the Boston Police Department at that time?
> A.    I did.
> Q.    So is it fair to say that you had extensive knowledge of the training in the Boston Police Department at that time?
> A.    I did.
> Q.    Is it fair to say that you had extensive knowledge of the training materials that existed at that time?
> A.    I did.
> Q.    To the best of your knowledge, did any of those training materials deal with turning over exculpatory or impeachment evidence?
> A.    Not that I'm aware of.  Id. at pp. 130-31.
>
> Q.    Did you ever talk with Captain Hogan about whether he taught the duty to document exculpatory evidence?
> A.    No, I did not talk with him about that.
> Q.    Did you ever talk with him about whether or not he taught the duty to disclose exculpatory evidence?
> A.    I did not.

Q.    You did not become aware from conversations with him that those topics were not taught?

A.    I did not have those discussions with him.

Q.    How did you become aware that those topics were not taught by him prior to you coming to the Police Department?

A.    Because when I looked at the materials that were being handed out, they were very -- to recruits, because that is who was being trained at that stage, it was not as well organized as it ought to be, and I did have discussions with him about the problem of recruits learning things in the classroom and then going out into the field and being told to do things in a very different way.

Q.    Other than reviewing his materials, is there any other way that you -- is there any other basis for your conclusion that Captain Hogan didn't teach the duty to disclose exculpatory evidence and document exculpatory evidence --

A.    No.

Q.    -- during his --

A.    No.

Q.    -- law practices class --

A.    No.

Q.    -- or in any other aspects of the police academy training?

A.    No.  Id. at pp. 126-27.

**RESPONSE:**

Admit that Wasserman gave the testimony quoted above on pages 126-27 and 130-31, but clarify that these are not the only times that Wasserman testified about his knowledge of the training that was provided prior to his arrival at the academy in 1973 nor does this represent the sole basis for Wasserman's opinion that there was no training on the duty to disclose exculpatory evidence.  *See* Exhibit 32, Wasserman Dep. at 37, 43, 47-48, 50-51, 71, 76, 78, 134; Exhibit 36, Wasserman Report at ¶¶ 9, 29.


120.    Mr. Wasserman does not know whether the updates to existing Academy training materials that were made when he was Director of Training and Education expressly deal with turning over exculpatory or impeachment evidence or whether the new Academy training materials that were introduced when he was Director expressly dealt with turning over such evidence.  Id. at p. 88.

**RESPONSE:**

Deny that updated materials did not reflect duty to disclose evidence. *See* Exhibit 32, Wasserman Dep. at 88 (newly-created investigative training would have reflected duty to disclose); *id.* at 112 ("Q. Do you know if the commissioner's concerns regarding [the duty to disclose] were documented in any way? A. No, but I think the existence of the Task Force to put together the manual is reflective of those discussions."); *see id.* at 113 (DiGrazia raised his concern about need to train on duty to disclose evidence :in the discussion about the need to get an investigative manual out that sets the standards that we had.").

121.   As part of discovery in this matter, the Defendants conducted a diligent search for pre- 1972 Academy training materials. However discovery has only yielded a <u>partial</u> copy of the Academy's 1968 training materials. The Training Academy's written materials from 1968 contain an index of "The Big Ten" training topics to be covered. This index includes, "Familiarization with the U.S. and Mass Constitutions," "Emphasis on 1st -- 4th – 5th – 6th – Amendments to the U.S. Constitution," and "Civil Rights –Mass Statutes – Department Rules – Prisoners." The index states that instruction on each of these topics will include, Academy Lectures on Subjects Matter – Visual Aids – Handout Materials." <u>Exhibit 26</u>

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Academy training and instruction. Exhibit 26, which consists of 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.,*

895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct."). Also object to Exhibit 26 because no foundation has been laid for the documents contained in that exhibit. Fed. R. Evid. 602.

