UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10197-RGS

JAMES A. HALEY

v.

CITY OF BOSTON, JOSEPH KELLEY, JOHN HARRINGTON, and
UNKNOWN EMPLOYEES OF THE CITY OF BOSTON

MEMORANDUM AND ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

September 12, 2013

STEARNS, D.J.

Plaintiff James A. Haley brought this lawsuit under the Federal Civil Rights Act, 42 U.S.C. § 1983, against the Boston Police Department (BPD) and two now deceased officers. The suit alleges that a wrongful withholding by the officers of exculpatory evidence resulted in Haley's conviction and imprisonment for a murder that he did not commit. Defendants City of Boston, Joseph Kelley (a former Boston Police Sergeant), and John B. Harrington (a former Boston Police Patrolman) now move for summary judgment.[1]

FACTUAL BACKGROUND

---

[1] Defendants Kelley and Harrington predeceased this lawsuit. Haley passed away after commencing the litigation. The administratrix of his estate is now prosecuting his claims.

The underlying facts are laid out in detail in the prior opinions of this court, the Supreme Judicial Court, and the Court of Appeals. *See Haley v. City of Boston* (*Haley III*), 657 F.3d 39 (1st Cir. 2011); *Haley v. City of Boston* (*Haley I*), 677 F. Supp. 2d 379 (D. Mass. 2009); *Commonwealth v. Haley*, 363 Mass. 513,(1973). At the heart of Haley's claims is the alleged failure of officers Kelley and Harrington to produce to the prosecution the prior statements of two key witnesses that materially contradicted their testimony at trial.

David Myers, the murder victim, lived with Haley's sister-in-law Gloria Custis in Dorchester, Massachusetts. In the early morning of July 11, 1971, Myers was killed in the apartment by an intruder. Custis told Kelley and Harrington, the investigating officers, that she had awakened to see Haley, armed with a knife and a gun, struggling with Myers. She also stated that a dying Myers had told her that Haley had stabbed him. She speculated that Haley had broken into the apartment in search of his estranged wife Brenda (Custis's sister). When asked when she had last seen Hayley before the murder, Custis replied "about last month."

After separating from Haley, Brenda had moved to Delaware to live with her parents. However, she returned to Dorchester just prior to the murder and was staying with Custis. Brenda told the officers that she had telephoned Haley on July 9, asking for a divorce. She also stated that she had not seen

2

Haley for at least a month prior to the murder.

At the trial, both Custis and Brenda testified that they had encountered Haley on the street while returning to Custis's apartment on the afternoon of July 10, the day before the murder. The prosecution seized on this testimony to explain Haley's motive for breaking into Custis's apartment and to refute his argument that he had not seen either sister on July 10, and thus had no reason to suspect that Brenda had returned to Massachusetts. No physical evidence linked Haley to the murder.

In 2006, pursuant to the Massachusetts Public Records Act, Mass. Gen. Laws ch. 66 § 10, Haley requested copies of his case file from the Suffolk County District Attorney's Office and the BPD. The District Attorney's Office could not locate the file, but the BPD produced sixty pages of investigative records, including the statements that Custis and Brenda had given immediately after the murder. Armed with these statements, Haley filed a motion for a new trial. Because most of the evidence necessary for a retrial had been "inadvertently lost or destroyed," the Superior Court dismissed the murder indictment without prejudice.

PROCEDURAL BACKGROUND

Haley filed this lawsuit on February 11, 2009. The original ten counts of

the Amended Complaint[2] were premised on the alleged failure of Kelley and Harrington to disclose to the prosecution the sisters' statements contradicting their later testimony at trial. The Complaint further alleged that the statements were suppressed pursuant to a then-existing BPD custom or policy. After a hearing, this court dismissed the Complaint against the individual officers.[3] In doing so, the court relied on the doctrine of qualified immunity, reasoning that, as of 1972, the *Brady* disclosure requirement applied only to prosecutors and not to police officers.[4] (The Supreme Court did not extend the *Brady* requirement to police officers until more than twenty years after Haley's trial. *See Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995)). The court also noted that *Brady* had defined exculpatory evidence as encompassing only

---

[2] Counts I through V allege violations under section 1983 of Haley's federal constitutional rights to due process and a fair trial: violation of due process (I), malicious prosecution (II), supervisory liability (III), failure to intervene (IV), and (V) conspiracy to deprive constitutional rights. Counts VI (malicious prosecution) and IX (civil conspiracy) are state common-law claims asserted against the defendant officers. Counts VIII (negligent training and supervision) and X ("respondeat superior") are hybrid claims against the City of Boston. Count VII (negligent investigation) was withdrawn by Haley.