Notwithstanding that objection, admit that Exhibit 26 includes an index, which lists the "topics" identified above and admit that Exhibit 26 states instruction on each topic will include Academy Lectures on Subjects Matter – Visual Aids – Handout Materials." Clarify that that index to "1st – 4th – 5th – 6th Amendments to U.S. CONSTITUTION" further states: "Extreme Emphasis on (4th Amendment U.S.) Search-Seizure – Mapp case . . . ). 5th Amendment – (Self-Incrimination Clause – Miradda *[sic]* Ruling) 6th Amendment – (Right to Counsel Clause – Miradna [*sic*] Rule)." *See* Exhibit 39, Index to 1968 Academy training materials at Bates 3291. Also clarify that index to "Civil Rights – Mass Statutes – Department Rules – Prisoners" further states "Academy Lectures on Chapter 263 of the General Laws on Rights of Persons accused of Crime – Academy Visual Aids or Subject – and Handout Lecture Material. Boston Police Department Rules and Regulations – on the Care – Custody and Processing of Prisoners under arrest by or Detained by this Department." *See id*.

Deny the remainder of this statement as it is not supported by any of the documents included in Exhibit 26 and even if it were, none are the documents in Exhibit 26 are admissible for the purposes for which Defendants seek to use them: to demonstrate the training that was provided.


122. The training materials related to the Constitutional Law curriculum also list as major topics to be covered, "Civil Rights - and Rights by Mass. Statutes,"

"Understanding of 1st -- 4th -- 5th -- 6th --Amendments to the U.S. Constitution," "Updated knowledge of Judicial Decisions on pertinent issues." "Courts, functions -- powers procedures," and "Arrests … statements -- victims -- witnesses -- suspects -- attorneys." These materials also state that "police officers should strive at all times to observe zealously the fundamental rights of a person lawfully avail to him." <u>Exhibit 26</u>

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Academy training and instruction. Exhibit 26, which consists of 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted -- and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct."). Also object to Exhibit 26 because no foundation has been laid for the documents contained in that exhibit. Fed. R. Evid. 602.

Notwithstanding that objection, deny that Exhibit 26 includes the above-quoted text. Deny that Exhibit 26 can be used to prove the content of the academy training in 1968. *See Garside*, 895 F.2d at 50; *Luong*, 2013 WL 2389648, at *10.

123.    The constitutional law training materials also address the 14th Amendment and the due process rights of individuals. <u>Exhibit 26.</u>

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Academy training and instruction.  Exhibit 26, which consists of 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here:  the truth of the matter asserted.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").  Also object to Exhibit 26 because no foundation has been laid for the documents contained in that exhibit.  Fed. R. Evid. 602.

Admit that the text "the 14th Amendment" appears on Defendants' Exhibit 26, at Bates 003446 ("The last sentence of the 14th Amendment . . . the Due Process of Law Clause which makes the above Amendments applicable to the States."  Deny the remainder of this statement.  Exhibit 26 cannot be used to prove the content of the Academy training on constitutional law.  *See Garside*, 895 F.2d at 50; *Luong*, 2013 WL 2389648, at *10.  Even if that were not the case, the implication from Bates 003446 is simply that the Fourteenth Amendment was discussed only insofar as it made the other Amendments discussed applicable to the States.  As to the "due process rights of individuals," Exhibit 26 states that "[t]he Fifth and Sixth Amendments in the critical areas of intererogation and warning of rights to counsel are of prime importance."  Defs Exhibit 26, at Bates 003446.  There is no text discussing *Brady* or the duty to disclose exculpatory and/or impeachment evidence.  *See id.*

124. The training materials relating to instruction on the topic of courtroom procedures, cover presentation of the government's case, including rules of evidence and criminal procedure. Exhibit 26

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Academy training and instruction. Exhibit 26, which consists of 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here: the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct."). Also object to Exhibit 26 because no foundation has been laid for the documents contained in that exhibit. Fed. R. Evid. 602.

Notwithstanding that objection, admit that the text "Presentation of Government's Case" appears on Defendants' Exhibit 26, at page 18. Deny the remainder of the statement of fact because Exhibit 26 cannot be used to prove the content of training on courtroom presentations. *See Garside*, 895 F.2d at 50; *Luong*, 2013 WL 2389648, at *10. Even if that were not the case, there is no implication that Exhibit 26 discusses the "rules of evidence" and "criminal procedure" apart from how to introduce real/physical evidence, exclusion of public from trial, how to make objections and what constitutes hearsay. *See* Def's Exhibit 26, at 18-19. No inference can be drawn that recruits were taught to disclose evidence or the rule under *Brady* in this course.