[3] Haley's municipal liability claims were subsequently dismissed on a motion for reconsideration. *Haley v. City of Boston* (*Haley II*), 2010 WL 3198900, at *2-3 (D. Mass. Aug. 12, 2010).

[4] *See Brady v. Maryland*, 373 U.S. 83 (1963). The Supreme Court declared that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process." *Id.* at 87.

"evidence material either to guilt or punishment," 373 U.S. at 87, and that the Supreme Court did not broaden the definition to include impeachment evidence until 1985. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Finally, while recognizing that municipalities may not invoke qualified immunity, *see Owen v. City of Independence, Mo.*, 445 U.S. 622, 657 (1980), the court dismissed Haley's federal claims against the City of Boston after finding that the sisters' alleged statements on the night of Myers's murder were not material within the meaning of *Brady*. *See Haley II*, 2010 WL 3198900, at *5.[5]

On appeal, the First Circuit affirmed this court's rulings as to Haley's state-law claims, but reversed and remanded the dismissal of his federal section 1983 claims against the individual officers and the City of Boston. While the First Circuit agreed that the officers were entitled to qualified immunity on the *Brady* leg of the suppression claim, the Court drew a distinction between *Brady*'s *no-fault* disclosure obligation, and the Supreme Court's earlier decision in *Mooney v. Holohan*, 294 U.S. 103 (1935), which held

---

[5] The court found all but one of Haley's state-law claims barred by his failure to comply with the presentment requirements of the Massachusetts Tort Claims Act. *See* Mass. Gen. Laws ch. 258, § 4. The court declined to exercise supplemental jurisdiction over Haley's remaining malicious prosecution claim.

that a *deliberate police deception* violates a defendant's due process rights. *Haley III*, 657 at 51. Consequently, the Court concluded that Haley's "deliberate suppression" claim should have survived the motion to dismiss. *Id*. Finally, the Court held that the City of Boston could be found liable if the officers were found to have committed a *Mooney* or *Brady* violation as the result of a policy or custom of the BPD. *Id*., citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted). "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." *Id*. A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case,

6

the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

DISCUSSION

**Section 1983 Claims Against Kelley**[6]

Relying on the First Circuit's discussion of *Mooney*, Haley argues that he has identified a trialworthy issue as to whether Kelley deliberately suppressed the statements the sisters gave on the night of Myers's murder. Haley claims that Kelley "was subjectively aware of the significance of the statements" and that "[t]he only real question, therefore, is whether [he] shared this evidence with the prosecutor, or . . . simply kept it to [himself]. If the jury decides [he] did the latter, then the Constitutional right in *Mooney* has been violated." Pl.'s Mem. in Opp'n to Summ. J. at 28-29.

The argument is based on a generous reading of *Mooney* and its progeny. The *Mooney* line of cases sanctions a § 1983 cause of action where police engage in "the deliberate creation of false evidence, the knowing submission of perjured testimony, [and] the attempt to frame an unwitting suspect . . . ." *Drumgold v. Callahan*, 707 F.3d 28, 60-61 (1st Cir. 2013) (Lynch, C.J.,

---

[6] Haley has withdrawn all of his claims against Harrington. Pl.'s Mem. in Opp'n to Summ. J. at 31 n.15 ("As Defendants point out, Harrington died months before Haley's criminal trial. As such, Plaintiff does not oppose his dismissal.")

dissenting); *see Mooney*, 294 U.S. 103, 109-112 (due process violation where state authorities knowingly used perjured testimony and suppressed evidence that would have refuted the perjury); *Pyle v. Kansas*, 317 U.S. 213, 214-216 (1942) (same); *see also Limone v. Condon*, 372 F.3d 39, (1st Cir. 2004) (same). As the First Circuit explained in *Haley III*, *Mooney* protects an accused from the "[d]eliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction . . . ." *Haley III*, 657 F.3d at 49.

Here, there is no direct evidence that Kelley knew (or even suspected) that the sisters would claim at trial to have seen Haley on the day before the murder. The chain of circumstantial inferences that a jury is being asked to draw is reed thin: (1) that Kelley became aware of the sisters' contradictory testimony while the trial was progressing; (2) that he recognized at the time the inconsistency and its impeachment value; (3) and that he deliberately decided to conceal the existence of the statements from the prosecutor. While the proof adduced at trial may not survive a motion for a directed verdict, the court has little room for independent judgment given the mandate of the Court of Appeals. It is true that the First Circuit has "been careful to distinguish between the proscription originating in *Mooney* and *Pyle* against the deliberate suppression of evidence and the more recent affirmative disclosure obligation

8

announced in *Brady*." *Drumgold*, 707 F.3d at 39. But the Court has also held that a due process claim under *Mooney* must not be interpreted so narrowly as to require "deliberate withholding of evidence" to rise to the level of "intentional framing," leaving a lesser species of egregious behavior "without a category of constitutional redress." *Id.* at 44 (emphasis omitted). Given that admonition, this court has no real choice other than to permit Haley to test his *Mooney* theory in a jury setting.