125.    The training materials relating to instruction on the topic of report writing, stress that reports from officers need to contain complete, accurate and truthful information.  <u>Exhibit 26.</u>

**RESPONSE:**

Object to the use of Exhibit 26 to demonstrate the content of Academy training and instruction.  Exhibit 26, which consists of 1968 Boston Police Department Academy Training Materials, is hearsay that is inadmissible in summary judgment proceedings for the purposes that the Defendants have sought to use it for here:  the truth of the matter asserted.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."); *Luong v. S.F. City & County*, No. C-11-05661, 2013 WL 2389648, at *10 (N.D. Cal. May 30, 2013) ("Defendants counter that Plaintiffs attempted to introduce the POST training materials to show the proper methods for arresting suspects -- *.i.e.*, for the truth of the matter asserted – and thus the Court properly excluded them as inadmissible hearsay under 802 . . . Defendants are correct.").  Also object to Exhibit 26 because no foundation has been laid for the documents contained in that exhibit.  Fed. R. Evid. 602.

Notwithstanding that objection, admit that Exhibit 26 contains a document titled "Sample Report Writing" at Bates 3513 (page 23 of the Exhibit).  Admit also that page 23 of Exhibit 26 also contains the headings "COMPLETENESS cont'd," "3- NEATNESS," "4 – BREVITY AND CONCISENESS," "5 – CLEARNESS and UNDERSTANDABILITY," "6- SPELLING AND LANGUAGE," and "7 – FORM and SEQUENCE."  *Id.*

Deny the remainder of the statement of fact because Exhibit 26 cannot be used to prove the content of training on report writing.  *See Garside*, 895 F.2d at 50; *Luong*, 2013 WL 2389648, at *10.  Even if that were not the case, there is no mention of the terms "accurate" or "truthful" in this document.

126.     As Director of Training and Education, Mr. Wasserman assisted in development of a investigative manual which was subsequently used to train Boston police detectives in proper investigative procedures.  He does not know whether this training material expressly addressed the duty to disclose exculpatory or impeachment evidence to the prosecution.  Exhibit 22 at p. 111.

**RESPONSE:**

Admit that Wasserman assisted in the development of an investigative manual after speaking with DiGrazia about officers withholding exculpatory or impeachment evidence.  *See* Exhibit 32, Wasserman Dep. at 113 ("Q.  I'm talking about conversations with regard to officers withholding exculpatory or impeachment evidence in an effort to secure an arrest or prosecution.  Do you remember particular conversations regarding that topic with Commissioner DiGrazia?  A.  I remember that he raised that issue with me . . . . Q.  Do you remember how many times he raised that issue?  A.  Oh, I think he raised it once with me in the discussion about the need to get an investigative manual out that set the standards that we had.").  Admit that Wasserman does not know whether this manual expressly addressed the duty to disclose exculpatory or impeachment evidence to the prosecution, but clarify that Wasserman had no role in creating the manual; it was done by Boston University.  *Id*. at 92, 94-95.

127.     Captain Hogan continued to instruct all recruits in constitutional law and to answer the legal questions of recruits in the field after Mr. Wasserman took over as Director of Training and Education in 1973.  Id. at pp. 81-83.

**RESPONSE:**

Admit, but clarify that after DiGrazia was appointed Commissioner, DiGrazia told everyone if they had a question about the law they could go to the legal advisor, but the reality is that officers went to Hogan.  *See* Exhibit 32, Wasserman Dep. at 46.

128.   Beginning in 1973, The Boston Police Department began operating a Regional Basic Recruit School, which served as the training academy for other smaller municipalities in Massachusetts, such as Brookline, Quincy and Lynn. Captain Hogan was selected by Robert Wasserman to teach the Constitutional Law curriculum at this regional academy.   Id.