**Section 1983 Claims Against The City of Boston**

While it may seem an oddity, section 1983 claims against municipalities "are measured under *current* law, without regard to whether the municipality's legal obligations were clearly established when the alleged malfeasance occurred." *Haley III*, 657 F.3d at 51 (emphasis added); *see also Owen*, 445 U.S. at 655 ("[E]ven where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting loss to the inevitable costs of government borne by all taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated."); *Barber v. City of Salem*, 953 F.2d 232, 237-238 (6th Cir. 1992) ("While officials may not be liable under section 1983 because their actions (or failure to act) were not constitutional violations according to clearly established law at the time the actions took place, a municipality may nevertheless be liable

if the actions complained of rise to the level of constitutional violations in light of present law.").[7]

The parties first vigorously dispute whether the alleged constitutional violation – the failure to turn over the witness statements to the prosecution – occurred at all.  The City of Boston argues that the prosecutor possessed the statements but, consistent with the law as it then existed, did not produce them to defense counsel.  Alternatively, the City suggests that Haley's attorney had the statements, but was so unprepared that he neglected to make use of them at trial.  Finally, the City points to the fact that the homicide file included the paginated, transcribed statements of Custis and Brenda; a form dated September 1, 1971, that "indicates that 'Reports of Officers' and 'Statements' were included among the material submitted to the prosecutor"; and a "memorandum summarizing Sgt. Det. Kelley's testimony before the grand jury

---

[7] There is a question whether *Owen* imposes liability on a municipality for a change in constitutional law that could not have been anticipated.  *See Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 185 (1990) (O'Connor, J., pl. op.) (removing qualified immunity from municipalities requires an official to "'consider whether his decision comports with constitutional mandates and . . . weigh the risk that a violation might result in an award of damages from the public treasury.' [*Owen*, 445 U.S.] at 656.  This analysis does not apply when a decision clearly breaks with precedent, a type of departure which, by definition, public officials should not anticipate nor have any responsibility to anticipate.").  Because extension of the *Brady* doctrine does not implicate this concern, the court need not address it here.

on September 10, 1971, indicating that he 'testified in essence to the statement of one Gloria Custis.'" Def.'s Mem. in Supp. of Summ. J. at 6 (emphasis omitted).

Haley in response offers the deposition testimony of former Suffolk Assistant District Attorney Thomas Dwyer to the effect that it was "standard practice" of the prosecutor on Haley's case, Gerald Muldoon, "to disclose any exculpatory evidence, including impeachment evidence, to defense counsel prior to trial . . . ." Pl.'s Mem. in Opp'n to Summ. J. at 17. Haley also highlights his counsel's attempt to impeach the sisters with less-probative inconsistencies to support his argument that, had he possessed the sisters' inconsistent statements, he would have used them. The short answer is that the dispute (as the various alternative arguments of the parties underscores) is one that cannot be decided on a summary judgment record.[8]

A municipality is subject to liability under section 1983 only for its own unconstitutional actions, and not for the tortious acts of its employees. *Haley III*, 657 F.3d at 51. "Instead, a plaintiff seeking to impose liability on a

---

[8] The City of Boston also relies on this court's finding in *Haley II* that the sisters' statements were not material in the *Brady* sense. Although not specifically addressed by the First Circuit, the import of its decision – that the City may be found liable if Haley can prove the factual allegations in his complaint – forecloses a revisiting of this argument.

municipality under § 1983 must identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Silva v. Worden*, 130 F.3d 26, 30-31 (1st Cir. 1997), citing *Brown*, 520 U.S. 397, 403-404 (1997). Haley alleges three grounds for municipal liability: (1) a BPD custom of deliberately withholding exculpatory material (implicating *Mooney*); (2) the BPD's failure to institute a policy requiring *Brady* disclosure; and (3) the BPD's failure to train its officers in *Brady*'s disclosure obligations.

For a constitutional violation to be grounded in custom, the practice "must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 2005). Moreover, "the custom must have been the cause of and the moving force behind the deprivation of constitutional rights." *Id*.