**RESPONSE:**

Deny that Hogan was "selected" by Wasserman to teach the Constitutional Law curriculum at the regional academy, but admit that Hogan did teach the Constitutional Law course.  *See* Def's Exhibit 22, at 82 ("Q.  Did William Hogan continue to teach constitutional law to those individuals [in the regional academy]?  A.  He did.").  Admit the remainder of this statement.

129.   The International Association of Chiefs of Police (IACP) and the National Law Enforcement Policy Center (NLEPC) assist law enforcement agencies across the country in developing and refining law enforcement policies.  The model law enforcement policies created by the NLEPC are utilized by more than five hundred law enforcement agencies as a basis for their own internal policies.  See <u>Affidavit of Philip Lynn and National Law</u> <u>Enforcement Policy Center Model</u> <u>Policy Regarding Brady Disclosure Requirements</u>, attached as **<u>Exhibit 34</u>**.

**RESPONSE:**

Object to Exhibit 34 as Philip Lynn was never identified as a witness in this case during the time that this Court allowed for discovery.  *See* Exhibit 40, Defendants' Rule 26(a)(1) disclosures; Exhibit 41, Defendants' First Supplemental Response to Plaintiff's Interrogatory No. 2.  As a result, it is wholly improper at this stage for the Defendants to rely on his affidavit in support of their motion for summary judgment.  *See* Fed. R. Civ. P. 26(a)(1) & (e); Fed. R. Civ. P. 37;  That is particularly true because the failure to identify Lynn during the course of fact (or

expert) discovery has greatly prejudiced Plaintiff: Had Plaintiff known about Lynn as a witness and the content of his knowledge, the Plaintiff would have had an expert evaluate and respond to the contentions he offered. *See Sellers v. Mineta*, 350 F.3d 706, 711 -712 (8th Cir. 2003) (excluding witness not properly disclosed where party had no justification for failing to disclose witness and where other side would have had no reason to expect witness' testimony); *Troknya v. Cleveland Chiropractic Clinic*, 280 F.3d 1200, 1205 (8th Cir. 2002) (finding no abuse of discretion where defendant failed to disclose witnesses in Rule 26(a)(1) disclosures and supplements, where excluded witnesses were not critical to defendant's defense and "more importantly," where "use of the undisclosed witnesses and exhibits would have unfairly prejudiced plaintiffs at trial . . . ."); *Boardman v. National Medical Enterprises*, 106 F.3d 840, 843 (8th Cir. 1997) (no abuse of discretion for excluding witnesses because in doing so, "[t]he court protected the integrity of the trial process by shielding NME from unexpected testimony, the presentation of which would have undermined the goals of discovery and prejudiced NME"); *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3rd Cir. 1977) (evidence of accounting study not disclosed to opposing party in pretrial properly excluded); *Insight Technology, Inc. v. Surefire, LLC*, No. 04 CV 74, 2007 WL 3244092, at *5-*6 (D.N.H. Nov. 1, 2007) ("Insight seeks to strike the entire affidavit based on SureFire's failure to identify Glock as a witness under Rule 26(a)(1) . . . [A]s submitted in support of summary judgment, Glock's declaration is stricken.").

Likewise, object to Exhibit 34 because the National Law Enforcement Policy Center Model Policy Regarding Brady Disclosure Requirements was never disclosed by the Defendants during discovery. *See id.* Had Plaintiff known about this document and the Defendants' attendant reliance on it for their case, Plaintiff would have had his experts evaluate and respond to the contents of this document.

In addition, object because the facts herein are irrelevant to the matter at issue.

130.    The NLEPC and IACOP did not create a model policy regarding Brady disclosure requirements and their applicability to police officers until April 2009.

**RESPONSE:**

Plaintiff objects to this statement of fact because it is irrelevant.

Notwithstanding that objection, Plaintiff denies this statement of fact as the Defendants have cited no evidence whatsoever to support it.  To the extent that the Defendants intended to rely on Exhibit 34 for this proposition, Plaintiff objects because neither Philip Lynn nor the Model Policy of the NLEPC and IACP were ever disclosed during the pendency of discovery.  *See* Fed. R. Civ. P. 26(a)(1) & (e); Fed. R. Civ. P. 37;  That is particularly true because the failure to identify Lynn during the course of fact (or expert) discovery has greatly prejudiced Plaintiff:  Had Plaintiff known about Lynn as a witness and the content of his knowledge, the Plaintiff would have had an expert evaluate and respond to the contentions he offered.  *See Sellers v. Mineta*, 350 F.3d 706, 711 -712 (8th Cir. 2003) (excluding witness not properly disclosed where party had no justification for failing to disclose witness and where other side would have had no reason to expect witness' testimony); *Troknya v. Cleveland Chiropractic Clinic*, 280 F.3d 1200, 1205 (8th Cir. 2002) (finding no abuse of discretion where defendant failed to disclose witnesses in Rule 26(a)(1) disclosures and supplements, where excluded witnesses were not critical to defendant's defense and "more importantly," where "use of the undisclosed witnesses and exhibits would have unfairly prejudiced plaintiffs at trial . . . ."); *Boardman v. National Medical Enterprises*, 106 F.3d 840, 843 (8th Cir. 1997) (no abuse of discretion for excluding witnesses because in doing so, "[t]he court protected the integrity of the trial process by shielding NME from unexpected testimony, the presentation of which would have undermined the goals of discovery and prejudiced NME"); *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3rd Cir. 1977) (evidence of accounting study not disclosed to

opposing party in pretrial properly excluded); *Insight Technology, Inc. v. Surefire, LLC*, No. 04 CV 74, 2007 WL 3244092, at *5-*6 (D.N.H. Nov. 1, 2007) ("Insight seeks to strike the entire affidavit based on SureFire's failure to identify Glock as a witness under Rule 26(a)(1) . . . [A]s submitted in support of summary judgment, Glock's declaration is stricken.").

## VI.  Lack of Evidence Regarding a Boston Police Custom or Practice of Withholding Evidence

131.   Robert Wasserman is not aware of a single instance in which a police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution. Id. at pp. 113-14.

**RESPONSE:**

Admit that Wasserman is not aware of any specific instances in which a police officer withheld evidence in order to secure an arrest or prosecution but deny that he was not aware of the practice of doing so.  *See* Exhibit 32, Wasserman Dep. at 114 (DiGrazia "told [him] that he was concerned about those kind of practices"); *id.* at 115 ("Q.  Were you ever made aware of any particularized instance of that for purposes of future training?  A.  No, I was just aware that it was an issue that needed to be addressed."); Exhibit 36, Wasserman Report, at ¶ 28 ("While I was the Director of Police Training, I communicated regularly with then-Commissioner DiGrazia.  Commissioner DiGrazia recognized that there was a widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution.").

132.   Robert Wasserman has no knowledge as to whether Captain William Hogan was ever aware of even a single instance in which a police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution.  Id. at pp. 116-17.

**RESPONSE:**

Admit that Wasserman does not know whether Hogan was aware of specific instances in which a police officer withheld exculpatory or impeachment evidence, but deny that Hogan had no such knowledge. Given the widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution, and Hogan's role in training and communicating with police officers, Hogan would have known about this practice. *See* Exhibit 37, DiGrazia Report, at 5 ("it was standard practice at that time *not* to disclose exculpatory and/or impeachment evidence") (emphasis in original); *id.* at 7-8 (Department aware about problems within it but resisted any efforts to modernize); Exhibit 36, Wasserman Report, at ¶ 28 (DiGrazia communicated with him about the Department's widespread practice of withholding exculpatory and impeachment evidence); Exhibit 32, Wasserman Dep. at 81-83 (Hogan answered questions from police officers in the field).

133.    Edmund L. McNamara served as the Commissioner of the Boston Police Department from 1962 until May 1972.

**RESPONSE:**

Admit.

134.    Robert Wasserman has no knowledge as to whether Commissioner Edmund McNamara was ever aware of even a single instance in which a police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution. Id. at pp. 116.

**RESPONSE:**

Admit that Wasserman does not know whether McNamara was aware of

specific instances in which a police officer withheld exculpatory or impeachment evidence, but deny that McNamara had no such knowledge. Given the widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution, McNamara would have known about this practice. *See* Exhibit 37, DiGrazia Report, at 5 ("it was standard practice at that time *not* to disclose exculpatory and/or impeachment evidence") (emphasis in original); *id.* at 7-8 (Department aware about problems within it but resisted any efforts to modernize); Exhibit 36, Wasserman Report, at ¶ 28 (DiGrazia communicated with him about the Department's widespread practice of withholding exculpatory and impeachment evidence).

135.    Robert J. DiGrazia served as the Commissioner of the Boston Police Department from November 1972 until November 1976.

**RESPONSE:**

    Admit.

136.    Robert Wasserman has no knowledge as to whether Commissioner Robert DiGrazia knew of any instances in which any police officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution. Id. at p. 114.

**RESPONSE:**

    Deny. *See* Exhibit 32, Wasserman Dep. at 114 (and referencing question at 113) ("Q. Did he ever tell you that he was aware of any instance when [an officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution]? A. He told me he was concerned about those kind of practices."); *id.*at 110-11 (describing conversations he had with DiGrazia regarding officers withholding evidence where DiGrazia expressed "a sense that

officers were not being completely truthful about what they had . . . It was just a concern of his and reflected the need to make sure we updated our training and we had to do something about improving the quality of supervision."); *id.* at 113 (recalling that DiGrazia raised the issue of officers withholding exculpatory or impeachment evidence with him); Exhibit 36, Wasserman Report, at ¶ 28 ("While I was the Director of Police Training, I communicated regularly with then-Commissioner DiGrazia. Commissioner DiGrazia recognized that there was a widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution.").

137.    Commissioner DiGrazia spoke frequently with Mr. Wasserman at command staff meetings and at in-service classes, which Mr. DiGrazia visited. Id. at p. 112.

**RESPONSE:**

        Admit.

138.    Although Commissioner DiGrazia spoke with Robert Wasserman regarding detectives generally failing to follow their training, completing sloppy investigations and being untruthful, Commissioner DiGrazia never once spoke with Robert Wasserman regarding the topic of officers withholding exculpatory evidence from the prosecutor or indicated that he believed this was a problem in the Department. Id. at pp. 111-13, 118, 125-26, 133-34.

**RESPONSE:**

        Deny. *See* Exhibit 32, Wasserman Dep. at 114 (and referencing question at 113) ("Q. Did he ever tell you that he was aware of any instance when [an officer withheld exculpatory or impeachment evidence in an effort to secure an arrest or prosecution]? A. He told me he was concerned about those kind of practices.");

*id.*at 110-11 (describing conversations he had with DiGrazia regarding officers withholding evidence where DiGrazia expressed "a sense that officers were not being completely truthful about what they had . . . It was just a concern of his and reflected the need to make sure we updated our training and we had to do something about improving the quality of supervision."); *id.* at 113 (recalling that DiGrazia raised the issue of officers withholding exculpatory or impeachment evidence with him); Exhibit 36, Wasserman Report, at ¶ 28 ("While I was the Director of Police Training, I communicated regularly with then-Commissioner DiGrazia. Commissioner DiGrazia recognized that there was a widespread practice within the Department in which officers were withholding exculpatory and/or impeachment evidence in an effort to secure an arrest and prosecution.").

139.   On November 27, 1972, after joining the Boston Police Department, Commissioner DiGrazia wrote a special order entitled, "Greetings from Police Commissioner Robert DiGrazia," which was distributed to all members of the Department. In this order, he remarked that "I find [the Department] to be professional with sophisticated programs and dedicated personnel. If it is not now the best Department in the world, I know that we will all be working together to make it the best." See <u>Boston Police Department Special Order, "Greetings from Police Commissioner Robert DiGrazia," Dated November 27, 1972</u>, attached as **Exhibit 35**.

**RESPONSE:**

Admit that the sentences quoted above appear in the two-page Special Order appended as Defendant's Exhibit 35. Exhibit 35, however, is hearsay. As such, deny that the contents of that Special Order, including the above-quoted sentences can be admitted for the truth of the matter asserted. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.");