Haley's second and third theories are premised on municipal inaction. A municipality may set a "policy" bringing it within the scope of section 1983 liability if it "fail[s] . . . to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *City of Canton*, 489 U.S. at 390; *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th

12

Cir. 2012) ("A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations. To establish that there is a policy based on a failure to preserve constitutional rights, a plaintiff must show, in addition to a constitutional violation, that this policy amounts to 'deliberate indifference' to the plaintiff's constitutional right." (internal quotation marks and citations omitted)).[9]

To support his claims for municipal liability, Haley offers the testimony of former BPD Commissioner Robert DiGrazia and DiGrazia's Director of Training and Education Robert Wasserman. DiGrazia served as Commissioner from November 1, 1972 to November 15, 1976; Wasserman served as Director

---

[9] A municipality may be deemed to have been "deliberately indifferent" to a constitutional right where a municipal policymaker disregards "a known or obvious" risk of a violation of that right. *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011). At oral argument, the City of Boston questioned how it could have been "deliberately indifferent" to a constitutional right that had not yet been announced. This point is essentially the one made by the dissent in *Owen*, that imposing liability on a municipality for violating constitutional rights unknown at the time of the violation is the equivalent of holding the municipality strictly liable for such violations. *Id*. at 658 (Powell, J., dissenting). The argument is not unique to future-arising rights, the same lack-of-intent theory could be applied to rights that were already established, but not clearly established at the time of the violation. Logic aside, to credit the City's argument would be to cloak it with the protection of qualified immunity, rendering *Owen* a nullity.

of Training from 1973 to 1976.[10] DiGrazia testifies that when he arrived at the BPD, the operating procedures were "archaic" and "mired in corruption." DiGrazia Aff. at 3. Specifically as to *Brady* obligations, "there was no policy or practice in the BPD [in 1971 and 1972] requiring the disclosure of exculpatory and/or impeachment evidence to state prosecutors or to defendants." *Id.* at 5. As a result, "officers were not trained to turn over exculpatory and/or impeachment evidence." *Id.* at 6. Wasserman's testimony virtually echoes that of Commissioner DiGrazia.

The City of Boston responds that the testimony Haley provides is merely an amalgam of "broad allegation[s] regarding a municipal practice, without [ ] any factual support for its existence or [ ] even a single representative instance " of a *Brady* violation. Def.'s Mem. in Supp. of Summ. J. at 26. The City further challenges the cases Haley cites[11] as insufficient to establish a

---

[10] Defendants argue that the testimony of DiGrazia and Wasserman cannot support Haley's *Monell* claims because they did not join the BPD until shortly after Haley's trial. It strains credulity to believe that a practice of withholding exculpatory evidence erupted only a few months after Haley's trial.

[11] Haley identifies two cases in which a state court found a deliberate withholding of *Brady* information, one of which implies suppression by the police. *See Commonwealth v. Adams*, 2004 WL 1588108 (Mass. Super. May 20, 2004) (*Brady* violation found where defendant did not receive multiple witness statements given to police that undercut the prosecution's theory of the case); *Commonwealth v. Paul Robinson*, Mem. and Order on Def.'s Mot. for

pattern supporting the existence of a widespread municipal custom or a deficient training program.[12]  Finally, the City offers the testimony of former BPD officers to the effect that the Boston Police Training Academy routinely taught trainees to turn over exculpatory and impeachment evidence to the prosecutor.

The bottom line is that the testimony of Commissioner DiGrazia and Wasserman, if credited by a jury, would establish that *Brady* and possibly *Mooney* violations were rampant within the BPD and possibly linked to the BPD's use of outdated policy manuals and deficient training in the constitutional obligations of police with respect to exculpatory evidence. That

---

a New Trial (Mass. Sup. Ct. Aug. 31, 2006) (No. 40114-17) (Commonwealth withheld non-material exculpatory and impeachment evidence). (Haley also cites *Commonwealth v. Meehan*, 377 Mass. 552 (1979), although the case did not involve an allegation of *Brady* non-disclosure).

[12] A pattern of violations is ordinarily required to successfully link a constitutional violation to a municipal policy or custom. *See St. Hilaire v. City of Laconia*, 71 F.3d 20, 29 (1st Cir. 1995) ("Evidence of a single incident is usually insufficient to establish a 'custom or usage.'").  But the lack of pattern evidence is not necessarily fatal to a municipal liability claim. "A § 1983 cause of action is as available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims . . . ." *Kibbe v. City of Springfield*, 777 F.2d 801, 806 (1st Cir. 1985), quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985) (Brennan, J., concurring); *see also Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989) ("[M]unicipal liability is not precluded simply because the events occurred in a 'single evening.'").

in turn would support a finding that constitutional violations were "well settled" and "widespread," such that "the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 2005). The City's argument that the testimony is disputed and generic in many of its recitals is well-taken, but its weight and force are ultimately for the jury to decide.

ORDER

The motion for summary judgment as to Haley's section 1983 claims against Kelley is <u>DENIED</u>.  The City's motion for summary judgment as to the municipal liability claim is also <u>DENIED</u>.  Trial will be scheduled to begin at 9:00 a.m., October 7, 2013, in Courtroom 21.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE